MARC J. WINTHROP -- State Bar No. 63218
mwinthrop@winthropcouchot.com
GARRICK A. HOLLANDER -- State Bar No. 166316
ghollander@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

General Insolvency Counsel for
Debtors and Debtors-in-Possession

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>☒ STARRIBS NORTH, LP<br>☒ STARRIBS SOUTH, LP<br>☒ WHITTOWN PARTNERS, LP<br>☐ OCEANCOUNTRY, LP<br>☐ BLUEOCEAN PARTNERS, LP<br>☐ STONERIVER PARTNERS, LP<br>☐ SOWESTBRECK, LLC<br><br>☐ All Debtors<br><br>      Debtors and<br>      Debtors-in-Possession. | Case No. 8:08-17182 TA<br>Jointly Administered with Case Nos.<br>8:08-17183 TA; 8:08-17187 TA;<br>8:08-17193 TA;  8:08-17194 TA;<br>8:09-13275 TA; and 8:09-13590 TA<br>Chapter 11 Proceedings<br><br>**DEBTORS' AMENDED DISCLOSURE STATEMENT TO ACCOMPANY DEBTORS' CHAPTER 11 AMENDED PLAN OF REORGANIZATION**<br><br>**Disclosure Statement Hearing**<br><br>Date:     September 23, 2009<br>Time:    10:00 a.m.<br>Place:   Courtroom 5B |

# **TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION.................................................................................... 2

II.   DEFINITIONS AND RULES OF INTERPRETATION ............................. 7
      A.    Definitions................................................................................ 7
      B.    Rules of Construction ............................................................. 20
      C.    Exhibits .................................................................................. 21

III.  CONFIRMATION AND VOTING ........................................................ 21

IV.   BACKGROUND OF THE DEBTORS ................................................... 23
      A.    The Debtors............................................................................ 23
      B.    Jointly Administered Debtors ................................................. 23
      C.    Financial Performance of the Debtors .................................... 24
      D.    Restaurant Facilities............................................................... 25
      E.    Ownership and Management of the Debtors (Pre-Confirmation).................. 26
            1.    Shared Services Management Company............................. 26
            2.    Appointment of Chief Restructuring Officer ..................... 27
      F.    Pre-Petition Legal Proceedings .............................................. 28

V.    THE DEBTORS' CHAPTER 11 PROCEEDINGS.................................. 28
      A.    Events Precipitating Chapter 11 Filings.................................. 28
      B.    Debtor-in-Possession Status.................................................... 29
      C.    The Automatic Stay ................................................................ 29
      D.    Significant Events Which Have Occurred After the
            Petition Dates ........................................................................ 29
            1.    First Day Motions ........................................................... 29
            2.    Motions for Relief from Stay ........................................... 30
            3.    Other Motions ................................................................. 30
                  a.    Debtors' Motion for Use of any Cash
                        Collateral of Secured Claimants ........................... 30
                  b.    Motion to Extend Time to Assume or
                        Reject Leases........................................................ 31
                  c.    Motion for Appointment of CRO ......................... 31
                  d.    Motion to Enter into Management Agreement ....... 31
                  e.    Motion to Set Bar Date ........................................ 31
                  f.    Motion to Approve Stipulation for
                        Amendment to Lease ............................................ 31
                  g.    Applications to Employ Professionals .................... 31
                  h.    Motion to Extend Exclusivity Periods ................... 32
      E.    Actual and Projected Recovery of Preferential or Fraudulent
            Transfers ............................................................................... 32
      F.    Projected Objections to Claims Filed Against the Estates ............ 32

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

# TABLE OF CONTENTS

## (Continued)

**PAGE**

| | | |
|---|---|---|
| VI. | FINANCIAL INFORMATION REGARDING THE DEBTORS | 33 |
| | A. Historical Financial Information | 33 |
| | B. Financial Information Provided During the Cases | 33 |
| | C. Financial Performance During the Cases | 34 |
| VII. | DESCRIPTION OF THE PLAN OF REORGANIZATION | 34 |
| | A. Substantive Consolidation of the Debtors | 34 |
| | B. Basic Structure of the Plan | 35 |
| | C. Classification and Treatment of Claims | 35 |
| VIII. | UNCLASSIFIED CLAIMS | 35 |
| | A. Administrative Claims | 35 |
| | 1. Payment Generally | 36 |
| | 2. Waiver of Claims | 36 |
| | 3. Administrative Claims Bar Date | 36 |
| | 4. Projected Administrative Claims | 36 |
| | B. Priority Tax Claims | 37 |
| | C. Amount of Priority Tax Claims | 38 |
| IX. | CLASSIFICATION OF CLAIMS AND INTERESTS | 38 |
| | A. General Overview | 38 |
| | B. Designation of Classes | 38 |
| X. | PROVISIONS FOR THE TREATMENT OF CLAIMS AND INTERESTS | 39 |
| | A. Classes 1.1 Through 1.8 | 39 |
| | 1. Allowance of Secured Claims | 39 |
| | 2. Payment of Allowed Secured Claim | 39 |
| | a. Option 1 | 39 |
| | b. Option 2 | 40 |
| | c. Option 3 | 40 |
| | 3. Insurance | 41 |
| | 4. Late Fees and Event of Default | 41 |
| | 5. Inspection of Equipment | 41 |
| | B. Class 2.1 Allowed Secured Capital Lease Claims | 41 |
| | 1. Option 1 | 42 |
| | 2. Option 2 | 42 |
| | 3. Option 3 | 42 |
| | C. Class 3 - Allowed Priority Unsecured Wage Claims | 42 |
| | D. Class 4 - Allowed General Unsecured Claims | 43 |
| | 1. Equity Interest in Holdco | 43 |
| | 2. Payment of Claims | 43 |

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

# TABLE OF CONTENTS

## (Continued)

**PAGE**

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | 3. | Holdco Board | 44 |
|  |  | 4. | Waiver of Gantes Parties' Claims | 44 |
|  |  | 5. | Waiver | 44 |
|  | E. | Class 5 -- Any Allowed Secured Claim of Governmental Units | | 44 |
|  | F. | Class 6 -- Any Allowed Non-Pecuniary Loss Penalty Claims | | 44 |
|  | G. | Class 7 -- Interests in StarRibs North, StarRibs South and WhitTown | | 44 |
| XI. | | MEANS OF IMPLEMENTING THE PLAN | | 45 |
|  | A. | Introduction | | 45 |
|  | B. | The Reorganized Debtors. | | 45 |
|  |  | 1. | General Unsecured Creditors' Interest in Holdco | 45 |
|  |  | 2. | Gantes's Interest in Holdco | 45 |
|  | C. | Management/Board of Directors | | 46 |
|  |  | 1. | Gantes | 46 |
|  |  | 2. | Brian Weiss | 46 |
|  |  | 3. | Al Chavez | 48 |
|  |  | 4. | Compensation for Independent Holdco Board Members | 48 |
|  |  | 5. | Management of Operations | 48 |
|  |  | 6. | Synergy | 50 |
|  |  | 7. | Subco's Management Fee to Holdco | 50 |
|  | D. | Corporate Actions | | 51 |
|  | E. | Transfer of Estate Property to Reorganized Debtors | | 51 |
|  | F. | Funding of the Plan | | 52 |
|  | G. | Post-Confirmation Estate Claims | | 52 |
|  | H. | Avoidance Actions | | 53 |
|  | I. | Disposition of Assets | | 53 |
|  | J. | Compromise of Controversies | | 53 |
|  | K. | Bankruptcy Court Approval Relative to Post-Confirmation Matters | | 53 |
|  | L. | Debtors' Right of Setoff | | 54 |
|  | M. | Cash Payments | | 54 |
|  | N. | Reorganized Debtors' Certification | | 54 |
| XII. | | DISTRIBUTIONS | | 55 |
|  | A. | Distribution Agent | | 55 |
|  | B. | Distributions | | 55 |
|  |  | 1. | Dates of Distributions | 55 |
|  |  | 2. | Limitation on Liability | 55 |

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

# TABLE OF CONTENTS

## (Continued)

**PAGE**

|  |  |  |  |
|---|---|---|---|
| | C. | Instruments and Securities | 56 |
| | | 1. Rights of Persons Holding Instruments and Securities | 56 |
| | | 2. Cancellation of Liens | 56 |
| | D. | De Minimis Distributions | 56 |
| | E. | Delivery of Distributions | 56 |
| | F. | Undeliverable Distributions | 57 |
| | G. | Disposition of Unclaimed Property | 57 |
| XIII. | | OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS | 57 |
| | A. | Objections to Claims | 57 |
| | B. | Schedule of Disputed Claims | 58 |
| | C. | Treatment of Disputed Claims | 59 |
| | | 1. No Distribution Pending Allowance | 59 |
| | | 2. Distribution After Allowance | 59 |
| | | 3. Reserves for Disputed Claims | 59 |
| XIV. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 60 |
| | A. | Executory Contracts Being Assumed | 60 |
| | B. | Payment of Cure Claims | 61 |
| | C. | Executory Contracts Being Rejected | 61 |
| | D. | Retention of Property Rights by Reorganized Debtors | 61 |
| | E. | Bar Date for Rejection Damages | 62 |
| | F. | Claims Schedule | 62 |
| XV. | | TAX CONSEQUENCES OF PLAN | 62 |
| | A. | Introduction | 62 |
| | B. | Federal Income Tax Consequences to the Debtors | 63 |
| | C. | Tax Consequences to Creditors | 65 |
| XVI. | | CONFIRMATION REQUIREMENTS AND PROCEDURES | 65 |
| | A. | Introduction | 65 |
| | B. | Who May Object to Confirmation of the Plan | 66 |
| | C. | Who May Vote to Accept/Reject the Plan | 66 |
| | | 1. What Is an Allowed Claim/Interest | 66 |
| | | 2. What Is an Impaired Class of Claim(s)/Interest(s) | 66 |
| | D. | Who Is Not Entitled to Vote | 66 |
| | E. | Who Can Vote in More than One Class | 67 |
| | F. | Votes Necessary to Confirm the Plan | 67 |
| | G. | Votes Necessary for a Class to Accept the Plan | 67 |
| | H. | Treatment of Non-Accepting Classes | 67 |

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

# TABLE OF CONTENTS

## (Continued)

|  |  |  |  | PAGE |
|---|---|---|---|---|
| I. | Request for Confirmation Despite Non-Acceptance by Impaired Class(es) | | | 68 |
| J. | Liquidation Analysis | | | 68 |
|  | 1. | Class 1 Claims | | 71 |
|  | 2. | Class 2 Claims | | 71 |
|  | 3. | Class 3 Claims | | 72 |
|  | 4. | Class 4 Claims | | 72 |
|  | 5. | Class 5 Claims | | 72 |
|  | 6. | Class 6 Claims | | 72 |
|  | 7. | Class 7 Claims | | 72 |
| K. | Feasibility | | | 73 |
|  | 1. | Projections of Future Cash Flow | | 73 |
|  |  | a. | Effective Date of the Plan | 74 |
|  |  | b. | Revenues Generated by the Reorganized Debtors' Business | 74 |
|  |  | c. | Expenses of the Reorganized Debtors | 74 |
|  | 2. | Funding of Distributions Required by the Plan | | 74 |
|  |  | a. | Funding of Distributions Required on or About the Effective Date | 74 |
|  |  | b. | Funding of Ongoing Distributions to Holders of Allowed Claims Required by the Plan | 75 |
| XVII. | EFFECT OF CONFIRMATION PLAN | | | 76 |
| A. | Discharge | | | 76 |
| B. | Injunction | | | 76 |
| XVIII. | LIMITATION OF LIABILITY AND RELEASES | | | 77 |
| A. | No Liability for Solicitation or Participation | | | 77 |
| B. | Limitation of Liability | | | 78 |
| XIX. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS | | | 78 |
| A. | Conditions Precedent to Plan Confirmation | | | 78 |
| B. | Condition Precedent to Plan Effectiveness | | | 78 |
| C. | Waiver of Conditions | | | 79 |
| XX. | RETENTION OF JURISDICTION | | | 79 |
| XXI. | MODIFICATION OF THE PLAN; CRAMDOWN | | | 81 |
| A. | Modification of the Plan | | | 81 |
| B. | Nonconsensual Confirmation | | | 81 |

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

### (Continued)

|  |  |  | PAGE |
|---|---|---|---|
| XXII. | MISCELLANEOUS | | 81 |
| | A. | Payment of Statutory Fees | 81 |
| | B. | Payment Dates | 82 |
| | C. | Other Documents and Actions | 82 |
| | D. | Notices | 82 |
| | E. | Governing Law | 83 |
| | F. | Binding Effect | 83 |
| | G. | Successors and Assigns | 83 |
| | H. | No Waiver | 84 |
| | I. | Inconsistencies | 84 |
| | J. | Exemption from Certain Transfer axes and Recording Fees | 84 |
| | K. | Exemption from Securities Laws | 84 |
| | L. | Post-Confirmation Status Report | 84 |
| | M. | Post-Confirmation Conversion/Dismissal | 85 |
| | N. | Changes in Rates Subject to Regulatory Commission Approval | 85 |
| | O. | Final Decree | 85 |
| XXIII. | CONCLUSION | | 85 |

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

# I.

## INTRODUCTION

StarRibs North, LP ("StarRibs North"); StarRibs South, LP ("StarRibs South"); and WhitTown Partners, LP ("WhitTown"), certain of the jointly administered debtors in the above-captioned cases (collectively, "Debtors"), filed voluntary petitions under Chapter 11 of the Bankruptcy Code on November 6, 2008[1]. Since the Petition Date, the Debtors have continued to operate their businesses in the ordinary course as debtors-in-possession. On November 6, 2008, the Bankruptcy Court entered an order authorizing the joint administration of the Debtors' Cases.

The document that you are reading is the Debtors' Disclosure Statement. This Disclosure Statement is furnished for the purpose of soliciting acceptances to the Debtors' Plan which has been filed with the Bankruptcy Court. A copy of the Plan accompanies this Disclosure Statement.

Section 1125[2] of the Bankruptcy Code requires that, at the time when the Plan is delivered to Creditors, the Plan be accompanied by this Disclosure Statement. The purpose of this Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtors and the condition of the Debtors' books and records, to enable a typical Creditor to make an informed judgment about the Plan and to enable such Creditor to determine whether it is in its best interest to vote for (accept) or against (reject) the Plan.

This Disclosure Statement contains a description of the Plan and other information relevant to the decision whether to vote to accept or to reject the Plan. The Debtors urge you to read this Disclosure Statement because it contains important information concerning the Debtors' history, businesses, assets and liabilities, projected financial performance, and sets forth a summary of the Plan.

---

[1] Unless otherwise defined in this Disclosure Statement, the definitions of the capitalized terms contained in this Disclosure Statement are set forth in Article II herein.

[2] Section 1125(b) provides, in pertinent part, as follows:
An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1    This Disclosure Statement does not purport to be a complete description of the Plan, the

2  financial data pertaining to the Debtors' business operations, the applicable provisions of the

3  Bankruptcy Code, or any other matters which may be deemed significant by Creditors. Out of

4  practical necessity, this Disclosure Statement represents an attempt to summarize extensive

5  overall data, legal documents and legal principles, including provisions of the Bankruptcy Code,

6  and set them forth in understandable, readable form. Thus, although the Debtors have attempted

7  to describe fairly and accurately the matters set forth and discussed in this Disclosure Statement,

8  the Debtors emphasize that the documents and instruments referred to or summarized in this

9  Disclosure Statement (including, without limitation, historical financial information for the

10  Debtors' business operations) are available for inspection at the office of the Debtors' attorneys,

11  Winthrop Couchot Professional Corporation ("Winthrop Couchot"), located at 660 Newport

12  Center Drive, Suite 400, Newport Beach, CA 92660 (Attn: Garrick A. Hollander, Esq.), during

13  normal business hours, and upon reasonable written request made prior to the Confirmation

14  Hearing.

15    If any interested party does not understand fully this Disclosure Statement, or feels that the

16  information provided herein is insufficient to enable it to determine whether to accept or to reject

17  the Plan, that party is invited to make written inquiry of the Debtors' attorneys, Winthrop

18  Couchot, at the address set forth hereinabove.

19    To vote to accept or reject the Plan, a Creditor must indicate its acceptance or rejection

20  thereof on the ballot which accompanies this Disclosure Statement and return it to Winthrop

21  Couchot Professional Corporation in the envelope provided, such that the ballot is actually

22  received by Winthrop Couchot by 4:00 p.m. Pacific Daylight Time on October 30, 2009. Each

23  Class of Creditors allowed to vote on the Plan will be deemed to have accepted the Plan if the

24  Plan is accepted by valid ballots cast by Creditors in that Class holding at least two-thirds (2/3) in

25  dollar amount and more than one half (1/2) in number of the Allowed Claims of Creditors in that

26  Class actually voting on the Plan. **ONLY PROPERLY EXECUTED BALLOTS TIMELY**

27  **RECEIVED BY COUNSEL FOR THE DEBTORS WILL BE COUNTED AS HAVING**

28  **VOTED ON THE PLAN.**

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1    Since mail delays may occur, and because time is of the essence, it is important that ballots

2    be mailed well in advance of the date specified hereinabove as the deadline for Winthrop Couchot

3    to receive ballots. Any ballots received after that date will not be included in any calculation to

4    determine whether the Debtors' Creditors have accepted or rejected the Plan.

5    At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to

6    Section 1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary

7    Classes of Claims created under the Plan, and, if not, whether the Bankruptcy Court should,

8    nevertheless, confirm the Plan. If at such hearing the Bankruptcy Court should determine that the

9    Plan meets all of the requirements for confirmation prescribed by the Bankruptcy Code, the

10   Bankruptcy Court will enter a Confirmation Order. Pursuant to Section 1141 of the Bankruptcy

11   Code, the effect of the Confirmation Order will be to make the provisions of the Plan binding

12   upon the Debtors and each of their Creditors, regardless of whether the Creditor voted to accept

13   the Plan.

14   Pursuant to the Section 1128 of the Bankruptcy Code, any party-in-interest may object to

15   the confirmation of the Plan. The Bankruptcy Court has fixed October 30, 2009 as the deadline

16   for filing an objection to the Plan and for serving a copy thereof upon the Debtors' attorneys,

17   Winthrop Couchot, at the address set forth hereinabove (Attn: Garrick A. Hollander, Esq.); upon

18   the Committee's attorneys, Blakeley & Blakeley, located at 4685 MacArthur Court, Suite 421,

19   Newport Beach, California 92660 (Attn: Ronald Clifford, Esq.); and upon the United States

20   Trustee, located at 411 West Fourth Street, Suite 9041, Santa Ana, California 92701 (Attn:

21   Nancy S. Goldenberg, Esq.).

22   **THIS IS A SOLICITATION BY THE DEBTORS. THE REPRESENTATIONS**

23   **HEREIN ARE THOSE OF THE DEBTORS AND NOT OF THEIR ATTORNEYS OR**

24   **THEIR OTHER PROFESSIONALS. NO REPRESENTATIONS CONCERNING THE**

25   **DEBTORS, INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO**

26   **THEIR FUTURE BUSINESS OPERATIONS, CASH FLOW PROJECTIONS, THE**

27   **VALUE OF THEIR PROPERTY, THE AMOUNT OF CLAIMS AGAINST THE**

28   **ESTATES, OR ANY TAX EFFECT OF THE TRANSACTIONS PROPOSED UNDER**

1   THE PLAN, ARE AUTHORIZED BY THE DEBTORS, OTHER THAN AS SET FORTH

2   IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR

3   INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN THAT ARE IN

4   ADDITION TO OR DIFFERENT FROM THE STATEMENTS CONTAINED IN THIS

5   DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PARTY-IN-

6   INTEREST.  ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS

7   SHOULD BE REPORTED TO THE DEBTORS' ATTORNEYS WHO, IN TURN, WILL

8   DELIVER THE INFORMATION TO THE BANKRUPTCY COURT FOR SUCH

9   ACTION AS THE BANKRUPTCY COURT MAY DEEM TO BE APPROPRIATE.

10   THE DISCUSSION IN THIS DISCLOSURE STATEMENT REGARDING THE

11   DEBTORS MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE

12   MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.

13   SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A

14   RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF

15   FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT,"

16   "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF OR

17   OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE

18   READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE

19   NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND

20   UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO

21   DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD

22   LOOKING STATEMENTS.  THE LIQUIDATION ANALYSES, DISTRIBUTION

23   PROJECTIONS, PROJECTIONS OF FINANCIAL PERFORMANCE  AND OTHER

24   INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING,

25   AMOUNT AND VALUE OF ACTUAL DISTRIBUTIONS TO CREDITORS MAY BE

26   AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE,

27   ANY ANALYSES, ESTIMATES, OR PROJECTIONS MAY OR MAY NOT PROVE TO

28   BE ACCURATE.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1    UNLESS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY, THE

2  INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE

3  STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT.  RECORDS KEPT BY THE

4  DEBTORS RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED

5  INTERNALLY BY THE DEBTORS.  THE DEBTORS BELIEVE THAT EVERY

6  REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL INFORMATION

7  AS ACCURATE AS IS REASONABLY PRACTICABLE GIVEN THE NATURE AND

8  HISTORY OF THE DEBTORS' BUSINESSES AND THE CONDITION OF THE

9  DEBTORS' BOOKS AND RECORDS.  HOWEVER, THE RECORDS KEPT BY THE

10  DEBTORS ARE NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF

11  INACCURACY.  NEITHER DEBTORS' CHIEF RESTRUCTURING OFFICER,

12  DEBTORS' MANAGEMENT COMPANY, DEBTORS' GENERAL INSOLVENCY

13  COUNSEL, OR DEBTORS' SPECIAL TAX COUNSEL VERIFIED INDEPENDENTLY

14  THE INFORMATION CONTAINED HEREIN, OR MAKE ANY REPRESENTATIONS OR

15  WARRANTIES WITH RESPECT TO THE ACCURACY THEREOF.

16    THE DEBTORS AND THEIR PROFESSIONALS HAVE MADE A DILIGENT

17  EFFORT TO IDENTIFY IN THIS DISCLOSURE STATEMENT ALL LITIGATION

18  CLAIMS, INCLUDING CLAIMS FOR RELIEF, COUNTERCLAIMS, AND OBJECTIONS

19  TO CLAIMS.  HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT

20  A PARTICULAR LITIGATION CLAIM IS OR IS NOT IDENTIFIED IN THIS

21  DISCLOSURE STATEMENT.  THE DEBTORS OR OTHER PARTIES-IN-INTEREST

22  MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE POST-CONFIRMATION

23  ESTATE CLAIMS WHETHER OR NOT SUCH CLAIMS ARE IDENTIFIED IN THIS

24  DISCLOSURE STATEMENT.

25    ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO

26  CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR

27  TO VOTING ON THE PLAN. THE CONTENTS OF THIS DISCLOSURE STATEMENT

28  SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS OR

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1  TAX ADVICE. EACH CREDITOR AND OTHER PARTY-IN-INTEREST SHOULD

2  CONSULT WITH ITS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT

3  OR ACCOUNTANT PRIOR TO VOTING ON THE PLAN IN ORDER TO ENSURE A

4  COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN. THIS

5  DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE

6  CREDITORS OF THE DEBTORS TO ENABLE THEM TO MAKE AN INFORMED

7  DECISION REGARDING THE PLAN.

8       THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE

9  STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT

10  CONTAINS ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION

11  OF ACCEPTANCES TO THE PLAN BY THE DEBTORS, ASSUMING THE

12  ACCURACY OF THE CONTENTS OF THIS DISCLOSURE STATEMENT. THE

13  BANKRUPTCY COURT HAS NOT YET DETERMINED SUCH ACCURACY, BUT MAY

14  DO SO AT THE HEARING REGARDING THE CONFIRMATION OF THE PLAN.

15  II.

16  **DEFINITIONS AND RULES OF INTERPRETATION**

17      **A.**    **Definitions**. The following defined terms are used in this Disclosure Statement.

18  Any capitalized term that is not defined herein, but that is defined in the Bankruptcy Code or in the

19  Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or

20  Bankruptcy Rules.

21      1.    "Administrative Claim" means a Claim for costs and expenses of the

22  administration of a Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including,

23  without limitation, a Claim of a Professional employed at the expense of an Estate and any fees or

24  charges asserted against an Estate under 28 U.S.C. § 1930.

25      2.    "Administrative Tax Claim" means a request by a Governmental Unit for

26  payment of Administrative Claims for Taxes (and for interest or penalties related to such

27  Taxes) for any tax year or period, all or any portion of which occurs within the period from and

28  including the Petition Date through and including the Effective Date.

-7-

1         3.    "<u>Allowable Interest Rate</u>" means the interest rate that is fixed at one

2 percentage point (1%) over the prime rate of interest as published in the <u>Wall Street Journal</u> on the

3 Effective Date.

4         4.    "<u>Allowed Administrative Claim</u>" means an Administrative Claim allowed

5 pursuant to Sections 503(b) or 507(a)(1) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

6         5.    "<u>Allowed Claim</u>" means a Claim that is either (i) listed in the Schedules

7 filed with the Bankruptcy Court by the Debtors and not listed as disputed, contingent, unliquidated

8 or unknown as to amount and as to which no timely objection has been filed; or (ii) with respect to

9 which a Proof of Claim has been filed within the time period fixed by the Bankruptcy Court, and

10 as to which no objection was filed within the time period fixed by the Bankruptcy Code, the

11 Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or as to which any such objection

12 has been determined by a Final Order.  The amount of an Allowed Claim shall be as follows:  (a) if

13 the Creditor did not file a Proof of Claim with the Bankruptcy Court on or before the Bar Date, the

14 amount of the Creditor's Claim as listed in the Schedules as neither disputed, contingent,

15 unliquidated or unknown; or (b) if the Creditor filed a Proof of Claim with the Bankruptcy Court

16 on or before the Bar Date, (1) the amount stated in such Proof of Claim if no objection to such

17 Proof of Claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy

18 Rules, the Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final

19 Order of the Bankruptcy Court if an objection to such Proof of Claim was filed within the time

20 period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy

21 Court.  Any Claim that is not filed by the applicable Bar Date and that is listed as disputed,

22 unliquidated, contingent or unknown, or that is not allowed under the terms of the Plan, shall be

23 zero, and no Distribution shall be made on account of such Claim.

24         6.    "<u>Allowed Cure Claims</u>" means an Allowed Claim for Cure Claims pursuant

25 to the terms of the Plan and a Final Order.

26         7.    "<u>Allowed Deficiency Claim</u>" means that portion of an Allowed Claim

27 which is in excess of the value of any collateral which is security for the repayment of the Claim,

28 calculated in accordance with the provisions of Section 506 of the Bankruptcy Code.  Unless the

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1    Creditor should make an election under Section 1111(b) of the Bankruptcy Code, an Allowed

2    Deficiency Claim is treated hereunder as a Class 4 Allowed General Unsecured Claim.

3           8.    "Allowed General Unsecured Claim" means an unsecured Allowed Claim

4    against the Debtors, however arising, not entitled to priority under Section 507(a) of the

5    Bankruptcy Code, including, without limitation, a Rejection Claim.

6           9.    "Allowed Interest" means an Interest to the extent, and only to the extent, of

7    the allowed amount of such Interest.  The amount of an Allowed Interest shall be (i) the amount

8    provided by or established in the records of the Debtors on the Confirmation Date, provided,

9    however, that a timely filed Proof of Interest shall supersede any listing of such Interest on the

10   records of the Debtors; (ii) the amount stated in a timely filed Proof of Interest if no objection to

11   such Interest is filed prior to the Confirmation Date or such later date as the Bankruptcy Court

12   allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

13         10.    "Allowed Non-Pecuniary Loss Penalty Claim" means an Allowed Claim for

14   non-pecuniary loss penalties of the type described in Section 726(a)(f).

15         11.    "Allowed Priority Tax Claim" means an Allowed Claim provided for by

16   Section 507(a)(8) of the Bankruptcy Code.

17         12.    "Allowed Priority Unsecured Wage Claim" means an unsecured Allowed

18   Claim entitled to priority under Sections 507(a)(3) or (4) of the Bankruptcy Code.

19         13.    "Allowed Section 503(b)(9) Administrative Claims" means an Allowed

20   Claim entitled to administrative priority pursuant to Section 503(b)(9) of the Bankruptcy Code.

21         14.    "Allowed Secured Claim" means an Allowed Claim secured by a valid and

22   unavoidable Lien against property in which an Estate has an interest, or which is subject to setoff

23   under Section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance

24   with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Claim in

25   the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the

26   case may be.

27         15.    "Allowed Secured Capital Lease Claim" means the Allowed Secured Claim

28   of a Creditor under a Capital Lease.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

16.    "Avoidance Action" means any action or proceeding filed pursuant to the provisions of Sections 510, 542, 543, 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code, or any similar action or proceeding filed to recover property for or on behalf of an Estate or to avoid a Lien or transfer.

17.    "Bankruptcy Code" means Title 11, United States Code, as amended. All citations in the Plan to Section numbers are to the Bankruptcy Code, unless otherwise expressly stated herein.

18.    "Bankruptcy Court" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division, which has jurisdiction over the Cases and the Estates of the Debtors, or such successor court or tribunal as may hereafter be confirmed or created by lawful authority with power to confirm reorganization plans under Chapter 11 of the Bankruptcy Code and all applicable statutes, rules and regulations pertaining thereto.

19.    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended, and the Local Bankruptcy Rules for use in the United States Bankruptcy Court for the Central District of California, as amended.

20.    "Bar Date" means the last date for creditors and equity security holders whose claims or interests are not scheduled, or are scheduled as disputed, contingent, or unliquidated in the Debtors' Schedules to file Proofs of Claim, except for the following Claims: (i) Administrative Claims other than Section 503(b)(9) Administrative Claims, and (ii) Rejection Claims. The Bar Date was May 5, 2009.

21.    "Budget" means an annual operating budget of the Reorganized Debtors which shall be approved by the Holdco Board.

22.    "Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Rule 9006(a) of the Bankruptcy Rules.

23.    "Capital Lease" means a transaction in the form of a lease that creates a security interest pursuant to Section 1203 of the California Commercial Code.

-10-

24.    "Cases" means the Chapter 11 cases commenced by the Debtors on their respective Petition Dates and pending before the Bankruptcy Court, as Case Nos. 8:08-17182 TA; 8:08-17183 TA; and 8:08-17187 TA.

25.    "Cash" means cash and cash equivalents including, but not limited to, checks or similar forms of payment or exchange.

26.    "Claim" means (i) a right to payment from the Debtors, whether or not such right to payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtors whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

27.    "Claims Objection Deadline" means, the latest of the following: (i) the one hundredth (100th) day after the Effective Date; (ii) with respect to a specific Claim, the one hundredth (100th) day after a Proof of Claim with respect to such Claim is filed by a Creditor, or (iii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between a Debtor or Reorganized Debtor and the Creditor.

28.    "Class" means the group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

29.    "Class 1 Event of Default" means a material breach of the Debtors' obligations to any Creditor of Class 1.1 through 1.8 under the Plan as against such Creditor.

30.    "Committee" means the duly appointed and acting Official Committee of Creditors Holding Unsecured Claims in the Cases, and its successor under the Plan, the Holdco Board.

31.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

32.    "Confirmation Hearing" means the hearing(s) scheduled by the Bankruptcy Court for the purpose of considering the confirmation of the Plan.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

33.    "Confirmation Order" means the order, as entered, of the Bankruptcy Court confirming the Plan.

34.    "Creditor" means the holder of an Allowed Claim or Allowed Administrative Claim.

35.    "Creditor Board Member" means a person that serves as a member of the Holdco Board pursuant to the Plan.

36.    "Creditor Involvement Period" means the period of time from the Effective Date through the date at which point the General Unsecured Creditors no longer own an Interest in Holdco pursuant to the terms of the Plan.

37.    "Cure Claims" means the amounts necessary to cure any defaults under executory contracts and unexpired leases assumed under the Plan.

38.    "Cure Claims Schedule" means the schedule of the Cure Claims, which shall be filed with the Bankruptcy Court, and served on the Committee, on or before the twenty-fourth (24th) day prior to the Confirmation Hearing.

39.    "Debtors" means StarRibs North, StarRibs South, and WhitTown.  For the purpose of the Plan, reference to "Debtors" shall include the Reorganized Debtors.

40.    "Disclosure Statement" means the Debtors' Amended Disclosure Statement, as the same may be amended or modified from time to time.

41.    "Disputed Claim" means all or any part of a Claim as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and the Claim is listed in the Schedules as unliquidated, disputed, contingent or unknown, or; (ii) the Claim is the subject of a timely objection or request for estimation which is filed on or before the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or determined by a Final Order.  In addition, prior to the earlier of (a) the Claims Objection Deadline, and (b) such date as the Bankruptcy Court allows the Claim pursuant to a Final Order, any Claim that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of calculating and making any Distributions under the Plan if: (1) no Claim corresponding to the Proof of Claim is listed in the Schedules, (2) the Claim corresponding to the Proof of Claim is

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1  listed in the Schedules as disputed, contingent, unliquidated or unknown, (3) the amount of the

2  Claim as specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in

3  the Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the

4  priority or classification of the Claim as specified in the Proof of Claim differs from the priority of

5  any corresponding Claim listed in the Schedules.

6          42.    "Disputed Claims Reserve" means a segregated, interest-bearing trust

7  account for the benefit of General Unsecured Creditors, established at a financial institution that is

8  an authorized depository under United States Trustee guidelines, into which the Distribution Agent

9  will deposit the Distributions required by Section 9.3.3 hereof.

10         43.    "Disputed Claims Schedule" means the schedule setting forth a list of

11 Disputed Claims to which the Debtors intend to object.

12         44.    "Distribution" means the Cash that is required to be distributed under the

13 Plan to the holders of Allowed Claims.

14         45.    "Distribution Agent" means Holdco or its designee.

15         46.    "Effective Date" means a date to occur on or before the thirtieth (30th) day

16 after the satisfaction or waiver of the conditions set forth in Sections 13.1 and 13.2 of the Plan.

17         47.    "El Centro Restaurant" means that certain Famous Dave's Restaurant

18 located at 3103 South Dogwood Avenue, El Centro, California 92243.

19         48.    "Estates" means the Debtors' bankruptcy estates created under Section 541

20 of the Bankruptcy Code in the Cases.

21         49.    "Excess Cash" means semiannual net income generated from the

22 Restaurants post-confirmation, plus cash on hand, depreciation, amortization and non-cash items,

23 minus the following:  (i) payments for debt service, if any, including principal and interest;

24 (ii) capital expenditures; (iii) payments made on Allowed Administrative Claims; (iv) payments

25 made on Allowed Priority Unsecured Wage Claims; (v) payments made on Allowed Priority Tax

26 Claims; (vi) payments made on Allowed Cure Claims; and (vii) Minimum Cash Balance.

27         50.    "Fair Market Value" means the value of an asset based on a going concern

28 basis, as determined by an independent third party holding requisite appraiser credentials.

1           51.    "Famous Dave's" means restaurants owned and operated by StarRibs North,

2  StarRibs South and WhitTown under the Famous Dave's, Inc. franchise agreement.

3           52.    "Famous Dave's, Inc." means Famous Dave's of America, Inc., a Minnesota

4  corporation, the franchisor of the Debtors' Famous Dave's.

5           53.    "Final Order" means an order or judgment of the Bankruptcy Court, or of

6  any court of competent jurisdiction where there is pending an action in which a Debtor, a

7  Reorganized Debtor, or the Committee is a party, as to which the time to appeal, petition for

8  certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for

9  certiorari, or other proceeding for reargument or rehearing shall then be pending or as to which any

10  right to appeal, petition for certiorari, move to reargue, or to rehear shall have been waived in

11  writing in form and substance satisfactory to the Debtor or to the Reorganized Debtor.

12           54.    "First Payment Date" means the first Business Day of the first full month

13  following the Effective Date.

14           55.    "Gantes" means John D. Gantes.

15           56.    "Gantes Involvement Period" means the period of time that Gantes

16  continues to be actively engaged in providing management services with respect to Holdco and the

17  Subcos pursuant to a management agreement either directly or through Managementco.

18           57.    "Gantes Parties" means Gantes, Allan Gantes, James Gantes, George

19  Gantes, and all other family members of and related parties to the foregoing, and any and all

20  affiliates of the Debtors and all other entities in which Gantes or a related party to Gantes hold an

21  interest.

22           58.    "General Administrative Claims Bar Date" means the date by which all

23  requests for payment of Administrative Claims, with the exception of Administrative Tax Claims

24  and Section 503(b)(9) Administrative Claims, shall be filed with the Bankruptcy Court and served

25  upon the Reorganized Debtors, which date shall be no later than sixty (60) days after the Effective

26  Date.

27

28

59.    "General Unsecured Claim" means an unsecured Claim against the Debtor, however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, a Rejection Claim.

60.    "General Unsecured Creditor" means the holder of an Allowed General Unsecured Claim.

61.    "Governmental Unit" shall have the meaning provided in Section 101(27) of the Bankruptcy Code.

62.    "Holdco" means a Delaware corporation, or such other corporate entity as the Debtor, in consultation with the Committee, determine to be in the best interests of creditors, which will be formed and will be the parent company that will manage and own 100% of the Interests in all Subcos, each of which will own one Restaurant.

63.    "Holdco Board" means the board of directors of Holdco.

64.    "Independent Holdco Board Member" means a member of the Holdco Board that is not employed or otherwise compensated (other than through director fees) by (a) Holdco, (b) a Subco, (c) Synergy, or (d) any affiliate or related party of Synergy or Gantes.

65.    "Initial Distribution Date" means the date on which the first Distribution is made to a Class.

66.    "Interest" means any equity security in any Debtor or Reorganized Debtor, as provided by Section 101(16) of the Bankruptcy Code, including, without limitation, any common stock interest, preferred stock interest, stock option, warrant, partnership interest, or membership interest.

67.    "Interest Holder" means the holder of an Interest in a Debtor.

68.    "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

69.    "Lenders" means, collectively all of the Creditors in Classes 1.1 through 1.8.

70.    "Lien" means any lien, encumbrance, pledge or other charge against property.

-15-

1    71.    "Long Beach Restaurant" means that certain Famous Dave's Restaurant

2  operated at 300 South Pine Avenue, Long Beach, California 90802.

3    72.    "Major Decisions" means significant and important decisions to be made by

4  the Reorganized Debtors, including any of the following regarding Holdco, any Sub and/or any

5  Restaurant: (a) issuing or repurchasing any beneficial interest in Holdco; (b) issuing, increasing,

6  amending or repurchasing debt; (c) acquisitions or divestitures of any business or any assets (other

7  than inventory in the normal course of business); (d) approval of an annual Budget; (e) capital

8  expenditures above approved budgeted amounts; (f) any merger, restructuring or other

9  reorganization; (g) dividends, distributions or other payments to or on behalf of holders of

10  beneficial interests in Holdco; (h) any other extraordinary expenditure; (i) entering into contracts

11  or obligations; (j) changes or amendments to the Managementco contract; (k) opening or closing

12  of a restaurant; (l) compliance with the terms of this Plan; or (m) bankruptcy or other insolvency

13  related action, any liquidation or dissolution, or any similar action.

14    73.    "Management Agreement" means the management services agreement

15  entered into between Managementco and each Subco.

16    74.    "Managementco" means a designated management company that will

17  oversee day-to-day restaurant operations, marketing, information technology and back-office

18  functions of the Subcos post-confirmation, including paying independent vendors, suppliers and

19  employees of all Subcos.

20    75.    "Minimum Cash Balance" means the minimum amount of cash that each

21  Restaurant must maintain after payment of capital expenditures, debt service, and the required

22  semiannual payments under the Plan on account of Allowed Administrative Claims, Allowed

23  Priority Unsecured Wage Claims, Allowed Priority Tax Claims and Allowed Cure Claims, which

24  initially shall be $75,000, but which may be modified from time to time by the Holdco Board.

25    76.    "Net Proceeds" means the proceeds generated from the pursuit of Post-

26  Confirmation Estate Claims, net of all attorneys' fees and other costs necessary to recover such

27  proceeds.

28

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

77.     "Objection Value" means the highest Fair Market Value of property asserted by a Creditor in opposition to the Debtors' asserted value in the Plan of a property securing such Creditor's Claim.

78.     "Paid in Full" means the Debtor's payment obligations to a particular Class of Creditor under the Plan have been fully satisfied.

79.     "Palmdale Restaurant" means that certain Famous Dave's Restaurant located at 1205 Rancho Vista Boulevard, Palmdale, California 93551.

80.     "Petition Date" means the date on which each Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code (November 6, 2008).

81.     "Plan" means the Debtors' Chapter 11 Amended Plan of Reorganization, together with the exhibits hereto, as the same may be amended or modified from time to time.

82.     "Post-Confirmation Estate Claims" means any and all claims and causes of action that constitute property of the Estates including, but not limited to, any Avoidance Actions and any causes of action or claims for recovery of any amounts owing to the Debtors or the Estates.

83.     "Priority Tax Claim" means any Claim provided for by Section 507(a)(8) of the Bankruptcy Code.

84.     "Priority Tax Claim Semiannual Yield" means the semiannual rate of return paid to Creditors holding Allowed Priority Tax Claims, which shall be calculated by the quotient of the semiannual cash payment made to the Creditors holding Allowed Priority Tax Claims divided by the total Allowed Priority Tax Claims.

85.     "Priority Unsecured Claim" means any Claim provided for by Section 507(a)(3) or (4) of the Bankruptcy Code.

86.     "Professional" means a person or entity employed by the Debtors or by the Committee pursuant to a Final Order in accordance with Sections 327 or 1103 of the Bankruptcy Code.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

87.    "Proof of Claim" means a written statement filed in a Case by a Creditor in which the Creditor sets forth the amount of its Claim, in accordance with Rule 3001 of the Bankruptcy Rules.

88.    "Proof of Interest" means a written statement filed in a Case by an Interest Holder in which the Interest Holder sets forth the amount of its Interest.

89.    "Pro Rata" means proportionately, so that with respect to any Distribution in respect of any Allowed Claim, the ratio of (i) (a) the amount of property distributed or reserved on account of such Allowed Claim to (b) the amount of such Allowed Claim, is the same as the ratio of (ii) (a) the amount of property distributed or reserved on account of all Allowed Claims of the Class sharing in such Distribution to (b) the amount of all Allowed Claims in such Class.

90.    "Rejection Claim" means any Claim based upon, or arising from, the rejection of any executory contract or unexpired lease pursuant to order of the Bankruptcy Court or pursuant to the Plan.

91.    "Reorganized Debtors" means the Debtors, as reorganized under the terms of the Plan on and after the Effective Date, and any successors thereto by merger, consolidation, acquisition, or otherwise, which, as contemplated by the Plan, would include Holdco and all Subcos.

92.    "Reorganized Debtors' Certification" means a certification by a person with requisite authority on behalf of the Reorganized Debtors stating that, in their sole and absolute discretion, the Reorganized Debtors have determined that all Allowed Claims have been duly paid and that all Post-Confirmation Estate Claims and objections to Disputed Claims have been resolved by Final Order, which certification shall be filed with the Bankruptcy Court and served upon the United States Trustee, as provided in Section 7.16 hereof.

93.    "Repayment Date" means the date that Allowed General Unsecured Claims have been Paid in Full.

94.    "Repossession Option" means the Debtor's option pursuant to Section 6.1.1 to require a holder of an Allowed Secured Claim to repossess the property securing such Claim.

95.    "Restaurant" means each individual restaurant operations owned by the Debtors and all assets used therein.

96.    "Schedules" means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by the Debtors in the Cases, as required by Section 521(1) of the Bankruptcy Code, Rules 1007(a)(3) and (b)(1) of the Bankruptcy Rules, and Official Bankruptcy Form No. 6, as the Schedules may be amended from time to time.

97.    "Section 503(b)(9) Administrative Claims" means any Claim, to the extent allowable pursuant to Section 503(b)(9) of the Bankruptcy Code and the Plan.

98.    "Secured Claim" means any Claim, including interest, reasonable attorneys' fees, costs, and charges, to the extent allowable pursuant to Section 506(b) of the Bankruptcy Code and the Plan, that is secured by a Lien on property in which a Debtor has an interest or that is subject to recoupment or setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the interest of the holder of such Secured Claim in the Debtor's interest in the property, determined pursuant to Section 506(a) of the Bankruptcy Code.

99.    "Simi Valley Restaurant" means that certain Famous Dave's Restaurant located at 1229 Simi Town Center, Simi Valley, California 93065.

100.    "StarRibs North" means StarRibs North, LP, a California limited partnership.

101.    "StarRibs South" means StarRibs South, LP, a California limited partnership.

102.    "Subco" means a Delaware limited liability company that will be formed and will own a Restaurant post-confirmation, which will be a wholly-owned subsidiary of Holdco.

103.    "Synergy" means Synergy Pacific Management, LLC.

104.    "Tax" means any tax, charge, fee, levy, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or additions attributable to, or imposed on or with respect to, such assessments.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1    105.    "<u>Tax Claims</u>" means any Claim, pre-petition or post-petition, relating to a

2    Tax.

3    106.    "<u>Tracy Restaurant</u>" means that certain Famous Dave's Restaurant located

4    at 3170 North Naglee Road, Tracy, California 95304.

5    107.    "<u>Unclaimed Property</u>" means any Distribution of Cash or other property to a

6    Creditor that is returned to the Reorganized Debtor as undeliverable.

7    108.    "<u>Unclaimed Property Reserve</u>" means an interest-bearing segregated

8    account in which Unclaimed Property shall be set aside and held as provided in Section 8.7 hereof.

9    109.    "<u>United States Trustee</u>" means the Office of the United States Trustee.

10    110.    "<u>Unsecured Creditors Semiannual Payment Cap</u>" means the maximum

11    semiannual distribution to Creditors holding Allowed General Unsecured Claims, which shall

12    equal the product of the total Allowed General Unsecured Claims and the Priority Tax Claim

13    Semiannual Yield.

14    111.    "<u>Vista Restaurant</u>" means that certain Famous Dave's Restaurant located

15    at 303 Vista Drive, Vista, California 92083.

16    112.    "<u>WhitTown</u>" means WhitTown Partners, LP, a California limited

17    partnership.

18    **B.**    **<u>Rules of Construction</u>.**  For the purpose of this Disclosure Statement, unless

19    otherwise provided in this Disclosure Statement, (i) whenever from the context it is appropriate,

20    each term, whether stated in the singular or the plural, shall include both the singular and the

21    plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine,

22    feminine and neuter; (iii) any reference in this Disclosure Statement to an existing document,

23    Exhibit or schedule filed or to be filed means such document or schedule as it may have been or

24    may be amended, modified or supplemented pursuant to this Disclosure Statement; (iv) any

25    reference to an entity as a holder of a Claim or Interest includes that entity's successors and

26    assigns; (v) except as otherwise stated herein, all references in this Disclosure Statement to

27    Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this

28    Disclosure Statement; (vi) the words "herein," "hereunder" and "hereto" refer to this Disclosure

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1 | Statement in its entirety rather than to a particular portion of this Disclosure Statement; (vii) unless

2 | otherwise provided in this Disclosure Statement, any reference in this Disclosure Statement to a

3 | contract, instrument, release, indenture, agreement, or other document being in a particular form or

4 | on particular terms and conditions means that such document shall be substantially and materially

5 | in such form or substantially and materially on such terms and conditions; and (viii) the rules of

6 | construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules

7 | are not inconsistent with the express terms of this Disclosure Statement or any other provision in

8 | this Section 2.2.

9 |     **C.**    **Exhibits**.  All exhibits to this Disclosure Statement are incorporated into and are a

10 | part of this Disclosure Statement as if set forth in full herein.

11 | **III.**

12 | **CONFIRMATION AND VOTING**

13 |     A Creditor may vote to accept or reject the Plan by filling out and mailing to the Debtors'

14 | counsel the form of the ballot which has been provided herewith.  Ballots should be mailed to

15 | Winthrop Couchot, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660 (Attn:  Ms.

16 | PJ Marksbury).

17 |     In order to vote for or against the Plan, a Creditor must have filed a Proof of Claim on or

18 | before the Bar Date, unless its Claim is listed in the Schedules filed in the Cases by the Debtors as

19 | not being disputed, unliquidated, contingent or unknown.  Any such Creditor is, to the extent listed

20 | in the Schedules, deemed to have filed a Claim, and, absent a timely objection to the Claim, such

21 | Claim is deemed allowed.  In order to determine whether a Creditor is entitled to vote on the Plan

22 | notwithstanding any failure to timely file a Proof of Claim, the Creditor should review the

23 | Debtors' Schedules on file with the Bankruptcy Court.  If the Creditor's Claim is not scheduled, or

24 | if it is scheduled as contingent, disputed, unliquidated or unknown and the Creditor did not file a

25 | Proof of Claim prior to the Bar Date, the Creditor may not be entitled to vote on the Plan.

26 |     The Bankruptcy Court has fixed October 30, 2009 as the last date by which ballots must be

27 | received by the Debtors' counsel.  Subject to review and determination by the Bankruptcy Court,

28 | votes received by the Debtors after that date may not be counted.  Regardless of whether a Creditor

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1   votes on the Plan, it will be bound by the terms and treatment set forth in the Plan if the Plan is

2   confirmed by the Bankruptcy Court.  Absent some affirmative act constituting a vote, such

3   Creditor will not be included in the voting tally.  Allowance of a Claim for voting purposes, or

4   disallowance of any Claim for voting purposes, does not necessarily mean that all or a portion of

5   the Claim will be allowed or disallowed for distribution purposes.

6          The Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the

7   Bankruptcy Code are satisfied.  Section 1129 requires, inter alia, that: (a) with respect to each

8   Class of Claims, each Creditor in that Class has accepted the Plan, or will receive or retain under

9   the Plan on account of such Claim, property of a value that is not less than the amount such

10  Creditor would receive if the Debtors were to liquidate their assets under Chapter 7 of the

11  Bankruptcy Code; (b) confirmation of the Plan is not likely to be followed by a liquidation of the

12  Debtors or the need for further reorganization of the Debtors; and (c) the Plan be accepted by each

13  Class of Claims that is impaired by the Plan, and/or the Plan does not discriminate unfairly and is

14  fair and equitable to any impaired Class that has not accepted the Plan.

15         To confirm the Plan, the Bankruptcy Court must determine whether the Plan has been

16  accepted by each "impaired" Class entitled to vote on the Plan.  Pursuant to Section 1124 of the

17  Bankruptcy Code, Classes "impaired" by the Plan are those Classes whose legal, equitable or

18  contractual rights are altered pursuant to the Plan.  Under Section 1126(c) of the Bankruptcy Code,

19  an impaired Class of Claims is deemed to have accepted the Plan if the Plan is accepted by

20  Creditors in that Class holding at least two-thirds (2/3) in dollar amount and more than

21  one-half (1/2) in number of the Allowed Claims of Creditors in that Class actually voting on the

22  Plan.

23         Only the votes of those Creditors whose ballots are timely received may be counted in

24  determining whether a Class has accepted the Plan.  Creditors are, therefore, urged to fill in, date,

25  sign and promptly mail the enclosed ballot.  Each Creditor must properly complete the ballot and

26  legibly identify its name on the ballot.

27         Any Creditor holding Claims in more than one impaired Class must file one ballot for each

28  such Class.  If a Creditor has received an incorrect ballot, or believes that it is entitled to vote in

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1  more than one Class, additional ballots may be obtained upon written request to Winthrop Couchot

2  (Attn: Ms. PJ Marksbury).

3        In the event that one impaired class but not all impaired Classes accept the Plan, the

4  Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to the provisions of

5  Section 1129(b) of the Bankruptcy Code.  Pursuant to Section 1129(b), the Plan may be confirmed

6  despite the failure of a Class of Claims to accept the Plan if the Bankruptcy Court determines that

7  the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of

8  Claims that is impaired under, and has not accepted, the Plan.  The condition that the Plan be fair

9  and equitable with respect to such nonaccepting Classes includes certain legal requirements as

10  more fully set forth in Section 1129(b).

11                                   **IV.**

12                    **BACKGROUND OF THE DEBTORS**

13        **A.    The Debtors.**  As of the Petition Date, the Debtors were among approximately 209

14  affiliated entities, approximately 50 of which owned and operated approximately 110 restaurants

15  throughout California, Washington, Nevada, and Oregon, and 60 entities of which owned and

16  operated various real properties from which many of the restaurants lease space.  The Debtors own

17  and operate six franchised Famous Dave's BBQ restaurants throughout California.  Famous

18  Dave's is a casual barbeque restaurant that offers dine-in, take-out and catering.

19        StarRibs North owns and operates a Famous Dave's in El Centro and Tracy, California;

20  StarRibs South owns and operates a Famous Dave's in Palmdale and Simi Valley, California; and

21  WhitTown owns and operates a Famous Dave's in Vista and Long Beach, California.  The

22  Debtors employ approximately 350 persons.

23        **B.    Jointly Administered Debtors.**  The Debtors' Cases have been jointly

24  administered with 12 other affiliated debtors.  Four of these debtors[3] own and operate 11

25  franchised Carino's Italian Grill restaurants throughout California.[4]  SoBreck, LLC ("SoBreck")

26  and NorBreck, LLC ("NorBreck") were general partners of SoBreck, LP and NorBreck, LP,

27  ─────────────────
[3] OceanCountry, LP, BlueOcean Partners, LP, StoneRiver Partners, LP, and SoWestBreck, LLC, (collectively, the "Carino's Debtors").

28  [4] The Carino's Debtors anticipate filing a separate disclosure statement and joint Chapter 11 plan of reorganization prior to September 30, 2009.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1   respectively, which owned and operated additional Carino's restaurants. As soon as it was

2   determined that SoBreck, LP and NorBreck, LP, of which SoBreck and NorBreck, respectively,

3   were general partners, were not going to file Chapter 11, the Debtors sought dismissal of the

4   SoBreck and NorBreck bankruptcy cases. On July 28, 2009, the Court entered an order

5   dismissing the SoBreck and NorBreck cases.

6        Two affiliates of the Debtors – Imperial Smokehouse Partners, LP ("Imperial") and

7   DesertBreck, LP ("DesertBreck") (collectively, the "Real Estate Debtors") – own real estate upon

8   which the Debtors operate certain of their restaurants.[5] In particular, Imperial owns the real

9   property that StarRibs North leases and from which it operates the El Centro Restaurant.

10   DesertBreck owns the real property that StarRibs South leases and from which it operates the

11   Palmdale Restaurant. The rents generated by the Real Property Debtors from StarRibs North and

12   StarRibs South were not sufficient to service the debt owing to Vineyard Bank. N.A.

13   ("Vineyard"), the secured creditor for each of the Real Property Debtors. Based on the

14   insufficient cash flow and lack of equity, the Real Property Debtors determined that they could not

15   develop a confirmable plan of reorganization. Accordingly, on or about April 16, 2009, the Real

16   Property Debtors entered into a stipulation with Vineyard for relief from stay. The Court entered

17   the order approving the stipulation on May 7, 2009. Based on the foregoing, the Real Property

18   Debtors filed a motion and order dismissing these cases, the order for which was entered on

19   July 28, 2009.

20       **C.**    **Financial Performance of the Debtors.** The following is a summary of the pre-

21   petition financial performance of each of the Debtors:

| DEBTOR | | 2007 | TEN MONTHS ENDED 10/31/08 |
|---|---|---|---|
| StarRibs North | Sales | $2,709,942 | $4,541,303 |
| | Net Profit (Loss) | 145,040 | (3,042) |
| StarRibs South | Sales | 10,342,281 | $6,632,500 |
| | Net Profit (Loss) | 666,945 | 416,157 |
| WhitTown | Sales | 4,104,333 | 6,054,191 |
| | Net Profit (Loss) | (902,693) | 243,312 |

[5] The remaining four jointly administered debtors own real estate upon which the Carino's Debtors own and operate certain of their restaurants.

-24-

1       On a consolidated basis, the Debtors generated approximately $17.2 million and $17.2

2   million in revenue and ($90,708) and $656,427 in net profit (loss), respectively, for the year

3   ending 2007 and ten months ended 2008, respectively.

4       **D.**   **Restaurant Facilities.** The Debtors operate their restaurants from facilities located

5   throughout California, the occupancy costs for which are based on a combination of ground

6   leases, building leases, and loans on buildings purchased by the Debtors.

7       Prior to the Petition Date, the Debtors were making payments to affiliate landlords for rent

8   in excess of market rates to facilitate the affiliate landlords' ability to service the debt owed by the

9   affiliates to their secured creditors, which debt secured the property owned by the affiliate and

10  used and leased by the Debtors. In order to fulfill the Debtors' fiduciary duties to creditors of the

11  Estate and stop the funding of the losses of its affiliates, from the outset of these bankruptcies, and

12  as promised to creditors and as articulated on the record to the Bankruptcy Court, the Debtors

13  have been paying what they believed were market lease rates – rather than the inflated lease rates

14  (which were based on affiliates' real property debt service) as provided for in the contract.

15      In some cases, based on the affiliate landlord's inability to service its debt, the affiliate's

16  secured creditor commenced proceedings to foreclose upon the underlying property used by the

17  Debtors. Recognizing the importance of these leases, knowing that these secured creditors were

18  taking control over the property used by the Debtors, and being concerned that a foreclosure

19  would wipe out the Debtors' leasehold interests (resulting in the loss of rights to operate

20  restaurants), which would prevent, if not substantially impair, the Debtors' ability to reorganize,

21  the Debtors have been actively negotiating with certain secured creditors of certain of the Debtors'

22  affiliates' market leases (with attornment provisions to ensure that the Debtor's interest in the

23  lease would not be extinguished in a foreclosure).

24      Based on the Debtors' efforts, the Debtors have successfully negotiated amended leases

25  with significant price reductions for their restaurants located in Vista, El Centro and Palmdale,

26  and are continuing to work with other landlords and, if necessary, their secured creditors. The

27  Debtors have already obtained authority from the Court to enter amended leases for the Vista

28  Restaurant, and are seeking authority to enter into amended leases for the El Centro Restaurant

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1    and Palmdale Restaurant.  Attached as Exhibit "1" is a Summary of Real Property Leases, which

2    summarizes the key terms of leases and proposed leases on which the Debtors base their Plan, as

3    well as the status of the Debtors' efforts to finalize and obtain Court approval of such leases.  In

4    addition, as set forth in Section 4.1.2 of the Plan, the Debtors have entered into an agreement

5    pursuant to which Gantes and any and all affiliates of the Debtors have agreed to waive their

6    administrative claims, including, without limitation, rent, late fees/penalties and property taxes

7    against the Estates.

8         **E.    Ownership and Management of the Debtors (Pre-Confirmation).**  As of the

9    Petition Date, Gantes and his family, through their family trusts, controlled and owned each of the

10   Debtors and all of their affiliates.  Attached hereto as Exhibit "2" are corporate organizational

11   charts that illustrate graphically the ownership relationship of the Debtors as of the Petition Date.

12        1.    Shared Services Management Company.  In order to leverage economies of

13   scale and otherwise maximize profits in the operation of the Debtors' restaurants, the Debtors

14   outsource general and administrative services for the operations of their restaurants through a

15   shared services management agreement.  Historically and through December 31, 2008, these

16   management services were provided by Breckenridge Group, Inc. ("BGI"), an entity owned and

17   controlled by Gantes.

18        As part of the Debtors' restructuring efforts, on January 1, 2009, the Debtors

19   replaced BGI with Synergy.  Synergy was founded in December 2008 as a hotel, restaurant,

20   development and real estate management organization.  Synergy is owned by Gladehill

21   Development Corp. ("Gladehill") and Colin Cooper ("Cooper"), a certified public accountant,

22   who has provided and continues to provide accounting and tax services to various affiliates of the

23   Debtors[6].  None of the Debtors or their affiliates has any ownership or profit-sharing interest in

24   Synergy, Gladehill or its respective principals.  Neither Cooper nor Gladehill has any ownership

25   or profit-sharing interest in any of the Debtors or any of their affiliated debtor and non-debtor

26   entities.  Synergy has, however, retained the same management as previously employed by BGI.

27   Specifically, John Gantes is the executive director, George Gantes is the marketing director, Tony

28

---

[6] The Reorganized Debtors do not intend to use Cooper for accounting or tax services post Effective Date.

-26-

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1   Meyer is the accounting director, Allan Gantes is the real estate and hotel director, Ed Rebella is

2   the human resources director, James Gantes is the technology director, Rick LeSage is the

3   operations director, and Les Keenan is the operations director.  The job descriptions and salaries

4   for Gantes and each of his family members included in Synergy's management are attached as

5   Exhibit "3."  While the focus of Synergy's operations at present is on the Debtors and their

6   affiliated entities, it eventually expects to provide similar services to other unaffiliated companies.

7         Through the Debtors' management agreements with Synergy, Synergy provides the

8   Debtors with general day-to-day management of the Famous Dave's restaurants, and general and

9   administrative services related to the operations of the Famous Dave's restaurants.  In particular,

10  Synergy manages the operations of the restaurants, including hiring, training and supervising

11  employees, marketing, accounting, information technology, and all other aspects of managing the

12  day-to-day operations of a restaurant.  The Debtors are in the process of modifying these

13  management agreements.  Attached as Exhibit "4" is the latest draft of a detailed description of

14  the services to be provided by Synergy.

15        2.    Appointment of Chief Restructuring Officer.  On or about February 2,

16  2009, the Debtors, the Committee and Gantes entered into a stipulation to appoint Brian Weiss,

17  Managing Director of BSW & Associates, as the Debtors' Chief Restructuring Officer ("CRO") to

18  oversee and manage the Debtors' restructuring effort and overall business operations.  Prior to

19  being employed by the Debtors, Mr. Weiss had no relationship or connection in any way with the

20  Debtors, their affiliates, Gantes, or creditors of the Debtors.  The Debtors and Committee believe

21  that this appointment was necessary to facilitate a successful reorganization for a variety of

22  reasons.  First, the Debtors believe that additional help was needed in these cases to resolve an

23  overwhelming number of issues arising from the corporate structure of the Debtors and their

24  affiliates.  Second, the Debtors understand that there is a fiduciary duty owing to each of the

25  Debtors' Estates, and wanted to ensure that proper focus was dedicated to these Debtors and that

26  creditors of these cases are not prejudiced as a result of any issues relating to or arising from

27  affiliates that were not part of the Debtors' bankruptcy cases.  Third, Gantes did not have

28  experience restructuring companies or otherwise operating in Chapter 11s or the administrative

-27-

duties associated therewith.  Based on the foregoing, in order to maximize value for the Estates'
creditors, the Debtors, Committee and Gantes determined that it was in the Debtors' best interests
to hire Mr. Weiss as the CRO, and allow Gantes to focus on managing the restaurants.

**F.    Pre-Petition Legal Proceedings.**  Prior to the Petition Dates, there were no legal
proceedings instituted against the Debtors.[7]

**V.**

**THE DEBTORS' CHAPTER 11 PROCEEDINGS**

**A.    Events Precipitating Chapter 11 Filings.**  The Debtors have suffered pre-petition
from cash flow problems primarily as a result of making advances to affiliate restaurants that were
sustaining losses from their operations and/or payments to affiliate landlords for rent in excess of
market rates to service the debt on the property held by an affiliate and the debt service of the
Debtors for the construction of buildings underlying certain restaurant locations.  The Debtors
realized substantial cash losses due to unanticipated development costs and delays in opening
restaurants.  Losses and cash flow difficulty were further attributed to the recessionary trend that
developed approximately 1-1/2 years ago, and have been exacerbated by the crash in the credit and
financial markets specifically and in the general economy.  Together, the foregoing factors placed
severe pressure on the Debtors' cash flow, and deprived the Debtors of the ability to timely pay
vendor obligations, resulting in defaults in the Debtors' obligations to vendors.  These defaults
precipitated complaints filed by secured creditors of the Real Estate Debtors to appoint receivers
for these and several other affiliated landlords.  In order to prevent the appointment of a receiver
and facilitate a reorganization of the Debtors' businesses, the Debtors filed petitions under
Chapter 11 of the Bankruptcy Code on the Petition Date.

**B.    Debtor-in-Possession Status.**  Since the Petition Date, the Debtors have continued
to operate as "debtors-in-possession" subject to the supervision of the Bankruptcy Court and in

---

[7] On or about March 5, 2009, J & K Drywall ("J&K") filed a post-petition complaint in Los Angeles Superior Court entitled J & K Drywall v. Breckenridge Restaurant Group, Inc. et al (Case No. 09C00956) seeking damages for breach of contract against WhitTown and certain other defendants.  It is well established that "actions taken in violation of the automatic stay are void ab initio."  In re Dunbar, 245 F.3d 1058, 1063 (9th Cir. 2001); *see also* Gruntz v. County of Los Angeles (In re Gruntz), 202 F.3d 1074, 1082 (9th Cir.2000) (en banc) ("judicial proceedings in violation of the stay are void ab initio").  Since J&K's complaint was filed on March 5, 2009, approximately four months after the Petition Dates, the complaint was filed in violation of the stay and is therefore void *ab initio*.  In addition, WhitTown has filed a Notice of Stay of Proceedings in that case.

-28-

1  accordance with the Bankruptcy Code.  The Debtors are authorized to operate their businesses in

2  the ordinary course of business.  However, all transactions outside of the ordinary course of

3  business must be approved by the Bankruptcy Court.

4       **C.**    **The Automatic Stay.**  Upon the filing of the Cases, an automatic stay was imposed

5  in each of the Cases pursuant to Section 362 of the Bankruptcy Code.  Subject to certain

6  statutorily defined exceptions, the stay enjoins the commencement or continuation of all collection

7  efforts by Creditors, the enforcement of Liens against property of the Debtors, and the

8  continuation of litigation against the Debtors. The automatic stay will remain in effect in each

9  Case until the earliest of the entry of an order of the Bankruptcy Court lifting or modifying the

10  stay, the Effective Date of the Plan, or the closing of the Cases.

11       **D.**    **Significant Events Which Have Occurred After the Petition Dates.**

12       1.    <u>First Day Motions</u>. On the Petition Date, the Debtors filed several motions

13  seeking what is commonly referred to as "first day orders."  The relief granted in the first day orders

14  is designed to enable a debtor to transition into Chapter 11 without any material disruption to its

15  business operations.  These orders generally grant relief that falls outside the ordinary course of

16  business, or otherwise requires a bankruptcy court order.  The first day orders for the motions listed

17  below were entered by the Bankruptcy Court on November 6, 2008 and November 10, 2008.

18         a.    Emergency Motions for Order Authorizing Joint Administration of

19  Chapter 11 Cases.

20         b.    Emergency Motion for Order Authorizing Use of Any Cash

21  Collateral of Secured Claimants.

22         c.    Emergency Motion for Order Authorizing Payment and Honoring of

23  Prepetition Payroll Obligations;

24         d.    Emergency Motion for Order: (1) Authorizing the Debtors to

25  Maintain Pre-Petition Merchant Services Accounts; and (2) Compelling Banks to Continue

26  Merchant Services.

27         e.    Emergency Motion for Order: (A) Prohibiting Utility Providers from

28  Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1    Performance, and (C) Establishing Procedures for Determining Adequate Assurances of Payment

2    under Section 366 of the Bankruptcy Code.

3            f.     Emergency Motion to Limit Notice of Certain Matters Requiring

4    Notice to Creditors Pursuant to Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure.

5            2.    <u>Motions for Relief from Stay</u>.

6            a.     AIG Commercial Equipment Finance, Inc. filed a motion for relief

7    from stay in the WhitTown Case to repossess and foreclose on certain personal property located at

8    the Famous Dave's restaurant in Vista, California. The motion was withdrawn because the parties

9    entered into a stipulation.

10            b.     American Contractors Indemnity filed a motion for relief from stay in

11    the StarRibs North Case to cancel all outstanding tax and utility bonds issued to these debtors. The

12    motion was withdrawn because the parties entered into a stipulation.

13            c.     General Motors Acceptance Corporation filed a motion for relief

14    from stay in the StarRibs South Case to repossess and foreclose on a car (2007 Chevrolet

15    Silverado). On April 28, 2009, the Court entered an order granting the motion.

16            3.    <u>Other Motions</u>.

17            a.     <u>Debtors' Motion for Use of Any Cash Collateral of Secured</u>

18    <u>Claimants</u>. Following the Bankruptcy Court's interim approval of the Debtors' use of cash

19    collateral, a final hearing regarding the Debtors' cash collateral use was scheduled by the

20    Bankruptcy Court for December 17, 2008. The hearing scheduled for December 17, 2008 was then

21    continued several times - January 14, 2009, February 25, 2009, March 4, 2009, and March 25,

22    2009 - pursuant to agreements among the Debtors, the secured creditors and the Committee in

23    order to allow the parties to attempt to reach a stipulation regarding the Debtors' continued use of

24    cash collateral. The Debtors, the secured creditors and the Committee ultimately entered into a

25    stipulation for the Debtors' use of any cash collateral of the Lenders, which currently expires

26    September 20, 2009. It is anticipated that the Debtors will continue to use cash collateral, by

27    stipulation with the secured creditors and the Committee, through the date of the Confirmation

28    Hearing.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1             b.     Motion to Extend Time to Assume or Reject Leases. The Debtors

2  filed a motion to extend the period within which the Debtors may assume or reject unexpired

3  leases. The motion was granted and the time within which the Debtors may assume or reject

4  unexpired leases was extended to and including June 5, 2009. The Debtors and the landlords

5  subsequently entered into a stipulation to extend the period within which the Debtors may assume

6  or reject unexpired leases to and including the date of plan confirmation.

7             c.     Motion for Appointment of CRO. The Debtors filed a motion

8  approving a stipulation to appoint Brian Weiss as the Debtors' CRO. The motion was granted and

9  Mr. Weiss was appointed as the Debtors' CRO.

10             d.     Motion to Enter into Management Agreement. The Debtors filed a

11  motion authorizing the Debtors to enter into a management agreement with Synergy. The motion

12  was granted and Synergy was authorized to provide shared management and general and

13  administrative services to and for the benefit of the Debtors.

14             e.     Motion to Set Bar Date. The Debtors filed a motion seeking setting a

15  deadline for filing proofs of claim. The motion was granted and, accordingly, the Bar Date is

16  May 5, 2009 for filing Proofs of Claim, except for Administrative Claims other than

17  Section 503(b)(9) Administrative Claims and Rejection Claims.

18             f.     Motion to Approve Stipulation for Amendment to Lease. The

19  Debtors filed a motion approving a stipulation between StarRibs North, WhitTown, 78 Village (the

20  landlord for the Debtors' Vista Restaurant), Lafayette Capital Group, Inc. and Gordon Dunfee, Esq.,

21  the state court receiver for 78 Village, amending a lease of the Vista Restaurant. Pursuant to the

22  terms of the stipulation, the lease was amended to reflect an agreed reduction in rent, StarRibs

23  North was granted a novation for any obligation that it may have had under the lease, and

24  WhitTown was granted an extension of time to assume or reject the amended lease.

25             g.     Applications to Employ Professionals. The Debtors and the

26  Committee filed several applications[8] to employ the following professionals:

27

28      [8] Trinity Capital, LLC, the Debtors' proposed financial advisors, terminated their employment with the Debtors and requested that the Debtors withdraw their application to employ Trinity Capital. LLC.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

| Winthrop Couchot | Debtors' General Insolvency Counsel |
| Braunco, Inc. | Debtors' Valuation Advisor |
| Law Offices of A. Lavar Taylor | Debtor's Special Tax Counsel |
| Blakeley & Blakeley, LLP | Committee's Counsel |
| Phoenix Group Advisory Services, LLC | Committee's Financial Advisors |

h.    Motion to Extend Exclusivity Periods. The Debtors filed a motion for Order for First Extension of Exclusive Periods to File a Plan and Solicit Thereof. The motion was granted and the Debtors' exclusive right to file a plan of reorganization was extended to July 31, 2009 and the Debtors' exclusive period to solicit acceptances to such a plan was extended to September 29, 2009.

E.    **Actual and Projected Recovery of Preferential or Fraudulent Transfers.** The Debtors have not completed the analysis of their books and records to determine whether any payments made prior to the Petition Date constitute preferential transfers avoidable pursuant to Section 547 of the Bankruptcy Code, or whether any transfers made by the Debtors are avoidable as fraudulent transfers under Sections 544(b) or 548 of the Bankruptcy Code. Based on the Debtors' preliminary review and analysis, the Debtors have prepared a Schedule of Potential Avoidance and Other Actions against third parties who have been preliminarily identified as recipients of potential preferential fraudulent transfers or other monies that the Debtors may be entitled to recover.

F.    **Projected Objections to Claims Filed Against the Estates.** The Debtors have not completed their review of the Claims in the Cases. The Debtors anticipate that they will file objections to a number of Claims. However, since the Debtors have not completed the process of reviewing Claims filed in the Cases, and management resources are being focused primarily upon the legal and financial reorganization of the Debtors, the Debtors anticipate that objections to Claims may not be filed until about or after the Confirmation Date.

/ / /

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

# VI.

## FINANCIAL INFORMATION REGARDING THE DEBTORS

A.    **Historical Financial Information.**  Attached hereto as Exhibit "5" are, collectively, copies of each of the Debtors' unaudited income statements for the fiscal years 2006-8.

B.    **Financial Information Provided During the Cases.**  The Debtors have filed their Schedules in the Cases.  The Schedules provide substantial financial information regarding the assets and liabilities of the Estates as of the Petition Date.  The Schedules are available for inspection, during normal business hours, at the Clerk's Office of the Bankruptcy Court, located at 411 West Fourth Street, Santa Ana, California 92701.

In addition to the Schedules, the Debtors have prepared throughout the Cases interim statements and operating reports in accordance with the requirements of the United States Trustee. Copies of the interim statements and operating reports are available for inspection, during normal business hours, at the United States Trustee, located at 411 West Fourth Street, Suite 9041, Santa Ana, California 92701.

Each of the Debtors has prepared an unaudited balance sheet (as of July 31, 2009) and an income statement for the period from the Petition Date through July 31, 2009.  These financial statements have been prepared in accordance with Generally Accepted Accounting Principles in the United States.  These statements have <u>not</u> been subject to independent audit.  True and complete copies of these financial statements are included in the financial statements attached hereto, collectively, as Exhibit "6" and are incorporated herein by this reference.

AS TO THE UNCERTIFIED AND UNAUDITED FINANCIAL INFORMATION CONTAINED IN, OR ATTACHED TO, THIS DISCLOSURE STATEMENT, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE FINANCIAL INFORMATION IS WITHOUT ANY INACCURACIES, ALTHOUGH THE DEBTORS BELIEVE THAT THEY HAVE MADE REASONABLE EFFORTS, UNDER THE CIRCUMSTANCES, TO PRESENT FAIRLY AND ACCURATELY SUCH FINANCIAL INFORMATION.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

C.    **Financial Performance During the Cases.**  During the Cases, the Debtors, as debtors-in-possession, have been responsible for the management of the Debtors' businesses and the administration and management of assets of the Estates.  The Debtors have paid all accruing post-petition expenses associated with the operation of the Debtors' businesses, with the exception of certain accrued fees and costs of Professionals, which fees and costs have not been timely paid throughout the Debtors' Cases, but which will be paid current on the Effective Date.  The Debtors have properly maintained and preserved assets of the Estates.  Attached as Exhibit "6" are the most recent (as of the date of filing of this Disclosure Statement) financial statements reflecting the Debtors' post-petition activity.

**VII.**

**DESCRIPTION OF THE PLAN OF REORGANIZATION**

The following is a brief summary of the Plan and is qualified in its entirety by the full text of the Plan.  The terms of the Plan will be controlling on the Creditors and Interest Holders in the event that the Plan is confirmed.  Therefore, all Creditors and Interest Holders are urged to read the Plan carefully in its entirety rather than relying on this summary.

A.    **Substantive Consolidation of the Debtors.**  The Plan constitutes a plan which effectuates a substantive consolidation of the Debtors.  The Debtors' respective Estates shall be merged.  Each Debtor shall assume liability under the Plan for the Allowed Claims against each other Debtor.

Pursuant to the substantive consolidation of the Debtors, (i) all assets and liabilities of the Debtors shall be consolidated for purposes of the Plan and deemed assets and liabilities of the consolidated Debtors, (ii) any Claim filed against any Debtor shall be treated as a Claim against the consolidated Debtors and any obligation of any Debtor shall be deemed to be an obligation of the consolidated Debtors and all duplicate claims or obligations shall be eliminated, and (iii) all obligations due or owing from any Debtor to any other Debtor shall be eliminated.

According, the treatment of the Claims set forth in Articles VIII, IX and X below shall be deemed to apply to each Debtor.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1     **B.**    **Basic Structure of the Plan.** The Plan proposes to pay the Claims of seven (7)

2 Classes of Creditors in accordance with the provisions of the Plan. The Plan provides for the

3 establishment of one (1) Class of Partnership Interest. All Classes of Claims are "impaired" under

4 the Plan, as that term is defined by Section 1124 of the Bankruptcy Code.

5     **C.**    **Classification and Treatment of Claims.** Section 1123 of the Bankruptcy Code

6 requires that the Debtors, with certain exceptions, classify separately in the Plan all Claims.

7 Pursuant to Section 1122 of the Bankruptcy Code, the Debtors may place all Claims that are

8 substantially the same in the same Class in the Plan. Section 1123(a)(4) of the Bankruptcy Code

9 requires that the Plan provide the same treatment for all Claims in the same Class, unless the

10 holder of a particular Claim agrees to a less favorable treatment of its Claim. The treatment of

11 each Class of Claims and Interests is set forth in Articles VIII, IX and X below.

12 **VIII.**

13 **UNCLASSIFIED CLAIMS**

14     As required by the Bankruptcy Code, the Plan places Claims and Interests into various

15 Classes according to their right to priority. However, in accordance with the provisions of

16 Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Section 503(b)(9)

17 Administrative Claims, and Priority Tax Claims are deemed "unclassified." These Claims are not

18 considered impaired, and they do not vote on the Plan, because they are automatically entitled to

19 specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not

20 placed these Claims in a Class. The treatment of these unclassified Claims is as provided below.

21     **A.**    **Administrative Claims.** Administrative Claims are Claims for the expenses of

22 administering a Debtor's Case that are allowed under Bankruptcy Code Section 507(a)(2), as well

23 as Claims for goods received by the Debtors in the ordinary course of business within 20 days of

24 the order for relief. The Bankruptcy Code requires that all administrative claims be paid on the

25 effective date of a Chapter 11 plan, unless a particular creditor agrees to a different treatment of its

26 claim. The treatment of Administrative Claims and Section 503(b)(9) Administrative Claims in

27 the Plan is as described below.

28

-35-

1       1.   <u>Payment Generally</u>. Except to the extent that the holder of an Allowed

2   Administrative Claim agrees to a different treatment of its Administrative Claim, and subject to

3   the bar dates for Section 503(b)(9) Administrative Claims and all other Administrative Claims,

4   each Allowed Administrative Claim shall be Paid in Full, in Cash, on the latest of (i) the Effective

5   Date, (ii) the tenth (10th) Business Day after the date upon which such Administrative Claim

6   becomes an Allowed Administrative Claim, or (iii) the date upon which such Allowed

7   Administrative Claim becomes due according to its terms.

8       2.   <u>Waiver of Claims</u>. The Gantes Parties have agreed to waive and thus are

9   hereby barred from asserting any and all Claims, including, but not limited to, Administrative

10  Claims, that any of the Gantes Parties, individually or collectively, have or may have against the

11  Estates.

12      3.   <u>Administrative Claims Bar Date</u>. Any holder of an Administrative Claim

13  that does not file and properly serve such a request for payment by the General Administrative

14  Claims Bar Date and the Bar Date for Section 503(b)(9) Claims, as the case may be, shall be

15  forever barred from asserting such Administrative Claim against the Debtors, the Reorganized

16  Debtors, their Estates, or any of their property, or the Committee.  Notwithstanding anything to the

17  contrary contained in the foregoing, (i) any Governmental Unit may assert an Administrative Tax

18  Claim or other post-petition Tax Claim pursuant to the statutory requirements applicable thereto

19  without regard to the General Administrative Claims Bar Date; and (ii) holders of accrued post-

20  petition *ad valorem* Tax Claims against property owned by the Reorganized Debtors shall retain

21  any Liens that they may have pursuant to applicable law on account of such Tax Claims, and

22  holders of such Tax Claims shall be paid the amount of their Tax Claims in the ordinary course of

23  the Reorganized Debtors' businesses without the requirement that a Proof of Claim or request for

24  payment of such Tax Claim be filed with the Bankruptcy Court.

25      4.   <u>Projected Administrative Claims</u>. The following chart is an estimate of all

26  of the Debtors' projected and unpaid Administrative Claims and Section 503(b)(9) Administrative

27  Claims.

28

-36-

| Name | Amount Owed |
|---|---|
| Clerk's Office Fees | $0 (est.) |
| Office of the U. S. Trustee Fees | $6,500 (est.) |
| Winthrop Couchot P.C. (Debtors' General Insolvency Counsel) | $95,000 (est.) |
| Braunco, Inc., (Debtors' Valuation Advisor) | $0 (est.) |
| Law Offices of A. Lavar Taylor (Debtors' Special Tax Counsel) | $5,000 (est.) |
| Blakeley & Blakeley LLP (Committee's Counsel) | $30,000 (est.) |
| Phoenix Group Advisory Services, LLC (Committee's Financial Advisors) | $10,000 (est.) |
| Section 503(b)(9) Claims | $0.00 (est.) |
| **TOTAL** | $146,500 (est.)[9] |

**B.**     **Priority Tax Claims.**  Unless the holder of an Allowed Priority Tax Claim agrees

to a different treatment thereof, each holder of an Allowed Priority Tax Claim shall receive under

the Plan deferred cash payments, of a value, as of the Effective Date, equal to its Allowed Claim.

Such deferred cash payments, including principal and interest, shall be paid on a quarterly basis,

and shall be in an amount sufficient to fully amortize each Allowed Priority Tax Claim over a

period not to exceed five (5) years from the Effective Date.  The outstanding and unpaid amount of

each Allowed Priority Tax Claim shall bear interest accruing at the rate specified by Section 6621

(a) of the Internal Revenue Code on the Effective Date, commencing on the Effective Date and

continuing until such Allowed Priority Tax Claim is paid in full.  Payment of any Allowed Priority

Tax Claim shall commence on the later of (a) the fifteenth (15th) day of the first full month

following the Effective Date, or (b) the tenth (10th) Business Day after the entry of a Final Order

allowing the Priority Tax Claim.  Such payments shall continue quarterly on the fifteenth day of

each full month every three (3) months thereafter until Paid in Full, in accordance with the

provisions of Section 4.2 of the Plan.  Creditors holding Allowed Priority Tax Claims may be

prepaid at any time without any penalty or other charges.

---

[9] The Professionals (Winthrop Couchot Professional Corporation, Braunco, Inc., Law Offices of A. Lavar Taylor, Blakeley & Blakeley and Phoenix Group Advisory Services, LLC) have obtained payment of a substantial amount of their post-petition fees and costs on a monthly basis during the Cases.  The Debtors' estimate of fees owed to the Professionals as of the Effective Date assumes that the Debtors will continue to make monthly payments to Professionals through the Effective Date, and accounts for any pre-petition retainers paid by the Debtors.

C.    **Amount of Priority Tax Claims.**  The following chart is an estimate of all of the Debtors' Priority Tax Claims.

| Creditor | Claim |
|---|---|
| Internal Revenue Service | $1,085,579 |
| Employment Development Department | 170,422 |
| State Board of Equalization | 896,311 |
| Total | $2,152,312 |

## IX.

## CLASSIFICATION OF CLAIMS AND INTERESTS

A.    **General Overview.**  As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights.  The table in Paragraph IX(B) below lists each Class of Claims and Interests established under the Plan and states whether each Class is impaired or is unimpaired by the Plan.  A Class is "unimpaired" if the Plan leaves unaltered the legal, equitable and contractual rights to which the holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code. Article VI of the Plan sets forth the treatment that each Class will receive under the Plan.

B.    **Designation of Classes.**  The Plan provides for the establishment of the following Classes of Claims and Interests.

| Class | Creditors | Impaired or Unimpaired |
|---|---|---|
| Class 1.1 Claims | Allowed Secured Claim of Silvergate Bank | Impaired |
| Class 1.2 Claims | Allowed Secured Claim of Irwin Franchise Capital Corp. | Impaired |
| Class 1.3 Claims | Allowed Secured Claim of Wells Fargo Bank | Impaired |
| Class 1.4 Claims | Allowed Secured Claim of GMAC | Impaired |
| Class 1.5 Claims | Allowed Secured Claim of AIG | Impaired |
| Class 1.6 Claims | Allowed Secured Claim of Sovereign Bank -- StarRibs South | Impaired |
| Class 1.7 Claims | Allowed Secured Claim of Sovereign Bank -- WhitTown Building | Impaired |
| Class 1.8 Claims | Allowed Secured Claim of Sovereign Bank -- WhitTown Accounts | Impaired |
| Class 2 Claims | Allowed Secured Capital Lease Claims | Impaired |
| Class 3 Claims | Allowed Priority Unsecured Wage Claims | Impaired |
| Class 4 Claims | Allowed General Unsecured Claims | Impaired |
| Class 5 Claim | Allowed Secured Claims of Governmental Units | Impaired |
| Class 6 Claims | Allowed Non-Pecuniary Loss Penalty Claims | Impaired |
| Class 7 Interests | Partnership Interests in StarRibs North, StarRibs South and WhitTown | Impaired |

-38-

# X.

## PROVISIONS FOR THE TREATMENT OF CLAIMS AND INTERESTS

    **A.**    **Classes 1.1 Through 1.8.** All Claims and rights of the members of Classes 1.1 through 1.8, as of the Effective Date, shall be governed by the terms of the Plan only, and all prior agreements shall be null and void. The treatment provided herein shall be a full satisfaction of each Class 1 Creditor's Allowed Secured Claim.

    1.    <u>Allowance of Secured Claims</u>. Each Creditor in Classes 1.1 through 1.8 shall be allowed a Secured Claim to the extent of the value of such Creditor's Claim and interest in the Estate's interest in such property, which shall be based on Fair Market Value of the property (or such other value as agreed to by the Debtors and the respective secured creditor) securing such Creditor's Claim in Classes 1.1 through 1.8 as set forth in Schedule 6.1 attached to the Plan.    If any Creditor objects to the Debtors' asserted value of the property securing such Creditor's Claim, then, the Debtors may elect, at their sole discretion, to:  (i) fix the amount of such objecting Creditor's Allowed Secured Claim at the Objection Value, and (ii) in lieu of making payments as proposed in Section 6.1.2 of the Plan, and in full satisfaction of such Creditor's Allowed Secured Claim, require that such Creditor repossess the property securing such Claim. In the event of such an objection and the Debtors' election of the Repossession Option, then the Allowed Deficiency Claim for such objecting Creditor shall be equal to the difference between such Creditor's Claim and the Objection Value.

    2.    <u>Payment of Allowed Secured Claim</u>. Each holder of an Allowed Secured Claim in Classes 1.1 through 1.8 shall be treated, at the election of the Debtors after consultation with the Committee and the Creditor Board Members, as the case may be, as follows:

    a.    <u>Option 1</u>. Each holder of an Allowed Secured Claim in Classes 1.1 through 1.8 will receive on account of such Allowed Secured Claim deferred cash payments totaling the allowed amount of such Allowed Secured Claim, equal to the value, as of the Effective Date, of such Creditor's interest in the Estate's interest in such property. In particular, Creditors of Classes 1.1 through 1.8 shall each be paid in equal monthly installments, with interest, which shall accrue at the Allowable Interest Rate, commencing on the First Payment Date, fully amortized

-39-

1    over the periods set forth in Schedule 6.1 based on the Allowed Secured Claim. The total Claim,

2    Allowed Secured Claim (i.e., Fair Market Value of the property securing the Claim), Allowed

3    Deficiency Claim, and monthly payments to be made to each particular Creditor is set forth on

4    Schedule 6.1 to the Plan. Any Allowed Secured Claim in Classes 1.1 through 1.8 may be prepaid

5    at any time without penalty or other charge. Notwithstanding the foregoing, in the event any

6    collateralized equipment or building is sold by the Reorganized Debtors, the proceeds generated

7    from the disposition of such sale, net of all expenses, shall be paid to the holder of the Allowed

8    Secured Claim whose collateral was sold, up to the amount of the Allowed Secured Claim,

9    reflecting all payments made to such Creditor under the terms of the Plan.

10    　　　　　　The Creditors' Allowed Secured Claims of Class 1 shall continue to be

11    secured by the Creditors' existing Lien on each of its collateral. Upon full satisfaction of the

12    Creditors' Allowed Secured Claim in Class 1, the Creditors' Lien on its collateral shall be released

13    and the applicable Debtor shall retain title to such collateral free and clear of the Creditors' Lien.

14    Any Allowed Deficiency Claim of the Creditor shall be treated as an Allowed General Unsecured

15    Claim in the amount set forth in Schedule 6.1 attached to the Plan.

16    　　　　　　b.　　Option 2. The Creditor's collateral shall be returned to the Creditor

17    on the Effective Date in full satisfaction of such Creditor's Allowed Secured Claim. Any Allowed

18    Deficiency Claim of the Creditor as set forth on Schedule 6.1 attached to the Plan shall be treated

19    as a Class 4 Allowed General Unsecured Claim.

20    　　　　　　c.　　Option 3. Notwithstanding any contractual provision or applicable

21    law that entitles the holder of the Allowed Secured Claim to demand or to receive accelerated

22    payment of such Claim after the occurrence of a default: (i) any such default shall be cured, other

23    than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) the maturity of

24    such Claim shall be reinstated as such maturity existed before such default; (iii) the holder of such

25    Allowed Secured Claim shall be compensated for any damages incurred by such Creditor as a

26    result of any reasonable reliance by such Creditor on such contractual provision or such applicable

27    law; and (iv) the legal, equitable or contractual rights to which such Allowed Secured Claim

28    entitles the holder of such Claim shall not otherwise be altered.

1    The foregoing treatment shall be in full satisfaction of each Class 1

2    Creditor's Allowed Secured Claim.

3    3.    Insurance. If either Option 1 or 3 is elected by the Debtors for a particular

4    Creditor in this Class, then the Debtors shall maintain insurance coverage for the property securing

5    the Claim for such Creditor.

6    4.    Late Fees and Event of Default. If either Option 1 or 3 is elected by the

7    Debtors for a particular Creditor in this Class, then the Debtors shall be liable for a late fee equal

8    to five percent (5%) of the past due amount for failure to make payments to this Creditor within

9    ten business days after the date due under the Plan, which is not imposed as a charge for the use of

10    money, but to offset administrative expenses and other costs incurred. Failure to make a payment

11    due to this Creditor under the Plan within fifteen business days after the date due under the Plan

12    shall constitute a Class 1 Event of Default as against such Creditor. The Debtors shall have a

13    period of thirty (30) days after receipt of written notice of an asserted Class 1 Event of Default

14    relating to an alleged failure by the Debtors to pay a payment required under the Plan within which

15    to cure such Class 1 Event of Default. In the event that the Debtors should fail to cure timely any

16    such Class 1 Event of Default, the applicable Class 1 creditor shall be entitled to proceed to

17    exercise its remedies against the Debtors and against such creditor's respective collateral, in

18    accordance with the provisions of the Bankruptcy Code, the Plan and applicable law.

19    5.    Inspection of Equipment. If either Option 1 or 3 is elected by the Debtors

20    for a particular Creditor in this Class, then in the event of an Unsecured Class 1 Default, the

21    applicable Creditor shall be entitled to inspect the collateral securing its Claim upon reasonable

22    notice made in writing not less than five Business Days in advance.

23    **B.    Class 2.1 -- Allowed Secured Capital Lease Claims.** The Debtors believe that no

24    Allowed Secured Capital Lease Claim will be asserted against them. In the event that the Debtors

25    should determine that Allowed Secured Capital Lease Claims will be asserted, each such Claim

26    shall be classified as a separate subclass under Section 6.2 of the Plan. Any holder of an Allowed

27    Secured Capital Lease Claim shall be treated as follows at the election of the Debtors after

28    consultation with the Committee or the Creditor Board Members, as the case may be:

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1           1.      Option 1. Each holder in Class 2.1 shall be paid in full through eighty-

2    four (84) equal monthly installments of principal equal to the Creditor's Allowed Secured Capital

3    Lease Claim plus interest accruing at the Allowable Interest Rate commencing on the First

4    Payment Date. Any Allowed Secured Capital Lease Claim may be prepaid at any time without

5    penalty or other charge. The Creditor's Allowed Secured Capital Lease Claim shall continue to be

6    secured by the Creditor's existing Lien on its collateral. Upon full satisfaction of the Creditor's

7    Allowed Secured Capital Lease Claim, the Creditor's Lien on its collateral shall be released and

8    the applicable Debtor shall retain title to such collateral free and clear of the Creditor's Lien. Any

9    Allowed Deficiency Claim of the Creditor shall be treated as a Class 4 Allowed General

10    Unsecured Claim.

11           2.      Option 2. The Creditor's collateral shall be returned to the Creditor on the

12    Effective Date in full satisfaction of such Creditor's Allowed Secured Capital Lease Claim. Any

13    Allowed Deficiency Claim of the Creditor shall be treated as a Class 4 Allowed General

14    Unsecured Claim.

15           3.      Option 3. Notwithstanding any contractual provision or applicable law that

16    entitles the holder of the Allowed Secured Capital Lease Claim to demand or to receive

17    accelerated payment of such Claim after the occurrence of a default: (i) any such default shall be

18    cured, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) the

19    maturity of such Claim shall be reinstated as such maturity existed before such default; (iii) the

20    holder of such Allowed Secured Capital Lease Claim shall be compensated for any damages

21    incurred by such Creditor as a result of any reasonable reliance by such Creditor on such

22    contractual provision or such applicable law; and (iv) the legal, equitable or contractual rights to

23    which such Allowed Secured Capital Lease Claim entitles the holder of such Claim shall not

24    otherwise be altered.

25           The foregoing treatment shall be in full satisfaction of each Class 2 Creditor's

26    Allowed Secured Claim.

27    **C.      Class 3 -- Allowed Priority Unsecured Wage Claims**. Each holder of an Allowed

28    Priority Unsecured Wage Claim shall be paid the full amount of its Allowed Priority Unsecured

-42-

1   Wage Claim in cash on the latest of the following dates:  (i) the Effective Date, (ii) the tenth

2   (10th) Business Day after the date upon which such Priority Unsecured Claim becomes an

3   Allowed Priority Unsecured Wage Claim, or (iii) the date upon which such Allowed Priority

4   Unsecured Wage Claim becomes due according to its terms.

5           **D.      Class 4 -- Allowed General Unsecured Claims**.  Class 4 consists of all Allowed

6   General Unsecured Claims.  Each General Unsecured Creditor shall receive, in exchange for its

7   Claim against the Estate, an Interest in and Claim against Holdco.  The treatment of Allowed

8   General Unsecured Claims is more particularly described as follows:

9           1.      Equity Interest in Holdco.  General Unsecured Creditors shall receive a 95%

10  Interest in Holdco, which shall include 100% voting rights over the Reorganized Debtors.  General

11  Unsecured Creditors shall retain 100% voting rights over the Reorganized Debtors until Paid in

12  Full.  The actual membership Interest provided to each General Unsecured Creditor will be based

13  on each General Unsecured Creditor's Pro Rata share of the aggregate of Allowed General

14  Unsecured Claims.  For an additional description of the equity interest to be owned by the General

15  Unsecured Creditors and the rights associated therewith, see Section 7.2. of the Plan.

16          2.      Payment of Claims.  Holdco shall assume all Allowed General Unsecured

17  Claims, which shall be paid, with simple interest accruing at one percentage point (1%) over the

18  Allowable Interest Rate per annum, commencing on the Effective Date, and continuing until Paid

19  in Full, based on the parameters described herein.  The Reorganized Debtors shall pay to each

20  General Unsecured Creditor, based on its Pro Rata share of all Allowed General Unsecured

21  Claims, a semiannual payment in an amount equal to the lesser of:  (i) Excess Cash, or

22  (ii) Unsecured Creditors Semiannual Payment Cap, unless Priority Tax Claims have been Paid in

23  Full, in which case the semiannual payment to General Unsecured Creditors may equal the Excess

24  Cash.  Payments to General Unsecured Creditors shall commence on the later of: (a) the fifteenth

25  (15th) business day of the first full month following the Effective Date, or (b) the tenth (10th)

26  Business Day after entry of a Final Order allowing all General Unsecured Creditors' Claims, and

27  shall continue on a semiannual basis thereafter, until the Allowed General Unsecured Claims are

28  Paid in Full, with interest.  In addition to the foregoing, General Unsecured Creditors shall also

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

receive any Net Proceeds to which they are entitled pursuant to Section 7.9 of the Plan. Allowed General Unsecured Claims may be prepaid at any time without penalty or other charge.

3. **Holdco Board**. The General Unsecured Creditors, through the Creditor Board Members, shall actively manage the Holdco Board and thus the Reorganized Debtors. For a detailed discussion of the composition, roles, responsibilities, and other matters relating to the Holdco Board, see Section 7.3 of the Plan.

4. **Waiver of Gantes Parties' Claims**. Except as other provided herein, the Gantes Parties have agreed to waive all Claims against the Estates. Accordingly, the Gantes Parties shall be barred from asserting any General Unsecured Claim against the Estates.

5. **Waiver**. Except as expressly provided herein with respect to consent required by the Holdco Board, any conditions set forth herein may be waived by the Holdco Board in its sole discretion.

**E.    Class 5 -- Any Allowed Secured Claim of Governmental Units**. The Debtors believe that no Allowed Secured Claims of any Governmental Unit will be asserted, or at a minimum, be allowed against the Estates. Nevertheless, if any such Claims are allowed, such Claims shall be treated and paid in the same manner as Allowed Priority Tax Claims as provided for in Section 4.2 of the Plan.

**F.    Class 6 -- Any Allowed Non-Pecuniary Loss Penalty Claims.** Each such Allowed Non-Pecuniary Loss Penalty Claim shall be classified as a separate subclass under Section 6.6 of the Plan. Each Class 6 Creditor shall receive an amount equal to 10% of the Allowed Non-Pecuniary Loss Penalty Claim, which shall not accrue interest, and shall be paid in one lump sum on the Repayment Date.

The Debtors reserve the right to object to any Non-Pecuniary Loss Penalty Claim asserted by a Governmental Unit. Nothing contained herein shall be deemed to be any admission by the Debtors of the amount of the Claim asserted by a Governmental Unit.

**G.    Class 7 -- Interests in StarRibs North, StarRibs South and WhitTown**. Class 7 is comprised of the Interests of the holders of all of the partnership interests in StarRibs North, StarRibs South and WhitTown. The legal, equitable and contractual rights of the holders of all

-44-

partnership interests in StarRibs North, StarRibs South and WhitTown are hereby extinguished.
Accordingly, these Interests are impaired by the Plan.

**XI.**

**MEANS OF IMPLEMENTING THE PLAN**

**A.**     **Introduction**. This article is intended to explain the means by which the Debtors intend to effectuate the reorganization provided for under the Plan, and how the Debtors intend to fund the obligations to Creditors undertaken in the Plan. This article provides information regarding prospective corporate governance of the Debtors, funding sources for Plan obligations, and other material issues bearing upon the performance of the Plan.

**B.**     **The Reorganized Debtors**. Subject to the provisions of Article III of the Plan, each Restaurant shall, upon the Effective Date, be transferred to and owned by a separate Subco, which shall be wholly-owned and managed by Holdco. A schematic illustrating the organization structure of Holdco and its subsidiary Subcos is attached as Schedule 7.2 to the Plan.

      1.    General Unsecured Creditors' Interest in Holdco. General Unsecured Creditors shall own and hold all of the Interests in Holdco other than the securities owned by Gantes as described below, as well as 100% of all shareholder voting rights in Holdco until General Unsecured Creditors are Paid in Full. The Creditor Board Members shall control the shareholder voting rights of the Holdco equity owned by the General Unsecured Creditors, and the shareholder voting rights of the Holdco equity owned by Gantes until the Repayment Date. Once the General Unsecured Creditors have been Paid in Full, any Interests in Holdco owned by the General Unsecured Creditors shall be immediately transferred to Gantes.

      2.    Gantes's Interest in Holdco. Gantes shall initially receive a 5% Interest in Holdco, and shall be entitled to earn the remaining 95% Interests in Holdco as General Unsecured Creditors are indefeasibly repaid in cash above certain thresholds (see Schedule 7.2 attached to the Plan, which outlines Gantes's right to earn additional Interests in Holdco) during the Gantes Involvement Period. Gantes shall assign his shareholder voting rights in Holdco to the Creditor Board Members until the Repayment Date. Gantes shall not be entitled to accrue or receive any dividends, distributions or other payment, compensation or consideration until the Repayment

-45-

1   Date. Once the General Unsecured Creditors have been Paid in Full, all securities for and

2   shareholder rights in Holdco owned by the General Unsecured Creditors shall be immediately

3   transferred to Gantes.

4         **C.**    **Management/Board of Directors**. During the Creditor Involvement Period,

5   Holdco shall be controlled by the Holdco Board consisting of five members, three of which shall

6   be Creditor Board Members, unless the Creditor Board Members determine a lesser number

7   should serve on the Holdco Board, and two of which shall include Gantes and Brian Weiss, unless

8   either choose to be replaced, which replacement must be approved by the Creditor Board

9   Members. The initial Creditor Board Members will consist of Al Chavez (the Committee's

10   financial advisor) and two additional members to be determined jointly by the Committee and the

11   Debtors. It is anticipated that Daniel W. Harrow and Lewis Jaffe will serve as the other Creditor

12   Board Members. Résumés for these Creditor Board Members are attached collectively as

13   Exhibit "9."

14         1.    Gantes. During the Creditor Involvement Period, Gantes will not receive

15   any direct compensation from the Debtors for his services as a member of the Holdco Board.

16   Gantes will not serve as an officer of Holdco. However, Gantes will receive an annual salary of

17   $260,000 from Synergy for his services as the executive director of Synergy.

18         Gantes earned a bachelor's degree in economics from Stanford University in 1976, and a

19   post-graduate degree in Finance and Real Estate from the UCLA Graduate School of Management

20   Executive MBA Program in 1982. In 1983, Gantes, through affiliated companies he owned and/or

21   controlled, began acquiring franchise rights from and operating more than 100 franchises of large

22   franchisors, including Burger King Corporation, Ruby's Diner, Bruegger's Bagel Bakery, On the

23   Border Mexican Grill, Carino's Italian Grill, Arby's, Coco's, Applebees, Houlihans, El Pollo

24   Loco, Famous Dave's, and more. The Gantes affiliated companies are consistently recognized as

25   one of the top franchisees of by various franchisors, and have received over the years numerous

26   awards from the franchisors.

27         2.    Brian Weiss. As stated in Section V.D.3.C above, on or about February 2,

28   2009, Brian Weiss was hired as the Debtors' CRO in order to facilitate the Debtors' efforts to

-46-

1  reorganize and to provide assurances to creditors that reorganization decisions are being made by

2  someone whose sole focus is on ensuring that the Debtors fulfill their fiduciary duties to creditors.

3  During the Creditor Involvement Period, Mr. Weiss will continue to serve as the Debtors' CRO for

4  which he will receive an annual salary of $115,000, subject to annual review by the Holdco Board.

5  Mr. Weiss's sophisticated experience and qualifications clearly justify his salary.   The following

6  is a brief description of Mr. Weiss's experience.

7           Mr. Weiss has extensive experience advising public and private companies on

8  complex transactions, corporate restructurings, operations, acquisitions and divestitures.  Mr.

9  Weiss has specifically played a critical role in the workouts and at least two successful Chapter 11

10  plan confirmations.  Mr. Weiss has also advised numerous companies through operational and

11  financial restructurings.

12           Mr. Weiss served in senior financial executive capacities for over ten years,

13  including Vice President of Finance, North America for an international toy company with

14  revenues in excess of $1 billion.  Mr. Weiss successfully led the financial turnaround of the North

15  America business unit, prior to its merger with its largest competitor.  Previously, Mr. Weiss

16  served as Financial Controller for Jazz Semiconductor, a spin-off of Conexant Systems'

17  semiconductor manufacturing operations through a joint venture with The Carlyle Group.  Mr.

18  Weiss was responsible for preparing the company for an initial public offering, leading the

19  acquisition due diligence process, structuring joint ventures/strategic investments, oversight of all

20  finance, accounting and reporting functions as well as the company-wide implementation of the

21  Sarbanes-Oxley Act.  Mr. Weiss holds an MBA from the University Southern California and is a

22  licensed Certified Public Accountant and was formerly employed by PriceWaterhouseCoopers

23  LLP.

24           Mr. Weiss was first introduced to Gantes by Winthrop Couchot ("Firm") in

25  approximately February 2009 to assist the Debtors in their organization.  The Firm first became

26  acquainted with Mr. Weiss through the Firm's representation of Flashcom, Inc., where Mr. Weiss

27  was employed in-house and played a critical role in the administration of the bankruptcy and

28  ultimately confirmation of a plan.  Thereafter, the Firm worked with Mr. Weiss on another

-47-

1  Chapter 11 bankruptcy, which too resulted in a successful confirmation of a plan. Since then, the

2  Firm has worked with Mr. Weiss on several other workouts and related projects, which has

3  produced successful results.

4      3.    Al Chavez. Mr. Chavez is a partner of the Phoenix Group, LLC

5  ("Phoenix"), which provides financial advisory and consulting services to clients in a broad array

6  of industries, particularly those in financial distress. Phoenix (and exclusively, Mr. Chavez) has

7  been serving as the Committee's financial advisor in this case. As a result, Mr. Chavez has gained

8  substantial knowledge about the Debtors' business. Mr. Chavez has vast experience in managing

9  and serving as a chief executive for middle market companies with revenues of $10-100 million,

10  particularly those in distress. Mr. Chavez, a Certified Public Accountant, began his career with

11  Arthur Young and Company in 1974, working primarily in the audit and management services

12  practices. Mr. Chavez represented companies in the public and private sectors with revenues

13  ranging from $5 million to over $1 billion. Mr. Chavez was involved in several mergers and

14  acquisitions and initial public offering engagements.

15      4.    Compensation for Independent Holdco Board Members. Only Independent

16  Holdco Board members shall receive customary fees and expense reimbursement for Holdco

17  Board participation. Initially, these fees shall be $3,000 per quarter, per Independent Holdco

18  Board Member, and subject to annual review by the Holdco Board. Gantes shall not receive any

19  compensation or expense reimbursement for his Board participation. The Independent Holdco

20  Board Members and officers will be indemnified by Holdco and will be covered by customary

21  directors' and officers' insurance as determined by the Holdco Board, including the affirmative

22  approval of at least a majority of the Creditor Board Members.

23      5.    Management of Operations. During the Creditor Involvement Period,

24  Holdco shall have officers independent and distinct from (a) Managementco, (b) the pre-petition

25  and current owners or principals of the Debtors (including Gantes) and (c) the affiliates and related

26  parties of any of the forgoing. Holdco through its officers and subject to Holdco Board oversight

27  and, as necessary, Holdco Board approval, will (i) oversee the restaurant operations performed by

28  Managementco; (ii) oversee all legal and financial functions, the operational performance and

-48-

1  adherence to the Franchise Agreement, measure Synergy's performance and monitor its financial

2  condition; (iii) provide administrative functions not provided by Synergy (including tax and

3  corporate filings); and (iv) manage any acquisitions and divestitures, contract approval and all

4  business proposals whether or not submitted by or on behalf of, or related directly or indirectly to,

5  Synergy and/or Gantes or any affiliate or related party of either of the foregoing subject to Holdco

6  Board oversight and, as necessary, Holdco Board approval.

7        ***Major Decisions.*** During the Creditor Involvement Period, Major Decisions

8  regarding Holdco, any Subco or any Restaurant require Holdco Board approval, including the

9  affirmative approval of at least a majority of the Creditor Board Members. Other items

10  customarily subject to oversight of a board which occur at a Subco or with respect to a Restaurant

11  would need the approval of Holdco.

12        ***Material Changes.*** During the Creditor Involvement Period, any material changes

13  to operations and/or internal controls for Holdco or any Subco, including (a) financial policies and

14  controls surrounding approval of commitments (e.g., purchase orders, non-franchisor advertising)

15  and distribution of funds and (b) operational policies and controls that fall outside of the terms of

16  the franchise agreement relating to restaurant key metrics (financial, operational and sales), will be

17  approved or established by Holdco and the Subcos with the approval of the Holdco Board,

18  including the affirmative approval of a majority of the Creditor Board Members.

19        ***Managementco.*** Each Subco will enter into an amended Management Agreement

20  with Managementco upon the Effective Date, which shall include a right for each party to

21  terminate the Management Agreement after ninety days' written notice. Managementco shall

22  oversee the day-to-day restaurant operations, including paying independent vendors, suppliers and

23  employees. The Management Agreement will include performance criteria, monitoring processes

24  (including receiving regular information), compensation (including fees and expense

25  reimbursement) and penalty provisions for non-performance and/or underperformance. The

26  officers of Holdco and each Subco shall directly oversee Managementco, including performance at

27  the restaurant, Subcos and Managementco levels. Synergy will be the initial Managementco.

28

1   During Creditor Involvement Period, any payment or other compensation or

2   consideration to Managementco, any of the current owners or principals of the Debtors (including

3   Gantes) or any affiliate or related party of any of the foregoing, whether such payment,

4   compensation or consideration is as a dividend, distribution, fee, expense reimbursement or

5   otherwise, would need the approval of the Holdco Board, including the affirmative approval of a

6   majority of the Creditor Board Members.

7   ***Employment Agreements.*** Holdco shall enter into an employment agreement with

8   Brian Weiss for a period of not less than one year, with a right to terminate such agreement for

9   cause. Holdco and/or each Subco may enter into other employment agreements with officers and

10  other members of management of Holdco and Subco, as the Holdco Board determines to be

11  necessary or otherwise in the best interests of the Reorganized Debtors.

12  6.   Synergy. As stated above in Section IV(D)(1), on January 1, 2009, as part

13  of the Debtors' restructuring efforts, the Debtors replaced their management company, BGI, an

14  affiliate of the Debtors, with Synergy, in which no affiliate of the Debtors have an interest.

15  Synergy was formed in December 2008 and is owned by Colin Cooper, a certified public

16  accountant that has provided accounting services to the Debtors and their affiliates.[10] Colin

17  Cooper has no ownership interest in any of the Debtors or their affiliated debtor and non-debtor

18  entities. Synergy has retained the same management as BGI, so that they are familiar with the

19  operations of the Debtors. Specifically, John Gantes is the executive director, George Gantes is

20  the marketing director, Tony Meyer is the accounting director, Allan Gantes is the real estate and

21  hotel director, Ed Rebella is the human resources director, Jim Gantes is the technology director,

22  Rick LeSage is the operations director, and Les Keenan is the operations director. During the

23  Post-Confirmation Committee Term, Holdco will pay Synergy a monthly management fee of

24  $8,500 pursuant to the terms of the management services agreement.

25  7.   Subco's Management Fee to Holdco. During the Post-Confirmation

26  Committee Term, each Subco will pay Holdco a management fee equal to $4,000 for the services

27  provided by Holdco. Such amount will be paid in two equal installments on the first and fifteenth

28

---

[10] The Reorganized Debtors do not intend to use Cooper for accounting or tax services post Effective Date.

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC

1    of each month.  A copy of the Holdco budget is included in Exhibit "7." Such management fee is

2    designed to pay all of the costs and expenses of Holdco, and shall be adjusted from time to time as

3    the Holdco Board deems reasonable, with the affirmative approval of at least a majority of the

4    Creditor Board Members.  Holdco may hire such advisors (including accountants and lawyers),

5    representatives and consultants, and pay the reasonable costs and expenses of such advisors,

6    representatives and consultants, as the Holdco Board deems reasonable and necessary (with the

7    affirmative approval of at least a majority of the Creditor Board Members) to operate the business

8    and perform the needed or desired functions of Holdco.

9         **D.**    **Corporate Actions**.  On the Effective Date, all actions contemplated by the Plan

10    shall be deemed authorized and approved in all respects (subject to the provisions of the Plan) by

11    virtue of the entry of the Confirmation Order, in accordance with the Bankruptcy Code and

12    applicable state law and without any requirement of further action by the stockholders, officers or

13    directors of the Debtors or the Reorganized Debtors.  All matters provided for under the Plan

14    involving the corporate structure of the Debtors or Reorganized Debtors and any corporate action

15    required by the Debtors or by the Reorganized Debtors in connection with the Plan shall be

16    deemed to have occurred and shall be in effect pursuant to the Bankruptcy Code, without any

17    requirement of further action by the shareholders, officers or directors of the Debtors or

18    Reorganized Debtors.  On the Effective Date, the officers of the Reorganized Debtors are

19    authorized and directed to implement the provisions by the Plan and any other agreements,

20    documents and instruments contemplated by the Plan in the name of and on behalf of the

21    Reorganized Debtors.

22         **E.**    **Transfer of Estate Property to Reorganized Debtors**.  Except as otherwise

23    specifically provided in the Plan, on the Effective Date, all property and rights of the Estates of

24    each of the Debtors shall be transferred to each of the Reorganized Debtors as illustrated in

25    Schedule 7.6 attached to the Plan, free and clear of all Claims, Liens, and rights of Creditors and

26    Interests of Interest Holders.  Subject to the provisions of Section 7.6 to the Plan, such property

27    and rights to be transferred to, the Reorganized Debtors include, without limitation, all alter ego

28    and derivative claims existing as of the Effective Date, and all other Avoidance Action claims.  As

MAINDOCS-#133511-v7-StarRibsAmdDisclosureStatement.DOC