1  MARC J. WINTHROP -- State Bar No. 63218
   mwinthrop@winthropcouchot.com
2  GARRICK A. HOLLANDER -- State Bar No. 166316
   ghollander@winthropcouchot.com
3  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
4  660 Newport Center Drive, Suite 400
   Newport Beach, CA 92660
5  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
6
7  General Insolvency Counsel for
   Debtors and Debtors-in-Possession

8

9

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12              **SANTA ANA DIVISION**

13
   In re                                    Case No. 8:08-17182 TA
14
   ☐ STARRIBS NORTH, LP                     Jointly Administered with Case Nos.
15 ☐ STARRIBS SOUTH, LP                     8:08-bk-17183 TA; 8:08-bk-17187 TA;
   ☐ WHITTOWN PARTNERS, LP                  8:08-bk-17193 TA; 8:08-bk-17194 TA;
16 ☐ OCEANCOUNTRY, LP                       8:09-bk-13275 TA and 8:09-bk-13590 TA
17 ☒ BLUEOCEAN PARTNERS, LP
   ☐ STONERIVER PARTNERS, LP                Chapter 11 Proceedings
18 ☒ SOWESTBRECK, LLC
                                            **DEBTORS' DISCLOSURE STATEMENT TO**
19 ☐ All Debtors                            **ACCOMPANY DEBTORS' CHAPTER 11 PLAN**
                                            **OF REORGANIZATION**
20
        Debtors and
21      Debtors-in-Possession.             **Disclosure Statement Hearing**

22          .                               Date:
23                                          Time:
                                            Place:    Courtroom 5B
24

25

26

27

28

# **TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ............................................................................................ 2

II.   DEFINITIONS AND RULES OF INTERPRETATION ............................... 7
     A.    Definitions ......................................................................................... 7
     B.    Rules of Construction ....................................................................... 20
     C.    Exhibits ............................................................................................. 21

III.   CONFIRMATION AND VOTING .............................................................. 21

IV.   BACKGROUND OF THE DEBTORS ........................................................ 23
     A.    The Debtors ....................................................................................... 23
     B.    Jointly Administered Debtors ........................................................... 23
     C.    Financial Performance of the Debtors .............................................. 24
     D.    Restaurant Facilities ......................................................................... 24
     E.    Ownership and Management of the Debtors (Pre-Confirmation) .... 25
         1.    Shared Services Management Company ............................... 26
         2.    Appointment of Chief Restructuring Officer ....................... 27
     F.    Pre-Petition Legal Proceedings ........................................................ 27

V.   THE DEBTORS' CHAPTER 11 PROCEEDINGS ....................................... 28
     A.    Events Precipitating Chapter 11 Filings ........................................... 28
     B.    Debtor-in-Possession Status ............................................................. 28
     C.    The Automatic Stay .......................................................................... 28
     D.    Significant Events Which Have Occurred After the
        Petition Dates .................................................................................... 29
         1.    First Day Motions ................................................................ 29
         2.    Other Motions ...................................................................... 30
             a.    Debtors' Motion for Use of any Cash
                Collateral of Secured Claimants ................................. 30
             b.    Motion to Extend Time to Assume or
                Reject Leases .............................................................. 30
             c.    Motion to Set Bar Date ............................................... 30
             d.    Motion for Appointment of CRO ............................... 31
             e.    Motion to Enter into Management Agreement ............ 31
             f.    Motion for Authority to Enter into Lease ................... 31
             g.    Applications to Employ Professionals ........................ 31
     E.    Actual and Projected Recovery of Preferential or Fraudulent
        Transfers ............................................................................................ 32
     F.    Projected Objections to Claims Filed Against the Estates ................ 32

**TABLE OF CONTENTS**

**(Continued)**

| | | PAGE |
|---|---|---|
| VI. | FINANCIAL INFORMATION REGARDING THE DEBTORS | 32 |
| | A. Historical Financial Information | 32 |
| | B. Financial Information Provided During the Cases | 33 |
| | C. Financial Performance During the Cases | 33 |
| VII. | DESCRIPTION OF THE PLAN OF REORGANIZATION | 34 |
| | A. Substantive Consolidation of the Debtors | 34 |
| | B. Basic Structure of the Plan | 34 |
| | C. Classification and Treatment of Claims | 34 |
| VIII. | UNCLASSIFIED CLAIMS | 35 |
| | A. Administrative Claims | 35 |
| | 1. Payment Generally | 35 |
| | 2. Waiver of Claims | 36 |
| | 3. Administrative Claims Bar Date | 36 |
| | 4. Projected Administrative Claims | 36 |
| | B. Priority Tax Claims | 37 |
| | C. Amount of Priority Tax Claims | 37 |
| IX. | CLASSIFICATION OF CLAIMS AND INTERESTS | 38 |
| | A. General Overview | 38 |
| | B. Designation of Classes | 38 |
| X. | PROVISIONS FOR THE TREATMENT OF CLAIMS AND INTERESTS | 38 |
| | A. Classes 1.1 Through 1.9 | 38 |
| | 1. Allowance of Secured Claims | 39 |
| | 2. Payment of Allowed Secured Claim | 39 |
| | a. Option 1 | 39 |
| | b. Option 2 | 40 |
| | c. Option 3 | 40 |
| | 3. Insurance | 41 |
| | 4. Late Fees and Event of Default | 41 |
| | 5. Inspection of Equipment | 41 |
| | B. Class 2.1 Through 2.4 | 41 |
| | 1. Allowance of Secured Claims | 41 |
| | 2. Payment of Allowed Secured Claims | 42 |
| | a. Option 1 | 42 |
| | b. Option 2 | 42 |
| | c. Option 3 | 42 |

## TABLE OF CONTENTS

### (Continued)

| | | PAGE |
|---|---|---|
| C. | Class 3 -- Allowed Secured Capital Lease Claims | 43 |
| | 1. Option 1 | 43 |
| | 2. Option 2 | 43 |
| | 3. Option 3 | 43 |
| D. | Class 4 - Allowed Priority Unsecured Wage Claims | 44 |
| E. | Class 5 - Allowed General Unsecured Claims | 44 |
| | 1. Equity Interest in Holdco | 44 |
| | 2. Payment of Claims | 45 |
| | 3. Holdco Board | 45 |
| | 4. Waiver of Gantes Parties' Claims | 45 |
| | 5. Waiver | 45 |
| F. | Class 6 -- Any Allowed Secured Claim of Governmental Units | 45 |
| G. | Class 7 -- Any Allowed Non-Pecuniary Loss Penalty Claims | 46 |
| H. | Class 8 -- Interests in BlueOcean and SoWestBreck | 46 |
| XI. | MEANS OF IMPLEMENTING THE PLAN | 46 |
| A. | Introduction | 46 |
| B. | The Reorganized Debtors | 46 |
| | 1. General Unsecured Creditors' Interest in Holdco | 46 |
| | 2. Gantes's Interest in Holdco | 47 |
| C. | Management/Board of Directors | 47 |
| | 1. Gantes | 47 |
| | 2. Brian Weiss | 48 |
| | 3. Al Chavez | 49 |
| | 4. Compensation for Independent Holdco Board Members | 50 |
| | 5. Management of Operations | 50 |
| | 6. Synergy | 51 |
| | 7. Subco's Management Fee to Holdco | 52 |
| D. | Corporate Actions | 52 |
| E. | Transfer of Estate Property to Reorganized Debtors | 53 |
| F. | Funding of the Plan | 53 |
| G. | Post-Confirmation Estate Claims | 54 |
| H. | Avoidance Actions | 54 |
| I. | Disposition of Assets | 55 |
| J. | Compromise of Controversies | 55 |
| K. | Bankruptcy Court Approval Relative to Post-Confirmation Matters | 55 |
| L. | Debtors' Right of Setoff | 55 |
| M. | Cash Payments | 56 |
| N. | Reorganized Debtors' Certification | 56 |

-iii-

## TABLE OF CONTENTS

**(Continued)**

|  |  |  | PAGE |
|---|---|---|---|
| XII. | DISTRIBUTIONS | | 56 |
| | A. | Distribution Agent | 56 |
| | B. | Distributions | 56 |
| | | 1. Dates of Distributions | 56 |
| | | 2. Limitation on Liability | 57 |
| | C. | Instruments and Securities | 57 |
| | | 1. Rights of Persons Holding Instruments and Securities | 57 |
| | | 2. Cancellation of Liens | 57 |
| | D. | De Minimis Distributions | 57 |
| | E. | Delivery of Distributions | 58 |
| | F. | Undeliverable Distributions | 58 |
| | G. | Disposition of Unclaimed Property | 58 |
| XIII. | OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS | | 59 |
| | A. | Objections to Claims | 59 |
| | B. | Schedule of Disputed Claims | 59 |
| | C. | Treatment of Disputed Claims | 60 |
| | | 1. No Distribution Pending Allowance | 60 |
| | | 2. Distribution After Allowance | 60 |
| | | 3. Reserves for Disputed Claims | 61 |
| XIV. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 61 |
| | A. | Executory Contracts Being Assumed | 61 |
| | B. | Payment of Cure Claims | 62 |
| | C. | Executory Contracts Being Rejected | 62 |
| | D. | Retention of Property Rights by Reorganized Debtors | 63 |
| | E. | Bar Date for Rejection Damages | 63 |
| | F. | Claims Schedule | 63 |
| XV. | TAX CONSEQUENCES OF PLAN | | 64 |
| | A. | Introduction | 64 |
| | B. | Federal Income Tax Consequences to the Debtors | 65 |
| | C. | Tax Consequences to Creditors | 66 |
| XVI. | CONFIRMATION REQUIREMENTS AND PROCEDURES | | 66 |
| | A. | Introduction | 66 |
| | B. | Who May Object to Confirmation of the Plan | 67 |

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

**TABLE OF CONTENTS**

**(Continued)**

|  |  | PAGE |
|---|---|---|
| C. | Who May Vote to Accept/Reject the Plan | 67 |
| | 1. What Is an Allowed Claim/Interest | 67 |
| | 2. What Is an Impaired Class of Claim(s)/Interest(s) | 67 |
| D. | Who Is Not Entitled to Vote | 68 |
| E. | Who Can Vote in More than One Class | 68 |
| F. | Votes Necessary to Confirm the Plan | 68 |
| G. | Votes Necessary for a Class to Accept the Plan | 68 |
| H. | Treatment of Non-Accepting Classes | 69 |
| I. | Request for Confirmation Despite Non-Acceptance by Impaired Class(es) | 69 |
| J. | Liquidation Analysis | 69 |
| | 1. Class 1 Claims | 72 |
| | 2. Class 2 Claims | 73 |
| | 3. Class 3 Claims | 73 |
| | 4. Class 4 Claims | 73 |
| | 5. Class 5 Claims | 74 |
| | 6. Class 6 Claims | 74 |
| | 7. Class 7 Claims | 74 |
| K. | Feasibility | 74 |
| | 1. Projections of Future Cash Flow | 74 |
| | a. Effective Date of the Plan | 75 |
| | b. Revenues Generated by the Reorganized Debtors' Business | 75 |
| | c. Expenses of the Reorganized Debtors | 75 |
| | 2. Funding of Distributions Required by the Plan | 76 |
| | a. Funding of Distributions Required on or About the Effective Date | 76 |
| | b. Funding of Ongoing Distributions to Holders of Allowed Claims Required by the Plan | 77 |
| XVII. | EFFECT OF CONFIRMATION PLAN | 77 |
| A. | Discharge | 77 |
| B. | Injunction | 78 |
| XVIII. | LIMITATION OF LIABILITY AND RELEASES | 79 |
| A. | No Liability for Solicitation or Participation | 79 |
| B. | Limitation of Liability | 79 |
| XIX. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS | 79 |
| A. | Conditions Precedent to Plan Confirmation | 79 |
| B. | Condition Precedent to Plan Effectiveness | 80 |
| C. | Waiver of Conditions | 80 |

<u>**TABLE OF CONTENTS**</u>

**(Continued)**

**PAGE**

XX.     RETENTION OF JURISDICTION ............................................................... 80

XXI.    MODIFICATION OF THE PLAN; CRAMDOWN ........................................ 82
        A.    Modification of the Plan ........................................................... 82
        B.    Nonconsensual Confirmation ................................................... 83

XXII.   MISCELLANEOUS ................................................................................. 83
        A.    Payment of Statutory Fees ....................................................... 83
        B.    Payment Dates ......................................................................... 83
        C.    Other Documents and Actions .................................................. 83
        D.    Notices .................................................................................... 83
        E.    Governing Law ........................................................................ 85
        F.    Binding Effect .......................................................................... 85
        G.    Successors and Assigns ........................................................... 85
        H.    No Waiver ............................................................................... 85
        I.    Inconsistencies ........................................................................ 85
        J.    Exemption from Certain Transfer axes and Recording Fees ......... 85
        K.    Exemption from Securities Laws .............................................. 86
        L.    Post-Confirmation Status Report ............................................. 86
        M.    Post-Confirmation Conversion/Dismissal ................................. 86
        N.    Changes in Rates Subject to Regulatory Commission
              Approval ................................................................................. 86
        O.    Final Decree ............................................................................ 86

XXIII.  CONCLUSION ...................................................................................... 86

# I.

## **INTRODUCTION**

BlueOcean and SoWestBreck filed voluntary petitions under Chapter 11 of the Bankruptcy Code on November 6, 2008 and April 23, 2009, respectively.[1] Since each respective Petition Date, the Debtors have continued to operate their businesses in the ordinary course as debtors-in-possession. On November 6, 2008 and April 23, 2009, the Bankruptcy Court entered orders authorizing the joint administration of the cases of BlueOcean and SoWestBreck, respectively, along with the above-captioned cases.

The document that you are reading is the Debtors' Disclosure Statement. This Disclosure Statement is furnished for the purpose of soliciting acceptances to the Debtors' Plan which has been filed with the Bankruptcy Court. A copy of the Plan accompanies this Disclosure Statement.

Section 1125[2] of the Bankruptcy Code requires that, at the time when the Plan is delivered to Creditors, the Plan be accompanied by this Disclosure Statement. The purpose of this Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtors and the condition of the Debtors' books and records, to enable a typical Creditor to make an informed judgment about the Plan and to enable such Creditor to determine whether it is in its best interest to vote for (accept) or against (reject) the Plan.

This Disclosure Statement contains a description of the Plan and other information relevant to the decision whether to vote to accept or to reject the Plan. The Debtors urge you to read this Disclosure Statement because it contains important information concerning the Debtors' history, businesses, assets and liabilities, projected financial performance, and sets forth a summary of the Plan.

---

[1] Unless otherwise defined in this Disclosure Statement, the definitions of the capitalized terms contained in this Disclosure Statement are set forth in Article II herein.

[2] Section 1125(b) provides, in pertinent part, as follows:
> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

1       This Disclosure Statement does not purport to be a complete description of the Plan, the

2   financial data pertaining to the Debtors' business operations, the applicable provisions of the

3   Bankruptcy Code, or any other matters which may be deemed significant by Creditors.  Out of

4   practical necessity, this Disclosure Statement represents an attempt to summarize extensive

5   overall data, legal documents and legal principles, including provisions of the Bankruptcy Code,

6   and set them forth in understandable, readable form.  Thus, although the Debtors have attempted

7   to describe fairly and accurately the matters set forth and discussed in this Disclosure Statement,

8   the Debtors emphasize that the documents and instruments referred to or summarized in this

9   Disclosure Statement (including, without limitation, historical financial information for the

10  Debtors' business operations) are available for inspection at the office of the Debtors' attorneys,

11  Winthrop Couchot Professional Corporation ("Winthrop Couchot"), located at 660 Newport

12  Center Drive, Suite 400, Newport Beach, CA 92660 (Attn: Garrick A. Hollander, Esq.), during

13  normal business hours, and upon reasonable written request made prior to the Confirmation

14  Hearing.

15      If any interested party does not understand fully this Disclosure Statement, or feels that the

16  information provided herein is insufficient to enable it to determine whether to accept or to reject

17  the Plan, that party is invited to make written inquiry of the Debtors' attorneys, Winthrop

18  Couchot, at the address set forth hereinabove.

19      To vote to accept or reject the Plan, a Creditor must indicate its acceptance or rejection

20  thereof on the ballot which accompanies this Disclosure Statement and return it to Winthrop

21  Couchot Professional Corporation in the envelope provided, such that the ballot is actually

22  received by Winthrop Couchot by 4:00 p.m. Pacific Daylight Time on [_____].  Each Class

23  of Creditors allowed to vote on the Plan will be deemed to have accepted the Plan if the Plan is

24  accepted by valid ballots cast by Creditors in that Class holding at least two-thirds (2/3) in dollar

25  amount and more than one half (1/2) in number of the Allowed Claims of Creditors in that Class

26  actually voting on the Plan.  **ONLY PROPERLY EXECUTED BALLOTS TIMELY**

27  **RECEIVED BY COUNSEL FOR THE DEBTORS WILL BE COUNTED AS HAVING**

28  **VOTED ON THE PLAN.**

1    Since mail delays may occur, and because time is of the essence, it is important that ballots

2    be mailed well in advance of the date specified hereinabove as the deadline for Winthrop Couchot

3    to receive ballots.  Any ballots received after that date will not be included in any calculation to

4    determine whether the Debtors' Creditors have accepted or rejected the Plan.

5    At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to

6    Section 1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary

7    Classes of Claims created under the Plan, and, if not, whether the Bankruptcy Court should,

8    nevertheless, confirm the Plan.  If at such hearing the Bankruptcy Court should determine that the

9    Plan meets all of the requirements for confirmation prescribed by the Bankruptcy Code, the

10    Bankruptcy Court will enter a Confirmation Order.  Pursuant to Section 1141 of the Bankruptcy

11    Code, the effect of the Confirmation Order will be to make the provisions of the Plan binding

12    upon the Debtors and each of their Creditors, regardless of whether the Creditor voted to accept

13    the Plan.

14    Pursuant to the Section 1128 of the Bankruptcy Code, any party-in-interest may object to

15    the confirmation of the Plan.  The Bankruptcy Court has fixed [_____] as the deadline for

16    filing an objection to the Plan and for serving a copy thereof upon the Debtors' attorneys,

17    Winthrop Couchot, at the address set forth hereinabove (Attn: Garrick A. Hollander, Esq.); upon

18    the Committee's attorneys, Blakeley & Blakeley, located at 4685 MacArthur Court, Suite 421,

19    Newport Beach, California 92660 (Attn: Ronald Clifford, Esq.); and upon the United States

20    Trustee, located at 411 West Fourth Street, Suite 9041, Santa Ana, California  92701 (Attn:

21    Nancy S. Goldenberg, Esq.).

22    **THIS IS A SOLICITATION BY THE DEBTORS.  THE REPRESENTATIONS**

23    **HEREIN ARE THOSE OF THE DEBTORS AND NOT OF THEIR ATTORNEYS OR**

24    **THEIR OTHER PROFESSIONALS.  NO REPRESENTATIONS CONCERNING THE**

25    **DEBTORS, INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO**

26    **THEIR FUTURE BUSINESS OPERATIONS, CASH FLOW PROJECTIONS, THE**

27    **VALUE OF THEIR PROPERTY, THE AMOUNT OF CLAIMS AGAINST THE**

28    **ESTATES, OR ANY TAX EFFECT OF THE TRANSACTIONS PROPOSED UNDER**

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1  THE PLAN, ARE AUTHORIZED BY THE DEBTORS, OTHER THAN AS SET FORTH

2  IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR

3  INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN THAT ARE IN

4  ADDITION TO OR DIFFERENT FROM THE STATEMENTS CONTAINED IN THIS

5  DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PARTY-IN-

6  INTEREST.  ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS

7  SHOULD BE REPORTED TO THE DEBTORS' ATTORNEYS WHO, IN TURN, WILL

8  DELIVER THE INFORMATION TO THE BANKRUPTCY COURT FOR SUCH

9  ACTION AS THE BANKRUPTCY COURT MAY DEEM TO BE APPROPRIATE.

10      THE DISCUSSION IN THIS DISCLOSURE STATEMENT REGARDING THE

11  DEBTORS MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE

12  MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.

13  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A

14  RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF

15  FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT,"

16  "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF OR

17  OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE

18  READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE

19  NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND

20  UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO

21  DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD

22  LOOKING STATEMENTS.  THE LIQUIDATION ANALYSES, DISTRIBUTION

23  PROJECTIONS, PROJECTIONS OF FINANCIAL PERFORMANCE AND OTHER

24  INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING,

25  AMOUNT AND VALUE OF ACTUAL DISTRIBUTIONS TO CREDITORS MAY BE

26  AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE,

27  ANY ANALYSES, ESTIMATES, OR PROJECTIONS MAY OR MAY NOT PROVE TO

28  BE ACCURATE.

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1  UNLESS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY, THE

2  INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE

3  STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT.  RECORDS KEPT BY THE

4  DEBTORS RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED

5  INTERNALLY BY THE DEBTORS.  THE DEBTORS BELIEVE THAT EVERY

6  REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL INFORMATION

7  AS ACCURATE AS IS REASONABLY PRACTICABLE GIVEN THE NATURE AND

8  HISTORY OF THE DEBTORS' BUSINESSES AND THE CONDITION OF THE

9  DEBTORS' BOOKS AND RECORDS.  HOWEVER, THE RECORDS KEPT BY THE

10  DEBTORS ARE NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF

11  INACCURACY.  NEITHER DEBTORS' CHIEF RESTRUCTURING OFFICER,

12  DEBTORS' MANAGEMENT COMPANY, DEBTORS' GENERAL INSOLVENCY

13  COUNSEL, NOR DEBTORS' SPECIAL TAX COUNSEL VERIFIED INDEPENDENTLY

14  THE INFORMATION CONTAINED HEREIN, OR MAKE ANY REPRESENTATIONS OR

15  WARRANTIES WITH RESPECT TO THE ACCURACY THEREOF.

16  THE DEBTORS AND THEIR PROFESSIONALS HAVE MADE A DILIGENT

17  EFFORT TO IDENTIFY IN THIS DISCLOSURE STATEMENT ALL LITIGATION

18  CLAIMS, INCLUDING CLAIMS FOR RELIEF, COUNTERCLAIMS, AND OBJECTIONS

19  TO CLAIMS.  HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT

20  A PARTICULAR LITIGATION CLAIM IS OR IS NOT IDENTIFIED IN THIS

21  DISCLOSURE STATEMENT.  THE DEBTORS OR OTHER PARTIES-IN-INTEREST

22  MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE POST-CONFIRMATION

23  ESTATE CLAIMS WHETHER OR NOT SUCH CLAIMS ARE IDENTIFIED IN THIS

24  DISCLOSURE STATEMENT.

25  ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO

26  CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR

27  TO VOTING ON THE PLAN.  THE CONTENTS OF THIS DISCLOSURE STATEMENT

28  SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS OR

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1  TAX ADVICE.  EACH CREDITOR AND OTHER PARTY-IN-INTEREST SHOULD

2  CONSULT WITH ITS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT

3  OR ACCOUNTANT PRIOR TO VOTING ON THE PLAN IN ORDER TO ENSURE A

4  COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN.  THIS

5  DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE

6  CREDITORS OF THE DEBTORS TO ENABLE THEM TO MAKE AN INFORMED

7  DECISION REGARDING THE PLAN.

8      THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE

9  STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT

10 CONTAINS ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION

11 OF ACCEPTANCES TO THE PLAN BY THE DEBTORS, ASSUMING THE

12 ACCURACY OF THE CONTENTS OF THIS DISCLOSURE STATEMENT.  THE

13 BANKRUPTCY COURT HAS NOT YET DETERMINED SUCH ACCURACY, BUT MAY

14 DO SO AT THE HEARING REGARDING THE CONFIRMATION OF THE PLAN.

## II.

## DEFINITIONS AND RULES OF INTERPRETATION

**A.**     **Definitions**.  The following defined terms are used in this Disclosure Statement.
Any capitalized term that is not defined herein, but that is defined in the Bankruptcy Code or in the
Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or
Bankruptcy Rules.

1.     "Administrative Claim" means a Claim for costs and expenses of the
administration of a Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including,
without limitation, a Claim of a Professional employed at the expense of an Estate and any fees or
charges asserted against an Estate under 28 U.S.C. § 1930.

2.     "Administrative Tax Claim" means a request by a Governmental Unit for
payment of Administrative Claims for Taxes (and for interest or penalties related to such
Taxes) for any tax year or period, all or any portion of which occurs within the period from and
including the Petition Date through and including the Effective Date.

MAINDOCS-#136659-v11-StrzRibs_DisclosureStatement_(Carinos).DOC

1    3.  "Allowable Interest Rate" means the interest rate that is fixed at one

2 percentage point (1%) over the prime rate of interest as published in the Wall Street Journal on the

3 Effective Date.

4    4.  "Allowed Administrative Claim" means an Administrative Claim allowed

5 pursuant to Sections 503(b) or 507(a)(1) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

6    5.  "Allowed Claim" means a Claim that is either (i) listed in the Schedules

7 filed with the Bankruptcy Court by the Debtors and not listed as disputed, contingent, unliquidated

8 or unknown as to amount and as to which no timely objection has been filed; or (ii) with respect to

9 which a Proof of Claim has been filed within the time period fixed by the Bankruptcy Court, and

10 as to which no objection was filed within the time period fixed by the Bankruptcy Code, the

11 Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or as to which any such objection

12 has been determined by a Final Order. The amount of an Allowed Claim shall be as follows:  (a) if

13 the Creditor did not file a Proof of Claim with the Bankruptcy Court on or before the Bar Date, the

14 amount of the Creditor's Claim as listed in the Schedules as neither disputed, contingent,

15 unliquidated or unknown; or (b) if the Creditor filed a Proof of Claim with the Bankruptcy Court

16 on or before the Bar Date, (1) the amount stated in such Proof of Claim if no objection to such

17 Proof of Claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy

18 Rules, the Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final

19 Order of the Bankruptcy Court if an objection to such Proof of Claim was filed within the time

20 period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy

21 Court.  Any Claim that is not filed by the applicable Bar Date and that is listed as disputed,

22 unliquidated, contingent or unknown, or that is not allowed under the terms of the Plan, shall be

23 zero, and no Distribution shall be made on account of such Claim.

24    6.  "Allowed Cure Claims" means an Allowed Claim for Cure Claims pursuant

25 to the terms of the Plan and a Final Order.

26    7.  "Allowed Deficiency Claim" means that portion of an Allowed Claim

27 which is in excess of the value of any collateral which is security for the repayment of the Claim,

28 calculated in accordance with the provisions of Section 506 of the Bankruptcy Code.  Unless the

1    Creditor should make an election under Section 1111(b) of the Bankruptcy Code, an Allowed

2    Deficiency Claim is treated hereunder as a Class 5 Allowed General Unsecured Claim.

3        8.    "Allowed General Unsecured Claim" means an unsecured Allowed Claim

4    against the Debtors, however arising, not entitled to priority under Section 507(a) of the

5    Bankruptcy Code, including, without limitation, a Rejection Claim.

6        9.    "Allowed Interest" means an Interest to the extent, and only to the extent, of

7    the allowed amount of such Interest.  The amount of an Allowed Interest shall be (i) the amount

8    provided by or established in the records of the Debtors on the Confirmation Date, provided,

9    however, that a timely filed Proof of Interest shall supersede any listing of such Interest on the

10   records of the Debtors; (ii) the amount stated in a timely filed Proof of Interest if no objection to

11   such Interest is filed prior to the Confirmation Date or such later date as the Bankruptcy Court

12   allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

13       10.   "Allowed Non-Pecuniary Loss Penalty Claim" means an Allowed Claim for

14   non-pecuniary loss penalties of the type described in Section 726(a)(4).

15       11.   "Allowed Priority Tax Claim" means an Allowed Claim provided for by

16   Section 507(a)(8) of the Bankruptcy Code.

17       12.   "Allowed Priority Unsecured Wage Claim" means an unsecured Allowed

18   Claim entitled to priority under Sections 507(a)(3) or (4) of the Bankruptcy Code.

19       13.   "Allowed Section 503(b)(9) Administrative Claims" means an Allowed

20   Claim entitled to administrative priority pursuant to Section 503(b)(9) of the Bankruptcy Code.

21       14.   "Allowed Secured Claim" means an Allowed Claim secured by a valid and

22   unavoidable Lien against property in which an Estate has an interest, or which is subject to setoff

23   under Section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance

24   with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Claim in

25   the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the

26   case may be.

27       15.   "Allowed Secured Capital Lease Claim" means the Allowed Secured Claim

28   of a Creditor under a capital lease.

1       16.    "Avoidance Action" means any action or proceeding filed pursuant to the

2   provisions of Sections 510, 542, 543, 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code, or

3   any similar action or proceeding filed to recover property for or on behalf of an Estate or to avoid a

4   Lien or transfer.

5       17.    "Bankruptcy Code" means Title 11, United States Code, as amended.  All

6   citations in the Plan to Section numbers are to the Bankruptcy Code, unless otherwise expressly

7   stated herein.

8       18.    "Bankruptcy Court" means the United States Bankruptcy Court for the

9   Central District of California, Santa Ana Division, which has jurisdiction over the Cases and the

10  Estates of the Debtors, or such successor court or tribunal as may hereafter be confirmed or created

11  by lawful authority with power to confirm reorganization plans under Chapter 11 of the

12  Bankruptcy Code and all applicable statutes, rules and regulations pertaining thereto.

13      19.    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy

14  Procedure, as amended, and the Local Bankruptcy Rules for use in the United States Bankruptcy

15  Court for the Central District of California, as amended.

16      20.    "Bar Date" means the last date for creditors and equity security holders

17  whose claims or interests are not scheduled, or are scheduled as disputed, contingent, or

18  unliquidated in the Debtors' Schedules to file Proofs of Claim, except for the following Claims:

19  (i) Administrative Claims other than Section 503(b)(9) Administrative Claims, and (ii) Rejection

20  Claims.  The Bar Date for BlueOcean is May 5, 2009 and for SoWestBreck is _____.

21      21.    "BlueOcean" means BlueOcean Partners, LP, one of the jointly

22  administered debtors in the above-captioned cases.

23      22.    "Budget" means an annual operating budget of the Reorganized Debtors

24  which shall  be approved by the Holdco Board.

25      23.    "Business Day" means any day, other than a Saturday, a Sunday or a "legal

26  holiday," as defined in Rule 9006(a) of the Bankruptcy Rules.

27      24.    "Capital Lease" means a transaction in the form of a lease that creates a

28  security interest pursuant to Section 1203 of the California Commercial Code.

25.    "Carino's" means the Carino's Italian Grill restaurants owned and operated by BlueOcean and SoWestBreck under the Fired Up, Inc. franchise agreement.

26.    "Cases" means the Chapter 11 cases commenced by the Debtors on their respective Petition Dates and pending before the Bankruptcy Court, as Case Nos. 8:08-bk-17194 TA and 8:09-bk-13590 TA.

27.    "Cash" means cash and cash equivalents including, but not limited to, checks or similar forms of payment or exchange.

28.    "Claim" means (i) a right to payment from the Debtors, whether or not such right to payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtors whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

29.    "Claims Objection Deadline" means, the latest of the following: (i) the one hundredth (100th) day after the Effective Date; (ii) with respect to a specific Claim, the one hundredth (100th) day after a Proof of Claim with respect to such Claim is filed by a Creditor, or (iii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between a Debtor or Reorganized Debtor and the Creditor.

30.    "Class" means the group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

31.    "Class 1 Event of Default" means a material breach of the Debtors' obligations to any Creditor of Class 1.1 through 1.9 under the Plan as against such Creditor.

32.    "Committee" means the duly appointed and acting Official Committee of Creditors Holding Unsecured Claims in the Cases, and its successor under the Plan, the Holdco Board.

33.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

1    34.    "Confirmation Hearing" means the hearing(s) scheduled by the Bankruptcy

2  Court for the purpose of considering the confirmation of the Plan.

3    35.    "Confirmation Order" means the order, as entered, of the Bankruptcy Court

4  confirming the Plan.

5    36.    "Creditor" means the holder of an Allowed Claim or Allowed

6  Administrative Claim.

7    37.    "Creditor Board Member" means a person that serves as a member of the

8  Holdco Board pursuant to the Plan.

9    38.    "Creditor Involvement Period" means the period of time from the Effective

10  Date through the date at which point the General Unsecured Creditors no longer own an Interest in

11  Holdco pursuant to the terms of the Plan.

12    39.    "Cure Claims" means the amounts necessary to cure any defaults under

13  executory contracts and unexpired leases assumed under the Plan.

14    40.    "Cure Claims Schedule" means the schedule of the Cure Claims, which

15  shall be filed with the Bankruptcy Court, and served on the Committee, on or before the twenty-

16  fourth (24th) day prior to the Confirmation Hearing.

17    41.    "Debtors" means BlueOcean and SoWestBreck. For the purpose of this

18  Disclosure Statement, reference to "Debtors" shall include the Reorganized Debtors.

19    42.    "DesertBreck" means DesertBreck, LP, a California limited partnership.

20    43.    "Disclosure Statement" means the Debtors' Amended Disclosure Statement,

21  as the same may be amended or modified from time to time.

22    44.    "Disputed Claim" means all or any part of a Claim as to which any one of

23  the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and the

24  Claim is listed in the Schedules as unliquidated, disputed, contingent or unknown, or; (ii) the

25  Claim is the subject of a timely objection or request for estimation which is filed on or before the

26  Claims Objection Deadline, which objection or request for estimation has not been withdrawn or

27  determined by a Final Order. In addition, prior to the earlier of (a) the Claims Objection Deadline,

28  and (b) such date as the Bankruptcy Court allows the Claim pursuant to a Final Order, any Claim

1    that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of

2    calculating and making any Distributions under the Plan if: (1) no Claim corresponding to the

3    Proof of Claim is listed in the Schedules, (2) the Claim corresponding to the Proof of Claim is

4    listed in the Schedules as disputed, contingent, unliquidated or unknown, (3) the amount of the

5    Claim as specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in

6    the Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the

7    priority or classification of the Claim as specified in the Proof of Claim differs from the priority of

8    any corresponding Claim listed in the Schedules.

9          45.    "Disputed Claims Reserve" means a segregated, interest-bearing trust

10    account for the benefit of General Unsecured Creditors, established at a financial institution that is

11    an authorized depository under United States Trustee guidelines, into which the Distribution Agent

12    will deposit the Distributions required by Section 9.3.3 hereof.

13          46.    "Disputed Claims Schedule" means the schedule setting forth a list of

14    Disputed Claims to which the Debtors intend to object.

15          47.    "Distribution" means the Cash that is required to be distributed under the

16    Plan to the holders of Allowed Claims.

17          48.    "Distribution Agent" means Holdco or its designee.

18          49.    "Dogwood" means Dogwood Partners, LP, a California limited partnership.

19          50.    "Effective Date" means a date to occur on or before the thirtieth (30th) day

20    after the satisfaction or waiver of the conditions set forth in Sections 13.1 and 13.2 of the Plan.

21          51.    "Estates" means the Debtors' bankruptcy estates created under Section 541

22    of the Bankruptcy Code in the Cases.

23          52.    "Excess Cash" means semiannual net income generated from the

24    Restaurants post-confirmation, plus cash on hand, depreciation, amortization and non-cash items,

25    minus the following: (i) payments for debt service, if any, including principal and interest;

26    (ii) capital expenditures; (iii) payments made on Allowed Administrative Claims; (iv) payments

27    made on Allowed Priority Unsecured Wage Claims; (v) payments made on Allowed Priority Tax

28    Claims; (vi) payments made on Allowed Cure Claims; and (vii) Minimum Cash Balance.

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

53.     "Fair Market Value" means the value of an asset based on a going concern basis, as determined by an independent third party holding requisite appraiser credentials or as mutually agreed by the relevant Debtor and Creditor.

54.     "Final Order" means an order or judgment of the Bankruptcy Court, or of any court of competent jurisdiction where there is pending an action in which a Debtor, a Reorganized Debtor, or the Committee is a party, as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, move to reargue, or to rehear shall have been waived in writing in form and substance satisfactory to the Debtor or to the Reorganized Debtor.

55.     "Fired Up" means Fired Up, Inc., the franchisor of the Debtors' Carino's restaurants.

56.     "First Payment Date" means the first Business Day of the first full month following the Effective Date.

57.     "Gantes" means John D. Gantes, or as it relates to Interests in Holdco, as set forth in subsections 7.2.1 and 7.2.2, means John D. Gantes or an entity designated by John D. Gantes, as applicable.

58.     "Gantes Involvement Period" means the period of time that Gantes continues to be actively engaged in providing management services with respect to Holdco and the Subcos pursuant to a management agreement either directly or through Managementco.

59.     "Gantes Parties" means Gantes, Allan Gantes, James Gantes, George Gantes, and all other family members of and related parties to the foregoing, and any and all affiliates of the Debtors and all other entities in which Gantes or a related party to Gantes hold an interest.

60.     "General Administrative Claims Bar Date" means the date by which all requests for payment of Administrative Claims, with the exception of Administrative Tax Claims and Section 503(b)(9) Administrative Claims, shall be filed with the Bankruptcy Court and served

1  upon the Reorganized Debtors, which date shall be no later than sixty (60) days after the Effective

2  Date.

3       61.    "General Unsecured Claim" means an unsecured Claim against the Debtor,

4  however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code, including,

5  without limitation, a Rejection Claim.

6       62.    "General Unsecured Creditor" means the holder of an Allowed General

7  Unsecured Claim.

8       63.    "GilBreck" means GilBreck, LP, a California limited partnership.

9       64.    "Governmental Unit" shall have the meaning provided in Section 101(27)

10  of the Bankruptcy Code.

11       65.    "HillBreck" means HillBreck, LP, a California limited partnership.

12       66.    "Holdco" means a California corporation, or such other corporate entity as

13  the Debtor, in consultation with the Committee, determine to be in the best interests of creditors,

14  which will be formed and will be the parent company that owns 100% of the outstanding stock in

15  all Subcos, each of which will own one Restaurant.

16       67.    "Holdco Board" means the board of directors of Holdco.

17       68.    "Imperial" means Imperial Smokehouse Partners, LP, a California limited

18  partnership.

19       69.    "Independent Holdco Board Member" means a member of the Holdco

20  Board that is not employed or otherwise compensated (other than through director fees) by

21  (a) Holdco, (b) a Subco, (c) Synergy, or (d) any affiliate or related party of Synergy or Gantes.

22       70.    "Initial Distribution Date" means the date on which the first Distribution is

23  made to a Class.

24       71.    "Interest" means any equity security in any Debtor or Reorganized Debtor,

25  as provided by Section 101(16) of the Bankruptcy Code, including, without limitation, any

26  common stock interest, preferred stock interest, stock option, warrant, partnership interest, or

27  membership interest.

28       72.    "Interest Holder" means the holder of an Interest in a Debtor.

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

73. "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

74. "Lenders" means, collectively all of the Creditors in Classes 1.1 through 1.9.

75. "Lien" means any lien, encumbrance, pledge or other charge against property.

76. "Major Decisions" means significant and important decisions to be made by the Reorganized Debtors, including any of the following regarding Holdco, any Sub and/or any Restaurant: (a) issuing or repurchasing any beneficial interest in Holdco; (b) issuing, increasing, amending or repurchasing debt; (c) acquisitions or divestitures of any business or any assets (other than inventory in the normal course of business); (d) approval of an annual Budget; (e) capital expenditures above approved budgeted amounts; (f) any merger, restructuring or other reorganization; (g) dividends, distributions or other payments to or on behalf of holders of beneficial interests in Holdco; (h) any other extraordinary expenditure; (i) entering into contracts or obligations outside the daily operations or normal course of business; (j) changes or amendments to the Managementco contract; (k) opening or closing of a restaurant; (l) compliance with the terms of the Plan; or (m) bankruptcy or other insolvency related action, any liquidation or dissolution, or any similar action.

77. "Management Agreement" means the management services agreement entered into between Managementco and each Subco.

78. "Managementco" means a designated management company that will oversee day-to-day restaurant operations, marketing, information technology and back-office functions of the Subcos post-confirmation, including paying independent vendors, suppliers and employees of all Subcos.

79. "Minimum Cash Balance" means the minimum amount of cash that each Restaurant must maintain after payment of capital expenditures, debt service, and the required semiannual payments under the Plan on account of Allowed Administrative Claims, Allowed

Priority Unsecured Wage Claims, Allowed Priority Tax Claims and Allowed Cure Claims, which initially shall be $50,000, but which may be modified from time to time by the Holdco Board.

80.   "Net Proceeds" means the proceeds generated from the pursuit of Post-Confirmation Estate Claims, net of all attorneys' fees and other costs necessary to recover such proceeds.

81.   "Objection Value" means the highest Fair Market Value of property asserted by a Creditor in opposition to the Debtors' asserted value in the Plan of a property securing such Creditor's Claim.

82.   "Paid in Full" means the Debtor's payment obligations to a particular Class of Creditor under the Plan have been fully satisfied.

83.   "PalmBreck" means PalmBreck, LP, a California limited partnership.

84.   "Petition Date" means the date on which each Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code (November 6, 2008 for BlueOcean and April 23, 2009 for SoWestBreck).

85.   "Plan" means this Chapter 11 Amended Plan of Reorganization, together with the exhibits hereto, as the same may be amended or modified from time to time.

86.   "Post-Confirmation Estate Claims" means any and all claims and causes of action that constitute property of the Estates including, but not limited to, any Avoidance Actions and any causes of action or claims for recovery of any amounts owing to the Debtors or the Estates.

87.   "Priority Tax Claim" means any Claim provided for by Section 507(a)(8) of the Bankruptcy Code.

88.   "Priority Tax Claim Semiannual Yield" means the semiannual rate of return paid to Creditors holding Allowed Priority Tax Claims, which shall be calculated by the quotient of the semiannual cash payment made to the Creditors holding Allowed Priority Tax Claims divided by the total Allowed Priority Tax Claims.

89.   "Priority Unsecured Claim" means any Claim provided for by Section 507(a)(3) or (4) of the Bankruptcy Code.

-17-

90.     "Professional" means a person or entity employed by the Debtors or by the Committee pursuant to a Final Order in accordance with Sections 327 or 1103 of the Bankruptcy Code.

91.     "Proof of Claim" means a written statement filed in a Case by a Creditor in which the Creditor sets forth the amount of its Claim, in accordance with Rule 3001 of the Bankruptcy Rules.

92.     "Proof of Interest" means a written statement filed in a Case by an Interest Holder in which the Interest Holder sets forth the amount of its Interest.

93.     "Pro Rata" means proportionately, so that with respect to any Distribution in respect of any Allowed Claim, the ratio of (i) (a) the amount of property distributed or reserved on account of such Allowed Claim to (b) the amount of such Allowed Claim, is the same as the ratio of (ii) (a) the amount of property distributed or reserved on account of all Allowed Claims of the Class sharing in such Distribution to (b) the amount of all Allowed Claims in such Class.

94.     "Real Property Debtors" shall mean Imperial, DesertBreck, Dogwood, HillBreck, GilBreck and PalmBreck.

95.     "Rejection Claim" means any Claim based upon, or arising from, the rejection of any executory contract or unexpired lease pursuant to order of the Bankruptcy Court or pursuant to the Plan.

96.     "Reorganized Debtors" means the Debtors, as reorganized under the terms of the Plan on and after the Effective Date, and any successors thereto by merger, consolidation, acquisition, or otherwise, which, as contemplated by the Plan, would include Holdco and all Subcos.

97.     "Reorganized Debtors' Certification" means a certification by a person with requisite authority on behalf of the Reorganized Debtors stating that, in their sole and absolute discretion, the Reorganized Debtors have determined that all Allowed Claims have been duly paid and that all Post-Confirmation Estate Claims and objections to Disputed Claims have been resolved by Final Order, which certification shall be filed with the Bankruptcy Court and served upon the United States Trustee, as provided in Section 7.16 hereof.

98.    "Repayment Date" means the date that Allowed General Unsecured Claims have been Paid in Full.

99.    "Repossession Option" means the Debtor's option pursuant to Section 6.1.1 to require a holder of an Allowed Secured Claim to repossess the property securing such Claim.

100.    "Restaurant" means each individual restaurant operations owned by the Debtors and all assets used therein.

101.    "Schedules" means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by the Debtors in the Cases, as required by Section 521(1) of the Bankruptcy Code, Rules 1007(a)(3) and (b)(1) of the Bankruptcy Rules, and Official Bankruptcy Form No. 6, as the Schedules may be amended from time to time.

102.    "Section 503(b)(9) Administrative Claims" means any Claim, to the extent allowable pursuant to Section 503(b)(9) of the Bankruptcy Code and the Plan.

103.    "Secured Claim" means any Claim, including interest, reasonable attorneys' fees, costs, and charges, to the extent allowable pursuant to Section 506(b) of the Bankruptcy Code and the Plan, that is secured by a Lien on property in which a Debtor has an interest or that is subject to recoupment or setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the interest of the holder of such Secured Claim in the Debtor's interest in the property, determined pursuant to Section 506(a) of the Bankruptcy Code.

104.    "SoWestBreck" means SoWestBreck, LLC, one of the jointly administered debtors in the above-captioned cases.

105.    "Subco" means a California corporation that will be formed and will own a Restaurant post-confirmation, which will be a wholly-owned subsidiary of Holdco.

106.    "Synergy" means Synergy Pacific Management, LLC.

107.    "Tax" means any tax, charge, fee, levy, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or additions attributable to, or imposed on or with respect to, such assessments.

-19-

1    108.    "Tax Claims" means any Claim, pre-petition or post-petition, relating to a

2    Tax.

3    109.    "Unclaimed Property" means any Distribution of Cash or other property to a

4    Creditor that is returned to the Reorganized Debtor as undeliverable.

5    110.    "Unclaimed Property Reserve" means an interest-bearing segregated

6    account in which Unclaimed Property shall be set aside and held as provided in Section 8.7 hereof.

7    111.    "United States Trustee" means the Office of the United States Trustee.

8    112.    "Unsecured Creditors Semiannual Payment Cap" means the maximum

9    semiannual distribution to Creditors holding Allowed General Unsecured Claims, which shall

10    equal the product of the total Allowed General Unsecured Claims and the Priority Tax Claim

11    Semiannual Yield.

12    113.    "Vineyard" shall mean Vineyard Bank, N.A.

13    **B.**    **Rules of Construction**.  For the purpose of this Disclosure Statement, unless

14    otherwise provided in this Disclosure Statement, (i) whenever from the context it is appropriate,

15    each term, whether stated in the singular or the plural, shall include both the singular and the

16    plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine,

17    feminine and neuter; (iii) any reference in this Disclosure Statement to an existing document,

18    Exhibit or schedule filed or to be filed means such document or schedule as it may have been or

19    may be amended, modified or supplemented pursuant to this Disclosure Statement; (iv) any

20    reference to an entity as a holder of a Claim or Interest includes that entity's successors and

21    assigns; (v) except as otherwise stated herein, all references in this Disclosure Statement to

22    Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this

23    Disclosure Statement; (vi) the words "herein," "hereunder" and "hereto" refer to this Disclosure

24    Statement in its entirety rather than to a particular portion of this Disclosure Statement; (vii) unless

25    otherwise provided in this Disclosure Statement, any reference in this Disclosure Statement to a

26    contract, instrument, release, indenture, agreement, or other document being in a particular form or

27    on particular terms and conditions means that such document shall be substantially and materially

28    in such form or substantially and materially on such terms and conditions; and (viii) the rules of

1   construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules

2   are not inconsistent with the express terms of this Disclosure Statement or any other provision in

3   this Section 2.2.

4         **C.**    **Exhibits**.  All exhibits to this Disclosure Statement are incorporated into and are a

5   part of this Disclosure Statement as if set forth in full herein.

6   **III.**

7   **CONFIRMATION AND VOTING**

8         A Creditor may vote to accept or reject the Plan by filling out and mailing to the Debtors'

9   counsel the form of the ballot which has been provided herewith.  Ballots should be mailed to

10   Winthrop Couchot, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660 (Attn:  Ms.

11   PJ Marksbury).

12         In order to vote for or against the Plan, a Creditor must have filed a Proof of Claim on or

13   before the Bar Date, unless its Claim is listed in the Schedules filed in the Cases by the Debtors as

14   not being disputed, unliquidated, contingent or unknown.  Any such Creditor is, to the extent listed

15   in the Schedules, deemed to have filed a Claim, and, absent a timely objection to the Claim, such

16   Claim is deemed allowed.  In order to determine whether a Creditor is entitled to vote on the Plan

17   notwithstanding any failure to timely file a Proof of Claim, the Creditor should review the

18   Debtors' Schedules on file with the Bankruptcy Court.  If the Creditor's Claim is not scheduled, or

19   if it is scheduled as contingent, disputed, unliquidated or unknown and the Creditor did not file a

20   Proof of Claim prior to the Bar Date, the Creditor may not be entitled to vote on the Plan.

21         The Bankruptcy Court has fixed [_____] as the last date by which ballots must be

22   received by the Debtors' counsel.  Subject to review and determination by the Bankruptcy Court,

23   votes received by the Debtors after that date may not be counted.  Regardless of whether a Creditor

24   votes on the Plan, it will be bound by the terms and treatment set forth in the Plan if the Plan is

25   confirmed by the Bankruptcy Court.  Absent some affirmative act constituting a vote, such

26   Creditor will not be included in the voting tally.  Allowance of a Claim for voting purposes, or

27   disallowance of any Claim for voting purposes, does not necessarily mean that all or a portion of

28   the Claim will be allowed or disallowed for distribution purposes.

1     The Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the

2    Bankruptcy Code are satisfied.  Section 1129 requires, inter alia, that:  (a) with respect to each

3    Class of Claims, each Creditor in that Class has accepted the Plan, or will receive or retain under

4    the Plan on account of such Claim, property of a value that is not less than the amount such

5    Creditor would receive if the Debtors were to liquidate their assets under Chapter 7 of the

6    Bankruptcy Code; (b) confirmation of the Plan is not likely to be followed by a liquidation of the

7    Debtors or the need for further reorganization of the Debtors; and (c) the Plan be accepted by each

8    Class of Claims that is impaired by the Plan, and/or the Plan does not discriminate unfairly and is

9    fair and equitable to any impaired Class that has not accepted the Plan.

10    To confirm the Plan, the Bankruptcy Court must determine whether the Plan has been

11    accepted by each "impaired" Class entitled to vote on the Plan.  Pursuant to Section 1124 of the

12    Bankruptcy Code, Classes "impaired" by the Plan are those Classes whose legal, equitable or

13    contractual rights are altered pursuant to the Plan.  Under Section 1126(c) of the Bankruptcy Code,

14    an impaired Class of Claims is deemed to have accepted the Plan if the Plan is accepted by

15    Creditors in that Class holding at least two-thirds (2/3) in dollar amount and more than

16    one-half (1/2) in number of the Allowed Claims of Creditors in that Class actually voting on the

17    Plan.

18    Only the votes of those Creditors whose ballots are timely received may be counted in

19    determining whether a Class has accepted the Plan.  Creditors are, therefore, urged to fill in, date,

20    sign and promptly mail the enclosed ballot.  Each Creditor must properly complete the ballot and

21    legibly identify its name on the ballot.

22    Any Creditor holding Claims in more than one impaired Class must file one ballot for each

23    such Class.  If a Creditor has received an incorrect ballot, or believes that it is entitled to vote in

24    more than one Class, additional ballots may be obtained upon written request to Winthrop Couchot

25    (Attn:  Ms. PJ Marksbury).

26    In the event that one impaired class but not all impaired Classes accept the Plan, the

27    Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to the provisions of

28    Section 1129(b) of the Bankruptcy Code.  Pursuant to Section 1129(b), the Plan may be confirmed

1   despite the failure of a Class of Claims to accept the Plan if the Bankruptcy Court determines that

2   the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of

3   Claims that is impaired under, and has not accepted, the Plan.  The condition that the Plan be fair

4   and equitable with respect to such nonaccepting Classes includes certain legal requirements as

5   more fully set forth in Section 1129(b).

6                                        **IV.**

7                          **BACKGROUND OF THE DEBTORS**

8        **A.    The Debtors.**  As of the Petition Date, the Debtors were among approximately 209

9   affiliated entities, approximately 50 of which owned and operated approximately 110 restaurants

10  throughout California, Washington, Nevada, Oregon, and Utah, and 60 entities of which owned

11  and operated various real properties from which many of the restaurants lease space.  The Debtors

12  own and operate six franchised Carino's restaurants throughout California and two in Utah.

13  Carino's is a casual dining Italian restaurant that offers dine-in, take-out and catering.

14       BlueOcean owns and operates a Carino's in Palmdale, Rancho Cucamonga, West Covina

15  and El Centro, California.[3]  SoWestBreck owns and operates a Carino's in West Jordan and

16  Sandy, Utah.  The Debtors employ approximately 260 persons.

17       **B.    Jointly Administered Debtors.**  The Debtors' Cases have been jointly

18  administered with 13 other affiliated debtors.  Three of these debtors[4] own and operate six

19  franchised Famous Dave's BBQ restaurants throughout California.[5]

20       SoBreck, LLC  and NorBreck, LLC were general partners of SoBreck, LP and NorBreck,

21  LP, respectively, which owned and operated additional Carino's restaurants.  As soon as it was

22  determined that SoBreck, LP and NorBreck, LP, of which SoBreck, LLC and NorBreck, LLC,

23  respectively, were general partners, were not going to file Chapter 11, the Debtors sought

24  dismissal of the SoBreck, LLC and NorBreck, LLC bankruptcy cases.  Concurrent with the

25  dismissal sought by SoBreck and NorBreck, Imperial and DesertBreck, which owned and leased

26  ────────────────

27  [3] Debtor StoneRiver Partners, LP will shortly file a motion seeking bankruptcy court approval for the sale of the
    Carino's located Downey, California to BlueOcean.
    [4] StarRibs North, LP, StarRibs South, LP and WhitTown Partners, LP (the "Famous Dave's Debtors").

28  [5] The Famous Dave's Debtors have already filed and on November 17, 2009, the Court approved a separate
    Chapter 11 plan of reorganization for the Famous Dave's Debtors only.

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1    real property to affiliated non-Carino's restaurants, and Dogwood, HillBreck, PalmBreck and

2    GilBreck also sought dismissal of their respective bankruptcy cases. Dogwood, HillBreck and

3    PalmBreck owned and leased real property to affiliated debtor BlueOcean for Carino's restaurants

4    in El Centro, Rancho Cucamonga, and Palmdale, respectively. GilBreck owned and leased real

5    property to OceanCountry for a Carino's restaurant in Gilroy. The rents generated by the Real

6    Property Debtors from affiliated debtor lessees were not sufficient to service the debt owing to

7    Vineyard, the secured creditor for each of the Real Property Debtors. Based on the insufficient

8    cash flow and lack of equity, the Real Property Debtors determined that they could not develop a

9    confirmable plan of reorganization. Accordingly, on or about April 16, 2009, the Real Property

10   Debtors entered into a stipulation with Vineyard for relief from stay. The Court entered the order

11   approving the stipulation on May 7, 2009. Based on the foregoing, the Real Property Debtors

12   filed a motion for an order dismissing these cases. On July 28, 2009, the Court entered an order

13   dismissing the SoBreck, LLC, NorBreck, LLC, Imperial, DesertBreck, Dogwood, HillBreck,

14   GilBreck, and PalmBreck cases.

15       **C.    Financial Performance of the Debtors.** The following is a summary of the pre-

16   petition financial performance of each of the Debtors:

*[handwritten: 2009 6,648,673]*

| DEBTOR | | 2007 | 2008 | |
|--------|--------|--------|--------|--------|
| BlueOcean | Sales | $11,701,988 | $9,755,493 | *(244,283)* |
| | Net Profit (Loss) | $59,751 | $638,362 | |
| SoWestBreck | Sales | $4,449,730 | $3,973,125 | *3,189,770* |
| | Net Profit (Loss) | $205,664 | $50,536 | *71,388* |

22       **D.    Restaurant Facilities.** The Debtors operate their restaurants from facilities located

23   throughout California and Utah, the occupancy costs for which are based on a combination of

24   ground leases, building leases, and loans on buildings purchased by the Debtors.

25       Prior to the Petition Date, the Debtors were making payments to affiliate landlords for rent

26   in excess of market rates to facilitate the affiliate landlords' ability to service the debt owed by the

27   affiliates to their secured creditors, which debt secured the property owned by the affiliate and

28   used and leased by the Debtors. In order to fulfill the Debtors' fiduciary duties to creditors of the

-24-

1  Estate and stop the funding of the losses of its affiliates, from the outset of these bankruptcies, and

2  as promised to creditors and as articulated on the record to the Bankruptcy Court, the Debtors

3  have been paying what they believed were market lease rates – rather than the inflated lease rates

4  (which were based on affiliates' real property debt service) as provided for in the contract.

5      In some cases, based on the affiliate landlord's inability to service its debt, the affiliate's

6  secured creditor commenced proceedings to foreclose upon the underlying property used by the

7  Debtors.  Recognizing the importance of these leases, knowing that the secured creditor was

8  taking control over some of the properties used by the Debtors, and being concerned that a

9  foreclosure would wipe out the Debtors' leasehold interests (resulting in the loss of rights to

10  operate restaurants), which would prevent, if not substantially impair, the Debtors' ability to

11  reorganize, the Debtors actively negotiated with the applicable secured creditor of certain of the

12  Debtors' affiliates' market leases (with attornment provisions to ensure that the Debtor's interest

13  in the lease would not be extinguished in a foreclosure).

14      Based on the Debtors' efforts, the Debtors successfully negotiated new leases with

15  significant price reductions for their restaurants located in Rancho Cucamonga, El Centro and

16  Palmdale, which leases the Court approved.  The Debtors continue to work with other landlords in

17  efforts to negotiate more favorable lease terms on other properties.  Attached as Exhibit "1" is a

18  Summary of Real Property Leases, which summarizes the key terms of leases on which the

19  Debtors base their Plan.  In addition, as set forth in Section 4.1.2 of the Plan, the Debtors have

20  entered into an agreement pursuant to which Gantes and any and all affiliates of the Debtors have

21  agreed to waive all claims, including, without limitation, pre-petition claims, administrative

22  claims, including, without limitation, rent, late fees/penalties and property tax claims against the

23  Estates.

24      **E.**    **Ownership and Management of the Debtors (Pre-Confirmation).**  As of the

25  Petition Date, Gantes and his family, through their family trusts, controlled and owned each of the

26  Debtors and all of their affiliates.  Attached hereto as Exhibit "2" are corporate organizational

27  charts that illustrate graphically the ownership relationship of the Debtors as of the Petition Date.

28

1          1.    <u>Shared Services Management Company</u>.  In order to leverage economies of

2  scale and otherwise maximize profits in the operation of the Debtors' restaurants, the Debtors

3  outsource general and administrative services for the operations of their restaurants through a

4  shared services management agreement.  Historically and through December 31, 2008, these

5  management services were provided by Breckenridge Group, Inc. ("BGI"), an entity owned and

6  controlled by Gantes.

7          As part of the Debtors' restructuring efforts, on January 1, 2009, the Debtors

8  replaced BGI with Synergy.  Synergy was founded in December 2008 as a hotel, restaurant,

9  development and real estate management organization.  Synergy is owned by Gladehill

10  Development Corp. ("Gladehill") and Colin Cooper ("Cooper"), a certified public accountant,

11  who has provided and continues to provide accounting and tax services to various affiliates of the

12  Debtors[6].  None of the Debtors or their affiliates has any ownership or profit-sharing interest in

13  Synergy, Gladehill or its respective principals.  Neither Cooper nor Gladehill has any ownership

14  or profit-sharing interest in any of the Debtors or any of their affiliated debtor and non-debtor

15  entities.  Synergy has, however, retained the same management as previously employed by BGI.

16  Specifically, John Gantes is the executive director, George Gantes is the marketing director, Tony

17  Meyer is the accounting director, Allan Gantes is the real estate and hotel director, Ed Rebella is

18  the human resources director, James Gantes is the technology director, Rick LeSage is the

19  operations director, and Les Keenan is the operations director.  The job descriptions and salaries

20  for Gantes and each of his family members included in Synergy's management are attached as

21  Exhibit "3."  While the focus of Synergy's operations at present is on the Debtors and their

22  affiliated entities, it eventually expects to provide similar services to other unaffiliated companies.

23          Through the Debtors' management agreements with Synergy, Synergy provides the

24  Debtors with general day-to-day management of the Carino's restaurants, and general and

25  administrative services related to the operations of the Carino's restaurants.  In particular, Synergy

26  manages the operations of the restaurants, including hiring, training and supervising employees,

27  marketing, accounting, information technology, and all other aspects of managing the day-to-day

28

---

[6] The Reorganized Debtors do not intend to use Cooper for accounting or tax services post Effective Date.

1    operations of a restaurant.  The Debtors are in the process of modifying these management

2    agreements.  Attached as Exhibit "4" is the latest draft of a detailed description of the services to

3    be provided by Synergy.

4           2.    Appointment of Chief Restructuring Officer.  On or about

5    February 2, 2009, BlueOcean, the Committee, Gantes, and other jointly administered debtors,

6    entered into a stipulation to appoint Brian Weiss, Managing Director of BSW & Associates, as the

7    Debtors' Chief Restructuring Officer ("CRO") to oversee and manage the restructuring effort and

8    overall business operations of BlueOcean and other jointly administered debtors.  On March 11,

9    2009, the Court entered an order approving the stipulation.  On April 23, 2009, the Court entered

10   an order jointly administering the SoWestBreck case with all other cases jointly administered with

11   In re StarRibs, which included an order authorizing Brian Weiss to serve as the CRO for

12   SoWestBreck.  Prior to being employed by the Debtors, Mr. Weiss had no relationship or

13   connection in any way with the Debtors, their affiliates, Gantes, or creditors of the Debtors.  The

14   Debtors and Committee believe that this appointment was necessary to facilitate a successful

15   reorganization for a variety of reasons.  First, the Debtors believe that additional help was needed

16   in these cases to resolve an overwhelming number of issues arising from the corporate structure of

17   the Debtors and their affiliates.  Second, the Debtors understand that there is a fiduciary duty

18   owing to each of the Debtors' Estates, and wanted to ensure that proper focus was dedicated to

19   these Debtors and that creditors of these cases are not prejudiced as a result of any issues relating

20   to or arising from affiliates that were not part of the Debtors' bankruptcy cases.  Third, Gantes did

21   not have experience restructuring companies or otherwise operating in Chapter 11s or the

22   administrative duties associated therewith.  Based on the foregoing, in order to maximize value

23   for the Estates' creditors, the Debtors, Committee and Gantes determined that it was in the

24   Debtors' best interests to hire Mr. Weiss as the CRO, and allow Gantes to focus on managing the

25   restaurants.

26         **F.**    **Pre-Petition Legal Proceedings.**  The following are the only legal proceedings

27   that the Debtors are aware of as having been instituted against the Debtors prior to the Petition

28   Date:

1.   Daina President et al. v. SoWestBreck, BlueOcean, et al.; Case No. D056219

2.   Carmella Trujillo et al v. BlueOcean, et al.; Case no. 37-2007-77675

## V.

## THE DEBTORS' CHAPTER 11 PROCEEDINGS

**A.    Events Precipitating Chapter 11 Filings.** The Debtors have suffered pre-petition from cash flow problems primarily as a result of making advances to affiliate restaurants that were sustaining losses from their operations and/or payments to affiliate landlords for rent in excess of market rates to service the debt on the property held by an affiliate and the debt service of the Debtors for the construction of buildings underlying certain restaurant locations. The Debtors realized substantial cash losses due to unanticipated development costs and delays in opening restaurants. Losses and cash flow difficulty were further attributed to the recessionary trend that developed approximately 1-1/2 years ago, and have been exacerbated by the crash in the credit and financial markets specifically and in the general economy. Together, the foregoing factors placed severe pressure on the Debtors' cash flow, and deprived the Debtors of the ability to timely pay vendor obligations, resulting in defaults in the Debtors' obligations to vendors. These defaults precipitated complaints filed by secured creditors of the Real Estate Debtors to appoint receivers for these and several other affiliated landlords. In order to prevent the appointment of a receiver and facilitate a reorganization of the Debtors' businesses, the Debtors filed petitions under Chapter 11 of the Bankruptcy Code on the Petition Date.

**B.    Debtor-in-Possession Status.** Since the Petition Date, the Debtors have continued to operate as "debtors-in-possession" subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their businesses in the ordinary course of business. However, all transactions outside of the ordinary course of business must be approved by the Bankruptcy Court.

**C.    The Automatic Stay.** Upon the filing of the Cases, an automatic stay was imposed in each of the Cases pursuant to Section 362 of the Bankruptcy Code. Subject to certain statutorily defined exceptions, the stay enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of Liens against property of the Debtors, and the

-28-

1  continuation of litigation against the Debtors. The automatic stay will remain in effect in each

2  Case until the earliest of the entry of an order of the Bankruptcy Court lifting or modifying the

3  stay, the Effective Date of the Plan, or the closing of the Cases.

4      **D.**    **Significant Events Which Have Occurred After the Petition Dates.**

5          1.    <u>First Day Motions</u>. On the Petition Date, the Debtors filed several motions

6  seeking what is commonly referred to as "first day orders." The relief granted in the first day orders

7  is designed to enable a debtor to transition into Chapter 11 without any material disruption to its

8  business operations. These orders generally grant relief that falls outside the ordinary course of

9  business, or otherwise requires a bankruptcy court order. On or about November 10, 2008 and

10  June 25, 2009, the Court entered first-day orders with respect to the BlueOcean and SoWestBreck

11  cases, respectively, for the following motions:

12          a.    Emergency Motions for Order Authorizing Joint Administration of

13  Chapter 11 Cases.

14          b.    Emergency Motion for Order Authorizing Use of Any Cash

15  Collateral of Secured Claimants.

16          c.    Emergency Motion for Order Authorizing Payment and Honoring of

17  Prepetition Payroll Obligations;

18          d.    Emergency Motion for Order: (1) Authorizing the Debtors to

19  Maintain Pre-Petition Merchant Services Accounts; and (2) Compelling Banks to Continue

20  Merchant Services.

21          e.    Emergency Motion for Order: (A) Prohibiting Utility Providers from

22  Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future

23  Performance, and (C) Establishing Procedures for Determining Adequate Assurances of Payment

24  under Section 366 of the Bankruptcy Code.

25          f.    Emergency Motion to Limit Notice of Certain Matters Requiring

26  Notice to Creditors Pursuant to Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure.

27

28

1         2.   <u>Other Motions.</u>

2             a.   <u>Debtors' Motion for Use of Any Cash Collateral of Secured</u>

3 <u>Claimants.</u> Following the Bankruptcy Court's interim approval of BlueOcean's use of cash

4 collateral, a final hearing regarding BlueOcean's cash collateral use was scheduled by the

5 Bankruptcy Court for December 17, 2008. The hearing scheduled for December 17, 2008 was then

6 continued several times -- January 14, 2009, February 25, 2009, March 4, 2009, and March 25,

7 2009 - pursuant to agreements among BlueOcean and affiliates, the secured creditors and the

8 Committee in order to allow the parties to attempt to reach a stipulation regarding BlueOcean and

9 other affiliated debtors' continued use of cash collateral. BlueOcean and other affiliated debtors,

10 the secured creditors and the Committee ultimately entered into a stipulation for use of any cash

11 collateral of secured creditors, which currently expires March 20, 2010, but is expected to be

12 extended through the date of the Confirmation Hearing. Based on the most recent cash flow budget

13 filed with the Court, SoWestBreck's use of cash collateral currently expires on April 25, 2010.

14 SoWestBreck expects to retain authority to use cash collateral through the date of the Confirmation

15 Hearing, if for some reason the Confirmation Hearing is not held prior to such expiration date.

16             b.   <u>Motion to Extend Time to Assume or Reject Leases.</u> The Debtors

17 filed a motion to extend the period within which the Debtors may assume or reject unexpired

18 leases. The motion was granted and the time within which the Debtors may assume or reject

19 unexpired leases was extended to and including June 5, 2009. The Debtors and the landlords

20 subsequently entered into a stipulation to extend the period within which the Debtors may assume

21 or reject unexpired leases to and including the date of plan confirmation.

22             c.   <u>Motion to Set Bar Date.</u> BlueOcean, as part of the jointly-

23 administered action, filed a motion seeking a deadline for filing proofs of claim. The motion was

24 granted and, accordingly, the Bar Date for filing Proofs of Claim against BlueOcean is May 5,

25 2009. Based on certain newly-discovered parties who may assert claims against BlueOcean,

26 BlueOcean served a supplemental notice of bar date, which pursuant to the Court's order extended

27 the BlueOcean Bar Date to file Proofs of Claim to December 28, 2009.

28

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1    SoWestBreck filed a motion seeking setting a deadline for filing Proofs of

2  Claim in the SoWestBreck case.  Based on the Court's order, the Bar Date for filing Proofs of

3  Claim in the SoWestBreck case is _____.

4    d.    Motion for Appointment of CRO.  BlueOcean and affiliated debtors

5  filed a motion approving a stipulation to appoint Brian Weiss as the Debtors' CRO.  The motion

6  was granted and Mr. Weiss was appointed as the Debtors' CRO.  Brian Weiss was subsequently

7  authorized by separate order of the Court to serve as CRO for SoWestBreck.

8    e.    Motion to Enter into Management Agreement.  BlueOcean and

9  affiliated debtors filed a motion authorizing the Debtors to enter into a management agreement with

10  Synergy.  The motion was granted and Synergy was authorized to provide shared management and

11  general and administrative services to and for the benefit of the Debtors.  SoWestBreck was

12  subsequently authorized to enter into a management agreement with Synergy by separate order of

13  the Court.

14    f.    Motion for Authority to Enter into Leases.  In order to maintain

15  certain leasehold interests and obtain more favorable lease terms, the Debtors entered into new

16  leases with several of the landlords and obtained attornment provisions from the secured creditor.

17  As a result, the Debtors sought and on September 4, 2009, the Court entered an order authorizing

18  the Debtors to enter into new leases with various landlords and attornment agreements with the

19  landlords' secured creditor.

20    g.    Applications to Employ Professionals.  The Debtors and the

21  Committee filed several applications[7] to employ the following professionals:

22  / / /

23

24

25

26

27

28

---

[7] Trinity Capital, LLC, the Debtors' proposed financial advisors, terminated their employment with the Debtors and requested that the Debtors withdraw their application to employ Trinity Capital. LLC.

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

| Winthrop Couchot | Debtors' General Insolvency Counsel |
|---|---|
| Blakeley & Blakeley, LLP | Committee's Counsel |
| Phoenix Group Advisory Services, LLC | Committee's Financial Advisors |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Debtor's Special Real Estate Counsel |
| Freeman & Smiley, LLP | Debtor's Special Corporate Counsel |
| Law Offices of Lavar A. Taylor | Debtor's Special Tax Counsel |
| Braunco, Inc. | Debtor's Valuation Advisor |

   **E.    Actual and Projected Recovery of Preferential or Fraudulent Transfers.** The
Debtors are in the process of performing an analysis of their books and records to determine
whether any payments made prior to the Petition Date constitute preferential transfers avoidable
pursuant to Section 547 of the Bankruptcy Code, or whether any transfers made by the Debtors are
avoidable as fraudulent transfers under Sections 544(b) or 548 of the Bankruptcy Code.  Based on
the Debtors' preliminary review and analysis, the Debtors have prepared a Schedule of Potential
Avoidance and Other Actions against third parties who have been preliminarily identified as
recipients of potential preferential fraudulent transfers or other monies that the Debtors may be
entitled to recover.

   **F.    Projected Objections to Claims Filed Against the Estates.** The Debtors have
not completed their review of the Claims in the Cases.  The Debtors anticipate that they will file
objections to a number of Claims.  However, since the Debtors have not completed the process of
reviewing Claims filed in the Cases, and management resources are being focused primarily upon
the legal and financial reorganization of the Debtors, the Debtors anticipate that objections to
Claims may not be filed until about or after the Confirmation Date.

**VI.**

**FINANCIAL INFORMATION REGARDING THE DEBTORS**

   **A.    Historical Financial Information.** Attached hereto as Exhibit "5" are,
collectively, copies of each of the Debtors' unaudited income statements for the fiscal
years 2007-2008.

-32-

**B.    Financial Information Provided During the Cases.** The Debtors have filed their Schedules in the Cases. The Schedules provide substantial financial information regarding the assets and liabilities of the Estates as of the Petition Date. The Schedules are available for inspection, during normal business hours, at the Clerk's Office of the Bankruptcy Court, located at 411 West Fourth Street, Santa Ana, California 92701.

In addition to the Schedules, the Debtors have prepared throughout the Cases interim statements and operating reports in accordance with the requirements of the United States Trustee. Copies of the interim statements and operating reports are available for inspection, during normal business hours, at the United States Trustee, located at 411 West Fourth Street, Suite 9041, Santa Ana, California 92701.

Each of the Debtors has prepared an unaudited balance sheet (as of December 31, 2009) and an income statement for the twelve-month period from the Petition Date through December 31, 2009. These financial statements have been prepared in accordance with Generally Accepted Accounting Principles in the United States. These statements have <u>not</u> been subject to independent audit. True and complete copies of these financial statements are included in the financial statements attached hereto, collectively, as Exhibit "6" and are incorporated herein by this reference.

AS TO THE UNCERTIFIED AND UNAUDITED FINANCIAL INFORMATION CONTAINED IN, OR ATTACHED TO, THIS DISCLOSURE STATEMENT, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE FINANCIAL INFORMATION IS WITHOUT ANY INACCURACIES, ALTHOUGH THE DEBTORS BELIEVE THAT THEY HAVE MADE REASONABLE EFFORTS, UNDER THE CIRCUMSTANCES, TO PRESENT FAIRLY AND ACCURATELY SUCH FINANCIAL INFORMATION.

**C.    Financial Performance During the Cases.** During the Cases, the Debtors, as debtors-in-possession, have been responsible for the management of the Debtors' businesses and the administration and management of assets of the Estates. The Debtors have paid all accruing post-petition expenses associated with the operation of the Debtors' businesses, with the exception of certain accrued fees and costs of Professionals, which fees and costs have not been timely paid

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Cerinos).DOC

throughout the Debtors' Cases, but which will be paid current on the Effective Date. The Debtors have properly maintained and preserved assets of the Estates. Attached as Exhibit "6" are the most recent (as of the date of filing of this Disclosure Statement) financial statements reflecting the Debtors' post-petition activity.

**VII.**

**DESCRIPTION OF THE PLAN OF REORGANIZATION**

The following is a brief summary of the Plan and is qualified in its entirety by the full text of the Plan. The terms of the Plan will be controlling on the Creditors and Interest Holders in the event that the Plan is confirmed. Therefore, all Creditors and Interest Holders are urged to read the Plan carefully in its entirety rather than relying on this summary.

**A.    Substantive Consolidation of the Debtors.** The Plan constitutes a plan which effectuates a substantive consolidation of the Debtors. The Debtors' respective Estates shall be merged. Each Debtor shall assume liability under the Plan for the Allowed Claims against each other Debtor.

Pursuant to the substantive consolidation of the Debtors, (i) all assets and liabilities of the Debtors shall be consolidated for purposes of the Plan and deemed assets and liabilities of the consolidated Debtors, (ii) any Claim filed against any Debtor shall be treated as a Claim against the consolidated Debtors and any obligation of any Debtor shall be deemed to be an obligation of the consolidated Debtors and all duplicate claims or obligations shall be eliminated, and (iii) all obligations due or owing from any Debtor to any other Debtor shall be eliminated.

According, the treatment of the Claims set forth in Articles VIII, IX and X below shall be deemed to apply to each Debtor.

**B.    Basic Structure of the Plan.** The Plan proposes to pay the Claims of seven (7) Classes of Creditors in accordance with the provisions of the Plan. The Plan provides for the establishment of one (1) Class of Partnership Interest. All Classes of Claims are "impaired" under the Plan, as that term is defined by Section 1124 of the Bankruptcy Code.

**C.    Classification and Treatment of Claims.** Section 1123 of the Bankruptcy Code requires that the Debtors, with certain exceptions, classify separately in the Plan all Claims.

-34-

1    Pursuant to Section 1122 of the Bankruptcy Code, the Debtors may place all Claims that are

2    substantially the same in the same Class in the Plan.  Section 1123(a)(4) of the Bankruptcy Code

3    requires that the Plan provide the same treatment for all Claims in the same Class, unless the

4    holder of a particular Claim agrees to a less favorable treatment of its Claim.  The treatment of

5    each Class of Claims and Interests is set forth in Articles VIII, IX and X below.

6                                                    **VIII.**

7                                      **UNCLASSIFIED CLAIMS**

8            As required by the Bankruptcy Code, the Plan places Claims and Interests into various

9    Classes according to their right to priority.  However, in accordance with the provisions of

10   Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Section 503(b)(9)

11   Administrative Claims, and Priority Tax Claims are deemed "unclassified."  These Claims are not

12   considered impaired, and they do not vote on the Plan, because they are automatically entitled to

13   specific treatment provided for them in the Bankruptcy Code.  As such, the Debtors have not

14   placed these Claims in a Class.  The treatment of these unclassified Claims is as provided below.

15           **A.        Administrative Claims**.  Administrative Claims are Claims for the expenses of

16   administering a Debtor's Case that are allowed under Bankruptcy Code Section 507(a)(2), as well

17   as Claims for goods received by the Debtors in the ordinary course of business within 20 days of

18   the order for relief.   The Bankruptcy Code requires that all administrative claims be paid on the

19   effective date of a Chapter 11 plan, unless a particular creditor agrees to a different treatment of its

20   claim.  The treatment of Administrative Claims and Section 503(b)(9) Administrative Claims in

21   the Plan is as described below.

22           1.        Payment Generally.  Except to the extent that the holder of an Allowed

23   Administrative Claim agrees to a different treatment of its Administrative Claim, and subject to

24   the bar dates for Section 503(b)(9) Administrative Claims and all other Administrative Claims,

25   each Allowed Administrative Claim shall be Paid in Full, in Cash, on the latest of (i) the Effective

26   Date, (ii) the tenth (10th) Business Day after the date upon which such Administrative Claim

27   becomes an Allowed Administrative Claim, or (iii) the date upon which such Allowed

28   Administrative Claim becomes due according to its terms.

2.    Waiver of Claims.  The Gantes Parties have agreed to waive and thus are hereby barred from asserting any and all Claims, including, but not limited to, Administrative Claims, that any of the Gantes Parties, individually or collectively, have or may have against the Estates.

3.    Administrative Claims Bar Date.  Any holder of an Administrative Claim that does not file and properly serve such a request for payment by the General Administrative Claims Bar Date and the Bar Date for Section 503(b)(9) Claims, as the case may be, shall be forever barred from asserting such Administrative Claim against the Debtors, the Reorganized Debtors, their Estates, or any of their property, or the Committee.  Notwithstanding anything to the contrary contained in the foregoing, (i) any Governmental Unit may assert an Administrative Tax Claim or other post-petition Tax Claim pursuant to the statutory requirements applicable thereto without regard to the General Administrative Claims Bar Date; and (ii) holders of accrued post-petition *ad valorem* Tax Claims against property owned by the Reorganized Debtors shall retain any Liens that they may have pursuant to applicable law on account of such Tax Claims, and holders of such Tax Claims shall be paid the amount of their Tax Claims in the ordinary course of the Reorganized Debtors' businesses without the requirement that a Proof of Claim or request for payment of such Tax Claim be filed with the Bankruptcy Court.

4.    Projected Administrative Claims.  The following chart is an estimate of all of the Debtors' projected and unpaid Administrative Claims and Section 503(b)(9) Administrative Claims.

| Name | Amount Owed |
|---|---|
| Clerk's Office Fees | $0 (est.) |
| Office of the U. S. Trustee Fees | $6,500 (est.) |
| Winthrop Couchot P.C. (Debtors' General Insolvency Counsel) | $20,000 (est.) |
| Braunco, Inc., (Debtors' Valuation Advisor) | $0 (est.) |
| Law Offices of A. Lavar Taylor (Debtors' Special Tax Counsel) | $0 (est.) |
| Blakeley & Blakeley LLP (Committee's Counsel) | $20,000 (est.) |
| Phoenix Group Advisory Services, LLC (Committee's Financial Advisors) | $10,000 (est.) |

| Name | Amount Owed |
|------|-------------|
| Freeman, Freeman & Smiley (Debtors' Special Corporate Counsel) | $25,000 |
| Section 503(b)(9) Claims | $0 (est.) |
| **TOTAL** | $81,500 (est.)[8] |

    **B.**    **Priority Tax Claims.**  Unless the holder of an Allowed Priority Tax Claim agrees to a different treatment thereof, each holder of an Allowed Priority Tax Claim shall receive under the Plan deferred cash payments, of a value, as of the Effective Date, equal to its Allowed Claim. Such deferred cash payments, including principal and interest, shall be paid on a quarterly basis, and shall be in an amount sufficient to fully amortize each Allowed Priority Tax Claim over a period not to exceed five (5) years from the Effective Date.  The outstanding and unpaid amount of each Allowed Priority Tax Claim shall bear interest accruing at the rate specified by Section 6621 (a) of the Internal Revenue Code on the Effective Date, commencing on the Effective Date and continuing until such Allowed Priority Tax Claim is paid in full.  Payment of any Allowed Priority Tax Claim shall commence on the later of (a) the fifteenth (15th) day of the first full month following the Effective Date, or (b) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Tax Claim.  Such payments shall continue quarterly on the fifteenth day of each full month every three (3) months thereafter until Paid in Full, in accordance with the provisions of Section 4.2 of the Plan.  Creditors holding Allowed Priority Tax Claims may be prepaid at any time without any penalty or other charges.

    **C.**    **Amount of Priority Tax Claims.**  The following chart is an estimate of all of the Debtors' Priority Tax Claims.

| Creditor | Claim |
|----------|-------|
| Internal Revenue Service | $ 633,782.00 |
| Employment Development Department (CA) | 160,842.75 |
| Franchise Tax Board (CA) | 454,162.00 |
| Utah Tax Board (Sales Taxes) | 275,761.32 |
| Utah Tax Board (Payroll Taxes) | 4,113.74 |
| Total | $1,528,661.81 |

---

[8] The Professionals (Winthrop Couchot Professional Corporation, Braunco, Inc., Law Offices of A. Lavar Taylor, Blakeley & Blakeley and Phoenix Group Advisory Services, LLC) have obtained payment of a substantial amount of their post-petition fees and costs on a monthly basis during the Cases.  The Debtors' estimate of fees owed to the Professionals as of the Effective Date assumes that the Debtors will continue to make monthly payments to Professionals through the Effective Date, and accounts for any pre-petition retainers paid by the Debtors.

-37-

# IX.

## CLASSIFICATION OF CLAIMS AND INTERESTS

A.    **General Overview.**  As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights.  The table in Paragraph IX(B) below lists each Class of Claims and Interests established under the Plan and states whether each Class is impaired or is unimpaired by the Plan.  A Class is "unimpaired" if the Plan leaves unaltered the legal, equitable and contractual rights to which the holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.  Article VI of the Plan sets forth the treatment that each Class will receive under the Plan.

B.    **Designation of Classes**.  The Plan provides for the establishment of the following Classes of Claims and Interests.

| Class | Creditors | Impaired or Unimpaired |
|---|---|---|
| Class 1.1 Claims | Allowed Secured Claim of Irwin Franchise Capital | Impaired |
| Class 1.2 Claims | Allowed Secured Claim of Irwin Franchise Capital | Impaired |
| Class 1.3 Claims | Allowed Secured Claim of Irwin Franchise Capital | Impaired |
| Class 1.4 Claims | Allowed Secured Claim of American Sterling | Impaired |
| Class 1.5 Claims | Allowed Secured Claim of American Sterling | Impaired |
| Class 1.6 Claims | Allowed Secured Claim of California Bank & Trust | Impaired |
| Class 1.7 Claims | Allowed Secured Claim of Coca Cola Financial | Impaired |
| Class 1.8 Claims | Allowed Secured Claim of Leaf Financial | Impaired |
| Class 1.9 Claims | Allowed Secured Claim of Vineyard Bank | Impaired |
| Class 2.1 Claims | Allowed Secured Claim of CommerceWest | Unimpaired |
| Class 2.2 Claims | Allowed Secured Claim of CommerceWest | Unimpaired |
| Class 2.3 Claims | Allowed Secured Claim of CommerceWest | Unimpaired |
| Class 2.4 Claims | Allowed Secured Claim of Sunwest Bank | Unimpaired |
| Class 3 Claims | Allowed Secured Capital Lease Claims | Impaired |
| Class 4 Claims | Allowed Priority Unsecured Wage Claims | Impaired |
| Class 5 Claims | Allowed General Unsecured Claims | Impaired |
| Class 6 Claim | Allowed Secured Claims of Governmental Units | Impaired |
| Class 7 Claims | Allowed Non-Pecuniary Loss Penalty Claims | Impaired |
| Class 8 Interests | Interests in BlueOcean and SoWestBreck | Impaired |

# X.

## PROVISIONS FOR THE TREATMENT OF CLAIMS AND INTERESTS

A.    **Classes 1.1 Through 1.9.**  All Claims and rights of the members of Classes 1.1 through 1.9 as of the Effective Date, shall be governed by the terms of the Plan only, and all prior

-38-

1  agreements shall be null and void.  The treatment provided herein shall be a full satisfaction of

2  each Class 1 Creditor's Allowed Secured Claim.

3         1.    Allowance of Secured Claims.  Each Creditor in Classes 1.1 through 1.9

4  shall be allowed a Secured Claim to the extent of the value of such Creditor's Claim and interest in

5  the Estate's interest in such property, which shall be based on Fair Market Value of the property

6  (or such other value as agreed to by the Debtors and the respective secured creditor) securing such

7  Creditor's Claim in Classes 1.1 through 1.9 as set forth in Schedule 6.1 attached to the Plan.    If

8  any Creditor objects to the Debtors' asserted value of the property securing such Creditor's Claim,

9  then, the Debtors may elect, at their sole discretion, to:  (i) fix the amount of such objecting

10  Creditor's Allowed Secured Claim at the Objection Value, and (ii) in lieu of making payments as

11  proposed in Section 6.1.2 of the Plan, and in full satisfaction of such Creditor's Allowed Secured

12  Claim, require that such Creditor repossess the property securing such Claim.  In the event of such

13  an objection and the Debtors' election of the Repossession Option, then the Allowed Deficiency

14  Claim for such objecting Creditor shall be equal to the difference between such Creditor's Claim

15  and the Objection Value.

16         2.    Payment of Allowed Secured Claim.  Each holder of an Allowed Secured

17  Claim in Classes 1.1 through 1.9 shall be treated, at the election of the Debtors after consultation

18  with the Committee and the Creditor Board Members, as the case may be, as follows:

19         a.    Option 1.  Each holder of an Allowed Secured Claim in Classes 1.1

20  through 1.9 will receive on account of such Allowed Secured Claim deferred cash payments

21  totaling the allowed amount of such Allowed Secured Claim, equal to the value, as of the Effective

22  Date, of such Creditor's interest in the Estate's interest in such property.  In particular, Creditors of

23  Classes 1.1 through 1.9 shall each be paid interest only for the first twelve months after the

24  Effective Date, and thereafter, shall be paid in equal monthly installments, with interest, which

25  shall accrue at the Allowable Interest Rate, commencing on the First Payment Date, fully

26  amortized over the periods set forth in Schedule 6.1 based on the Allowed Secured Claim.  The

27  total Claim, Allowed Secured Claim (i.e., Fair Market Value of the property securing the Claim),

28  Allowed Deficiency Claim, and monthly payments to be made to each particular Creditor is set

1  forth on Schedule 6.1 to the Plan. Any Allowed Secured Claim in Classes 1.1 through 1.9 may be

2  prepaid at any time without penalty or other charge. Notwithstanding the foregoing, in the event

3  any collateralized equipment or building is sold by the Reorganized Debtors, the proceeds

4  generated from the disposition of such sale, net of all expenses, shall be paid to the holder of the

5  Allowed Secured Claim whose collateral was sold, up to the amount of the Allowed Secured

6  Claim, reflecting all payments made to such Creditor under the terms of the Plan.

7          The Creditors' Allowed Secured Claims of Class 1 shall continue to be

8  secured by the Creditors' existing Lien on each of its collateral. Upon full satisfaction of the

9  Creditors' Allowed Secured Claim in Class 1, the Creditors' Lien on its collateral shall be released

10  and the applicable Debtor shall retain title to such collateral free and clear of the Creditors' Lien.

11  Any Allowed Deficiency Claim of the Creditor shall be treated as an Allowed General Unsecured

12  Claim in the amount set forth in Schedule 6.1 attached to the Plan.

13          b.    Option 2. The Creditor's collateral shall be returned to the Creditor

14  on the Effective Date in full satisfaction of such Creditor's Allowed Secured Claim. Any Allowed

15  Deficiency Claim of the Creditor as set forth on Schedule 6.1 attached to the Plan shall be treated

16  as a Class 4 Allowed General Unsecured Claim.

17          c.    Option 3. Notwithstanding any contractual provision or applicable

18  law that entitles the holder of the Allowed Secured Claim to demand or to receive accelerated

19  payment of such Claim after the occurrence of a default: (i) any such default shall be cured, other

20  than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) the maturity of

21  such Claim shall be reinstated as such maturity existed before such default; (iii) the holder of such

22  Allowed Secured Claim shall be compensated for any damages incurred by such Creditor as a

23  result of any reasonable reliance by such Creditor on such contractual provision or such applicable

24  law; and (iv) the legal, equitable or contractual rights to which such Allowed Secured Claim

25  entitles the holder of such Claim shall not otherwise be altered.

26          The foregoing treatment shall be in full satisfaction of each Class 1

27  Creditor's Allowed Secured Claim.

28

3.    <u>Insurance</u>. If either Option 1 or 3 is elected by the Debtors for a particular Creditor in this Class, then the Debtors shall maintain insurance coverage for the property securing the Claim for such Creditor.

4.    <u>Late Fees and Event of Default</u>. If either Option 1 or 3 is elected by the Debtors for a particular Creditor in this Class, then the Debtors shall be liable for a late fee equal to five percent (5%) of the past due amount for failure to make payments to this Creditor within ten business days after the date due under the Plan, which is not imposed as a charge for the use of money, but to offset administrative expenses and other costs incurred. Failure to make a payment due to this Creditor under the Plan within fifteen business days after the date due under the Plan shall constitute a Class 1 Event of Default as against such Creditor. The Debtors shall have a period of thirty (30) days after receipt of written notice of an asserted Class 1 Event of Default relating to an alleged failure by the Debtors to pay a payment required under the Plan within which to cure such Class 1 Event of Default. In the event that the Debtors should fail to cure timely any such Class 1 Event of Default, the applicable Class 1 creditor shall be entitled to proceed to exercise its remedies against the Debtors and against such creditor's respective collateral, in accordance with the provisions of the Bankruptcy Code, the Plan and applicable law.

5.    <u>Inspection of Equipment</u>. If either Option 1 or 3 is elected by the Debtors for a particular Creditor in this Class, then in the event of an Unsecured Class 1 Default, the applicable Creditor shall be entitled to inspect the collateral securing its Claim upon reasonable notice made in writing not less than five Business Days in advance.

**B.    Classes 2.1 Through 2.4.** All Claims and rights of the members of Classes 2.1 through 2.4, as of the Effective Date, shall be governed by the Plan and the terms of the loan assumption agreement entered into post-petition between BlueOcean and each member of Class 2. The treatment provided herein shall be a full satisfaction of each Class 2 Creditor's Allowed Secured Claim.

1.    <u>Allowance of Secured Claims</u>. Each Creditor in Classes 2.1 through 2.4 shall be allowed a Secured Claim in the amount set forth in Schedule 6.2 attached to the Plan.

1        2.    Payment of Allowed Secured Claim. Each holder of an Allowed Secured

2    Claim in Classes 2.1 through 2.4 shall be treated, at the election of the Debtors after consultation

3    with the Committee and the Creditor Board Members, as the case may be, as follows:

4        a.    Option 1. Each holder of an Allowed Secured Claim in Classes 2.1

5    through 2.4 will receive on account of such Allowed Secured Claim deferred cash payments

6    totaling the allowed amount of such Allowed Secured Claim, equal to the value, as of the Effective

7    Date, of such Creditor's interest in the Estate's interest in such property. In particular, Creditors of

8    Classes 2.1 through 2.4 shall each be paid in equal monthly installments, with interest, which shall

9    accrue at the Allowable Interest Rate, commencing on the First Payment Date, fully amortized

10   over the periods set forth in Schedule 6.2 based on the Allowed Secured Claim. The total Allowed

11   Secured Claim and monthly payments to be made to each particular Creditor is set forth on

12   Schedule 6.2 to the Plan. Any Allowed Secured Claim in Classes 2.1 through 2.4 may be prepaid

13   at any time without penalty or other charge. Notwithstanding the foregoing, in the event any

14   collateralized equipment or building is sold by the Reorganized Debtors, the proceeds generated

15   from the disposition of such sale, net of all expenses, shall be paid to the holder of the Allowed

16   Secured Claim whose collateral was sold, up to the amount of the Allowed Secured Claim,

17   reflecting all payments made to such Creditor under the terms of the Plan.

18       The Creditors' Allowed Secured Claims of Class 1 shall continue to be

19   secured by the Creditors' existing Lien on each of its collateral. Upon full satisfaction of the

20   Creditors' Allowed Secured Claim in Class 1, the Creditors' Lien on its collateral shall be released

21   and the applicable Debtor shall retain title to such collateral free and clear of the Creditors' Lien.

22       b.    Option 2. The Creditor's collateral shall be returned to the Creditor

23   on the Effective Date in full satisfaction of such Creditor's Allowed Secured Claim.

24       c.    Option 3. Notwithstanding any contractual provision or applicable

25   law that entitles the holder of the Allowed Secured Claim to demand or to receive accelerated

26   payment of such Claim after the occurrence of a default: (i) any such default shall be cured, other

27   than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) the maturity of

28   such Claim shall be reinstated as such maturity existed before such default; (iii) the holder of such

1  Allowed Secured Claim shall be compensated for any damages incurred by such Creditor as a

2  result of any reasonable reliance by such Creditor on such contractual provision or such applicable

3  law; and (iv) the legal, equitable or contractual rights to which such Allowed Secured Claim

4  entitles the holder of such Claim shall not otherwise be altered.

5          The foregoing treatment shall be in full satisfaction of each Class 2

6  Creditor's Allowed Secured Claim.

7          **C.     Class 3 – Allowed Secured Capital Lease Claims.**  The Debtors believe that no

8  Allowed Secured Capital Lease Claim will be asserted against them.  In the event that the Debtors

9  should determine that Allowed Secured Capital Lease Claims will be asserted, each such Claim

10  shall be classified as a separate subclass under Section 6.3 of the Plan.  Any holder of an Allowed

11  Secured Capital Lease Claim shall be treated as follows at the election of the Debtors after

12  consultation with the Committee or the Creditor Board Members, as the case may be:

13          1.     Option 1.  Each holder in Class 3 2.1 shall be paid in full through eighty-

14  four (84) equal monthly installments of principal equal to the Creditor's Allowed Secured Capital

15  Lease Claim plus interest accruing at the Allowable Interest Rate commencing on the First

16  Payment Date.  Any Allowed Secured Capital Lease Claim may be prepaid at any time without

17  penalty or other charge.  The Creditor's Allowed Secured Capital Lease Claim shall continue to be

18  secured by the Creditor's existing Lien on its collateral.  Upon full satisfaction of the Creditor's

19  Allowed Secured Capital Lease Claim, the Creditor's Lien on its collateral shall be released and

20  the applicable Debtor shall retain title to such collateral free and clear of the Creditor's Lien.  Any

21  Allowed Deficiency Claim of the Creditor shall be treated as a Class 5 Allowed General

22  Unsecured Claim.

23          2.     Option 2.  The Creditor's collateral shall be returned to the Creditor on the

24  Effective Date in full satisfaction of such Creditor's Allowed Secured Capital Lease Claim.  Any

25  Allowed Deficiency Claim of the Creditor shall be treated as a Class 5 Allowed General

26  Unsecured Claim.

27          3.     Option 3.  Notwithstanding any contractual provision or applicable law that

28  entitles the holder of the Allowed Secured Capital Lease Claim to demand or to receive

-43-

1  accelerated payment of such Claim after the occurrence of a default: (i) any such default shall be

2  cured, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) the

3  maturity of such Claim shall be reinstated as such maturity existed before such default; (iii) the

4  holder of such Allowed Secured Capital Lease Claim shall be compensated for any damages

5  incurred by such Creditor as a result of any reasonable reliance by such Creditor on such

6  contractual provision or such applicable law; and (iv) the legal, equitable or contractual rights to

7  which such Allowed Secured Capital Lease Claim entitles the holder of such Claim shall not

8  otherwise be altered.

9         The foregoing treatment shall be in full satisfaction of each Class 3 Creditor's

10 Allowed Secured Claim.

11     **D.**     **Class 4 -- Allowed Priority Unsecured Wage Claims**.  Each holder of an Allowed

12 Priority Unsecured Wage Claim shall be paid the full amount of its Allowed Priority Unsecured

13 Wage Claim in cash on the latest of the following dates:  (i) the Effective Date, (ii) the tenth

14 (10th) Business Day after the date upon which such Priority Unsecured Claim becomes an

15 Allowed Priority Unsecured Wage Claim, or (iii) the date upon which such Allowed Priority

16 Unsecured Wage Claim becomes due according to its terms.

17     **E.**     **Class 5 -- Allowed General Unsecured Claims**.  Class 5 consists of all Allowed

18 General Unsecured Claims. Each General Unsecured Creditor shall receive, in exchange for its

19 Claim against the Estate, an Interest in and Claim against Holdco.  The treatment of Allowed

20 General Unsecured Claims is more particularly described as follows:

21         1.     Equity Interest in Holdco.  General Unsecured Creditors shall receive a 95%

22 Interest in Holdco, which shall include 100% voting rights over the Reorganized Debtors.  General

23 Unsecured Creditors shall retain 100% voting rights over the Reorganized Debtors until Paid in

24 Full.  The actual Interest provided to each General Unsecured Creditor will be based on each

25 General Unsecured Creditor's Pro Rata share of the aggregate of Allowed General Unsecured

26 Claims.  For an additional description of the equity interest to be owned by the General Unsecured

27 Creditors and the rights associated therewith, see Section 7.2. of the Plan.

28

2.    <u>Payment of Claims</u>. Holdco shall assume all Allowed General Unsecured Claims, which shall be paid, with simple interest accruing at the Allowable Interest Rate per annum, commencing on the Effective Date, and continuing until Paid in Full, based on the parameters described herein. The Reorganized Debtors shall pay to each General Unsecured Creditor, based on its Pro Rata share of all Allowed General Unsecured Claims, a semiannual payment in an amount equal to the lesser of: (i) Excess Cash, or (ii) Unsecured Creditors Semiannual Payment Cap, unless Priority Tax Claims have been Paid in Full, in which case the semiannual payment to General Unsecured Creditors may equal the Excess Cash. Payments to General Unsecured Creditors shall commence on the later of: (a) the fifteenth (15th) business day of the first full month following the Effective Date, or (b) the tenth (10th) Business Day after entry of a Final Order allowing all General Unsecured Creditors' Claims, and shall continue on a semiannual basis thereafter, until the Allowed General Unsecured Claims are Paid in Full, with interest. In addition to the foregoing, General Unsecured Creditors shall also receive any Net Proceeds to which they are entitled pursuant to Section 7.9 of the Plan. Allowed General Unsecured Claims may be prepaid at any time without penalty or other charge.

3.    <u>Holdco Board</u>. The General Unsecured Creditors, through the Creditor Board Members, shall actively manage the Holdco Board and thus the Reorganized Debtors. For a detailed discussion of the composition, roles, responsibilities, and other matters relating to the Holdco Board, see Section 7.3 of the Plan.

4.    <u>Waiver of Gantes Parties' Claims</u>. Except as other provided herein, the Gantes Parties have agreed to waive all Claims against the Estates. Accordingly, the Gantes Parties shall be barred from asserting any General Unsecured Claim against the Estates.

5.    <u>Waiver</u>. Except as expressly provided herein with respect to consent required by the Holdco Board, any conditions set forth herein may be waived by the Holdco Board in its sole discretion.

**F.    Class 6 -- Any Allowed Secured Claim of Governmental Units**. The Debtors believe that no significant Claims of any Governmental Unit will be allowed as a secured claim against the Estates. Nevertheless, if any of the asserted Claims are allowed, such Claims shall be

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1  treated and paid in the same manner as Allowed Priority Tax Claims as provided for in Section 4.2

2  of the Plan.

3      **G.     Class 7 -- Any Allowed Non-Pecuniary Loss Penalty Claims.**  Each such

4  Allowed Non-Pecuniary Loss Penalty Claim shall be classified as a separate subclass under

5  Section 6.7 of the Plan.  Each Class 7 Creditor shall receive an amount equal to 10% of the

6  Allowed Non-Pecuniary Loss Penalty Claim, which shall not accrue interest, and shall be paid in

7  one lump sum on the Repayment Date.

8      The Debtors reserve the right to object to any Non-Pecuniary Loss Penalty Claim asserted

9  by a Governmental Unit.  Nothing contained herein shall be deemed to be any admission by the

10  Debtors of the amount of the Claim  asserted by a Governmental Unit.

11      **H.     Class 8 -- Interests in BlueOcean and SoWestBreck.**  Class 8 is comprised of the

12  Interests of the holders of all of the interests in BlueOcean and SoWestBreck.  All legal, equitable

13  and contractual rights of the holders of all interests in BlueOcean and SoWestBreck are hereby

14  unequivocally extinguished in their entirety.  Accordingly, these Interests are impaired by this

15  Plan.

16                          **XI.**

17              **MEANS OF IMPLEMENTING THE PLAN**

18      **A.     Introduction**.  This article is intended to explain the means by which the Debtors

19  intend to effectuate the reorganization provided for under the Plan, and how the Debtors intend to

20  fund the obligations to Creditors undertaken in the Plan.  This article provides information

21  regarding prospective corporate governance of the Debtors, funding sources for Plan obligations,

22  and other material issues bearing upon the performance of the Plan.

23      **B.     The Reorganized Debtors**.  Subject to the provisions of Article III of the Plan,

24  each Restaurant shall, upon the Effective Date, be transferred to and owned by a separate Subco,

25  which shall be wholly-owned and managed by Holdco.  A schematic illustrating the organization

26  structure of Holdco and its subsidiary Subcos is attached as Schedule 7.2 to the Plan.

27          1.     General Unsecured Creditors' Interest in Holdco.  General Unsecured

28  Creditors shall own and hold all of the Interests in Holdco other than the securities owned by

1  Gantes as described below, as well as 100% of all shareholder voting rights in Holdco until

2  General Unsecured Creditors are Paid in Full.  The Creditor Board Members shall control the

3  shareholder voting rights of the Holdco equity owned by the General Unsecured Creditors, and the

4  shareholder voting rights of the Holdco equity owned by Gantes until the Repayment Date.  Once

5  the General Unsecured Creditors have been Paid in Full, any Interests in Holdco owned by the

6  General Unsecured Creditors shall be immediately transferred to Gantes.

7          2.      Gantes's Interest in Holdco.  Gantes shall initially receive a 5% Interest in

8  Holdco, and shall be entitled to earn the remaining 95% Interests in Holdco as General Unsecured

9  Creditors are indefeasibly repaid in cash above certain thresholds (see Schedule 7.2 attached to the

10  Plan, which outlines Gantes's right to earn additional Interests in Holdco) during the Gantes

11  Involvement Period.  Gantes shall assign his shareholder voting rights in Holdco to the Creditor

12  Board Members until the Repayment Date.  Gantes shall not be entitled to accrue or receive any

13  dividends, distributions or other payment, compensation or consideration until the Repayment

14  Date.  Once the General Unsecured Creditors have been Paid in Full, all securities for and

15  shareholder rights in Holdco owned by the General Unsecured Creditors shall be immediately

16  transferred to Gantes.

17      **C.      Management/Board of Directors.**  During the Creditor Involvement Period,

18  Holdco shall be controlled by the Holdco Board consisting of five members, three of which shall

19  be Creditor Board Members, unless the Creditor Board Members determine a lesser number

20  should serve on the Holdco Board, and two of which shall include Gantes and Brian Weiss, unless

21  either choose to be replaced, which replacement must be approved by the Creditor Board

22  Members. 'It is anticipated that Al Chavez (the Committee's financial advisor), Daniel W.

23  Harrow and Lewis Jaffe will serve as the initial Creditor Board Members. Résumés for these

24  Creditor Board Members are attached collectively as Exhibit "7." Should a change in the

25  composition of the Creditor Board Members be necessary prior to the Effective Date, then the

26  Debtors shall make such changes after considering input from the Committee.

27          1.      Gantes.  During the Creditor Involvement Period, Gantes will not receive

28  any direct compensation from the Debtors for his services as a member of the Holdco Board.  It is

1   expected that Gantes will receive an annual salary of $260,000 from Synergy for his services as the

2   executive director of Synergy, which services include the management of numerous restaurants

3   other than those owned by the Debtors, many of which Gantes may have an interest.

4          Gantes earned a bachelor's degree in economics from Stanford University in 1976, and a

5   post-graduate degree in Finance and Real Estate from the UCLA Graduate School of Management

6   Executive MBA Program in 1982. In 1983, Gantes, through affiliated companies he owned and/or

7   controlled, began acquiring franchise rights from and operating more than 100 franchises of large

8   franchisors, including Burger King Corporation, Ruby's Diner, Bruegger's Bagel Bakery, On the

9   Border Mexican Grill, Carino's Italian Grill, Arby's, Coco's, Applebees, Houlihans, El Pollo

10  Loco, Famous Dave's, and more. The Gantes affiliated companies are consistently recognized as

11  one of the top franchisees of by various franchisors, and have received over the years numerous

12  awards from the franchisors.

13         2.    Brian Weiss.    As stated in Section V.D.3.C above, on or about February 2,

14  2009, Brian Weiss was hired as the Debtors' CRO in order to facilitate the Debtors' efforts to

15  reorganize and to provide assurances to creditors that reorganization decisions are being made by

16  someone whose sole focus is on ensuring that the Debtors fulfill their fiduciary duties to creditors.

17  During the Creditor Involvement Period, Mr. Weiss will continue to serve as the Debtors' CRO for

18  which he will receive an annual salary of $84,000, subject to annual review by the Holdco Board.

19  Mr. Weiss's sophisticated experience and qualifications clearly justify his salary.  The following

20  is a brief description of Mr. Weiss's experience.

21         Mr. Weiss has extensive experience advising public and private companies on

22  complex transactions, corporate restructurings, operations, acquisitions and divestitures.  Mr.

23  Weiss has specifically played a critical role in the workouts and at least two successful Chapter 11

24  plan confirmations. Mr. Weiss has also advised numerous companies through operational and

25  financial restructurings.

26         Mr. Weiss served in senior financial executive capacities for over ten years,

27  including Vice President of Finance, North America for an international toy company with

28  revenues in excess of $1 billion. Mr. Weiss successfully led the financial turnaround of the North

1  America business unit, prior to its merger with its largest competitor. Previously, Mr. Weiss

2  served as Financial Controller for Jazz Semiconductor, a spin-off of Conexant Systems'

3  semiconductor manufacturing operations. Mr. Weiss was responsible for preparing the company

4  for an initial public offering, leading the acquisition due diligence process, structuring joint

5  ventures/strategic investments, oversight of all finance, accounting and reporting functions as well

6  as the company-wide implementation of the Sarbanes-Oxley Act. Mr. Weiss holds an MBA from

7  the University Southern California and is a licensed Certified Public Accountant and was formerly

8  employed by PriceWaterhouseCoopers LLP.

9          Mr. Weiss was first introduced to Gantes by Winthrop Couchot ("Firm") in

10 approximately February 2009 to assist the Debtors in their organization. The Firm first became

11 acquainted with Mr. Weiss through the Firm's representation of Flashcom, Inc., where Mr. Weiss

12 was employed in-house and played a critical role in the administration of the bankruptcy and

13 ultimately confirmation of a plan. Thereafter, the Firm worked with Mr. Weiss on other

14 Chapter 11 bankruptcies, which too resulted in successful confirmation of plans of reorganization.

15 Since then, the Firm has worked with Mr. Weiss on several other workouts and related projects,

16 which has produced successful results.

17          3.      Al Chavez. Mr. Chavez is a partner of the Phoenix Group, LLC

18 ("Phoenix"), which provides financial advisory and consulting services to clients in a broad array

19 of industries, particularly those in financial distress. Phoenix (and exclusively, Mr. Chavez) has

20 been serving as the Committee's financial advisor in this case. As a result, Mr. Chavez has gained

21 substantial knowledge about the Debtors' business. Mr. Chavez has vast experience in managing

22 and serving as a chief executive for middle market companies with revenues of $10-100 million,

23 particularly those in distress. Mr. Chavez, a Certified Public Accountant, began his career with

24 Arthur Young and Company in 1974, working primarily in the audit and management services

25 practices. Mr. Chavez represented companies in the public and private sectors with revenues

26 ranging from $5 million to over $1 billion. Mr. Chavez was involved in several mergers and

27 acquisitions and initial public offering engagements.

28

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1          4.    Compensation for Independent Holdco Board Members.  Only objective

2 Independent Holdco Board members shall receive customary fees and expense reimbursement for

3 Holdco Board participation.  Initially, these fees shall be $3,000 per quarter, per Independent

4 Holdco Board Member, and subject to annual review by the Holdco Board.  Gantes shall not

5 receive any compensation or expense reimbursement for his Board participation.  The Independent

6 Holdco Board Members and officers will be indemnified by Holdco and will be covered by

7 customary directors' and officers' insurance as determined by the Holdco Board, including the

8 affirmative approval of at least a majority of the Creditor Board Members.

9          5.    Management of Operations.  Holdco through its officers and subject to

10 Holdco Board oversight and, as necessary, Holdco Board approval, will (i) oversee the restaurant

11 operations performed by Managementco; (ii) oversee all legal and financial functions, monitor

12 operational performance and adherence to the Franchise Agreement, measure Synergy's

13 performance and monitor its financial condition; (iii) provide administrative functions not

14 provided by Synergy; and (iv) manage any acquisitions and divestitures, contract approval and all

15 business proposals whether or not submitted by or on behalf of, or related directly or indirectly to,

16 Synergy and/or Gantes or any affiliate or related party of either of the foregoing subject to Holdco

17 Board oversight and, as necessary, Holdco Board approval.

18        ***Major Decisions.***  During the Creditor Involvement Period, Major Decisions

19 regarding Holdco, any Subco or any Restaurant require Holdco Board approval, including the

20 affirmative approval of at least a majority of the Creditor Board Members.  Other items

21 customarily subject to oversight of a board which occur at a Subco or with respect to a Restaurant

22 would need the approval of the Holdco Board.

23        ***Material Changes.***  During the Creditor Involvement Period, any material changes

24 to operations and/or internal controls for Holdco or any Subco, including (a) financial policies and

25 controls surrounding approval of commitments (e.g., purchase orders, non-franchisor advertising)

26 and distribution of funds and (b) operational policies and controls that fall outside of the terms of

27 the franchise agreement relating to restaurant key metrics (financial, operational and sales), will be

28

1  approved or established by Holdco and the Subcos with the approval of the Holdco Board,

2  including the affirmative approval of a majority of the Creditor Board Members.

3         ***Managementco.*** It is anticipated that each Subco will enter into an amended

4  Management Agreement with Managementco upon the Effective Date, which shall include a right

5  for each party to terminate the Management Agreement after ninety days' written notice. This

6  amended Management Agreement shall contain terms more favorable than the Management

7  Agreement already approved by this Court. Managementco shall oversee the day-to-day restaurant

8  operations, including paying independent vendors, suppliers and employees. The Management

9  Agreement will include performance criteria, monitoring processes (including receiving regular

10 information), compensation (including fees and expense reimbursement) and penalty provisions

11 for non-performance and/or underperformance. The officers of Holdco and each Subco shall

12 directly oversee Managementco, including performance at the restaurant, Subcos and

13 Managementco levels. Synergy will be the initial Managementco.

14        During Creditor Involvement Period, any payment or other compensation or

15 consideration to Managementco, any of the current owners or principals of the Debtors (including

16 Gantes) or any affiliate or related party of any of the foregoing, whether such payment,

17 compensation or consideration is as a dividend, distribution, fee, expense reimbursement or

18 otherwise, would need the approval of the Holdco Board, including the affirmative approval of a

19 majority of the Creditor Board Members.

20        ***Employment Agreements.*** Holdco shall employ Brian Weiss for a period of not

21 less than one year, with a right to terminate Mr. Weiss for cause. Holdco and/or each Subco may

22 enter into other employment agreements with officers and other members of management of

23 Holdco and Subco, as the Holdco Board determines to be necessary or otherwise in the best

24 interests of the Reorganized Debtors.

25        6.   Synergy. As stated above in Section IV(D)(1), on January 1, 2009, as part

26 of the Debtors' restructuring efforts, the Debtors replaced their management company, BGI, an

27 affiliate of the Debtors, with Synergy, in which no affiliate of the Debtors have an interest.

28 Synergy was formed in December 2008 and is owned by Colin Cooper, a certified public

1 | accountant that has provided accounting services to the Debtors and their affiliates.[9] Colin Cooper

2 | has no ownership interest in any of the Debtors or their affiliated debtor and non-debtor entities.

3 | Synergy has retained the same management as BGI, so that they are familiar with the operations of

4 | the Debtors. Specifically, John Gantes is the executive director, George Gantes is the marketing

5 | director, Tony Meyer is the accounting director, Allan Gantes is the real estate and hotel director,

6 | Ed Rebella is the human resources director, Jim Gantes is the technology director, Rick LeSage is

7 | the operations director, and Les Keenan is the operations director. During the Post-Confirmation

8 | Committee Term, Holdco will pay Synergy a monthly management fee of $6,000 pursuant to the

9 | terms of the management services agreement.

10 |        7.   Subco's Management Fee to Holdco. During the Post-Confirmation

11 | Committee Term, each restaurant will pay Holdco a management fee equal to $2,500 for the

12 | services provided by Holdco. Such amount will be paid on the first day of each month. A copy of

13 | the Holdco budget is included in Exhibit "9." Such management fee is designed to pay all of the

14 | costs and expenses of Holdco, and shall be adjusted from time to time as the Holdco Board deems

15 | reasonable, with the affirmative approval of at least a majority of the Creditor Board Members.

16 | Holdco may hire such advisors (including accountants and lawyers), representatives and

17 | consultants, and pay the reasonable costs and expenses of such advisors, representatives and

18 | consultants, as the Holdco Board deems reasonable and necessary (with the affirmative approval of

19 | at least a majority of the Creditor Board Members) to operate the business and perform the needed

20 | or desired functions of Holdco.

21 |     **D.**   **Corporate Actions**. On the Effective Date, all actions contemplated by the Plan

22 | shall be deemed authorized and approved in all respects (subject to the provisions of the Plan) by

23 | virtue of the entry of the Confirmation Order, in accordance with the Bankruptcy Code and

24 | applicable state law and without any requirement of further action by the stockholders, officers or

25 | directors of the Debtors or the Reorganized Debtors. All matters provided for under the Plan

26 | involving the corporate structure of the Debtors or Reorganized Debtors and any corporate action

27 | required by the Debtors or by the Reorganized Debtors in connection with the Plan shall be

28 |

---

[9] The Reorganized Debtors do not intend to use Cooper for accounting or tax services post Effective Date.

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1  deemed to have occurred and shall be in effect pursuant to the Bankruptcy Code, without any

2  requirement of further action by the shareholders, officers or directors of the Debtors or

3  Reorganized Debtors. On the Effective Date, the officers of the Reorganized Debtors are

4  authorized and directed to implement the provisions by the Plan and any other agreements,

5  documents and instruments contemplated by the Plan in the name of and on behalf of the

6  Reorganized Debtors.

7  **E.    Transfer of Estate Property to Reorganized Debtors**. Except as otherwise

8  specifically provided in the Plan, on the Effective Date, all property and rights of the Estates of

9  each of the Debtors shall be transferred to each of the Reorganized Debtors as illustrated in

10  Schedule 7.5 attached to the Plan, free and clear of all Claims, Liens, and rights of Creditors and

11  Interests of Interest Holders. Subject to the provisions of Section 7.6 to the Plan, such property

12  and rights to be transferred to, the Reorganized Debtors include, without limitation, all alter ego

13  and derivative claims existing as of the Effective Date, and all other Avoidance Action claims. As

14  of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and

15  dispose of property and settle and compromise Claims or Interests without the supervision of, or

16  any authorization from, the Bankruptcy Court or the United States Trustee, and free of any

17  restriction of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions specifically

18  provided for in the Plan or the Confirmation Order. As of the Effective Date, all property of the

19  Reorganized Debtors shall be free and clear of all Claims, Liens, and other rights of Creditors and

20  Interests of Interest Holders, except as otherwise expressly provided herein.

21  **F.    Funding of the Plan**. The funds necessary to meet the Debtors' obligations to

22  Creditors under the Plan will be generated primarily from the Debtors' operations after the

23  Effective Date. As the financial projections attached hereto as Exhibit "8" indicate, the Debtors

24  project that there will be cash flow from the Debtors' operations during the term of the Plan

25  sufficient for the Debtors to meet such cash needs. The funds necessary to meet the Debtors'

26  obligations on the Effective Date of the Plan will be obtained from the Debtors' operating capital.

27  As the Debtors' financial projections indicate, the Debtors project that they will have cash

28  sufficient to meet all of the obligations provided for in the Plan.

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

**G.**    **Post-Confirmation Estate Claims**.  The Reorganized Debtors shall maintain all rights to enforce, file, litigate, prosecute, settle and collect (on behalf of the Estates) the Post-Confirmation Estate Claims.  Notwithstanding the rights of the Debtors with respect to Post-Confirmation Estate Claims, nothing in the Plan shall require the Debtors to prosecute or litigate any such matters, all of which may be determined by the Debtors in the exercise of their sole and absolute discretion.

**THE DEBTORS HAVE NOT DETERMINED WHETHER POST-CONFIRMATION ESTATE CLAIMS EXIST, INCLUDING, WITHOUT LIMITATION, WHETHER THERE ARE ANY AVOIDANCE ACTIONS THAT MAY BE FILED BY THE REORGANIZED DEBTORS AFTER THE CONFIRMATION DATE.  THIS INVESTIGATION IS ONGOING AND WILL OCCUR, IN LARGE PART, AFTER THE CONFIRMATION DATE.  AS A RESULT, ALL PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE EXISTENCE OF ANY PARTICULAR AVOIDANCE ACTION OR OTHER POST-CONFIRMATION ESTATE CLAIM MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THE PLAN, AN AVOIDANCE ACTION OR OTHER POST-CONFIRMATION ESTATE CLAIM MAY BE FILED AGAINST ANY CREDITOR OR OTHER PARTY AT ANY TIME.**

**H.**    **Avoidance Actions**.  Notwithstanding anything to the contrary herein, one hundred percent (100%) of any Net Proceeds recovered, either before or after the Effective Date, from prosecution or settlement of Avoidance Action claims shall be paid in the following Order: (i) first, to Creditors holding Allowed Administrative Claims and Allowed Cure Claims, based on the pro rata share of such Claims, up to an amount that, in conjunction with other payments made to these Creditors under the Plan, renders such Creditors Paid in Full; (ii) second, to Creditors holding Allowed Priority Tax Claims, up to an amount that, in conjunction with other payments made to these Creditors under the Plan, renders such Creditors Paid in Full; and (iii) third, to General Unsecured Creditors, up to an amount that, in conjunction with other payments made to these Creditors under the Plan, renders such Creditors Paid in Full.  Within three Business Days after the Debtors receive any such Net Proceeds, the Debtors shall deposit such proceeds into an

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1    interest-bearing, segregated account for the benefit of the foregoing from which no disbursements

2    shall be made except for the purpose of funding Distributions hereunder to the foregoing

3    Creditors. The Debtors shall use the funds held in this account to make distributions pursuant to

4    the terms of the Plan. Allowed Claims of the foregoing Creditors shall be credited by the amount

5    of Net Proceeds paid to Creditors of such Claims.

6    **I.**      **Disposition of Assets**. From and after the Effective Date, a Reorganized Debtor

7    shall be entitled to sell, transfer, encumber or otherwise dispose of any interest in any of its assets,

8    without any need for obtaining any approval of the Bankruptcy Court.

9    **J.**      **Compromise of Controversies**. From and after the Effective Date, the

10    Reorganized Debtors shall be entitled to compromise any objections to Disputed Claims, or any

11    controversies relating to Post-Confirmation Estate Claims, Avoidance Actions or other litigation

12    pending after the Confirmation Date without any need for any notice to Creditors or any approval

13    of the Bankruptcy Court.

14    **K.**      **Bankruptcy Court Approval Relative to Post-Confirmation Matters**. Nothing

15    contained in the Plan shall be deemed to impair in any manner the right of a Reorganized Debtor

16    or any party-in-interest to seek at any time after the Effective Date orders of the Bankruptcy Court

17    approving actions to be taken consistent with the Plan as may be necessary or desirable to

18    effectuate the provisions of the Plan.

19    **L.**      **Debtors' Right of Setoff.** Pursuant to Section 553 of the Bankruptcy Code or

20    applicable non-bankruptcy law, the Debtors may set off against any Allowed Claim and

21    Distribution to be made pursuant to the Plan on account of such Allowed Claim (before any

22    Distribution is made on account of such Allowed Claim), any account stated, claim, right, or cause

23    of action which the Debtors or the Estates may possess against the holder of such Allowed Claim;

24    provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim

25    shall constitute a waiver or release by the Debtors or the Estates of any such account, claim, right,

26    and cause of action that the Debtors or the Estates may possess against the holder of such Allowed

27    Claim. To the extent that the Debtors in allowing a Claim fails to effect a setoff with a Creditor

28    and seeks to collect a claim from such Creditor after a Distribution to such Creditor pursuant to the

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1 | Plan, the Debtors shall be entitled to full recovery on their claim against such Creditor,

2 | notwithstanding any payment of the Creditor's Allowed Claim pursuant to the Plan.

3 |      In accordance with the provisions of Section 553 of the Bankruptcy Code, the Internal

4 | Revenue Service shall be entitled to set off against any amounts that the Internal Revenue Service

5 | may owe to the Debtors on account of overpayments by the Debtors of pre-confirmation taxes any

6 | pre-confirmation tax liabilities that the Debtors may owe to the Internal Revenue Service.

7 |     **M.**    **Cash Payments**. Cash payments made pursuant to the Plan shall be in United

8 | States dollars by checks drawn on a domestic bank selected by the Reorganized Debtor or by wire

9 | transfer from a domestic bank, at the option of the Reorganized Debtor.

10 |     **N.**    **Reorganized Debtors' Certification**. On or before the date upon which the

11 | Reorganized Debtors determine, in their sole and absolute discretion, that all Allowed Claims have

12 | been duly paid and that all Post-Confirmation Estate Claims and objections to Disputed Claims

13 | have been resolved by Final Order, the Reorganized Debtors shall file with the Bankruptcy Court

14 | and serve the Reorganized Debtors' Certification upon the United States Trustee.

15 | **XII.**

16 | **DISTRIBUTIONS**

17 |     **A.**    **Distribution Agent**. The Reorganized Debtor shall serve as the Distribution Agent

18 | for Distributions to be made to holders of Allowed Claims. The Distribution Agent may employ

19 | one or more sub-agents on such terms and conditions as it deems appropriate in the exercise of its

20 | sole and absolute discretion. The Distribution Agent shall not be required to provide any bond in

21 | connection with the making of any Distributions pursuant to the Plan. The Distribution Agent will

22 | receive customary fees and expense reimbursement for its services and certain funds shall be set

23 | aside by Holdco to pay for such functions.

24 |     **B.**    **Distributions**.

25 |     1.    Dates of Distributions. Any Distribution required to be made on the

26 | Effective Date shall be deemed timely if made as soon as practicable after such date and, in any

27 | event, within fifteen (15) days after such date. Any Distribution required to be made upon a

28 | Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be

1  deemed timely if made as soon as practicable thereafter but, in any event, within fifteen (15) days

2  thereafter.

3          2.    Limitation on Liability.  Neither the Debtors, the Reorganized Debtors, their

4  respective affiliates, the Committee, the Holdco Board, nor any of their respective employees,

5  members, officers, directors, shareholders, agents, or Professionals shall be liable for (i) any acts

6  or omissions (except for willful misconduct) in connection with implementing the Distribution

7  provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, or

8  (ii) any change in the value of Distributions made pursuant to the Plan resulting from any delays in

9  making such Distributions in accordance with the terms of the Plan (including, but not limited to,

10  any delays caused by the resolution of Disputed Claims).

11          **C.    Instruments and Securities**.

12          1.    Rights of Persons Holding Instruments and Securities.  Except as otherwise

13  provided herein, as of the Effective Date, and whether or not surrendered by the holder thereof, all

14  Instruments and Securities evidencing or relating to any Claims or Interests shall be deemed

15  automatically cancelled and deemed void and of no further force or effect, without any further

16  action on the part of any person, and any Claims or Interests evidenced by or relating to such

17  Instruments or Securities shall be deemed discharged.

18          2.    Cancellation of Liens.  Except as otherwise provided herein, any Lien

19  securing any Secured Claim shall be deemed released and discharged, and the Creditor holding

20  such Secured Claim shall be authorized and directed to release any collateral or other property of

21  the Debtors (including, without limitation, any cash collateral) held by such Creditor and to take

22  such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of

23  such Lien, including, without limitation, by the execution, delivery and filing or recording of such

24  releases as may be requested by the Reorganized Debtors.

25          **D.    De Minimis Distributions**.  No Cash payment of less than ten dollars

26  ($10.00) shall be made by the Reorganized Debtors to any Creditor.  Whenever payment of a

27  fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down

28  of such fraction to the nearest whole cent.  Any Cash or other property that is not distributed as a

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

consequence of this Section 8.4 shall, after the last Distribution on account of Allowed Claims in the applicable Class, be treated as Unclaimed Property under Section 8.7 of the Plan.

**E.    Delivery of Distributions**.  Except as provided in Section 8.7 with respect to Unclaimed Property, Distributions to holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:  (i) with respect to each holder of an Allowed Claim that has filed a Proof of Claim, at the address for such Creditor reflected in such Proof of Claim; (ii) with respect to each holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the Schedules filed by the Debtors; provided, however, that, if the Debtors or the Reorganized Debtors have received a written notice of a change of address for such Creditor, the address set forth in such notice shall be used; or (iii) with respect to each holder of an Allowed Administrative Claim, at such address as the holder thereof may specify in writing.

**F.    Undeliverable Distributions**.  No further distribution of Unclaimed Property shall be made to a Creditor unless and until the Reorganized Debtors are notified in writing of such Creditor's then current address.  Subject to the provisions of Section 8.7 hereof, Unclaimed Property shall remain in the possession of the Reorganized Debtors pursuant to this Section 8.6, and shall be set aside and held in the Unclaimed Property Reserve to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable.  Nothing contained in the Plan shall require the Reorganized Debtors or any other person to attempt to locate such Creditor.

**G.    Disposition of Unclaimed Property**.  If the Creditor entitled to a Distribution of Unclaimed Property notifies the Reorganized Debtors of such Creditor's claim to the Distribution of such Unclaimed Property within nine (9) months following the Initial Distribution Date, the Unclaimed Property distributable to such Creditor shall be released from the Unclaimed Property Reserve and paid to such Creditor within fifteen (15) days thereof.  Any Holder of an Allowed Claim or Allowed Administrative Claim that does not assert a claim in writing for Unclaimed Property held by the Reorganized Debtors within nine (9) months following the Initial Distribution Date shall no longer have any claim to or interest in such Unclaimed Property, and shall be forever barred from receiving any Distributions under the Plan or otherwise from the Reorganized

1  Debtors.  In such cases, any such Unclaimed Property shall be retained by the Reorganized

2  Debtors, shall not be subject to the unclaimed property or escheat laws of any state or other

3  governmental unit, and shall be distributed on account of Allowed General Unsecured Claims at

4  the time when the succeeding Distribution is to be paid to General Unsecured Creditors pursuant

5  to Section 6.4 of the Plan.

6                                         **XIII.**

7                    **OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

8          **A.      Objections to Claims**.  The Reorganized Debtors shall have the sole and exclusive

9  right to file objections to Claims; provided, however, that (i) any party-in-interest, including

10  without limitation the Creditor Board Members, shall be entitled to object to any Claims asserted

11  by any insider of the Debtors, and (ii) in the event that the Debtors should fail to object, within

12  ninety (90) days after the Effective Date, to a Claim that the Committee disputes, the Committee,

13  through the Holdco Board or Creditor Board Members, shall have the right to file and pursue an

14  objection to such Claim.  Notwithstanding the foregoing, the Committee shall have standing to be

15  heard with respect to any objection that the Debtors may file seeking to have a Secured Claim,

16  Administrative Claim or Priority Unsecured Claim disallowed and treated instead as a General

17  Unsecured Claim hereunder.  Unless another date is established by order of the Bankruptcy Court,

18  any objection to a Claim shall be filed with the Bankruptcy Court and served on the Holdco Board

19  or Creditor Board Members and on the Creditor holding such Claim on or before the applicable

20  Claims Objection Deadline.  The Reorganized Debtors, and, in the case of any Claim to which the

21  Holdco Board or Creditor Board Members has standing to object under Section 9.1 of the Plan, the

22  Holdco Board or Creditor Board Members, shall have the right to request that the Bankruptcy

23  Court extend the Claims Objection Deadline.

24          **B.      Schedule of Disputed Claims**.  The Debtors shall file and serve the Disputed

25  Claims Schedule on the Committee on or before the twenty-fourth (24th) day prior to the

26  Confirmation Hearing.  The Debtors reserve the right to amend the Disputed Claims Schedule, by

27  adding or deleting Claims, as the Debtors deem appropriate in the exercise of their sole and

28  absolute discretion.

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1    Notwithstanding the fact that the Reorganized Debtors shall have the right to file, litigate,

2  and settle objections to Disputed Claims on behalf of the Debtors and Estates, nothing contained

3  herein shall be deemed to obligate the Reorganized Debtors to take any such actions, all of which

4  shall be determined by the Reorganized Debtors in their sole and absolute discretion.

5    **THE DEBTORS HAVE NOT FULLY REVIEWED THE CLAIMS IN THE CASES**

6  **OR DETERMINED WHETHER OBJECTIONS TO CLAIMS EXIST. THIS**

7  **INVESTIGATION IS ONGOING AND MAY OCCUR, IN LARGE PART, AFTER THE**

8  **CONFIRMATION DATE. AS A RESULT, CREDITORS AND OTHER PARTIES-IN-**

9  **INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THAT THE**

10  **EXISTENCE OF ANY PARTICULAR OBJECTION TO A DISPUTED CLAIM MAY NOT**

11  **BE LISTED, DISCLOSED OR SET FORTH IN THE PLAN, AN OBJECTION TO A**

12  **CLAIM MAY BE FILED AGAINST ANY CREDITOR OR PARTY-IN-INTEREST AT**

13  **ANY TIME, SUBJECT TO THE CLAIMS OBJECTION DEADLINE. THE DEBTORS**

14  **AND THE REORGANIZED DEBTORS HEREBY RESERVE THE RIGHT TO OBJECT**

15  **TO AMOUNTS THAT HAVE BEEN SCHEDULED BY THE DEBTORS, OR**

16  **REFLECTED IN THE DEBTORS' BOOKS AND RECORDS, AND WHICH ARE FOUND**

17  **TO BE OBJECTIONABLE IN ANY RESPECT.**

18    C.    **Treatment of Disputed Claims.**

19    1.    No Distribution Pending Allowance. If any portion of a Claim is a Disputed

20  Claim, no Distribution provided for under the Plan shall be made on account of such Claim unless

21  and until such Claim becomes an Allowed Claim and is no longer a Disputed Claim.

22    2.    Distribution After Allowance. Within fifteen (15) days following the date

23  on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the

24  Distribution Agent shall distribute to the Creditor holding such Allowed Claim any Cash that

25  would have been distributable to such Creditor if, at the time of the making of any Distribution to

26  the Class of which such Creditor is a member, such Claim had been an Allowed Claim and not a

27  Disputed Claim. No interest shall be paid on such Claim.

28

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

3.     <u>Reserves for Disputed Claims</u>. In the event that a Disputed Claim is pending as to a Class 5 Creditor, the Distribution Agent shall establish a Disputed Claims Reserve, and maintain a reasonable reserve necessary to pay such Disputed Claim in accordance with Section 6.5. No disbursement of funds from the Disputed Claims Reserve shall be made on account of a Disputed Claim until such Disputed Claim has been determined by a Final Order of the Bankruptcy Court. In the event that any Disputed Claim is ultimately disallowed by the Bankruptcy Court, the amount reserved for such Disputed Claim, which has been disallowed by the Bankruptcy Court, shall be distributed on account of Allowed General Unsecured Claims at the time when the succeeding Distribution is to be paid to General Unsecured Creditors pursuant to Section 6.4 of the Plan.

## XIV.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     <u>**Executory Contracts Being Assumed**</u>. Effective as of, and conditioned on, the occurrence of the Effective Date, each of the Debtors hereby assumes all of the executory contracts and unexpired leases of the Debtors, including, without limitation, those executory contracts and unexpired leases of the Debtors listed on Schedule 10.1 of the Plan, except only for those executory contracts and unexpired leases set forth in Schedule 10.3 of the Plan.

The Debtors may amend Schedule 10.1 to add thereto any executory contract or unexpired leases, or to delete therefrom any executory contract or lease, up to and including the Confirmation Date. However, if any amendments are made to Schedule 10.1 less than twenty-four (24) days before the Confirmation Date, the affected contract or lease parties shall have fifteen (15) days from the date of service of notice of such amendments within which to serve on the Debtors a written objection to the same. Upon receipt of any such objection, the Debtors shall promptly set a hearing on the same, and the assumption or rejection of the affected contract or lease shall be delayed until the Bankruptcy Court makes a determination on this issue (such determination may be made after the Confirmation Date, without delaying the confirmation of the Plan). To the extent that an executory contract or unexpired lease has been assumed prior to the Confirmation Date by a Debtor pursuant to an order of the Bankruptcy Court, such assumption shall not be

-61-

1  affected by the Plan. The assumption of any contract or lease pursuant to the provisions of this

2  Section 10.1 shall be only to the extent that such assumed contract or lease constitutes an

3  executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code.

4  Inclusion of an agreement in Schedule 10.1 does not constitute an admission by the Debtors or

5  Reorganized Debtors that (i) such agreement is an executory contract or unexpired lease within the

6  meaning of Section 365 of the Bankruptcy Code, (ii) the Debtors must assume such agreement in

7  order to continue to receive or retain rights, benefits, or performance thereunder or that any Claim

8  under such agreement must be paid or default cured, or (iii) such agreement is a valid contract or

9  lease. Any contract or lease assumed pursuant to the Plan shall be assumed as previously amended

10 or otherwise modified by the parties thereto, whether before or after the Petition Date.

11        **B.    Payment of Cure Claims.** Each Subco shall be liable and responsible for the

12 payment of all Allowed Cure Claims applicable to such Subco as set forth on Schedule 10.1.

13 Payment of such Allowed Cured Claims shall be paid over a period not to exceed thirty-six (36)

14 months, in equal monthly installments commencing on the First Payment Date, which payments

15 are reflected in the Debtors' Budget. Holdco hereby guarantees the payment of all Allowed Cured

16 Claims, but does not otherwise guarantee the performance of any assumed contract. In addition to

17 the foregoing, the Debtors may make, as the Debtors determine, at their sole discretion, such

18 additional periodic payments on account of unpaid Allowed Cure Claims, so long as each

19 Restaurant maintains the Minimum Cash Balance after such payments.

20        **C.    Executory Contracts Being Rejected**. The Debtors hereby reject all of the

21 executory contracts and unexpired leases listed on Schedule 10.3 of the Plan. The Debtors reserve

22 the right to amend Schedule 10.3 to add thereto any executory contracts or leases, or to delete

23 therefrom any executory contract or unexpired lease, up to and including the Confirmation Date.

24 However, if any amendments are made to Schedule 10.3 later than twenty-four (24) days before

25 the Confirmation Date, the affected contract or lease parties shall have fifteen (15) days from the

26 date of service of notice of such amendments within which to serve on the Debtors a written

27 objection to the same. Upon receipt of any such objection, the Debtors shall promptly set a

28 hearing on the same, and the rejection of the affected contract or lease shall be delayed until the

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1  Bankruptcy Court makes a determination on this issue (such determination may be made after the

2  Confirmation Date, without delaying the confirmation of the Plan).  To the extent that an

3  executory contract or unexpired lease has been rejected by the Debtors prior to the Confirmation

4  Date pursuant to an order of the Bankruptcy Court, such rejection shall not be affected by the Plan.

5      **D.**     <u>**Retention of Property Rights By Reorganized Debtors**</u>.  To the extent that an

6  agreement that provides the Debtors with property rights does not constitute an executory contract

7  or unexpired lease, or the Debtors have obtained property rights under the executed portion of an

8  executory contract or unexpired lease, rejection of such agreement shall not constitute an

9  abandonment by the Debtors of any such property rights.

10      **E.**     <u>**Bar Date for Rejection Damages**</u>.  Any Claim arising out of the rejection of an

11  executory contract or unexpired lease shall be forever barred and shall not be enforceable against

12  the Debtors, the Reorganized Debtors, their affiliates, their successors, Estates, or their properties,

13  and shall not be entitled to any Distribution under the Plan, unless a Proof of Claim for such

14  Rejection Claim is filed and served on the Debtors or Reorganized Debtors within thirty (30) days

15  after the later of (i) the date of entry of the order of the Bankruptcy Court approving the rejection

16  of the executory contract or unexpired lease, or (ii) the Confirmation Date.

17      **F.**     <u>**Claims Schedule**</u>.  The Cure Claims Schedule shall be filed with the Bankruptcy

18  Court, and served on the Committee and the non-debtor parties to such executory contracts and

19  unexpired leases, on or before the twenty-fourth (24th) day prior to the Confirmation Hearing.

20  Any objection to the amount of any Cure Claim set forth in the Cure Claims Schedule shall be

21  filed and served upon counsel for the Debtors and the Committee on or before the fourteenth

22  (14th) day prior to the Confirmation Hearing.  In the event that any such objection to the amount

23  stated for a Cure Claim in the Cure Claims Schedule is not filed and served as set forth herein, the

24  amount of the Creditor's Cure Claim shall be deemed forever to be the amount set forth in the

25  Cure Claims Schedule, and any Cure Claim in excess of the amount set forth in the Cure Claims

26  Schedule shall be waived and shall be forever barred in the Case, without further notice.  If the

27  Debtors cannot resolve any such objections with the Creditor, the Debtors may either (i) elect to

28  reject the executory contract or unexpired lease at the Confirmation Hearing, or (ii) have the

1   Bankruptcy Court determine the merits of the objection on or after the Confirmation Hearing

2   (without delaying the confirmation of the Plan).  Any amount of Cure Claim payable upon the

3   assumption of an executory contract or unexpired lease shall be due and payable on or before the

4   fifteenth (15th) day after the entry of a Final Order fixing the amount of the Cure Claim and then

5   only in the amount fixed by such Final Order.

6                                               **XV.**

7                              **TAX CONSEQUENCES OF PLAN**

8          **A.       Introduction.**  The implementation of the Plan may have federal, state and local

9   tax consequences to the Debtors and the Debtors' Creditors and Interest Holders.  No tax opinion

10  has been sought or will be obtained with respect to any tax consequences of the Plan.  This

11  Disclosure Statement does not constitute, and is not intended to constitute, either a tax opinion or

12  tax advice to any person, and the summary contained herein is provided for informational purposes

13  only.

14         The discussion below summarizes only certain of the federal income tax consequences

15  associated with the Plan's implementation.  This discussion does not attempt to comment on all

16  aspects of the federal income tax consequences associated with the Plan, nor does it attempt to

17  consider various facts or limitations applicable to any particular Creditor or Interest Holder which

18  may modify or alter the consequences described herein.  A Creditor or Interest Holder may find

19  that the tax consequences of the Plan to such Creditor or Interest Holder differ materially from the

20  tax consequences discussed below because of such Creditor's or Interest Holder's facts and

21  circumstances.  This discussion does not address state, local or foreign tax consequences or the

22  consequences of any federal tax other than the federal income tax.

23         The following discussion is based upon the provisions of the Internal Revenue Code of

24  1986, as amended (the "Internal Revenue Code"), the regulations promulgated thereunder, and

25  existing judicial decisions and administrative rulings.  In light of the rapidly-changing nature of tax

26  law, no assurance can be given that legislative, judicial or administrative changes will not be

27  forthcoming that would affect the accuracy of the discussion below.  Any such changes could be

28  material and could be retroactive with respect to the transactions entered into or completed prior to

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1    the enactment or promulgation thereof. The tax consequences of certain aspects of the Plan are

2    uncertain due to the lack of applicable legal authority and may be subject to judicial or

3    administrative interpretations that differ from the discussion below.

4        CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH

5    THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND

6    TO THE DEBTORS OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN,

7    INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

8        **B.    Federal Income Tax Consequences to the Debtors.** Consummation of the Plan

9    may reduce substantially the amount of the Debtors' aggregate outstanding indebtedness (any

10    amount of potential discharged indebtedness for federal income tax purposes will be referred to

11    herein as a "Debt Discharge Amount"). In general, the Internal Revenue Code provides that a

12    taxpayer who realizes a discharge of indebtedness must include the Debt Discharge Amount in its

13    gross income in the taxable year of discharge to the extent that the Debt Discharge Amount

14    exceeds any consideration given for such discharge.[10] However, if a taxpayer is in a Title 11 case

15    and the discharge of indebtedness occurs pursuant to a plan approved by the bankruptcy court, as

16    in these Cases, then such discharge of indebtedness is specifically excluded from gross income.

17    Accordingly, the Debtors will not be required to include in income any Debt Discharge Amount as

18    a result of Plan transactions.

19        Although the Debtors will not have to include the Debt Discharge Amount resulting from

20    Plan transactions in their gross income, there will be a tax effect. The Internal Revenue Code

21    requires certain tax attributes of a debtor to be reduced by the Debt Discharge Amount excluded

22    from income. Tax attributes are reduced in the following order of priority: net operating losses

23    and net operating loss carryovers; general business credits; minimum tax credits; capital loss

24    carryovers; basis of property of the taxpayer; passive activity loss or credit carryovers; and foreign

25    tax credit carryovers. Tax attributes are generally reduced by one dollar for each dollar excluded

26    from gross income, except that general tax credits, minimum tax credits and foreign tax credits are

27    reduced by 33.3 cents for each dollar excluded from gross income.

28
_____

[10] No income from the discharge of indebtedness is realized to the extent that payment of the liability being discharged
would have given rise to a deduction.

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

An election can be made to alter the order of priority of attribute reduction by first applying the reduction against depreciable property held by the taxpayer in an amount not to exceed the aggregate adjusted basis of such property. The Debtors have not yet decided whether to make such election. The deadline for making such election is the due date (including extensions) of the Debtors' federal income tax return for the taxable year in which such debt is discharged pursuant to the Plan.

Any Claim against the Debtors (except a Claim that would give rise to a deduction if paid) that is discharged by payment to a Creditor of Cash and/or property will result in the creation of a Debt Discharge Amount reducing tax attributes to the extent that the adjusted issue price of the debt discharged (plus accrued interest) exceeds the fair market value of the payment made in cancellation thereof.

A Debtors' Debt Discharge Amount may be increased to the extent that General Unsecured Creditors holding unscheduled Claims fail to timely file a Proof of Claim and have their claims discharged on the Confirmation Date pursuant to Bankruptcy Code Section 1141.

**C.    Tax Consequences To Creditors.** A Creditor who receives a Distribution on his or her Claim that is less than the Creditor's adjusted basis in such Claim may be entitled to claim a bad debt deduction for this difference. A bad debt deduction is allowed in the taxable year of the Creditor in which a debt becomes wholly worthless. The discharge of a Claim pursuant to the Plan establishes that such Claim is wholly worthless as of the date of discharge (assuming the holder of the Claim receives no consideration under the Plan with respect to such Claim). It is possible, however, that such Claim may have become wholly worthless on an earlier date, depending upon all the facts and circumstances. The Debtors express no opinion regarding the date or dates on which Claims discharged under the Plan became worthless.

## XVI.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

**A.    Introduction.** PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN OR THE PROVISIONS OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1  PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended

2  solely for the purpose of alerting readers about basic confirmation issues, which they may wish to

3  consider, as well as certain deadlines for filing claims. The Debtors CANNOT and DO NOT

4  represent that the discussion contained below is a complete summary of the law on this topic and

5  are not providing any legal opinions with respect thereto.

6      Many requirements must be met before a Bankruptcy Court can confirm a Chapter 11 plan.

7  Some of the requirements include that the plan must be proposed in good faith, the distributions to

8  non-accepting creditors and impaired classes must be at least as much as such creditors would

9  receive in a Chapter 7 liquidation, and the plan must be feasible. These requirements are not the

10  only requirements for confirmation.

11     **B.    Who May Object to Confirmation of the Plan.** Any party-in-interest may object

12  to the confirmation of the Plan, but, as explained below, not every party-in-interest is entitled to

13  vote to accept or reject the Plan.

14     **C.    Who May Vote to Accept/Reject the Plan.** A Creditor or Interest Holder has a

15  right to vote for or against the Plan if that Creditor or Interest Holder has a Claim that is both (1)

16  Allowed or allowed for voting purposes and (2) classified in an impaired Class.

17         1.    What Is an Allowed Claim/Interest. As noted above, a Creditor or Interest

18  Holder must first have an Allowed Claim or Interest to have the right to vote. Generally, a Proof of

19  Claim or Proof of Interest will be allowed, unless a party-in-interest brings a motion objecting to

20  the Claim or Interest. When an objection to a Claim or Interest is filed, the Creditor or Interest

21  Holder holding the Claim or Interest cannot vote unless the Bankruptcy Court, after notice and a

22  hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

23         2.    What Is an Impaired Class of Claim(s)/Interest(s). As noted above, the

24  holder of an Allowed Claim or Interest has the right to vote on the Plan only if it is in a Class that

25  is impaired under the Plan. A Class is impaired if the Plan alters the legal, equitable, or

26  contractual rights of the holders of Claims or Interests in that Class, with certain exceptions.

27         The Debtors believe that Classes 1 through 7 are impaired under the Plan. Parties

28  who dispute the Debtors' characterization of their Claim or Interest as being in an impaired or

1  unimpaired Class may file an objection to the Plan contending that the Debtors have incorrectly

2  characterized the Class.

3      **D.**    **Who Is Not Entitled to Vote.**  The following four types of Claims are <u>not</u> entitled

4  to vote on the Plan: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3)

5  Administrative Claims and Priority Tax Claims; and (4) Claims in Classes that do not receive or

6  retain any property under the Plan.  Claims in unimpaired Classes are not entitled to vote because

7  such Classes are deemed to have accepted the Plan.  Administrative Claims and Priority Tax

8  Claims are not entitled to vote because such Claims are not placed in Classes and they are required

9  to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not

10  receive or retain any property under the Plan do not vote because such Classes are deemed to have

11  rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU

12  MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

13      **E.**    **Who Can Vote in More Than One Class.**  A Creditor whose Claim is both an

14  Allowed Secured Claim and an Allowed General Unsecured Claim is entitled to accept or reject

15  the Plan in both capacities by casting one ballot for the secured part of the Claim and another

16  ballot for the General Unsecured Claim.  Also, any party who holds Allowed Claims or Interests in

17  more than one Class may vote the Claim or Interest in each Class.

18      **F.**    **Votes Necessary to Confirm the Plan.**  If impaired classes exist, the Bankruptcy

19  Court cannot confirm a Chapter 11 plan unless (1) all impaired classes have voted to accept the

20  plan, or (2) at least one impaired class has accepted the plan without counting the votes of any

21  insiders within that class and the plan is eligible to be confirmed by "cramdown" on non-accepting

22  classes, as discussed in Article XVI.H below.

23      **G.**    **Votes Necessary for a Class to Accept the Plan.**  A class of claims is deemed to

24  have accepted a Chapter 11 plan where more than one-half (1/2) in number and at least two-thirds

25  (2/3) in dollar amount of the claims that actually vote, vote in favor of the plan.  A class of

26  interests is deemed to have accepted the plan where at least two-thirds (2/3) in amount of the

27  interest holders of such class which actually vote to accept the plan.

28

**H.    Treatment of Non-Accepting Classes.**  As noted above, even if there are impaired classes that do not accept a Chapter 11 plan, a bankruptcy court may nonetheless confirm the plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code and there is at least one impaired class that accepts the plan.  The process by which a plan can be confirmed and become binding on non-accepting classes notwithstanding rejection by one or more classes is commonly referred to as "cramdown."  The Bankruptcy Code allows a plan to be "crammed down" on non-accepting classes of claims or interests if it meets all requirements for confirmation except the voting requirements of Section 1129(a)(8) of the Bankruptcy Code and if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class that has not voted to accept the plan, as provided in Section 1129(b) of the Bankruptcy Code and applicable case law.

**I.    Request for Confirmation Despite Non-Acceptance by Impaired Class(es).**  The Debtors will ask the Bankruptcy Court to confirm the Plan by cramdown on any impaired Class if such Class does not vote to accept the Plan.

**J.    Liquidation Analysis.**  Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a plan cannot be confirmed unless the bankruptcy court determines that distributions under the plan to all holders of claims and interests who have not accepted the plan, and whose claims and interests are classified in classes that are impaired under the plan, are no less than those which they would receive in a liquidation proceeding under Chapter 7. This test must be satisfied even if a plan is accepted by each impaired class of claims and interests.   This test, which is often referred to as the "best interests" test, requires the bankruptcy court to find either that (i) _all_ holders of claims and interests in an impaired class of claims or interests have accepted the plan, or (ii) the plan will provide each holder of claims and interests in an impaired class who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To satisfy the "best interest" test, the bankruptcy court must reach a conclusion regarding the probable distribution to the holders in each impaired class of claims and interests if the debtor

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1    were liquidated in a Chapter 7 proceeding. The first step in this process is to determine the

2    "liquidation value" that would be generated from a forced sale of the debtor's assets by a Chapter 7

3    trustee. The second step requires the application of the projected liquidation proceeds in

4    accordance with the various rights of creditors holding liens on the property. For example, if a

5    claimant holds a lien on corporate equipment but not inventory, the proceeds of the liquidation

6    derived from this asset would have to be applied against this claimant's debt. If the proceeds were

7    sufficient to retire the claimant's secured claim, then the claimant's claim would be paid in full.

8    However, if the liquidation proceeds are not sufficient, then that portion of the claim which is not

9    satisfied from the sale proceeds is treated as an unsecured claim and shares pro rata at this

10    distribution level. This process must then be repeated as to each collateral category to ensure that

11    the claims secured by collateral are paid from their collateral and only from their collateral.

12    Once all of the claims secured by liens on assets of a debtor's estate are deducted from the

13    projected liquidation proceeds of the sale of the claimant's collateral, then the costs and expenses

14    associated with the liquidation of the estate incurred by the Chapter 7 trustee must be paid. These

15    costs would include the compensation of the trustee, as well as compensation of counsel and other

16    professionals retained by the trustee, and asset disposition expenses.

17    After payment of the costs and expenses associated with the Chapter 7 liquidation are paid,

18    all unpaid administrative expenses incurred by the debtor in its Chapter 11 case (such as

19    compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the

20    Chapter 7 case, and all unpaid claims arising from the operations of the debtor during the pendency

21    of the Chapter 11 case, must be paid.

22    After the payment of Chapter 11 administrative expenses, the remaining liquidation

23    proceeds would be used to pay priority claims, such as tax and wage claims that are entitled to

24    priority under the Bankruptcy Code. Thereafter the remaining liquidation proceeds would be made

25    available to pay general unsecured claims. Finally, to the extent that any proceeds remain after

26    paying all allowed claims, they would be distributed to interest holders in accordance with their

27    liquidation priorities.

28

1    Attached hereto as Exhibit "9" is a liquidation analysis prepared by the Debtors that

2    estimates the probable liquidation value of the Debtors, and applies the foregoing liquidation

3    methodology to the estimated Claims against the Estates in a Chapter 7 liquidation in an effort to

4    quantify what each Class of Creditors and Interest Holders would receive in a Chapter 7

5    liquidation.  Any liquidation analysis of this nature entails a significant degree of estimation and

6    projection regarding both probable asset value and probable Allowed Claim totals.  For example,

7    in preparing Exhibit "10," the Debtors have necessarily quantified what they believe will be the

8    Allowed Claims within each Class.  Although this quantification was based upon information in

9    the Debtors' books and records, as the date of the preparation of the liquidation analysis, it was not

10    possible to quantify exactly the amount of Allowed Claims in that there was a substantial amount

11    of Disputed Claims and no judicial determinations had been made regarding the merits of the

12    Disputed Claims.  These and other factors may significantly increase or reduce the Allowed Claims

13    total within each Class.

14    On the valuation side, the Debtors have estimated the liquidation value of the Debtors'

15    assets utilizing their best estimate of the value of the Debtors' assets assuming the assets are sold

16    through a true asset sale, with each category of assets, and in some instances individual assets,

17    being sold, or collected in the case of accounts receivable and cash, with the proceeds then

18    aggregated for distribution.

19    Although liquidation values are typically substantially lower than going concern values, the

20    Debtors believe that the value differential in this case would be particularly pronounced for the

21    following reasons.  Unlike a manufacturing concern, or another business that has a large

22    concentration of tangible assets or intellectual property with substantial realizable values, the

23    Debtors are in the food service industry.  Their business model utilizes specialized equipment

24    much of which is "fixturized" in the restaurants.  Given the current economic climate and trends in

25    the casual restaurant dining segment, this equipment has a low resale value, and the cost of

26    (i) removing the larger items of equipment from the premises where it is installed, (ii) refurbishing

27    the equipment and (iii) marketing it for resale will frequently exceed the resale value of the

28

1   equipment. In addition, some items are leasehold improvements that are considered fixtures and

2   may not be removed and liquidated.

3        The core value in the Debtors is derived from the revenue stream generated from the

4   Debtors' restaurants. This revenue stream is generated from a customer base that has a positive

5   perception of restaurants and the trade names under which they operate. The Debtors believe that,

6   if the Debtors ceased operating as going concerns for even an abbreviated period of time, the

7   Debtors' customers would seek alternative dining options, the Debtors' revenue stream would

8   cease, the franchisor may terminate its franchise agreement and the inherent value and goodwill in

9   the trade names under which the restaurants operate would quickly erode; these events could

10  constitute a default under the applicable ground lease. The Debtors believe that the end result

11  would necessarily be a massive and precipitous collapse in values.

12       Although there are inherent difficulties in quantifying with exactitude the potential

13  recoveries that Creditors would receive in a Chapter 7 liquidation scenario, the Debtors believe that

14  the comprehensive liquidation analysis attached hereto as Exhibit "9" provides a fair estimate of

15  the results that would occur in a Chapter 7 liquidation. As this analysis indicates, a substantial

16  portion of Debtors' assets are currently encumbered by Liens in favor of secured creditors. Based

17  upon the foregoing valuation assumptions, and given the amount of the existing Secured Claims,

18  the Debtors believe that the Secured Claim will not be paid in full in a Chapter 7 liquidation, and

19  that Creditors holding General Unsecured Claims would receive no distributions whatsoever on

20  account of their Claims.

21       In contrast, the Debtors believe that substantially more value will be available for Creditors

22  under the terms of the Plan. Consider the following class by class comparative analysis:

23            1.    Class 1 Claims. In a Chapter 7 liquidation, the holders of Claims in

24  Classes 1.1 through 1.7 would, in all likelihood, have their property returned to them in full

25  satisfaction of their Allowed Secured Claims. No funds would be available for payment of these

26  Creditors' Allowed Deficiency Claims. In contrast, under the Plan, the holders of Allowed

27  Secured Claims on buildings, leasehold interests and equipment may receive their property in

28  satisfaction of their Allowed Secured Claims as in the Chapter 7 liquidation, and receive

1    distributions equal to the value of the assets, which value would be greater than in a Chapter 7 as

2    the valuation under the plan is based on going concern value, which is substantially higher than

3    liquidation value.  In addition, to the extent that such Creditors have Allowed Deficiency Claims,

4    these Creditors will receive a dividend of as much as 100% of their Allowed Deficiency Claims,

5    plus interest over time.  In summary, the Creditors within this Class would receive at least as much

6    under the Plan as they would receive in a Chapter 7 liquidation, and they could well receive

7    substantially more.

8        2.    Class 2 Claims.  The Debtors believe that there are no Allowed Secured

9    Capital Lease Claims.  Assuming that there proves to be Allowed Secured Capital Lease Claims, in

10   a Chapter 7 liquidation, the holders of Allowed Secured Capital Lease Claims would, in all

11   likelihood, have their equipment returned to them in full satisfaction of their Allowed Secured

12   Claims.  No funds would be available for payment of these Creditors' Allowed Deficiency Claims.

13   In contrast, under the Plan, the holders of Allowed Capital Lease Claims may receive their

14   equipment in satisfaction of their Allowed Secured Claims as in the Chapter 7 liquidation.

15   However, to the extent that such Creditors have Allowed Deficiency Claims, these Creditors will

16   receive a distribution of as much as 100% of their Allowed Deficiency Claims, plus interest over

17   time.  In summary, the Creditors within this Class would receive at least as much under the Plan as

18   they would receive in a Chapter 7 liquidation, and they could well receive substantially more.

19       3.    Class 3.  Under a Chapter 7 liquidation, the Allowed Priority Unsecured

20   Wage Claims would receive nothing.  Under the Plan, Allowed Priority Unsecured Wage Claims

21   will be paid in full.

22       4.    Class 4.  Under a Chapter 7 liquidation, Allowed General Unsecured

23   Creditors would not receive any distribution whatsoever.[11]  In contrast, under the Plan, these

24   Creditors will receive payment of as much as 100% of their Allowed General Unsecured Claims,

25   plus interest.

26

27

28   
[11] It should be noted that, in a liquidation scenario, the amount of General Unsecured Claims may increase
substantially by reason of Claims arising from the rejection of unexpired leases and executory contracts that would
otherwise be assumed under the Plan.

5.      Class 5.  Under a Chapter 7 liquidation, the Allowed Secured Claim of
Imperial County, California, Tax Assessor's Office would receive nothing.  In contrast, under the
Plan, this Class will be paid in full over time.

6.      Class 6.  Under a Chapter 7 liquidation, the Allowed Secured Claim of
Governmental Units not Included in Class 5 would receive nothing.  In contrast, under the Plan,
this Class will be paid in full over time.

7.      Class 7.  Under a Chapter 7 liquidation and the Plan, the holders of Interests
in BlueOcean and SoWestBreck would not receive any distribution.  Therefore, the members of
this Class would receive at least as much under the Plan as they would receive in a Chapter 7
liquidation.

In summary, the Debtors believe that the Creditors of the Estates will receive as much if not
substantially more under the Plan than they would receive in a Chapter 7 liquidation.  Accordingly,
the Plan fully satisfies the "best interests" of creditors test.

**K.      Feasibility.**

1.      Projections of Future Cash Flow.  Attached hereto as Exhibit "8" are
financial projections ("Financial Projections") prepared by the Debtors, with assistance from the
Debtors' CRO, which provide support for the feasibility of the Plan, pursuant to
Section 1129(a)(11) of the Bankruptcy Code.  The Financial Projections set forth the Debtors'
estimate of the anticipated cash flow of the Reorganized Debtors for the term of the Plan.
Projections of anticipated cash flow are based, in part, upon the historical earnings of the Debtors
and the Debtors' historical expenses as such historical financial performance is relevant to the
future operations of the Reorganized Debtors, as well as anticipated trends within the casual dining
restaurant segment and impact the current economic climate is having on the Debtors' business.
Attached to the Financial Projections is a statement of the material assumptions underlying the
Financial Projections.  Although the Debtors have devoted considerable effort to the development
of the Financial Projections and believe that the Financial Projections represent fairly the projected
future cash flow of the Reorganized Debtors, care should be taken in analyzing the Financial

1    Projections as no guarantee exists that the Financial Projections can be met by the Reorganized

2    Debtors.

3        THE FINANCIAL PROJECTIONS SET FORTH IN THIS DISCLOSURE STATEMENT

4    REPRESENT AN ESTIMATE OF FUTURE PERFORMANCE BASED UPON CERTAIN

5    ASSUMPTIONS SET FORTH WITH SUCH FINANCIAL PROJECTIONS. THESE FUTURE

6    EVENTS MAY OR MAY NOT OCCUR, AND THE FINANCIAL PROJECTIONS MAY NOT

7    BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL

8    RESULTS WHICH WILL OCCUR. BECAUSE OF THE UNCERTAINTIES INHERENT IN

9    PREDICTIONS OF FUTURE EVENTS AND EVENTS OUTSIDE OF THE DEBTORS'

10    CONTROL, THE REORGANIZED DEBTORS' ACTUAL CASH FLOW MAY WELL BE

11    DIFFERENT FROM THAT PREDICTED, AND SUCH DIFFERENCE MAY BE MATERIAL

12    AND ADVERSE TO THE INTERESTS OF CREDITORS.

13        The Financial Projections are intended to assess the future cash flow available to the

14    Reorganized Debtors for making the Distributions required by the Plan. Significant assumptions

15    underlying the Financial Projections include the following:

16            a.    Effective Date of the Plan. For the purpose of the Financial

17    Projections, the Debtors estimate that the Confirmation Date will occur on or about March 31,

18    2010 and that the Effective Date will occur on or about April 30, 2010.

19            b.    Revenues Generated By the Reorganized Debtors' Business

20    Operations. The Debtors' projections of the future revenues which will be generated by the

21    Reorganized Debtors' business operations are derived, in large part, from the pattern exhibited by

22    the Debtors' pre-Confirmation operations, to the extent that they are relevant. As reflected in

23    Exhibit "8" hereto, sales are forecasted to be steady through 2010, and then increasing by 5% in

24    2011, 4% in 2012, and then increasing at declining rates thereafter.

25            c.    Expenses of the Reorganized Debtors. The Debtors have assumed,

26    for the purpose of the Financial Projections, that the expenses of the Reorganized Debtors will

27    remain fairly constant as a percentage of historical sales for variable cost and constant in terms of

28    fixed cost based on current expectation during the term of the Plan.

2.      Funding of Distributions Required by the Plan.  The Debtors' Financial Projections indicate that, for each year after the Effective Date, the Reorganized Debtors will have Cash sufficient to pay the expenses which will be incurred in connection with the operation of the Reorganized Debtors' businesses and to make all payments required to be made pursuant to the Plan.

The following components are essential to the execution of the Plan:

a.      Funding of Distributions Required on or About the Effective Date. In order to emerge from Chapter 11, the Debtors must have Cash sufficient to fund the Distributions that are required to be made on or about the Effective Date.  On or about the Effective Date, the Debtors must pay all of the Allowed Administrative Claims, Allowed Priority Unsecured Wage Claims and the amounts necessary to cure all defaults pursuant to the executory contracts and unexpired leases which it will assume on the Effective Date (unless the non-debtor parties to such executory contracts or unexpired leases agree to different treatment of their Claims).  The Debtors estimate that, on or about the Effective Date, it may have to pay the following Claims:

| | |
|---|---|
| Administrative Claims | $81,500 |
| Allowed Priority Unsecured Wage Claims | 0 |
| **TOTAL** | **$81,500** |

The Debtors' projections of the Administrative Claims related to fees of Professionals which it will have to pay on or about the Effective Date, is only an estimate, and is not to be construed as any agreement as to the amount or reasonableness of such fees.  The actual fees of Professionals which may be allowed by the Bankruptcy Court and which will have to be paid by the Reorganized Debtors on or before the Effective Date may be higher or lower than the amount estimated by the Debtors.

The Debtors' projections regarding the cure of defaults regarding executory contracts and unexpired leases reflect agreements reached with the Debtors' franchisor that allow the Allowed Cure Claims to be paid over time following the Effective Date.  The Debtors estimate

1     that the total amount due to the cure claimants as of the Effective Date will be approximately

2     $_____, which shall be paid over time as provided in the Plan.

3            The Debtors' Financial Projections indicate that the Reorganized Debtors

4     will have Cash sufficient to fund the Distributions required to be paid to Creditors on or before the

5     Effective Date.

6           b.     Funding of Ongoing Distributions to Holders of Allowed Claims

7     Required by the Plan. The second component essential to the execution of the Plan relates to the

8     Reorganized Debtors' funding of the ongoing Distributions to holders of Allowed Claims required

9     by the Plan. The Debtors' Financial Projections indicate that, over the term of the Plan, the

10     Reorganized Debtors will have funds sufficient to timely pay their accruing obligations with

11     respect to the Allowed Secured Claims, the Allowed Priority Tax Claims, and the Allowed

12     General Unsecured Claims, and will be able to timely meet all of the Reorganized Debtors'

13     accruing expenses of operating the Reorganized Debtors' businesses.

14     The Debtors' Financial Projections indicate, therefore, that the Reorganized Debtors will

15     generate revenues sufficient to meet all of their obligations under the Plan, as well as to pay the

16     costs of their ongoing business operations. While the Debtors recognize that the projections of the

17     revenues and expenses of their future business operations are subject to a variety of unpredictable

18     outside forces and circumstances which could adversely affect such projections, the Debtors

19     believe that the Financial Projections have been prepared with sufficient care to allow the Debtors

20     to endorse them.

21                  **XVII.**

22         **EFFECT OF CONFIRMATION OF PLAN**

23     Confirmation of the Debtors' Plan will have, in part, the following effects.

24     **A.**     **Discharge.** Except as otherwise specifically provided in the Plan or in the

25     Confirmation Order, pursuant to Section 1141(d) of the Bankruptcy Code, the Distributions and

26     rights that are provided in the Plan will be in complete satisfaction, discharge and release, effective

27     as of the Effective Date, of all Claims, whether known or unknown, Liens, rights against,

28     obligations, liabilities of, and Interests in the Debtors, and any of their assets or properties,

1    regardless of whether any property will have been distributed or retained pursuant to the Plan on

2    account of such Claims, rights and Interests, including but not limited to, Claims and Interests that

3    arose before the Confirmation Date, including all debts of the kind specified in Section 502(g),

4    502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim or

5    Proof of Interest based upon such Claim or Interest is filed or deemed filed under Section 501 of

6    the Bankruptcy Code, (ii) such Claim or Interest is allowed under Section 502 of the Bankruptcy

7    Code, or (iii) the holder of such Claim or Interest accepted the Plan.  The Confirmation Order will

8    constitute a determination of the discharge of all of the Claims against and Interests in the Debtors,

9    subject to the occurrence of the Effective Date.

10       **B.**    **Injunction.**  Except as otherwise expressly provided in the Plan, or in the

11   Confirmation Order, on and after the Effective Date, all Creditors who have held, hold, or who

12   may hold a Claim, or Interest Holders who have held, hold, or who may hold an Interest,

13   discharged pursuant to the terms of the Plan (including but not limited to states and other

14   governmental units, and any state official, employee, or other entity acting in an individual or

15   official capacity on behalf of any state or other governmental units) will be permanently enjoined

16   from the following: (i) taking any of the following actions on account of any such discharged

17   Claim or Interest: (a) commencing or continuing in any manner any action or other proceeding

18   against the Debtors, the Reorganized Debtors, their successors, or their property; (b) enforcing,

19   attaching, executing, collecting, or recovering in any manner any judgment, award, decree, or order

20   against the Debtors, the Reorganized Debtors, their successors, or their property; (c) creating,

21   perfecting, or enforcing any Lien against the Debtors, the Reorganized Debtors, their successors,

22   or their property; (d) asserting any set off, right of subrogation, or recoupment of any kind against

23   any obligation due to the Debtors, the Reorganized Debtors, their successors, or their property; and

24   (e) commencing or continuing any action, in any manner, in any place that does not comply with

25   or is inconsistent with the provisions of the Plan; and (ii) taking any action on account of any

26   claims or rights of action that are revested in, or transferred to, the Reorganized Debtors as of the

27   Effective Date or under the Plan (to the extent that a Debtor's Estate first held such claim or right

28   of action or held the right to assert such claim or right of action after the Petition Date), including,

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1  without limitation, commencing or continuing in any manner any Avoidance Action (i.e., no party

2  may pursue any avoidance claims, except for Holdco, or as otherwise provided by the Plan).  Any

3  person or entity injured by any willful violation of such injunction will recover its actual damages,

4  including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive

5  damages from the willful violator.

6  **XVIII.**

7  **LIMITATION OF LIABILITY AND RELEASES**

8      **A.**    **No Liability for Solicitation or Participation.**  As specified in Section 1125(e) of

9  the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan or that participate in

10  the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and

11  in compliance with the applicable provisions of the Bankruptcy Code, will not be liable, on

12  account of such solicitation or participation, for violation of any applicable law, rule, or regulation

13  governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or

14  purchase of securities.

15      **B.**    **Limitation of Liability.**  Effective as of the Effective Date, none of the Debtors,

16  Reorganized Debtors, their respective affiliates or the Committee, nor any of their respective

17  members, officers, directors, shareholders, employees and other agents, advisors and Professionals

18  will have or incur any liability to any Creditor or Interest Holder or to any other person for any act

19  or omission in connection with or arising out of the negotiation, preparation and pursuit of

20  confirmation of the Plan, the approval of this Disclosure Statement, the consummation of the Plan,

21  the administration of the Plan, the Cases or the property to be distributed under the Plan, to the

22  fullest extent permitted by applicable statutory and case law, except the Reorganized Debtors will

23  be liable for the performance of obligations assumed by them or imposed upon them under or by

24  the Plan.

25  **XIX.**

26  **CONDITIONS TO CONFIRMATION AND EFFECTIVENESS**

27      **A.**    **Conditions Precedent to Plan Confirmation.**  The following are conditions

28  precedent to the confirmation of the Plan:

1    1.    The Bankruptcy Court will have entered the Confirmation Order.

2    2.    All agreements, instruments and other acts contemplated by, or to be entered

3    into, or completed pursuant to, or in order to facilitate the implementation of, the Plan, will have

4    been duly and validly executed and delivered by the parties thereto, and completed, as the case

5    may be, and all conditions to their effectiveness will have been satisfied or waived, except only for

6    the entry of the Confirmation Order.

7    **B.    Condition Precedent to Plan Effectiveness.**  As a condition precedent to the

8    effectiveness of the Plan and the occurrence of the Effective Date, the Confirmation Order must

9    become a Final Order.  The Committee reserves the right to object to the form of the Confirmation

10    Order.  In the event that an appeal, petition for certiorari or motion for reargument or rehearing or

11    comparable post-confirmation relief is filed with respect to the Confirmation Order, and no stay of

12    the effectiveness of the Confirmation Order is obtained, the Debtors may elect, in the exercise of

13    their sole and absolute discretion, to proceed with the Effective Date of the Plan and to commence

14    to consummate the Plan, by filing and serving upon counsel for the Lenders, counsel for the

15    Committee, the United States Trustee and the party seeking such post-confirmation relief, notice of

16    such election.

17    **C.    Waiver of Conditions.**  The conditions set forth in Sections 13.1 and 13.2 of the

18    Plan may be waived by the Debtors without notice, leave or order of the Bankruptcy Court, and

19    without any formal action other than proceeding to obtain the Confirmation Order and to

20    consummate the Plan.

21    **XX.**

22    **RETENTION OF JURISDICTION**

23    Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective

24    Date, the Bankruptcy Court will retain jurisdiction over the Cases and any of the proceedings

25    arising from, or relating to, the Cases pursuant to Section 1142 of the Bankruptcy Code and 28

26    U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law,

27    including, without limitation, such jurisdiction as is necessary to ensure that the purposes and

28

-80-

MAINDOCS-#136659-v11-Star:R:bs_DisclosureStatement_(Carinos).DOC

intent of the Plan are carried out. Without limiting the generality of the foregoing, the Bankruptcy Court will retain jurisdiction for the following purposes:

A.    To hear and determine any and all objections to the allowance, or requests for estimation, of Claims or the establishment of reserves pending the resolution of Disputed Claims;

B.    To consider and act on the compromise and settlement of any Claim against, or cause of action on behalf of, any Debtor or any Estate, including, without limitation, any Avoidance Action;

C.    To hear and determine any motions pending on the Effective Date to assume, assume and assign or reject any executory contract or unexpired lease and to determine the allowance of any Claim resulting therefrom;

D.    To enter such orders as may be necessary or appropriate in connection with the recovery of the Debtors' assets, wherever located;

E.    To hear and determine any and all applications for allowance of compensation and reimbursement of expenses of Professionals;

F.    To hear and determine any and all controversies, suits and disputes arising under or in connection with the interpretation, implementation or enforcement of the Plan and any of the documents intended to implement the provisions of the Plan or any other matters to be resolved by the Bankruptcy Court under the terms of the Plan;

G.    To hear and determine any motions or contested matters involving Taxes, tax refunds, tax attributes and tax benefits and similar and related matters with respect to any Debtor, including, without limitation, matters involving federal, state and local Taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

H.    To hear and determine any and all applications, adversary proceedings and contested matters pending on the Effective Date or that may be commenced after the Effective Date as provided in the Plan;

I.    To effectuate Distributions under, and performance of, the provisions of the Plan;

MAINDOCS-#136659-v11-StarRhs_DisclosureStatement_(Carinos).DOC

1    J.    To hear and determine any motion to modify any provision of the Plan after

2    confirmation of the Plan, and, if in the best interests of the Debtors and Creditors, modification of

3    the Plan even after the Plan has been substantially consummated;

4    K.    To correct any defect, cure any omission or reconcile any inconsistency in the Plan,

5    the exhibits to the Plan or this Disclosure Statement and any documents executed in connection

6    with the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, as may be

7    necessary to carry out the purposes and intent of the Plan;

8    L.    To determine such other matters as may be provided for in the Confirmation Order

9    or as may from time to time be authorized under the provisions of the Bankruptcy Code or any

10   other applicable law;

11   M.    To enforce all orders, judgments, injunctions and exculpations issued or entered in

12   connection with the Cases or the Plan;

13   N.    To enter such orders as may be necessary or appropriate in aid of confirmation and

14   to facilitate implementation of the Plan, including, without limitation, any orders as may be

15   appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or

16   vacated;

17   O.    To determine any other matter not inconsistent with the Bankruptcy Code; and

18   P.    To issue a final decree closing the Cases.

19                                                **XXI.**

20                        **MODIFICATION OF THE PLAN; CRAMDOWN**

21   **A.    Modification of the Plan.** At any time prior to the confirmation of the Plan, the

22   Debtors may supplement, amend or modify the Plan, provided that, without the consent of the

23   Committee, after the voting with respect to the Plan, the Debtors will not make any modifications

24   to the Plan which affect materially and adversely the interests of General Unsecured Creditors

25   under the Plan. The Debtors will provide to the Committee notice of any such modification of the

26   Plan, and an opportunity to be heard thereon. After confirmation of the Plan, the Debtors or

27   Reorganized Debtors may (i) apply to the Bankruptcy Court to modify the Plan, notwithstanding

28   any substantial consummation of the Plan if in the best interests of the Debtors and Creditors; and

1  (ii) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile

2  inconsistencies in the Plan.

3      **B.**    **Nonconsensual Confirmation.**  In the event that any impaired Class of Claims or

4  Interests should fail to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy

5  Code, the Debtors (i) may request that the Bankruptcy Court confirm the Plan in accordance with

6  Section 1129(b) of the Bankruptcy Code, and (ii) may modify the Plan in accordance with

7  Section 1127(a) of the Bankruptcy Code and Section 15.1 of the Plan.

8  **XXII.**

9  **MISCELLANEOUS**

10      **A.**    **Payment of Statutory Fees.**  All quarterly fees due and payable to the United

11  States Trustee pursuant to 28 U.S.C. 1930(a)(6) will be paid in full on or before the Effective Date,

12  or, to the extent such quarterly fees are disputed, an adequate reserve will be established and set

13  aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy Code.  The

14  Reorganized Debtors will remain responsible for timely payment of their quarterly fees due and

15  payable after the Effective Date, until the Reorganized Debtors' Cases are closed, to the extent

16  required by 28 U.S.C. 1930(a)(6).

17      **B.**    **Payment Dates.**  Whenever any Distribution to be made under the Plan becomes

18  due on a day other than a Business Day, such Distribution instead will be made, without interest,

19  on the immediately following Business Day.

20      **C.**    **Other Documents and Actions.**  The Reorganized Debtors may execute such other

21  documents and take such other actions as may be necessary or appropriate to effectuate the

22  transactions contemplated under the Plan.

23      **D.**    **Notices.**  Except as expressly set forth herein to the contrary, all notices and

24  requests in connection with the Plan and this Disclosure Statement must be in writing and must be

25  hand delivered or sent by telefacsimile, with a copy sent by first-class mail, addressed to:

26  /  /  /

27

28

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

**TO THE DEBTORS:**
Brian Weiss
Chief Restructuring Officer
c/o BSW & Associates
2020 Main Street, Suite 500
Irvine, CA 92614
Telephone:  (949) 933-7011
Facsimile: (949) 428-7401

**WITH A COPY TO:**
Garrick A. Hollander, Esq.
Winthrop Couchot Professional Corporation
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone:  (949) 720-4100
Facsimile:  (949) 720-4111

**TO THE CREDITOR BOARD MEMBER**
Al Chavez
c/o Phoenix Group Advisory Services, LLC
805 Manhattan Beach Blvd., Suite 204
Manhattan Beach, CA 90266
Telephone:  (310) 546-5800
Facsimile:  (310) 402-8209

**TO THE CREDITOR BOARD MEMBER**
Daniel Harrow
2312 Janet Lee Drive
La Crescent, CA 91214
Telephone:  (818) 249-2271
Facsimile:  (818) 249-4249

**TO THE CREDITOR BOARD MEMBER**
Lewis Jaffe
Telephone:  (310) 990-7469

**WITH A COPY TO:**
Scott E. Blakeley, Esq.
Blakeley & Blakeley LLP
4685 MacArthur Court, Suite 421
Newport Beach, CA 92660
Telephone: (949) 260-0611
Facsimile: (949) 260-0613

All notices to the Creditor Board Members will be given in accordance with information to be set forth in a notice to be filed by the Committee on or before the Confirmation Date.

-84-

1   All notices to any Creditor or Interest Holder will be sent to it at its last known address or

2 to the last known address of its attorney of record.  Any such person may designate in writing any

3 other address for purposes of this Paragraph, which designation will be effective on receipt thereof

4 by the Debtors.

5   **E.**  <u>**Governing Law.**</u>  Unless a rule of law or procedure is supplied by federal law

6 (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California

7 (without reference to its conflict of law rules) will govern the construction and implementation of

8 the Plan and any agreements, documents, and instruments executed in connection with the Plan,

9 unless otherwise specifically provided in such agreements, documents, or instruments.

10   **F.**  <u>**Binding Effect.**</u>  The Plan and all rights, duties and obligations thereunder will be

11 binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, Creditors, Interest

12 Holders, the Committee and their respective successors and assigns.

13   **G.**  <u>**Successors and Assigns.**</u>  The rights, benefits, and obligations of any entity named

14 or referred to in the Plan will be binding on, and will inure to the benefit of, the heirs, executors,

15 administrators, successors, and assigns of such entity.

16   **H.**  <u>**No Waiver.**</u>  The failure of the Debtors or any other entity to object to any Claim

17 for purposes of voting will not be deemed to be a waiver of the Debtors' or other entities' right to

18 object to or examine such Claim, in whole or in part.

19   **I.**  <u>**Inconsistencies.**</u>  In the event that the terms or provisions of the Plan are

20 inconsistent with the terms and provisions of the exhibits to the Plan, any document executed in

21 connection with the Plan, the Disclosure Statement, or the exhibits to the Disclosure Statement,

22 the terms of the Plan will control.

23   **J.**  <u>**Exemption from Certain Transfer Taxes and Recording Fees.**</u>  Pursuant to

24 Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or

25 to any other person or entity pursuant to, or implemented by, the Plan (including, without

26 limitation, the granting of a security interest) will not be subject to any document recording tax,

27 stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer

28 tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

tax or governmental assessment. The Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**K.    Exemption from Securities Laws.** Pursuant to Section 1145, the offer or sale of a security of a successor to the Debtors under the Plan shall not require registration for offer or sale of such security or registration or licensing of an issue of, underwriter of, or broker or dealer in, such a security, as such offer or sale under the Plan is in exchange for a Claim against the Debtors.

**L.    Post-Confirmation Status Report.** Within 180 days following the entry of the Confirmation Order, the Reorganized Debtors will file with the Bankruptcy Court a status report explaining the progress made toward consummation of the Plan. The status report will be served on the United States Trustee, the Creditor Board Members, and any parties who file a request for special notice of post-confirmation matters. Unless otherwise ordered by the Bankruptcy Court, further status reports will be filed every 180 days and served on the same entities.

**M.    Post-Confirmation Conversion/Dismissal.** A Creditor or other party-in-interest may file a motion to convert or dismiss the Cases under Section 1112(b), if there is a default by the Reorganized Debtors in performing the Plan. The Reorganized Debtors reserve the right to object to any such motion for conversion or dismissal.

**N.    Changes in Rates Subject to Regulatory Commission Approval.** The Debtors are not subject to governmental regulatory commission approval of their rates.

**O.    Final Decree.** Unless earlier filed by the Reorganized Debtors, by the thirtieth (30th) day after the filing of the Reorganized Debtors' Certification, in accordance with Rule 3022 of the Bankruptcy Rules, the Reorganized Debtors will file an application with the Bankruptcy Court to obtain a final decree to close the Cases of the Reorganized Debtors.

## XXIII.

## CONCLUSION

The materials provided in this Disclosure Statement are intended to assist Creditors in voting on the Plan. If the Plan is confirmed, Creditors will be bound by the terms of the Plan.

MAINDOCS-#136659-v11-StarRibs_DisclosureStatement_(Carinos).DOC

1   Therefore, all Creditors are urged to review this material and to make such further inquiries as

2   they deem appropriate, and then cast an informed vote on the Plan.

3

4   Date: January ___, 2010          **BLUEOCEAN PARTNERS, LP**
                                      **a California limited partnership**
5
                                      By: /s/ *Brian Weiss*
6                                              Brian Weiss,
                                      Its:  Chief Restructuring Officer
7

8   Date: January ___, 2010          **SOWESTBRECK, LLC**
                                      **a California limited liability company**
9
                                      By: /s/ *Brian Weiss*
10                                             Brian Weiss,
                                      Its:  Chief Restructuring Officer
11

12  **SUBMITTED BY:**

13
    **WINTHROP COUCHOT**
14  **PROFESSIONAL CORPORATION**

15
    By: /s/ *Garrick A. Hollander*
16          Marc J. Winthrop
            Garrick A. Hollander
17  General Insolvency Counsel to the
    Debtors and Debtors-in-Possession
18

19

20

21

22

23

24

25

26

27

28