1  MARC J. WINTHROP -- State Bar No. 63218
   mwinthrop@winthropcouchot.com
2  GARRICK A. HOLLANDER -- State Bar No. 166316
   ghollander@winthropcouchot.com
3  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
4  660 Newport Center Drive, Suite 400
   Newport Beach, CA 92660
5  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
6
7  General Insolvency Counsel for
   Debtors and Debtors-in-Possession

8

9

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                  **SANTA ANA DIVISION**

13

14  In re                          Case No. 8:08-17182 TA

15  ☐ STARRIBS NORTH, LP           Jointly Administered with Case Nos.
   ☐ STARRIBS SOUTH, LP           8:08-bk-17183 TA; 8:08-bk-17187 TA;
16  ☐ WHITTOWN PARTNERS, LP        8:08-bk-17193 TA; 8:08-bk-17194 TA;
17  ☐ OCEANCOUNTRY, LP             8:09-bk-13275 TA and 8:09-bk-13590 TA
   ☒ BLUEOCEAN PARTNERS, LP
18  ☒ STONERIVER PARTNERS, LP      Chapter 11 Proceedings
   ☒ SOWESTBRECK, LLC
19                                 **DEBTORS' AMENDED DISCLOSURE**
20  ☐ All Debtors                  **STATEMENT TO ACCOMPANY DEBTORS'**
                                   **AMENDED CHAPTER 11 PLAN OF**
21       Debtors and              **REORGANIZATION**
         Debtors-in-Possession.
22                                 **Disclosure Statement Hearing**

23                                 Date:    March 3, 2010
24                                 Time:    2:00 p.m.
                                   Place:   Courtroom 5B
25                                          411 West Fourth Street
                                            Santa Ana, California 92701
26

27

28

# **TABLE OF CONTENTS**

**PAGE**

I.      INTRODUCTION ........................................................................................... 2

II.     DEFINITIONS AND RULES OF INTERPRETATION ............................. 7
        A.    Definitions ........................................................................................ 7
        B.    Rules of Construction ...................................................................... 21
        C.    Exhibits ............................................................................................ 21

III.    CONFIRMATION AND VOTING ............................................................. 21

IV.     BACKGROUND OF THE DEBTORS ....................................................... 23
        A.    The Debtors ...................................................................................... 23
        B.    Jointly Administered Debtors .......................................................... 24
        C.    Financial Performance of the Debtors ............................................. 25
        D.    Restaurant Facilities ........................................................................ 25
        E.    Ownership and Management of the Debtors (Pre-Confirmation) .... 26
              1.    Shared Services Management Company ................................ 26
              2.    Appointment of Chief Restructuring Officer ....................... 28
        F.    Pre-Petition Legal Proceedings ....................................................... 28

V.      THE DEBTORS' CHAPTER 11 PROCEEDINGS .................................... 29
        A.    Events Precipitating Chapter 11 Filings .......................................... 29
        B.    Debtor-in-Possession Status ............................................................ 29
        C.    The Automatic Stay ......................................................................... 29
        D.    Significant Events Which Have Occurred After the
              Petition Dates .................................................................................. 30
              1.    First Day Motions ................................................................ 30
              2.    Other Motions ...................................................................... 30
                    a.    Debtors' Motion for Use of any Cash
                          Collateral of Secured Claimants ........................... 30
                    b.    Motion to Extend Time to Assume or
                          Reject Leases ......................................................... 31
                    c.    Motion to Set Bar Date .......................................... 31
                    d.    Motion for Appointment of CRO .......................... 32
                    e.    Motion to Enter into Management Agreement ....... 32
                    f.    Motion for Authority to Enter into Lease .............. 32
                    g.    Motion Approving Purchase of Certain Assets
                          and Assignment and Assumption of Certain
                          Unexpired Leases and Executory Contracts .......... 32
                    g.    Applications to Employ Professionals .................... 33
        E.    Actual and Projected Recovery of Preferential or Fraudulent
              Transfers .......................................................................................... 33
        F.    Projected Objections to Claims Filed Against the Estates ............... 33

**TABLE OF CONTENTS**

**(Continued)**

|  |  | | PAGE |
|---|---|---|---|
| VI. | FINANCIAL INFORMATION REGARDING THE DEBTORS | | 34 |
| | A. | Historical Financial Information | 34 |
| | B. | Financial Information Provided During the Cases | 34 |
| | C. | Financial Performance During the Cases | 35 |
| VII. | DESCRIPTION OF THE PLAN OF REORGANIZATION | | 35 |
| | A. | Substantive Consolidation of the Debtors | 35 |
| | B. | Basic Structure of the Plan | 36 |
| | C. | Classification and Treatment of Claims | 36 |
| VIII. | UNCLASSIFIED CLAIMS | | 36 |
| | A. | Administrative Claims | 37 |
| | | 1. Payment Generally | 37 |
| | | 2. Waiver of Claims | 37 |
| | | 3. Administrative Claims Bar Date | 37 |
| | | 4. Projected Administrative Claims | 38 |
| | B. | Priority Tax Claims | 38 |
| | C. | Amount of Priority Tax Claims | 39 |
| IX. | CLASSIFICATION OF CLAIMS AND INTERESTS | | 39 |
| | A. | General Overview | 39 |
| | B. | Designation of Classes | 40 |
| X. | PROVISIONS FOR THE TREATMENT OF CLAIMS AND INTERESTS | | 40 |
| | A. | Classes 1.1 Through 1.9 | 40 |
| | | 1. Allowance of Secured Claims | 40 |
| | | 2. Payment of Allowed Secured Claim | 41 |
| | |     a. Option 1 | 41 |
| | |     b. Option 2 | 42 |
| | |     c. Option 3 | 42 |
| | | 3. Insurance | 42 |
| | | 4. Late Fees and Event of Default | 42 |
| | | 5. Inspection of Equipment | 43 |
| | B. | Class 2.1 Through 2.2 | 43 |
| | | 1. Allowance of Secured Claims | 43 |
| | | 2. Payment of Allowed Secured Claims | 43 |
| | |     a. Option 1 | 43 |
| | |     b. Option 2 | 44 |
| | |     c. Option 3 | 44 |

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

## TABLE OF CONTENTS

### (Continued)

| | | | PAGE |
|---|---|---|---|
| C. | Class 3 -- Allowed Secured Capital Lease Claims | | 44 |
| | 1. | Option 1 | 45 |
| | 2. | Option 2 | 45 |
| | 3. | Option 3 | 45 |
| D. | Class 4 - Allowed Priority Unsecured Wage Claims | | 45 |
| E. | Class 5 - Allowed General Unsecured Claims | | 46 |
| | 1. | Equity Interest in Holdco | 46 |
| | 2. | Payment of Claims | 46 |
| | 3. | Holdco Board | 47 |
| | 4. | Waiver of Gantes Parties' Claims | 47 |
| | 5. | Waiver | 47 |
| F. | Class 6 -- Any Allowed Secured Claim of Governmental Units | | 47 |
| G. | Class 7 -- Any Allowed Non-Pecuniary Loss Penalty Claims | | 48 |
| H. | Class 8 -- Interests in BlueOcean and SoWestBreck | | 48 |
| XI. | MEANS OF IMPLEMENTING THE PLAN | | 48 |
| A. | Introduction | | 48 |
| B. | The Reorganized Debtors | | 49 |
| | 1. | General Unsecured Creditors' Interest in Holdco | 49 |
| | 2. | Gantes's Interest in Holdco | 49 |
| C. | Management/Board of Directors | | 49 |
| | 1. | Gantes | 50 |
| | 2. | Brian Weiss | 50 |
| | 3. | Al Chavez | 51 |
| | 4. | Compensation for Independent Holdco Board Members | 52 |
| | 5. | Management of Operations | 52 |
| | 6. | Synergy | 54 |
| | 7. | Subco's Management Fee to Holdco | 54 |
| D. | Corporate Actions | | 55 |
| E. | Transfer of Estate Property to Reorganized Debtors | | 55 |
| F. | Funding of the Plan | | 56 |
| G. | Post-Confirmation Estate Claims | | 56 |
| H. | Avoidance Actions | | 57 |
| I. | Disposition of Assets | | 57 |
| J. | Compromise of Controversies | | 57 |
| K. | Bankruptcy Court Approval Relative to Post-Confirmation Matters | | 57 |
| L. | Debtors' Right of Setoff | | 58 |
| M. | Cash Payments | | 58 |
| N. | Reorganized Debtors' Certification | | 58 |

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

## TABLE OF CONTENTS

### (Continued)

PAGE

XII.  DISTRIBUTIONS ............................................................................................. 59
    A.  Distribution Agent ............................................................................... 59
    B.  Distributions ....................................................................................... 59
        1.  Dates of Distributions ........................................................... 59
        2.  Limitation on Liability ........................................................... 59
    C.  Instruments and Securities .................................................................. 59
        1.  Rights of Persons Holding Instruments and
            Securities ................................................................................ 59
        2.  Cancellation of Liens ............................................................. 60
    D.  De Minimis Distributions .................................................................... 60
    E.  Delivery of Distributions ..................................................................... 60
    F.  Undeliverable Distributions ................................................................. 60
    G.  Disposition of Unclaimed Property ...................................................... 61

XIII.  OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS ....................... 61
    A.  Objections to Claims ........................................................................... 61
    B.  Schedule of Disputed Claims .............................................................. 62
    C.  Treatment of Disputed Claims ............................................................. 63
        1.  No Distribution Pending Allowance ....................................... 63
        2.  Distribution After Allowance ................................................. 63
        3.  Reserves for Disputed Claims ................................................ 63

XIV.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................... 63
    A.  Executory Contracts Being Assumed .................................................. 63
    B.  Payment of Cure Claims ..................................................................... 64
    C.  Executory Contracts Being Rejected ................................................... 65
    D.  Retention of Property Rights by Reorganized Debtors .......................... 65
    E.  Bar Date for Rejection Damages .......................................................... 65
    F.  Claims Schedule .................................................................................. 66

XV.  TAX CONSEQUENCES OF PLAN ......................................................... 66
    A.  Introduction ........................................................................................ 66
    B.  Federal Income Tax Consequences to the Debtors ............................... 67
    C.  Tax Consequences to Creditors ........................................................... 69

XVI.  CONFIRMATION REQUIREMENTS AND PROCEDURES .................. 69
    A.  Introduction ........................................................................................ 69
    B.  Who May Object to Confirmation of the Plan ...................................... 70

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

## TABLE OF CONTENTS

### (Continued)

| | | | PAGE |
|---|---|---|---|
| C. | | Who May Vote to Accept/Reject the Plan | 70 |
| | 1. | What Is an Allowed Claim/Interest | 70 |
| | 2. | What Is an Impaired Class of Claim(s)/Interest(s) | 70 |
| D. | | Who Is Not Entitled to Vote | 70 |
| E. | | Who Can Vote in More than One Class | 71 |
| F. | | Votes Necessary to Confirm the Plan | 71 |
| G. | | Votes Necessary for a Class to Accept the Plan | 71 |
| H. | | Treatment of Non-Accepting Classes | 71 |
| I. | | Request for Confirmation Despite Non-Acceptance by Impaired Class(es) | 72 |
| J. | | Liquidation Analysis | 72 |
| | 1. | Class 1 and 2 Claims | 75 |
| | 2. | Class 3 Claims | 75 |
| | 3. | Class 4 Claims | 76 |
| | 4. | Class 5 Claims | 76 |
| | 5. | Class 6 Claims | 76 |
| | 6. | Class 7 Claims | 76 |
| | 7. | Class 8 Claims | 76 |
| K. | | Feasibility | 77 |
| | 1. | Projections of Future Cash Flow | 77 |
| | | a. Effective Date of the Plan | 78 |
| | | b. Revenues Generated by the Reorganized Debtors' Business | 78 |
| | | c. Expenses of the Reorganized Debtors | 78 |
| | 2. | Funding of Distributions Required by the Plan | 78 |
| | | a. Funding of Distributions Required on or About the Effective Date | 78 |
| | | b. Funding of Ongoing Distributions to Holders of Allowed Claims Required by the Plan | 79 |
| XVII. | EFFECT OF CONFIRMATION PLAN | | 80 |
| A. | | Discharge | 80 |
| B. | | Injunction | 81 |
| XVIII. | LIMITATION OF LIABILITY AND RELEASES | | 81 |
| A. | | No Liability for Solicitation or Participation | 81 |
| B. | | Limitation of Liability | 82 |
| XIX. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS | | 82 |
| A. | | Conditions Precedent to Plan Confirmation | 82 |
| B. | | Condition Precedent to Plan Effectiveness | 82 |
| C. | | Waiver of Conditions | 83 |

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

## TABLE OF CONTENTS

### (Continued)

|  |  |  | PAGE |
|---|---|---|---|
| XX. | RETENTION OF JURISDICTION | | 83 |
| XXI. | MODIFICATION OF THE PLAN; CRAMDOWN | | 85 |
| | A. | Modification of the Plan | 85 |
| | B. | Nonconsensual Confirmation | 85 |
| XXII. | MISCELLANEOUS | | 85 |
| | A. | Payment of Statutory Fees | 85 |
| | B. | Payment Dates | 86 |
| | C. | Other Documents and Actions | 86 |
| | D. | Notices | 86 |
| | E. | Governing Law | 87 |
| | F. | Binding Effect | 87 |
| | G. | Successors and Assigns | 87 |
| | H. | No Waiver | 88 |
| | I. | Inconsistencies | 88 |
| | J. | Exemption from Certain Transfer axes and Recording Fees | 88 |
| | K. | Exemption from Securities Laws | 88 |
| | L. | Post-Confirmation Status Report | 88 |
| | M. | Post-Confirmation Conversion/Dismissal | 89 |
| | N. | Changes in Rates Subject to Regulatory Commission Approval | 89 |
| | O. | Final Decree | 89 |
| XXIII. | CONCLUSION | | 89 |

# I.

## **INTRODUCTION**

BlueOcean and SoWestBreck filed voluntary petitions under Chapter 11 of the Bankruptcy Code on November 6, 2008 and April 23, 2009, respectively.[1]  Since each respective Petition Date, the Debtors have continued to operate their businesses in the ordinary course as debtors-in-possession.  On November 6, 2008 and April 23, 2009, the Bankruptcy Court entered orders authorizing the joint administration of the cases of BlueOcean and SoWestBreck, respectively, along with the above-captioned cases.

The document that you are reading is the Debtors' Disclosure Statement.  This Disclosure Statement is furnished for the purpose of soliciting acceptances to the Debtors' Plan which has been filed with the Bankruptcy Court.  A copy of the Plan accompanies this Disclosure Statement.

Section 1125[2] of the Bankruptcy Code requires that, at the time when the Plan is delivered to Creditors, the Plan be accompanied by this Disclosure Statement.  The purpose of this Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtors and the condition of the Debtors' books and records, to enable a typical Creditor to make an informed judgment about the Plan and to enable such Creditor to determine whether it is in its best interest to vote for (accept) or against (reject) the Plan.

This Disclosure Statement contains a description of the Plan and other information relevant to the decision whether to vote to accept or to reject the Plan.  **As you will see, creditors of all classifications have made significant accommodations and compromises in their rights in efforts to enable the Debtors to successfully reorganize in these difficult economic time, including (i) Synergy has agreed to eliminate its management fee through 2012 for three locations; (ii) Franchisor has agreed to eliminate the prepetition royalties totaling $386,375;**

---

[1] Unless otherwise defined in this Disclosure Statement, the definitions of the capitalized terms contained in this Disclosure Statement are set forth in Article II herein.

[2] Section 1125(b) provides, in pertinent part, as follows:
> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

1    **and (iii) Franchisor has reduced the royalty rate between 50% to 75% through February**

2    **2011.** The Debtors urge you to read this Disclosure Statement because it contains important

3    information concerning the Debtors' history, businesses, assets and liabilities, projected financial

4    performance, and sets forth a summary of the Plan.

5    This Disclosure Statement does not purport to be a complete description of the Plan, the

6    financial data pertaining to the Debtors' business operations, the applicable provisions of the

7    Bankruptcy Code, or any other matters which may be deemed significant by Creditors. Out of

8    practical necessity, this Disclosure Statement represents an attempt to summarize extensive

9    overall data, legal documents and legal principles, including provisions of the Bankruptcy Code,

10   and set them forth in understandable, readable form. Thus, although the Debtors have attempted

11   to describe fairly and accurately the matters set forth and discussed in this Disclosure Statement,

12   the Debtors emphasize that the documents and instruments referred to or summarized in this

13   Disclosure Statement (including, without limitation, historical financial information for the

14   Debtors' business operations) are available for inspection at the office of the Debtors' attorneys,

15   Winthrop Couchot Professional Corporation ("Winthrop Couchot"), located at 660 Newport

16   Center Drive, Suite 400, Newport Beach, CA 92660 (Attn: Garrick A. Hollander, Esq.), during

17   normal business hours, and upon reasonable written request made prior to the Confirmation

18   Hearing.

19   If any interested party does not understand fully this Disclosure Statement, or feels that the

20   information provided herein is insufficient to enable it to determine whether to accept or to reject

21   the Plan, that party is invited to make written inquiry of the Debtors' attorneys, Winthrop

22   Couchot, at the address set forth hereinabove.

23   To vote to accept or reject the Plan, a Creditor must indicate its acceptance or rejection

24   thereof on the ballot which accompanies this Disclosure Statement and return it to Winthrop

25   Couchot Professional Corporation in the envelope provided, such that the ballot is actually

26   received by Winthrop Couchot by 4:00 p.m. Pacific Daylight Time on April 5, 2010. Each Class

27   of Creditors allowed to vote on the Plan will be deemed to have accepted the Plan if the Plan is

28   accepted by valid ballots cast by Creditors in that Class holding at least two-thirds (2/3) in dollar

1  amount and more than one half (1/2) in number of the Allowed Claims of Creditors in that Class

2  actually voting on the Plan. **ONLY PROPERLY EXECUTED BALLOTS TIMELY**

3  **RECEIVED BY COUNSEL FOR THE DEBTORS WILL BE COUNTED AS HAVING**

4  **VOTED ON THE PLAN.**

5      Since mail delays may occur, and because time is of the essence, it is important that ballots

6  be mailed well in advance of the date specified hereinabove as the deadline for Winthrop Couchot

7  to receive ballots. Any ballots received after that date will <u>not</u> be included in any calculation to

8  determine whether the Debtors' Creditors have accepted or rejected the Plan.

9      At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to

10  Section 1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary

11  Classes of Claims created under the Plan, and, if not, whether the Bankruptcy Court should,

12  nevertheless, confirm the Plan. If at such hearing the Bankruptcy Court should determine that the

13  Plan meets all of the requirements for confirmation prescribed by the Bankruptcy Code, the

14  Bankruptcy Court will enter a Confirmation Order. Pursuant to Section 1141 of the Bankruptcy

15  Code, the effect of the Confirmation Order will be to make the provisions of the Plan binding

16  upon the Debtors and each of their Creditors, regardless of whether the Creditor voted to accept

17  the Plan.

18      Pursuant to the Section 1128 of the Bankruptcy Code, any party-in-interest may object to

19  the confirmation of the Plan. The Bankruptcy Court has fixed April 9, 2010 as the deadline for

20  filing an objection to the Plan and for serving a copy thereof upon the Debtors' attorneys,

21  Winthrop Couchot, at the address set forth hereinabove (Attn: Garrick A. Hollander, Esq.); upon

22  the Committee's attorneys, Blakeley & Blakeley, located at 4685 MacArthur Court, Suite 421,

23  Newport Beach, California 92660 (Attn: Ronald Clifford, Esq.); and upon the United States

24  Trustee, located at 411 West Fourth Street, Suite 9041, Santa Ana, California 92701 (Attn:

25  Nancy S. Goldenberg, Esq.).

26      **THIS IS A SOLICITATION BY THE DEBTORS. THE REPRESENTATIONS**

27  **HEREIN ARE THOSE OF THE DEBTORS AND NOT OF THEIR ATTORNEYS OR**

28  **THEIR OTHER PROFESSIONALS. NO REPRESENTATIONS CONCERNING THE**

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1  DEBTORS, INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO

2  THEIR FUTURE BUSINESS OPERATIONS, CASH FLOW PROJECTIONS, THE

3  VALUE OF THEIR PROPERTY, THE AMOUNT OF CLAIMS AGAINST THE

4  ESTATES, OR ANY TAX EFFECT OF THE TRANSACTIONS PROPOSED UNDER

5  THE PLAN, ARE AUTHORIZED BY THE DEBTORS, OTHER THAN AS SET FORTH

6  IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR

7  INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN THAT ARE IN

8  ADDITION TO OR DIFFERENT FROM THE STATEMENTS CONTAINED IN THIS

9  DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PARTY-IN-

10  INTEREST.  ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS

11  SHOULD BE REPORTED TO THE DEBTORS' ATTORNEYS WHO, IN TURN, WILL

12  DELIVER THE INFORMATION TO THE BANKRUPTCY COURT FOR SUCH

13  ACTION AS THE BANKRUPTCY COURT MAY DEEM TO BE APPROPRIATE.

14       THE DISCUSSION IN THIS DISCLOSURE STATEMENT REGARDING THE

15  DEBTORS MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE

16  MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.

17  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A

18  RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF

19  FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT,"

20  "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF OR

21  OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE

22  READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE

23  NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND

24  UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO

25  DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD

26  LOOKING STATEMENTS.  THE LIQUIDATION ANALYSES, DISTRIBUTION

27  PROJECTIONS, PROJECTIONS OF FINANCIAL PERFORMANCE AND OTHER

28  INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING,

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1   AMOUNT AND VALUE OF ACTUAL DISTRIBUTIONS TO CREDITORS MAY BE

2   AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE,

3   ANY ANALYSES, ESTIMATES, OR PROJECTIONS MAY OR MAY NOT PROVE TO

4   BE ACCURATE.

5       UNLESS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY, THE

6   INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE

7   STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT. RECORDS KEPT BY THE

8   DEBTORS RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED

9   INTERNALLY BY THE DEBTORS. THE DEBTORS BELIEVE THAT EVERY

10  REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL INFORMATION

11  AS ACCURATE AS IS REASONABLY PRACTICABLE GIVEN THE NATURE AND

12  HISTORY OF THE DEBTORS' BUSINESSES AND THE CONDITION OF THE

13  DEBTORS' BOOKS AND RECORDS. HOWEVER, THE RECORDS KEPT BY THE

14  DEBTORS ARE NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF

15  INACCURACY. NEITHER DEBTORS' CHIEF RESTRUCTURING OFFICER,

16  DEBTORS' MANAGEMENT COMPANY, DEBTORS' GENERAL INSOLVENCY

17  COUNSEL, NOR DEBTORS' SPECIAL TAX COUNSEL VERIFIED INDEPENDENTLY

18  THE INFORMATION CONTAINED HEREIN, OR MAKE ANY REPRESENTATIONS OR

19  WARRANTIES WITH RESPECT TO THE ACCURACY THEREOF.

20      THE DEBTORS AND THEIR PROFESSIONALS HAVE MADE A DILIGENT

21  EFFORT TO IDENTIFY IN THIS DISCLOSURE STATEMENT ALL LITIGATION

22  CLAIMS, INCLUDING CLAIMS FOR RELIEF, COUNTERCLAIMS, AND OBJECTIONS

23  TO CLAIMS. HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT

24  A PARTICULAR LITIGATION CLAIM IS OR IS NOT IDENTIFIED IN THIS

25  DISCLOSURE STATEMENT. THE DEBTORS OR OTHER PARTIES-IN-INTEREST

26  MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE POST-CONFIRMATION

27  ESTATE CLAIMS WHETHER OR NOT SUCH CLAIMS ARE IDENTIFIED IN THIS

28  DISCLOSURE STATEMENT.

ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO
CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR
TO VOTING ON THE PLAN.  THE CONTENTS OF THIS DISCLOSURE STATEMENT
SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS OR
TAX ADVICE.  EACH CREDITOR AND OTHER PARTY-IN-INTEREST SHOULD
CONSULT WITH ITS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT
OR ACCOUNTANT PRIOR TO VOTING ON THE PLAN IN ORDER TO ENSURE A
COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN.  THIS
DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE
CREDITORS OF THE DEBTORS TO ENABLE THEM TO MAKE AN INFORMED
DECISION REGARDING THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE
STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT
CONTAINS ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION
OF ACCEPTANCES TO THE PLAN BY THE DEBTORS, ASSUMING THE
ACCURACY OF THE CONTENTS OF THIS DISCLOSURE STATEMENT.  THE
BANKRUPTCY COURT HAS NOT YET DETERMINED SUCH ACCURACY, BUT MAY
DO SO AT THE HEARING REGARDING THE CONFIRMATION OF THE PLAN.

## II.

## DEFINITIONS AND RULES OF INTERPRETATION

A.    **Definitions**.  The following defined terms are used in this Disclosure Statement.
Any capitalized term that is not defined herein, but that is defined in the Bankruptcy Code or in the
Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or
Bankruptcy Rules.

1.    "Administrative Claim" means a Claim for costs and expenses of the
administration of a Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including,
without limitation, a Claim of a Professional employed at the expense of an Estate and any fees or
charges asserted against an Estate under 28 U.S.C. § 1930.

2.    "<u>Administrative Tax Claim</u>" means a request by a Governmental Unit for payment of Administrative Claims for Taxes (and for interest or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs within the period from and including the Petition Date through and including the Effective Date.

3.    "<u>Allowable Interest Rate</u>" means the interest rate that is fixed at one percentage point (1%) over the prime rate of interest as published in the <u>Wall Street Journal</u> on the Effective Date.

4.    "<u>Allowed Administrative Claim</u>" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(a)(1) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

5.    "<u>Allowed Claim</u>"  means a Claim that is either (i) listed in the Schedules filed with the Bankruptcy Court by the Debtors and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection has been filed; or (ii) with respect to which a Proof of Claim has been filed within the time period fixed by the Bankruptcy Court, and as to which no objection was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or as to which any such objection has been determined by a Final Order.  The amount of an Allowed Claim shall be as follows:  (a) if the Creditor did not file a Proof of Claim with the Bankruptcy Court on or before the Bar Date, the amount of the Creditor's Claim as listed in the Schedules as neither disputed, contingent, unliquidated or unknown; or (b) if the Creditor filed a Proof of Claim with the Bankruptcy Court on or before the Bar Date, (1) the amount stated in such Proof of Claim if no objection to such Proof of Claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final Order of the Bankruptcy Court if an objection to such Proof of Claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court.  Any Claim that is not filed by the applicable Bar Date and that is listed as disputed, unliquidated, contingent or unknown, or that is not allowed under the terms of the Plan, shall be zero, and no Distribution shall be made on account of such Claim.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1    6.    "<u>Allowed Cure Claims</u>" means an Allowed Claim for Cure Claims pursuant

2  to the terms of the Plan and a Final Order.

3    7.    "<u>Allowed Deficiency Claim</u>" means that portion of an Allowed Claim

4  which is in excess of the value of any collateral which is security for the repayment of the Claim,

5  calculated in accordance with the provisions of Section 506 of the Bankruptcy Code. Unless the

6  Creditor should make an election under Section 1111(b) of the Bankruptcy Code, an Allowed

7  Deficiency Claim is treated hereunder as a Class 5 Allowed General Unsecured Claim.

8    8.    "<u>Allowed General Unsecured Claim</u>" means an unsecured Allowed Claim

9  against the Debtors, however arising, not entitled to priority under Section 507(a) of the

10  Bankruptcy Code, including, without limitation, a Rejection Claim.

11    9.    "<u>Allowed Interest</u>" means an Interest to the extent, and only to the extent, of

12  the allowed amount of such Interest. The amount of an Allowed Interest shall be (i) the amount

13  provided by or established in the records of the Debtors on the Confirmation Date, provided,

14  however, that a timely filed Proof of Interest shall supersede any listing of such Interest on the

15  records of the Debtors; (ii) the amount stated in a timely filed Proof of Interest if no objection to

16  such Interest is filed prior to the Confirmation Date or such later date as the Bankruptcy Court

17  allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

18    10.    "<u>Allowed Non-Pecuniary Loss Penalty Claim</u>" means an Allowed Claim for

19  non-pecuniary loss penalties of the type described in Section 726(a)(4).

20    11.    "<u>Allowed Priority Tax Claim</u>" means an Allowed Claim provided for by

21  Section 507(a)(8) of the Bankruptcy Code.

22    12.    "<u>Allowed Priority Unsecured Wage Claim</u>" means an unsecured Allowed

23  Claim entitled to priority under Sections 507(a)(3) or (4) of the Bankruptcy Code.

24    13.    "<u>Allowed Section 503(b)(9) Administrative Claims</u>" means an Allowed

25  Claim entitled to administrative priority pursuant to Section 503(b)(9) of the Bankruptcy Code.

26    14.    "<u>Allowed Secured Claim</u>" means an Allowed Claim secured by a valid and

27  unavoidable Lien against property in which an Estate has an interest, or which is subject to setoff

28  under Section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance

1  with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Claim in

2  the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the

3  case may be.

4      15.    "Allowed Secured Capital Lease Claim" means the Allowed Secured Claim

5  of a Creditor under a capital lease.

6      16.    "Avoidance Action" means any action or proceeding filed pursuant to the

7  provisions of Sections 510, 542, 543, 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code, or

8  any similar action or proceeding filed to recover property for or on behalf of an Estate or to avoid a

9  Lien or transfer.

10      17.    "Bankruptcy Code" means Title 11, United States Code, as amended. All

11  citations in the Plan to Section numbers are to the Bankruptcy Code, unless otherwise expressly

12  stated herein.

13      18.    "Bankruptcy Court" means the United States Bankruptcy Court for the

14  Central District of California, Santa Ana Division, which has jurisdiction over the Cases and the

15  Estates of the Debtors, or such successor court or tribunal as may hereafter be confirmed or created

16  by lawful authority with power to confirm reorganization plans under Chapter 11 of the

17  Bankruptcy Code and all applicable statutes, rules and regulations pertaining thereto.

18      19.    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy

19  Procedure, as amended, and the Local Bankruptcy Rules for use in the United States Bankruptcy

20  Court for the Central District of California, as amended.

21      20.    "Bar Date" means the last date for creditors and equity security holders

22  whose claims or interests are not scheduled, or are scheduled as disputed, contingent, or

23  unliquidated in the Debtors' Schedules to file Proofs of Claim, except for the following Claims:

24  (i) Administrative Claims other than Section 503(b)(9) Administrative Claims, and (ii) Rejection

25  Claims. The Bar Date for BlueOcean is May 5, 2009 and for SoWestBreck is April 28, 2010.

26      21.    "BlueOcean" means BlueOcean Partners, LP, one of the jointly

27  administered debtors in the above-captioned cases.

28

-10-

22.     "Budget" means an annual operating budget of the Reorganized Debtors which shall be approved by the Holdco Board.

23.     "Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Rule 9006(a) of the Bankruptcy Rules.

24.     "Capital Lease" means a transaction in the form of a lease that creates a security interest pursuant to Section 1203 of the California Commercial Code.

25.     "Carino's" means the Carino's Italian Grill restaurants owned and operated by BlueOcean and SoWestBreck under the Fired Up, Inc. franchise agreement.

26.     "Cases" means the Chapter 11 cases commenced by the Debtors on their respective Petition Dates and pending before the Bankruptcy Court, as Case Nos. 8:08-bk-17194 TA and 8:09-bk-13590 TA.

27.     "Cash" means cash and cash equivalents including, but not limited to, checks or similar forms of payment or exchange.

28.     "Claim" means (i) a right to payment from the Debtors, whether or not such right to payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtors whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

29.     "Claims Objection Deadline" means, the latest of the following: (i) the one hundredth (100th) day after the Effective Date; (ii) with respect to a specific Claim, the one hundredth (100th) day after a Proof of Claim with respect to such Claim is filed by a Creditor, or (iii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between a Debtor or Reorganized Debtor and the Creditor.

30.     "Class" means the group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

31.     "Class 1 Event of Default" means a material breach of the Debtors' obligations to any Creditor of Class 1.1 through 1.9 under the Plan as against such Creditor.

1   32.   "Committee" means the duly appointed and acting Official Committee of
2   Creditors Holding Unsecured Claims in the Cases, and its successor under the Plan, the Holdco
3   Board.

4   33.   "Confirmation Date" means the date on which the Bankruptcy Court enters
5   the Confirmation Order.

6   34.   "Confirmation Hearing" means the hearing(s) scheduled by the Bankruptcy
7   Court for the purpose of considering the confirmation of the Plan.

8   35.   "Confirmation Order" means the order, as entered, of the Bankruptcy Court
9   confirming the Plan.

10   36.   "Creditor" means the holder of an Allowed Claim or Allowed
11   Administrative Claim.

12   37.   "Creditor Board Member" means a person that serves as a member of the
13   Holdco Board pursuant to the Plan.

14   38.   "Creditor Involvement Period" means the period of time from the Effective
15   Date through the date at which point the General Unsecured Creditors no longer own an Interest in
16   Holdco pursuant to the terms of the Plan.

17   39.   "Cure Claims" means the amounts necessary to cure any defaults under
18   executory contracts and unexpired leases assumed under the Plan.

19   40.   "Cure Claims Schedule" means the  schedule of the Cure Claims, which
20   shall be filed with the Bankruptcy Court, and served on the Committee, on or before the twenty-
21   fourth (24th) day prior to the Confirmation Hearing.

22   41.   "Debtors" means BlueOcean and SoWestBreck.  For the purpose of this
23   Disclosure Statement, reference to "Debtors" shall include the Reorganized Debtors.

24   42.   "DesertBreck" means DesertBreck, LP, a California limited partnership.

25   43.   "Disclosure Statement" means the Debtors' Amended Disclosure Statement,
26   as the same may be amended or modified from time to time.

27   44.   "Disputed Claim" means all or any part of a Claim as to which any one of
28   the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and the

1   Claim is listed in the Schedules as unliquidated, disputed, contingent or unknown, or; (ii) the

2   Claim is the subject of a timely objection or request for estimation which is filed on or before the

3   Claims Objection Deadline, which objection or request for estimation has not been withdrawn or

4   determined by a Final Order. In addition, prior to the earlier of (a) the Claims Objection Deadline,

5   and (b) such date as the Bankruptcy Court allows the Claim pursuant to a Final Order, any Claim

6   that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of

7   calculating and making any Distributions under the Plan if: (1) no Claim corresponding to the

8   Proof of Claim is listed in the Schedules, (2) the Claim corresponding to the Proof of Claim is

9   listed in the Schedules as disputed, contingent, unliquidated or unknown, (3) the amount of the

10  Claim as specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in

11  the Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the

12  priority or classification of the Claim as specified in the Proof of Claim differs from the priority of

13  any corresponding Claim listed in the Schedules.

14          45.     "Disputed Claims Reserve" means a segregated, interest-bearing trust

15  account for the benefit of General Unsecured Creditors, established at a financial institution that is

16  an authorized depository under United States Trustee guidelines, into which the Distribution Agent

17  will deposit the Distributions required by Section 9.3.3 hereof.

18          46.     "Disputed Claims Schedule" means the schedule setting forth a list of

19  Disputed Claims to which the Debtors intend to object.

20          47.     "Distribution" means the Cash that is required to be distributed under the

21  Plan to the holders of Allowed Claims.

22          48.     "Distribution Agent" means Holdco or its designee.

23          49.     "Dogwood" means Dogwood Partners, LP, a California limited partnership.

24          50.     "Downey Restaurant" means the Carino's Restaurant located at

25  12036 Lakewood Boulevard, Downey, California 90242.

26          51.     "Effective Date" means a date to occur on or before the thirtieth (30th) day

27  after the satisfaction or waiver of the conditions set forth in Sections 13.1 and 13.2 of the Plan.

28

52.   "Estates" means the Debtors' bankruptcy estates created under Section 541 of the Bankruptcy Code in the Cases.

53.   "Excess Cash" means semiannual net income generated from the Restaurants post-confirmation, plus cash on hand, depreciation, amortization and non-cash items, minus the following: (i) payments for debt service, if any, including principal and interest; (ii) capital expenditures; (iii) payments made on Allowed Administrative Claims; (iv) payments made on Allowed Priority Unsecured Wage Claims; (v) payments made on Allowed Priority Tax Claims; (vi) payments made on Allowed Cure Claims; and (vii) Minimum Cash Balance.

54.   "Fair Market Value" means the value of an asset based on a going concern basis, as determined by an independent third party holding requisite appraiser credentials or as mutually agreed by the relevant Debtor and Creditor.

55.   "Final Order" means an order or judgment of the Bankruptcy Court, or of any court of competent jurisdiction where there is pending an action in which a Debtor, a Reorganized Debtor, or the Committee is a party, as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, move to reargue, or to rehear shall have been waived in writing in form and substance satisfactory to the Debtor or to the Reorganized Debtor.

56.   "Fired Up" means Fired Up, Inc., the franchisor of the Debtors' Carino's restaurants.

57.   "First Payment Date" means the first Business Day of the first full month following the Effective Date.

58.   "Franchisor" means Fired Up.

59.   "Gantes" means John D. Gantes, or as it relates to Interests in Holdco, as set forth in subsections 7.2.1 and 7.2.2, means John D. Gantes or an entity designated by John D. Gantes, as applicable.

-14-

1         60.     "Gantes Involvement Period" means the period of time that Gantes

2 continues to be actively engaged in providing management services with respect to Holdco and the

3 Subcos pursuant to a management agreement either directly or through Managementco.

4         61.     "Gantes Parties" means Gantes, Allan Gantes, James Gantes, George

5 Gantes, and all other family members of and related parties to the foregoing, and any and all

6 affiliates of the Debtors and all other entities in which Gantes or a related party to Gantes hold an

7 interest.

8         62.     "General Administrative Claims Bar Date" means the date by which all

9 requests for payment of Administrative Claims, with the exception of Administrative Tax Claims

10 and Section 503(b)(9) Administrative Claims, shall be filed with the Bankruptcy Court and served

11 upon the Reorganized Debtors, which date shall be no later than sixty (60) days after the Effective

12 Date.

13         63.     "General Unsecured Claim" means an unsecured Claim against the Debtor,

14 however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code, including,

15 without limitation, a Rejection Claim.

16         64.     "General Unsecured Creditor" means the holder of an Allowed General

17 Unsecured Claim.

18         65.     "GilBreck" means GilBreck, LP, a California limited partnership.

19         66.     "Governmental Unit" shall have the meaning provided in Section 101(27)

20 of the Bankruptcy Code.

21         67.     "HillBreck" means HillBreck, LP, a California limited partnership.

22         68.     "Holdco" means a California corporation, or such other corporate entity as

23 the Debtor determined to be in the best interests of creditors, which will be formed and will be the

24 parent company that owns 100% of the outstanding stock in all Subcos, each of which will own

25 one Restaurant.

26         69.     "Holdco Board" means the board of directors of Holdco.

27         70.     "Imperial" means Imperial Smokehouse Partners, LP, a California limited

28 partnership.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinoe).DOC

71.    "Independent Holdco Board Member" means a member of the Holdco Board that is not employed or otherwise compensated (other than through director fees) by (a) Holdco, (b) a Subco, (c) Synergy, or (d) any affiliate or related party of Synergy or Gantes.

72.    "Initial Distribution Date" means the date on which the first Distribution is made to a Class.

73.    "Interest" means any equity security in any Debtor or Reorganized Debtor, as provided by Section 101(16) of the Bankruptcy Code, including, without limitation, any common stock interest, preferred stock interest, stock option, warrant, partnership interest, or membership interest.

74.    "Interest Holder" means the holder of an Interest in a Debtor.

75.    "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

76.    "Lenders" means, collectively all of the Creditors in Classes 1.1 through 1.9.

77.    "Lien" means any lien, encumbrance, pledge or other charge against property.

78.    "Major Decisions" means significant and important decisions to be made by the Reorganized Debtors, including any of the following regarding Holdco, any Subco and/or any Restaurant:  (a) issuing or repurchasing any beneficial interest in Holdco; (b) issuing, increasing, amending or repurchasing debt; (c) acquisitions or divestitures of any business or any assets (other than inventory in the normal course of business); (d) approval of an annual Budget; (e) capital expenditures above approved budgeted amounts; (f) any merger, restructuring or other reorganization; (g) dividends, distributions or other payments to or on behalf of holders of beneficial interests in Holdco; (h) any other extraordinary expenditure; (i) entering into contracts or obligations outside the daily operations or normal course of business; (j) changes or amendments to the Managementco contract; (k) opening or closing of a restaurant; (l) compliance with the terms of the Plan; or (m) bankruptcy or other insolvency related action, any liquidation or dissolution, or any similar action.

1    79.    "<u>Management Agreement</u>" means the management services agreement
2    entered into between Managementco and each Subco.

3    80.    "<u>Managementco</u>" means a designated management company that will
4    oversee day-to-day restaurant operations, marketing, information technology and back-office
5    functions of the Subcos post-confirmation, including paying independent vendors, suppliers and
6    employees of all Subcos.

7    81.    "<u>Minimum Cash Balance</u>" means the minimum amount of cash that each
8    Restaurant must maintain after payment of capital expenditures, debt service, and the required
9    semiannual payments under the Plan on account of Allowed Administrative Claims, Allowed
10   Priority Unsecured Wage Claims, Allowed Priority Tax Claims and Allowed Cure Claims, which
11   initially shall be $50,000, but which may be modified from time to time by the Holdco Board.

12   82.    "<u>Natomas Equipment</u>" means the furniture, fixture and equipment used by
13   and located at the Natomas Restaurant.

14   83.    "<u>Natomas Restaurant</u>" means that Carino's Restaurant located at
15   3860 Truxel Road, Sacramento, California.

16   84.    "<u>Net Proceeds</u>" means the proceeds generated from the pursuit of Post-
17   Confirmation Estate Claims, net of all attorneys' fees and other costs necessary to recover such
18   proceeds.

19   85.    "<u>Objection Value</u>" means the highest Fair Market Value of property asserted
20   by a Creditor in opposition to the Debtors' asserted value in the Plan of a property securing such
21   Creditor's Claim.

22   86.    "<u>Paid in Full</u>" means the Debtor's payment obligations to a particular Class
23   of Creditor under the Plan have been fully satisfied.

24   87.    "<u>PalmBreck</u>" means PalmBreck, LP, a California limited partnership.

25   88.    "<u>Petition Date</u>" means the date on which each Debtor filed its petition for
26   relief under Chapter 11 of the Bankruptcy Code (November 6, 2008 for BlueOcean and April 23,
27   2009 for SoWestBreck).

28

MAINDOCS #136659 v12 StarRibs_DisclosureStatement_(Carinos).DOC

89.    "Plan" means this Chapter 11 Amended Plan of Reorganization, together
with the exhibits hereto, as the same may be amended or modified from time to time.

90.    "Post-Confirmation Estate Claims" means any and all claims and causes of
action that constitute property of the Estates including, but not limited to, any Avoidance Actions
and any causes of action or claims for recovery of any amounts owing to the Debtors or the
Estates.

91.    "Priority Tax Claim" means any Claim provided for by Section 507(a)(8) of
the Bankruptcy Code.

92.    "Priority Tax Claim Semiannual Yield" means the semiannual rate of return
paid to Creditors holding Allowed Priority Tax Claims, which shall be calculated by the quotient
of the semiannual cash payment made to the Creditors holding Allowed Priority Tax Claims
divided by the total Allowed Priority Tax Claims.

93.    "Priority Tax Holder" means a holder of an Allowed Priority Tax Claim.

94.    "Priority Unsecured Claim" means any Claim provided for by
Section 507(a)(3) or (4) of the Bankruptcy Code.

95.    "Professional" means a person or entity employed by the Debtors or by the
Committee pursuant to a Final Order in accordance with Sections 327 or 1103 of the Bankruptcy
Code.

96.    "Proof of Claim" means a written statement filed in a Case by a Creditor in
which the Creditor sets forth the amount of its Claim, in accordance with Rule 3001 of the
Bankruptcy Rules.

97.    "Proof of Interest" means a written statement filed in a Case by an Interest
Holder in which the Interest Holder sets forth the amount of its Interest.

98.    "Pro Rata" means proportionately, so that with respect to any Distribution in
respect of any Allowed Claim, the ratio of (i) (a) the amount of property distributed or reserved on
account of such Allowed Claim to (b) the amount of such Allowed Claim, is the same as the ratio
of (ii) (a) the amount of property distributed or reserved on account of all Allowed Claims of the
Class sharing in such Distribution to (b) the amount of all Allowed Claims in such Class.

-18-

1    99.    "Real Property Debtors" shall mean Imperial, DesertBreck, Dogwood,

2    HillBreck, GilBreck and PalmBreck.

3    100.    "Rejection Claim" means any Claim based upon, or arising from, the

4    rejection of any executory contract or unexpired lease pursuant to order of the Bankruptcy Court or

5    pursuant to the Plan.

6    101.    "Reorganized Debtors" means the Debtors, as reorganized under the terms

7    of the Plan on and after the Effective Date, and any successors thereto by merger, consolidation,

8    acquisition, or otherwise, which, as contemplated by the Plan, would include Holdco and all

9    Subcos.

10    102.    "Reorganized Debtors' Certification" means a certification by a person with

11    requisite authority on behalf of the Reorganized Debtors stating that, in their sole and absolute

12    discretion, the Reorganized Debtors have determined that all Allowed Claims have been duly paid

13    and that all Post-Confirmation Estate Claims and objections to Disputed Claims have been

14    resolved by Final Order, which certification shall be filed with the Bankruptcy Court and served

15    upon the United States Trustee, as provided in Section 7.16 hereof.

16    103.    "Repayment Date" means the date that Allowed General Unsecured Claims

17    have been Paid in Full.

18    104.    "Repossession Option" means the Debtor's option pursuant to Section 6.1.1

19    to require a holder of an Allowed Secured Claim to repossess the property securing such Claim.

20    105.    "Restaurant" means each individual restaurant operations owned by the

21    Debtors and all assets used therein.

22    106.    "Schedules" means the Schedules of Assets and Liabilities and Statement of

23    Financial Affairs filed by the Debtors in the Cases, as required by Section 521(1) of the

24    Bankruptcy Code, Rules 1007(a)(3) and (b)(1) of the Bankruptcy Rules, and Official Bankruptcy

25    Form No. 6, as the Schedules may be amended from time to time.

26    107.    "Section 503(b)(9) Administrative Claims" means any Claim, to the extent

27    allowable pursuant to Section 503(b)(9) of the Bankruptcy Code and the Plan.

28

-19-

1   108. "Secured Claim" means any Claim, including interest, reasonable attorneys'

2 fees, costs, and charges, to the extent allowable pursuant to Section 506(b) of the Bankruptcy Code

3 and the Plan, that is secured by a Lien on property in which a Debtor has an interest or that is

4 subject to recoupment or setoff under Section 553 of the Bankruptcy Code, to the extent of the

5 value of the interest of the holder of such Secured Claim in the Debtor's interest in the property,

6 determined pursuant to Section 506(a) of the Bankruptcy Code.

7   109. "SoWestBreck" means SoWestBreck, LLC, one of the jointly administered

8 debtors in the above-captioned cases.

9   110. "Subco" means a California corporation that will be formed and will own a

10 Restaurant post-confirmation, which will be a wholly-owned subsidiary of Holdco.

11   111. "Synergy" means Synergy Pacific Management, LLC.

12   112. "Tax" means any tax, charge, fee, levy, or other assessment by any federal,

13 state, local or foreign taxing authority, including, without limitation, income, excise, property,

14 sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated,

15 severance, stamp, occupation and withholding tax. "Tax" shall include any interest or additions

16 attributable to, or imposed on or with respect to, such assessments.

17   113. "Tax Claims" means any Claim, pre-petition or post-petition, relating to a

18 Tax.

19   114. "Unclaimed Property" means any Distribution of Cash or other property to a

20 Creditor that is returned to the Reorganized Debtor as undeliverable.

21   115. "Unclaimed Property Reserve" means an interest-bearing segregated

22 account in which Unclaimed Property shall be set aside and held as provided in Section 8.7 hereof.

23   116. "United States Trustee" means the Office of the United States Trustee.

24   117. "Unsecured Creditors Semiannual Payment Cap" means the maximum

25 semiannual distribution to Creditors holding Allowed General Unsecured Claims, which shall

26 equal the product of the total Allowed General Unsecured Claims and the Priority Tax Claim

27 Semiannual Yield.

28   118. "Vineyard" shall mean Vineyard Bank, N.A.

**B.**     **Rules of Construction**. For the purpose of this Disclosure Statement, unless otherwise provided in this Disclosure Statement, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine, feminine and neuter; (iii) any reference in this Disclosure Statement to an existing document, Exhibit or schedule filed or to be filed means such document or schedule as it may have been or may be amended, modified or supplemented pursuant to this Disclosure Statement; (iv) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (v) except as otherwise stated herein, all references in this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this Disclosure Statement; (vi) the words "herein," "hereunder" and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (vii) unless otherwise provided in this Disclosure Statement, any reference in this Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (viii) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of this Disclosure Statement or any other provision in this Section 2.2.

**C.**     **Exhibits**. All exhibits to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein.

**III.**

**CONFIRMATION AND VOTING**

A Creditor may vote to accept or reject the Plan by filling out and mailing to the Debtors' counsel the form of the ballot which has been provided herewith. Ballots should be mailed to Winthrop Couchot, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660 (Attn: Ms. PJ Marksbury).

MAINDOCS #136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1    In order to vote for or against the Plan, a Creditor must have filed a Proof of Claim on or
2    before the Bar Date, unless its Claim is listed in the Schedules filed in the Cases by the Debtors as
3    not being disputed, unliquidated, contingent or unknown. Any such Creditor is, to the extent listed
4    in the Schedules, deemed to have filed a Claim, and, absent a timely objection to the Claim, such
5    Claim is deemed allowed. In order to determine whether a Creditor is entitled to vote on the Plan
6    notwithstanding any failure to timely file a Proof of Claim, the Creditor should review the
7    Debtors' Schedules on file with the Bankruptcy Court. If the Creditor's Claim is not scheduled, or
8    if it is scheduled as contingent, disputed, unliquidated or unknown and the Creditor did not file a
9    Proof of Claim prior to the Bar Date, the Creditor may not be entitled to vote on the Plan.

10    The Bankruptcy Court has fixed April 5, 2010 as the last date by which ballots must be
11    received by the Debtors' counsel. Subject to review and determination by the Bankruptcy Court,
12    votes received by the Debtors after that date may not be counted. Regardless of whether a Creditor
13    votes on the Plan, it will be bound by the terms and treatment set forth in the Plan if the Plan is
14    confirmed by the Bankruptcy Court. Absent some affirmative act constituting a vote, such
15    Creditor will not be included in the voting tally. Allowance of a Claim for voting purposes, or
16    disallowance of any Claim for voting purposes, does not necessarily mean that all or a portion of
17    the Claim will be allowed or disallowed for distribution purposes.

18    The Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the
19    Bankruptcy Code are satisfied. Section 1129 requires, inter alia, that: (a) with respect to each
20    Class of Claims, each Creditor in that Class has accepted the Plan, or will receive or retain under
21    the Plan on account of such Claim, property of a value that is not less than the amount such
22    Creditor would receive if the Debtors were to liquidate their assets under Chapter 7 of the
23    Bankruptcy Code; (b) confirmation of the Plan is not likely to be followed by a liquidation of the
24    Debtors or the need for further reorganization of the Debtors; and (c) the Plan be accepted by each
25    Class of Claims that is impaired by the Plan, and/or the Plan does not discriminate unfairly and is
26    fair and equitable to any impaired Class that has not accepted the Plan.

27    To confirm the Plan, the Bankruptcy Court must determine whether the Plan has been
28    accepted by each "impaired" Class entitled to vote on the Plan. Pursuant to Section 1124 of the

1   Bankruptcy Code, Classes "impaired" by the Plan are those Classes whose legal, equitable or

2   contractual rights are altered pursuant to the Plan. Under Section 1126(c) of the Bankruptcy Code,

3   an impaired Class of Claims is deemed to have accepted the Plan if the Plan is accepted by

4   Creditors in that Class holding at least two-thirds (2/3) in dollar amount and more than

5   one-half (1/2) in number of the Allowed Claims of Creditors in that Class actually voting on the

6   Plan.

7          Only the votes of those Creditors whose ballots are timely received may be counted in

8   determining whether a Class has accepted the Plan. Creditors are, therefore, urged to fill in, date,

9   sign and promptly mail the enclosed ballot. Each Creditor must properly complete the ballot and

10  legibly identify its name on the ballot.

11         Any Creditor holding Claims in more than one impaired Class must file one ballot for each

12  such Class. If a Creditor has received an incorrect ballot, or believes that it is entitled to vote in

13  more than one Class, additional ballots may be obtained upon written request to Winthrop Couchot

14  (Attn: Ms. PJ Marksbury).

15         In the event that one impaired class but not all impaired Classes accept the Plan, the

16  Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to the provisions of

17  Section 1129(b) of the Bankruptcy Code. Pursuant to Section 1129(b), the Plan may be confirmed

18  despite the failure of a Class of Claims to accept the Plan if the Bankruptcy Court determines that

19  the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of

20  Claims that is impaired under, and has not accepted, the Plan. The condition that the Plan be fair

21  and equitable with respect to such nonaccepting Classes includes certain legal requirements as

22  more fully set forth in Section 1129(b).

23                                              **IV.**

24                          **BACKGROUND OF THE DEBTORS**

25      **A.     The Debtors.** As of the Petition Date, the Debtors were among approximately 209

26  affiliated entities, approximately 50 of which owned and operated approximately 110 restaurants

27  throughout California, Washington, Nevada, Oregon, and Utah, and 60 entities of which owned

28  and operated various real properties from which many of the restaurants lease space. The Debtors

1   own and operate five franchised Carino's restaurants throughout California and two in Utah.

2   Carino's is a casual dining Italian restaurant that offers dine-in, take-out and catering.

3       BlueOcean owns and operates a Carino's in Palmdale, Rancho Cucamonga, West Covina

4   and El Centro, and Downey, California.  SoWestBreck owns and operates a Carino's in West

5   Jordan and Sandy, Utah.  The Debtors employ approximately 260 persons.

6       **B.    Jointly Administered Debtors.**  The Debtors' Cases have been jointly

7   administered with 13 other affiliated debtors.  Three of these debtors[3] own and operate six

8   franchised Famous Dave's BBQ restaurants throughout California.[4]

9       SoBreck, LLC and NorBreck, LLC were general partners of SoBreck, LP and NorBreck,

10  LP, respectively, which owned and operated additional Carino's restaurants.  As soon as it was

11  determined that SoBreck, LP and NorBreck, LP, of which SoBreck, LLC and NorBreck, LLC,

12  respectively, were general partners, were not going to file Chapter 11, the Debtors sought

13  dismissal of the SoBreck, LLC and NorBreck, LLC bankruptcy cases.  Concurrent with the

14  dismissal sought by SoBreck and NorBreck, Imperial and DesertBreck, which owned and leased

15  real property to affiliated non-Carino's restaurants, and Dogwood, HillBreck, PalmBreck and

16  GilBreck also sought dismissal of their respective bankruptcy cases.  Dogwood, HillBreck and

17  PalmBreck owned and leased real property to affiliated debtor BlueOcean for Carino's restaurants

18  in El Centro, Rancho Cucamonga, and Palmdale, respectively.  GilBreck owned and leased real

19  property to OceanCountry for a Carino's restaurant in Gilroy.  The rents generated by the Real

20  Property Debtors from affiliated debtor lessees were not sufficient to service the debt owing to

21  Vineyard, the secured creditor for each of the Real Property Debtors.  Based on the insufficient

22  cash flow and lack of equity, the Real Property Debtors determined that they could not develop a

23  confirmable plan of reorganization.  Accordingly, on or about April 16, 2009, the Real Property

24  Debtors entered into a stipulation with Vineyard for relief from stay.  The Court entered the order

25  approving the stipulation on May 7, 2009.  Based on the foregoing, the Real Property Debtors

26  filed a motion for an order dismissing these cases.  On July 28, 2009, the Court entered an order

27

28
[3] StarRibs North, LP, StarRibs South, LP and WhitTown Partners, LP (the "Famous Dave's Debtors").
[4] The Famous Dave's Debtors have already filed a Chapter 11 plan of reorganization and on November 17, 2009, the Court approved a separate Chapter 11 plan of reorganization for the Famous Dave's Debtors only.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1  dismissing the SoBreck, LLC, NorBreck, LLC, Imperial, DesertBreck, Dogwood, HillBreck,

2  GilBreck, and PalmBreck cases.

3      **C.    Financial Performance of the Debtors.** The following is a summary of the pre-

4  petition financial performance of each of the Debtors:

| DEBTOR | | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| BlueOcean[5] | Sales | $11,701,988 | $9,755,493 | $6,648,673 |
| | Net Profit (Loss) | $59,751 | <$638,362> | <$244,284> |
| SoWestBreck | Sales | $4,449,730 | $3,973,125 | $3,189,770 |
| | Net Profit (Loss) | $205,664 | $50,536 | <$71,388> |

10     **D.    Restaurant Facilities.** The Debtors operate their restaurants from facilities located

11 throughout California and Utah, the occupancy costs for which are based on a combination of

12 ground leases, building leases, and loans on buildings purchased by the Debtors.

13     Prior to the Petition Date, the Debtors were making payments to affiliate landlords for rent

14 in excess of market rates to facilitate the affiliate landlords' ability to service the debt owed by the

15 affiliates to their secured creditors, which debt secured the property owned by the affiliate and

16 used and leased by the Debtors. In order to fulfill the Debtors' fiduciary duties to creditors of the

17 Estate and stop the funding of the losses of its affiliates, from the outset of these bankruptcies, and

18 as promised to creditors and as articulated on the record to the Bankruptcy Court, the Debtors

19 have been paying what they believed were market lease rates – rather than the inflated lease rates

20 (which were based on affiliates' real property debt service) as provided for in the contract.

21     In some cases, based on the affiliate landlord's inability to service its debt, the affiliate's

22 secured creditor commenced proceedings to foreclose upon the underlying property used by the

23 Debtors. Recognizing the importance of these leases, knowing that the secured creditor was

24 taking control over some of the properties used by the Debtors, and being concerned that a

25 foreclosure would wipe out the Debtors' leasehold interests (resulting in the loss of rights to

26 operate restaurants), which would prevent, if not substantially impair, the Debtors' ability to

27 reorganize, the Debtors actively negotiated with the applicable secured creditor of certain of the

28

---

[5] Excludes amounts attributable to the Downey location as it was acquired in February 2010.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1  Debtors' affiliates' market leases (with attornment provisions to ensure that the Debtor's interest

2  in the lease would not be extinguished in a foreclosure).

3          Based on the Debtors' efforts, the Debtors successfully negotiated new leases with

4  significant price reductions for their restaurants located in Rancho Cucamonga, El Centro and

5  Palmdale, which leases the Court approved. The Debtors continue to work with other landlords in

6  efforts to negotiate more favorable lease terms on other properties. Attached as Exhibit "1" is a

7  Summary of Real Property Leases, which summarizes the key terms of leases on which the

8  Debtors base their Plan. In addition, as set forth in Section 4.1.2 of the Plan, the Debtors have

9  entered into an agreement pursuant to which Gantes and any and all affiliates of the Debtors have

10  agreed to waive all claims, including, without limitation, pre-petition claims, administrative

11  claims, including, without limitation, rent, late fees/penalties and property tax claims against the

12  Estates.

13          **E.      Ownership and Management of the Debtors (Pre-Confirmation).** As of the

14  Petition Date, Gantes and his family, through their family trusts, controlled and owned each of the

15  Debtors and all of their affiliates. Attached hereto as Exhibit "2" are corporate organizational

16  charts that illustrate graphically the ownership relationship of the Debtors as of the Petition Date.

17          1.      Shared Services Management Company. In order to leverage economies of

18  scale and otherwise maximize profits in the operation of the Debtors' restaurants, the Debtors

19  outsource general and administrative services for the operations of their restaurants through a

20  shared services management agreement. Historically and through December 31, 2008, these

21  management services were provided by Breckenridge Group, Inc. ("BGI"), an entity owned and

22  controlled by Gantes.

23          As part of the Debtors' restructuring efforts, on January 1, 2009, the Debtors

24  replaced BGI with Synergy. Synergy was founded in December 2008 as a hotel, restaurant,

25  development and real estate management organization. Synergy is owned by Gladehill

26  Development Corp. ("Gladehill") and Colin Cooper ("Cooper"), a certified public accountant,

27  who has provided and continues to provide accounting and tax services to various affiliates of the

28

1   Debtors[6]. None of the Debtors or their affiliates has any ownership or profit-sharing interest in

2   Synergy, Gladehill or its respective principals. Neither Cooper nor Gladehill has any ownership

3   or profit-sharing interest in any of the Debtors or any of their affiliated debtor and non-debtor

4   entities. Synergy has, however, retained the same management as previously employed by BGI.

5   Specifically, John Gantes is the executive director, George Gantes is the marketing director, Tony

6   Meyer is the accounting director, Allan Gantes is the real estate and hotel director, Ed Rebella is

7   the human resources director, James Gantes is the technology director, Rick LeSage is the

8   operations director, and Les Keenan is an operations director. The job descriptions and salaries

9   for Gantes and each of his family members included in Synergy's management are attached as

10   Exhibit "3." While the focus of Synergy's operations at present is on the Debtors and their

11   affiliated entities, it eventually expects to provide similar services to other unaffiliated companies.

12         Through the Debtors' management agreements with Synergy, Synergy provides the

13   Debtors with general day-to-day management of the Carino's restaurants, and general and

14   administrative services related to the operations of the Carino's restaurants. In particular, Synergy

15   manages the operations of the restaurants, including hiring, training and supervising employees,

16   marketing, accounting, information technology, and all other aspects of managing the day-to-day

17   operations of a restaurant. Attached as Exhibit "4" is a detailed description of the services to be

18   provided by Synergy.

19         In an effort to facilitate the Debtors' efforts to successfully reorganize, Synergy has

20   agreed to make several accommodations to the Debtors. In particular, Synergy has agreed to

21   eliminate its management fee of $6,000 per month per store for the Palmdale, West Covina and

22   Sandy locations for a period of 18 months, commencing on the Effective Date of this Plan. If any

23   of these locations experience a substantial increase in sales and cash flows during this 18-month

24   period, the Board of Directors of Holdco has the sole discretion to increase the management fee

25   for any of these locations. Synergy has agreed to act in good faith in determining whether the

26   management fee after the 18th month will be changed based upon the available or projected cash

27   flows from each of the underlying Restaurants.

28

---

[6] The Reorganized Debtors do not intend to use Cooper for accounting or tax services post Effective Date.

2.    Appointment of Chief Restructuring Officer. On or about
February 2, 2009, BlueOcean, the Committee, Gantes, and other jointly administered debtors,
entered into a stipulation to appoint Brian Weiss, Managing Director of BSW & Associates, as the
Debtors' Chief Restructuring Officer ("CRO") to oversee and manage the restructuring effort and
overall business operations of BlueOcean and other jointly administered debtors. On March 11,
2009, the Court entered an order approving the stipulation. On April 23, 2009, the Court entered
an order jointly administering the SoWestBreck case with all other cases jointly administered with
In re StarRibs, which included an order authorizing Brian Weiss to serve as the CRO for
SoWestBreck. Prior to being employed by the Debtors, Mr. Weiss had no relationship or
connection in any way with the Debtors, their affiliates, Gantes, or creditors of the Debtors. The
Debtors and Committee believe that this appointment was necessary to facilitate a successful
reorganization for a variety of reasons. First, the Debtors believe that additional help was needed
in these cases to resolve an overwhelming number of issues arising from the corporate structure of
the Debtors and their affiliates. Second, the Debtors understand that there is a fiduciary duty
owing to each of the Debtors' Estates, and wanted to ensure that proper focus was dedicated to
these Debtors and that creditors of these cases are not prejudiced as a result of any issues relating
to or arising from affiliates that were not part of the Debtors' bankruptcy cases. Third, Gantes did
not have experience restructuring companies or otherwise operating in Chapter 11s or the
administrative duties associated therewith. Based on the foregoing, in order to maximize value
for the Estates' creditors, the Debtors, Committee and Gantes determined that it was in the
Debtors' best interests to hire Mr. Weiss as the CRO, and allow Gantes to focus on managing the
restaurants.

**F.    Pre-Petition Legal Proceedings.** The following are the only legal proceedings
that the Debtors are aware of as having been instituted against the Debtors prior to the Petition
Date:

1.    Diana President et al. v. SoWestBreck, BlueOcean, et al.; Case No. D056219

2.    Carmella Trujillo et al v. BlueOcean, et al.; Case no. 37-2007-77675

## V.

## THE DEBTORS' CHAPTER 11 PROCEEDINGS

**A.    Events Precipitating Chapter 11 Filings.** The Debtors have suffered pre-petition from cash flow problems primarily as a result of making advances to affiliate restaurants that were sustaining losses from their operations and/or payments to affiliate landlords for rent in excess of market rates to service the debt on the property held by an affiliate and the debt service of the Debtors for the construction of buildings underlying certain restaurant locations. The Debtors realized substantial cash losses due to unanticipated development costs and delays in opening restaurants. Losses and cash flow difficulty were further attributed to the recessionary trend that began in late 2007,[7] and have been exacerbated by the crash in the credit and financial markets specifically and in the general economy. Together, the foregoing factors placed severe pressure on the Debtors' cash flow, and deprived the Debtors of the ability to timely pay vendor obligations, resulting in defaults in the Debtors' obligations to vendors. These defaults precipitated complaints filed by secured creditors of the Real Estate Debtors to appoint receivers for these and several other affiliated landlords. In order to prevent the appointment of a receiver and facilitate a reorganization of the Debtors' businesses, the Debtors filed petitions under Chapter 11 of the Bankruptcy Code on the Petition Date.

**B.    Debtor-in-Possession Status.** Since the Petition Date, the Debtors have continued to operate as "debtors-in-possession" subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their businesses in the ordinary course of business. However, all transactions outside of the ordinary course of business must be approved by the Bankruptcy Court.

**C.    The Automatic Stay.** Upon the filing of the Cases, an automatic stay was imposed in each of the Cases pursuant to Section 362 of the Bankruptcy Code. Subject to certain statutorily defined exceptions, the stay enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of Liens against property of the Debtors, and the continuation of litigation against the Debtors. The automatic stay will remain in effect in each

---

[7] www.edd.ca.gov/aboutedd/pdf/labor_day_briefing%20_2009.pdf.

MAINDOCS-#136659-v12-SterRibs_DisclosureStatement_(Carinos).DOC

1   Case until the earliest of the entry of an order of the Bankruptcy Court lifting or modifying the

2   stay, the Effective Date of the Plan, or the closing of the Cases.

3       **D.   Significant Events Which Have Occurred After the Petition Dates.**

4           1.   First Day Motions. On the Petition Date, the Debtors filed several motions

5   seeking what is commonly referred to as "first day orders." The relief granted in the first day orders

6   is designed to enable a debtor to transition into Chapter 11 without any material disruption to its

7   business operations. These orders generally grant relief that falls outside the ordinary course of

8   business, or otherwise requires a bankruptcy court order. On or about November 10, 2008 and

9   June 25, 2009, the Court entered first-day orders with respect to the BlueOcean and SoWestBreck

10   cases, respectively, for the following motions:

11           a.   Emergency Motions for Order Authorizing Joint Administration of

12   Chapter 11 Cases.

13           b.   Emergency Motion for Order Authorizing Use of Any Cash

14   Collateral of Secured Claimants.

15           c.   Emergency Motion for Order Authorizing Payment and Honoring of

16   Prepetition Payroll Obligations;

17           d.   Emergency Motion for Order: (1) Authorizing the Debtors to

18   Maintain Pre-Petition Merchant Services Accounts; and (2) Compelling Banks to Continue

19   Merchant Services.

20           e.   Emergency Motion for Order: (A) Prohibiting Utility Providers from

21   Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future

22   Performance, and (C) Establishing Procedures for Determining Adequate Assurances of Payment

23   under Section 366 of the Bankruptcy Code.

24           f.   Emergency Motion to Limit Notice of Certain Matters Requiring

25   Notice to Creditors Pursuant to Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure.

26           2.   Other Motions.

27           a.   Debtors' Motion for Use of Any Cash Collateral of Secured

28   Claimants. Following the Bankruptcy Court's interim approval of BlueOcean's use of cash

1  collateral, a final hearing regarding BlueOcean's cash collateral use was scheduled by the

2  Bankruptcy Court for December 17, 2008. The hearing scheduled for December 17, 2008 was then

3  continued several times -- January 14, 2009, February 25, 2009, March 4, 2009, and March 25,

4  2009 - pursuant to agreements among BlueOcean and affiliates, the secured creditors and the

5  Committee in order to allow the parties to attempt to reach a stipulation regarding BlueOcean and

6  other affiliated debtors' continued use of cash collateral. BlueOcean and other affiliated debtors,

7  the secured creditors and the Committee ultimately entered into a stipulation for use of any cash

8  collateral of secured creditors, which currently expires March 21, 2010, but is expected to be

9  extended through the date of the Confirmation Hearing. Based on the most recent cash flow budget

10  filed with the Court, SoWestBreck's use of cash collateral currently expires on April 25, 2010.

11  SoWestBreck expects to retain authority to use cash collateral through the date of the Confirmation

12  Hearing, if for some reason the Confirmation Hearing is not held prior to such expiration date.

13          b.      Motion to Extend Time to Assume or Reject Leases. The Debtors

14  filed a motion to extend the period within which the Debtors may assume or reject unexpired

15  leases. The motion was granted and the time within which the Debtors may assume or reject

16  unexpired leases was extended to and including June 5, 2009. The Debtors and the landlords

17  subsequently entered into a stipulation to extend the period within which the Debtors may assume

18  or reject unexpired leases to and including the date of plan confirmation.

19          c.      Motion to Set Bar Date. BlueOcean, as part of the jointly-

20  administered action, filed a motion seeking a deadline for filing proofs of claim. The motion was

21  granted and, accordingly, the Bar Date for filing Proofs of Claim against BlueOcean is May 5,

22  2009. Based on certain newly-discovered parties who may assert claims against BlueOcean,

23  BlueOcean served a supplemental notice of bar date, which pursuant to the Court's order extended

24  the BlueOcean Bar Date to file Proofs of Claim to December 28, 2009.

25          SoWestBreck filed a motion seeking setting a deadline for filing Proofs of

26  Claim in the SoWestBreck case. Based on the Court's order, the Bar Date for filing Proofs of

27  Claim in the SoWestBreck case is April 28, 2010.

28

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1        d.    Motion for Appointment of CRO.  BlueOcean and affiliated debtors

2    filed a motion approving a stipulation to appoint Brian Weiss as the Debtors' CRO.  The motion

3    was granted and Mr. Weiss was appointed as the Debtors' CRO.  Brian Weiss was subsequently

4    authorized by separate order of the Court to serve as CRO for SoWestBreck.

5        e.    Motion to Enter into Management Agreement.  BlueOcean and

6    affiliated debtors filed a motion authorizing the Debtors to enter into a management agreement with

7    Synergy.  The motion was granted and Synergy was authorized to provide shared management and

8    general and administrative services to and for the benefit of the Debtors.  SoWestBreck was

9    subsequently authorized to enter into a management agreement with Synergy by separate order of

10    the Court.

11        f.    Motion for Authority to Enter into Leases.  In order to maintain

12    certain leasehold interests and obtain more favorable lease terms, the Debtors entered into new

13    leases with several of the landlords and obtained attornment provisions from the secured creditor.

14    As a result, the Debtors sought and on September 4, 2009, the Court entered an order authorizing

15    the Debtors to enter into new leases with various landlords and attornment agreements with the

16    landlords' secured creditor.

17        g.    Motion Approving Purchase of Certain Assets and Assignment and

18    Assumption of Certain Unexpired Leases and Executory Contracts.  BlueOcean and certain

19    affiliated debtors filed a motion for authority to sell to BlueOcean the Downey Restaurant and

20    Natomas Restaurant owned and operated by the Debtors' affiliates StoneRiver Partners, LP and

21    OceanCountry, LP, respectively.  On February 19, 2010, the Court entered an order approving the

22    sale of the Downey Restaurant to BlueOcean and continued the hearing on the sale of the Natomas

23    Restaurant to April 21, 2010, as Sunwest Bank, a creditor whose claim is secured by the Natomas

24    Equipment, does not consent to the sale of the Natomas Restaurant.  The Court entered an order

25    granting relief from stay in favor of Sunwest Bank as against the Natomas Equipment, but

26    foreclosure has not yet occurred.  BlueOcean is still trying to purchase the Natomas Restaurant.  In

27    its efforts, BlueOcean has identified equipment to replace the existing Natomas Equipment and is

28    working out financing details consistent with terms proposed in the purchase and sale motion in

1    order to proceed with the purchase of the Natomas Restaurant. The Debtors believe that the

2    purchase of the Natomas Restaurant will enhance the Debtors' profitability. The Debtors anticipate

3    that, if the purchase of the Natomas Restaurant is consummated, such purchase will probably close

4    after confirmation of the Plan. In any event, the confirmation of the Debtors' Plan does not hinge

5    upon the purchase of the Natomas Restaurant.

6               h.      Applications to Employ Professionals. The Debtors and the

7    Committee filed several applications[8] to employ the following professionals:

| Winthrop Couchot | Debtors' General Insolvency Counsel |
|---|---|
| Blakeley & Blakeley, LLP | Committee's Counsel |
| Phoenix Group Advisory Services, LLC | Committee's Financial Advisors |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Debtor's Special Real Estate Counsel |
| Freeman & Smiley, LLP | Debtor's Special Corporate Counsel |
| Law Offices of Lavar A. Taylor | Debtor's Special Tax Counsel |
| Braunco, Inc. | Debtor's Valuation Advisor |

**E.**      **Actual and Projected Recovery of Preferential or Fraudulent Transfers.** The

Debtors are in the process of performing an analysis of their books and records to determine

whether any payments made prior to the Petition Date constitute preferential transfers avoidable

pursuant to Section 547 of the Bankruptcy Code, or whether any transfers made by the Debtors are

avoidable as fraudulent transfers under Sections 544(b) or 548 of the Bankruptcy Code. Based on

the Debtors' preliminary review and analysis, the Debtors have prepared a Schedule of Potential

Avoidance and Other Actions against third parties who have been preliminarily identified as

recipients of potential preferential fraudulent transfers or other monies that the Debtors may be

entitled to recover.

**F.**      **Projected Objections to Claims Filed Against the Estates.** The Debtors have

not completed their review of the Claims in the Cases. The Debtors anticipate that they will file

objections to a number of Claims. However, since the Debtors have not completed the process of

reviewing Claims filed in the Cases, and management resources are being focused primarily upon

---

[8] Trinity Capital, LLC, the Debtors' proposed financial advisors, terminated their employment with the Debtors and requested that the Debtors withdraw their application to employ Trinity Capital. LLC.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1    the legal and financial reorganization of the Debtors, the Debtors anticipate that objections to

2    Claims may not be filed until about or after the Confirmation Date.

3                                              **VI.**

4                    **FINANCIAL INFORMATION REGARDING THE DEBTORS**

5          **A.      Historical Financial Information.**  Attached hereto as Exhibit "5" are,

6    collectively, copies of each of the Debtors' unaudited income statements and balance sheets for the

7    fiscal years 2007-2009 and consolidated unaudited pro forma combined[9] income statements of

8    BlueOcean and SoWestBreck for the fiscal years 2008 and 2009 and unaudited balance sheets for

9    each of the Debtors as of December 31, 2007 and December 31, 2008.

10         **B.      Financial Information Provided During the Cases.**  The Debtors have filed their

11   Schedules in the Cases.  The Schedules provide substantial financial information regarding the

12   assets and liabilities of the Estates as of the Petition Date.  The Schedules are available for

13   inspection, during normal business hours, at the Clerk's Office of the Bankruptcy Court, located at

14   411 West Fourth Street, Santa Ana, California 92701.

15         In addition to the Schedules, the Debtors have prepared throughout the Cases interim

16   statements and operating reports in accordance with the requirements of the United States Trustee.

17   Copies of the interim statements and operating reports are available for inspection, during normal

18   business hours, at the United States Trustee, located at 411 West Fourth Street, Suite 9041, Santa

19   Ana, California 92701.

20         Each of the Debtors has prepared an unaudited balance sheet (as of December 31, 2009)

21   and an income statement for the twelve-month period from the Petition Date through

22   December 31, 2009.  These financial statements have been prepared in accordance with Generally

23   Accepted Accounting Principles in the United States.  These statements have not been subject to

24   independent audit.  True and complete copies of these financial statements are included in the

25   financial statements attached hereto, collectively, as Exhibit "6" and are incorporated herein by

26   this reference.

27

28

---

[9] These statements combined the operating results of BlueOcean and SoWestBreck for three periods.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1  AS TO THE UNCERTIFIED AND UNAUDITED FINANCIAL INFORMATION

2  CONTAINED IN, OR ATTACHED TO, THIS DISCLOSURE STATEMENT, THE DEBTORS

3  ARE UNABLE TO WARRANT OR REPRESENT THAT THE FINANCIAL INFORMATION

4  IS IN CONFORMITY WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND

5  IS WITHOUT ANY INACCURACIES, ALTHOUGH THE DEBTORS BELIEVE THAT THEY

6  HAVE MADE REASONABLE EFFORTS, UNDER THE CIRCUMSTANCES, TO PRESENT

7  FAIRLY AND ACCURATELY SUCH FINANCIAL INFORMATION.

8  **C.**    **Financial Performance During the Cases.**  During the Cases, the Debtors, as

9  debtors-in-possession, have been responsible for the management of the Debtors' businesses and

10  the administration and management of assets of the Estates.  The Debtors have paid all accruing

11  post-petition expenses associated with the operation of the Debtors' businesses that have become

12  due, with the exception of certain accrued fees and costs of Professionals, which fees and costs

13  have not been timely paid throughout the Debtors' Cases, but which will be paid current on the

14  Effective Date.  The Debtors have properly maintained and preserved assets of the Estates.

15  Attached as Exhibit "6" are the most recent (as of the date of filing of this Disclosure Statement)

16  income statement reflecting the Debtors' post-petition activity for each of the Debtors and their

17  Restaurants and the balance sheet for each Debtor.

18  **VII.**

19  **DESCRIPTION OF THE PLAN OF REORGANIZATION**

20  The following is a brief summary of the Plan and is qualified in its entirety by the full text

21  of the Plan.  The terms of the Plan will be controlling on the Creditors and Interest Holders in the

22  event that the Plan is confirmed.  Therefore, all Creditors and Interest Holders are urged to read the

23  Plan carefully in its entirety rather than relying on this summary.

24  **A.**    **Substantive Consolidation of the Debtors.**  The Plan constitutes a plan which

25  effectuates a substantive consolidation of the Debtors.  The Debtors' respective Estates shall be

26  merged.  Each Debtor shall assume liability under the Plan for the Allowed Claims against each

27  other Debtor.

28

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1       Pursuant to the substantive consolidation of the Debtors, (i) all assets and liabilities of the

2   Debtors shall be consolidated for purposes of the Plan and deemed assets and liabilities of the

3   consolidated Debtors, (ii) any Claim filed against any Debtor shall be treated as a Claim against

4   the consolidated Debtors and any obligation of any Debtor shall be deemed to be an obligation of

5   the consolidated Debtors and all duplicate claims or obligations shall be eliminated, and (iii) all

6   obligations due or owing from any Debtor to any other Debtor shall be eliminated.

7       According, the treatment of the Claims set forth in Articles VIII, IX and X below shall be

8   deemed to apply to each Debtor.

9       **B.**    **Basic Structure of the Plan.**  The Plan proposes to pay the Claims of seven (7)

10  Classes of Creditors in accordance with the provisions of the Plan. The Plan provides for the

11  establishment of one (1) Class of Partnership Interest. All Classes of Claims are "impaired" under

12  the Plan, as that term is defined by Section 1124 of the Bankruptcy Code.

13      **C.**    **Classification and Treatment of Claims.**  Section 1123 of the Bankruptcy Code

14  requires that the Debtors, with certain exceptions, classify separately in the Plan all Claims.

15  Pursuant to Section 1122 of the Bankruptcy Code, the Debtors may place all Claims that are

16  substantially the same in the same Class in the Plan. Section 1123(a)(4) of the Bankruptcy Code

17  requires that the Plan provide the same treatment for all Claims in the same Class, unless the

18  holder of a particular Claim agrees to a less favorable treatment of its Claim. The treatment of

19  each Class of Claims and Interests is set forth in Articles VIII, IX and X below.

20                     **VIII.**

21             **UNCLASSIFIED CLAIMS**

22      As required by the Bankruptcy Code, the Plan places Claims and Interests into various

23  Classes according to their right to priority. However, in accordance with the provisions of

24  Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Section 503(b)(9)

25  Administrative Claims, and Priority Tax Claims are deemed "unclassified." These Claims are not

26  considered impaired, and they do not vote on the Plan, because they are automatically entitled to

27  specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not

28  placed these Claims in a Class. The treatment of these unclassified Claims is as provided below.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

**A.    Administrative Claims**. Administrative Claims are Claims for the expenses of administering a Debtor's Case that are allowed under Bankruptcy Code Section 507(a)(2), as well as Claims for goods received by the Debtors in the ordinary course of business within 20 days of the order for relief.  The Bankruptcy Code requires that all administrative claims be paid on the effective date of a Chapter 11 plan, unless a particular creditor agrees to a different treatment of its claim.  The treatment of Administrative Claims and Section 503(b)(9) Administrative Claims in the Plan is as described below.

1.    Payment Generally.  Except to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment of its Administrative Claim, and subject to the bar dates for Section 503(b)(9) Administrative Claims and all other Administrative Claims, each Allowed Administrative Claim shall be Paid in Full, in Cash, on the latest of (i) the Effective Date, (ii) the tenth (10th) Business Day after the date upon which such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date upon which such Allowed Administrative Claim becomes due according to its terms.

2.    Waiver of Claims.  The Gantes Parties have agreed to waive and thus are hereby barred from asserting any and all Claims, including, but not limited to, Administrative Claims, that any of the Gantes Parties, individually or collectively, have or may have against the Estates.

3.    Administrative Claims Bar Date.  Any holder of an Administrative Claim that does not file and properly serve such a request for payment by the General Administrative Claims Bar Date and the Bar Date for Section 503(b)(9) Claims, as the case may be, shall be forever barred from asserting such Administrative Claim against the Debtors, the Reorganized Debtors, their Estates, or any of their property, or the Committee.  Notwithstanding anything to the contrary contained in the foregoing, (i) any Governmental Unit may assert an Administrative Tax Claim or other post-petition Tax Claim pursuant to the statutory requirements applicable thereto without regard to the General Administrative Claims Bar Date; and (ii) holders of accrued post-petition *ad valorem* Tax Claims against property owned by the Reorganized Debtors shall retain any Liens that they may have pursuant to applicable law on account of such Tax Claims, and

MAINDOCS #136659 v12 StarRibs_DisclosureStatement_(Carinos).DOC

1   holders of such Tax Claims shall be paid the amount of their Tax Claims in the ordinary course of

2   the Reorganized Debtors' businesses without the requirement that a Proof of Claim or request for

3   payment of such Tax Claim be filed with the Bankruptcy Court.

4           4.    Projected Administrative Claims. The following chart is an estimate of all

5   of the Debtors' projected and unpaid Administrative Claims and Section 503(b)(9) Administrative

6   Claims.

| Name | Amount Owed |
|---|---|
| Clerk's Office Fees | $0 (est.) |
| Office of the U. S. Trustee Fees | $6,500 (est.) |
| Winthrop Couchot P.C. (Debtors' General Insolvency Counsel) | $20,000 (est.) |
| Braunco, Inc., (Debtors' Valuation Advisor) | $0 (est.) |
| Law Offices of A. Lavar Taylor (Debtors' Special Tax Counsel) | $0 (est.) |
| Blakeley & Blakeley LLP (Committee's Counsel) | $20,000 (est.) |
| Phoenix Group Advisory Services, LLC (Committee's Financial Advisors) | $10,000 (est.) |
| Freeman, Freeman & Smiley (Debtors' Special Corporate Counsel) | $25,000 (est.) |
| County of San Bernardino | $0 (est.) |
| Section 503(b)(9) Claims | $0 (est.) |
| **TOTAL** | $81,500 (est.)[10] |

    **B.**    **Priority Tax Claims.** Each holder of an Allowed Priority Tax Claim shall receive

under the Plan deferred cash payments, of a value, as of the Effective Date, equal to its Allowed

Claim. Except as described below, such deferred cash payments, including principal and interest,

shall be paid on a quarterly basis, in an amount sufficient to fully amortize each Allowed Priority

Tax Claim over a period not to exceed seven and a half years from the Effective Date. The

outstanding and unpaid amount of each Allowed Priority Tax Claim shall bear interest accruing at

the rate specified by Section 6621 (a) of the Internal Revenue Code on the Effective Date,

commencing on the first Business Day after the six month anniversary of the Effective Date, and

---

[10] The Professionals (Winthrop Couchot Professional Corporation, Braunco, Inc., Law Offices of A. Lavar Taylor, Blakeley & Blakeley and Phoenix Group Advisory Services, LLC) have obtained payment of a substantial amount of their post-petition fees and costs on a monthly basis during the Cases. The Debtors' estimate of fees owed to the Professionals as of the Effective Date assumes that the Debtors will continue to make monthly payments to Professionals through the Effective Date, and accounts for any pre-petition retainers paid by the Debtors.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1  continuing until such Allowed Priority Tax Claim is paid in full.  Payment of any Allowed Priority

2  Tax Claim shall commence on the later of (a) the fifteenth (15th) day of the seventh month

3  following the Effective Date, or (b) the tenth (10th) Business Day after the entry of a Final Order

4  allowing the Priority Tax Claim.  All remaining cash payments, which shall include principal and

5  interest amortized over the balance of the term (seven years), shall continue quarterly on the

6  fifteenth day of each full month every three (3) months thereafter until Paid in Full.  Creditors

7  holding Allowed Priority Tax Claims may be prepaid at any time without any penalty or other

8  charges.  If the Debtors fail to make payments as required herein (or, in the case of the Internal

9  Revenue Service, fail to remain in current Form 941 compliance), such Priority Tax Creditor shall

10  give notice of such default.  If the default is not cured within thirty (30) days after receipt of such

11  notice, such  Priority Tax Creditor may declare a default, whereby all remaining payments due to

12  such Priority Tax Creditor under the Plan will become due and payable.  **Any Priority Tax**

13  **Creditor who fails to object to the Plan and the proposed treatment herein shall be deemed**

14  **to have consented under section 1129(a)(9) to the proposed treatment of such Claim, which**

15  **treatment does not otherwise comply with the Bankruptcy Code.**

16      **C.      Amount of Priority Tax Claims.**  The following chart is an estimate of all of the

17  Debtors' Priority Tax Claims.

18

| Creditor | Claim |
|----------|-------|
| Internal Revenue Service | $ 758,625.89 |
| Employment Development Department (CA) | 160,842.75 |
| State Board of Equalization (CA) | 454,162.00 |
| Utah Tax Board (Sales Taxes) | 259,215.48 |
| Utah Tax Board (Payroll Taxes) | 12,070.17 |
| Total | $1,644,916.29 |

**IX.**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

25      **A.      General Overview.**  As required by the Bankruptcy Code, the Plan places Claims

26  and Interests into various Classes according to their right to priority and other relative rights.  The

27  table in Paragraph IX(B) below lists each Class of Claims and Interests established under the Plan

28  and states whether each Class is impaired or is unimpaired by the Plan.  A Class is "unimpaired" if

1    the Plan leaves unaltered the legal, equitable and contractual rights to which the holders of Claims

2    or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

3    Article VI of the Plan sets forth the treatment that each Class will receive under the Plan.

4        **B.**    **Designation of Classes**. The Plan provides for the establishment of the following

5    Classes of Claims and Interests.

| Class | Creditors | Impaired or Unimpaired |
|-------|-----------|------------------------|
| Class 1.1 Claims | Allowed Secured Claim of Irwin Franchise Capital | Impaired |
| Class 1.2 Claims | Allowed Secured Claim of Irwin Franchise Capital | Impaired |
| Class 1.3 Claims | Allowed Secured Claim of Irwin Franchise Capital | Impaired |
| Class 1.4 Claims | Allowed Secured Claim of American Sterling | Impaired |
| Class 1.5 Claims | Allowed Secured Claim of American Sterling | Impaired |
| Class 1.6 Claims | Allowed Secured Claim of California Bank & Trust | Impaired |
| Class 1.7 Claims | Allowed Secured Claim of Coca Cola Financial | Impaired |
| Class 1.8 Claims | Allowed Secured Claim of Leaf Financial | Impaired |
| Class 1.9 Claims | Allowed Secured Claim of Vineyard Bank | Impaired |
| Class 2.1 Claims | Allowed Secured Claim of CommerceWest | Unimpaired |
| Class 2.2 Claims | Allowed Secured Claim of CommerceWest | Unimpaired |
| Class 3 Claims | Allowed Secured Capital Lease Claims | Impaired |
| Class 4 Claims | Allowed Priority Unsecured Wage Claims | Impaired |
| Class 5 Claims | Allowed General Unsecured Claims | Impaired |
| Class 6 Claim | Allowed Secured Claims of Governmental Units | Impaired |
| Class 7 Claims | Allowed Non-Pecuniary Loss Penalty Claims | Impaired |
| Class 8 Interests | Interests in BlueOcean and SoWestBreck | Impaired |

**X.**

## PROVISIONS FOR THE TREATMENT OF CLAIMS AND INTERESTS

       **A.**    **Classes 1.1 Through 1.9.** All Claims and rights of the members of Classes 1.1

through 1.9 as of the Effective Date, shall be governed by the terms of the Plan only, and all prior

agreements shall be null and void. The treatment provided herein shall be a full satisfaction of

each Class 1 Creditor's Allowed Secured Claim.

       1.    Allowance of Secured Claims. Each Creditor in Classes 1.1 through 1.9

shall be allowed a Secured Claim to the extent of the value of such Creditor's Claim and interest in

the Estate's interest in such property, which shall be based on Fair Market Value of the property

(or such other value as agreed to by the Debtors and the respective secured creditor) securing such

Creditor's Claim in Classes 1.1 through 1.9 as set forth in Schedule 6.1 attached to the Plan. If

any Creditor objects to the Debtors' asserted value of the property securing such Creditor's Claim,

1    then, the Debtors may elect, at their sole discretion, to:  (i) fix the amount of such objecting

2    Creditor's Allowed Secured Claim at the Objection Value, and (ii) in lieu of making payments as

3    proposed in Section 6.1.2 of the Plan, and in full satisfaction of such Creditor's Allowed Secured

4    Claim, require that such Creditor repossess the property securing such Claim.  In the event of such

5    an objection and the Debtors' election of the Repossession Option, then the Allowed Deficiency

6    Claim for such objecting Creditor shall be equal to the difference between such Creditor's Claim

7    and the Objection Value.

8         2.    Payment of Allowed Secured Claim.  Each holder of an Allowed Secured

9    Claim in Classes 1.1 through 1.9 shall be treated, at the election of the Debtors, as follows:

10         a.    Option 1.  Each holder of an Allowed Secured Claim in Classes 1.1

11    through 1.9 will receive on account of such Allowed Secured Claim deferred cash payments

12    totaling the allowed amount of such Allowed Secured Claim, equal to the value, as of the Effective

13    Date, of such Creditor's interest in the Estate's interest in such property.  In particular, Creditors of

14    Classes 1.1 through 1.9 shall each be paid interest only for the first twelve months after the

15    Effective Date, and thereafter, shall be paid in equal monthly installments, with interest, which

16    shall accrue at the Allowable Interest Rate, commencing on the First Payment Date, fully

17    amortized over the periods set forth in Schedule 6.1 based on the Allowed Secured Claim.  The

18    total Claim, Allowed Secured Claim (i.e., Fair Market Value of the property securing the Claim),

19    Allowed Deficiency Claim, and monthly payments to be made to each particular Creditor is set

20    forth on Schedule 6.1 to the Plan.  Any Allowed Secured Claim in Classes 1.1 through 1.9 may be

21    prepaid at any time without penalty or other charge.  Notwithstanding the foregoing, in the event

22    any collateralized equipment or building is sold by the Reorganized Debtors, the proceeds

23    generated from the disposition of such sale, net of all expenses, shall be paid to the holder of the

24    Allowed Secured Claim whose collateral was sold, up to the amount of the Allowed Secured

25    Claim, reflecting all payments made to such Creditor under the terms of the Plan.

26         The Creditors' Allowed Secured Claims of Class 1 shall continue to be

27    secured by the Creditors' existing Lien on each of its collateral.  Upon full satisfaction of the

28    Creditors' Allowed Secured Claim in Class 1, the Creditors' Lien on its collateral shall be released

1    and the applicable Debtor shall retain title to such collateral free and clear of the Creditors' Lien.

2    Any Allowed Deficiency Claim of the Creditor shall be treated as an Allowed General Unsecured

3    Claim in the amount set forth in Schedule 6.1 attached to the Plan.

4                b.    Option 2. The Creditor's collateral shall be returned to the Creditor

5    on the Effective Date in full satisfaction of such Creditor's Allowed Secured Claim. Any Allowed

6    Deficiency Claim of the Creditor as set forth on Schedule 6.1 attached to the Plan shall be treated

7    as a Class 4 Allowed General Unsecured Claim.

8                c.    Option 3. Notwithstanding any contractual provision or applicable

9    law that entitles the holder of the Allowed Secured Claim to demand or to receive accelerated

10   payment of such Claim after the occurrence of a default: (i) any such default shall be cured, other

11   than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) the maturity of

12   such Claim shall be reinstated as such maturity existed before such default; (iii) the holder of such

13   Allowed Secured Claim shall be compensated for any damages incurred by such Creditor as a

14   result of any reasonable reliance by such Creditor on such contractual provision or such applicable

15   law; and (iv) the legal, equitable or contractual rights to which such Allowed Secured Claim

16   entitles the holder of such Claim shall not otherwise be altered.

17                The foregoing treatment shall be in full satisfaction of each Class 1

18   Creditor's Allowed Secured Claim.

19        3.    Insurance. If either Option 1 or 3 is elected by the Debtors for a particular

20   Creditor in this Class, then the Debtors shall maintain insurance coverage for the property securing

21   the Claim for such Creditor.

22        4.    Late Fees and Event of Default. If either Option 1 or 3 is elected by the

23   Debtors for a particular Creditor in this Class, then the Debtors shall be liable for a late fee equal

24   to five percent (5%) of the past due amount for failure to make payments to this Creditor within

25   ten business days after the date due under the Plan, which is not imposed as a charge for the use of

26   money, but to offset administrative expenses and other costs incurred. Failure to make a payment

27   due to this Creditor under the Plan within fifteen business days after the date due under the Plan

28   shall constitute a Class 1 Event of Default as against such Creditor. The Debtors shall have a

1  period of thirty (30) days after receipt of written notice of an asserted Class 1 Event of Default

2  relating to an alleged failure by the Debtors to pay a payment required under the Plan within which

3  to cure such Class 1 Event of Default.  In the event that the Debtors should fail to cure timely any

4  such Class 1 Event of Default, the applicable Class 1 creditor shall be entitled to proceed to

5  exercise its remedies against the Debtors and against such creditor's respective collateral, in

6  accordance with the provisions of the Bankruptcy Code, the Plan and applicable law.

7         5.    Inspection of Equipment.  If either Option 1 or 3 is elected by the Debtors

8  for a particular Creditor in this Class, then in the event of an Unsecured Class 1 Default, the

9  applicable Creditor shall be entitled to inspect the collateral securing its Claim upon reasonable

10  notice made in writing not less than five Business Days in advance.

11      **B.**    **Classes 2.1 Through 2.2.**  All Claims and rights of the members of Classes 2.1

12  through 2.2, as of the Effective Date, shall be governed by the Plan and the terms of the loan

13  assumption agreement entered into post-petition between BlueOcean and each member of Class 2.

14  The treatment provided herein shall be a full satisfaction of each Class 2 Creditor's Allowed

15  Secured Claim.

16      1.    Allowance of Secured Claims.  Each Creditor in Classes 2.1 through 2.2

17  shall be allowed a Secured Claim in the amount set forth in Schedule 6.2 attached to the Plan.

18      2.    Payment of Allowed Secured Claim.  Each holder of an Allowed Secured

19  Claim in Classes 2.1 through 2.2 shall be treated, at the election of the Debtors, as follows:

20      a.    Option 1.  Each holder of an Allowed Secured Claim in Classes 2.1

21  through 2.2 will receive on account of such Allowed Secured Claim deferred cash payments

22  totaling the allowed amount of such Allowed Secured Claim, equal to the value, as of the Effective

23  Date, of such Creditor's interest in the Estate's interest in such property.  In particular, Creditors of

24  Classes 2.1 through 2.2 shall each be paid in equal monthly installments, with interest, which shall

25  accrue at the Allowable Interest Rate, commencing on the First Payment Date, fully amortized

26  over the periods set forth in Schedule 6.2 based on the Allowed Secured Claim.  The total Allowed

27  Secured Claim and monthly payments to be made to each particular Creditor is set forth on

28  Schedule 6.2 to the Plan.  Any Allowed Secured Claim in Classes 2.1 through 2.2 may be prepaid

-43-

1   at any time without penalty or other charge. Notwithstanding the foregoing, in the event any

2   collateralized equipment or building is sold by the Reorganized Debtors, the proceeds generated

3   from the disposition of such sale, net of all expenses, shall be paid to the holder of the Allowed

4   Secured Claim whose collateral was sold, up to the amount of the Allowed Secured Claim,

5   reflecting all payments made to such Creditor under the terms of the Plan.

6           The Creditors' Allowed Secured Claims of Class 2 shall continue to be

7   secured by the Creditors' existing Lien on each of its collateral. Upon full satisfaction of the

8   Creditors' Allowed Secured Claim in Class 2, the Creditors' Lien on its collateral shall be released

9   and the applicable Debtor shall retain title to such collateral free and clear of the Creditors' Lien.

10          b.      Option 2. The Creditor's collateral shall be returned to the Creditor

11  on the Effective Date in full satisfaction of such Creditor's Allowed Secured Claim.

12          c.      Option 3. Notwithstanding any contractual provision or applicable

13  law that entitles the holder of the Allowed Secured Claim to demand or to receive accelerated

14  payment of such Claim after the occurrence of a default: (i) any such default shall be cured, other

15  than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) the maturity of

16  such Claim shall be reinstated as such maturity existed before such default; (iii) the holder of such

17  Allowed Secured Claim shall be compensated for any damages incurred by such Creditor as a

18  result of any reasonable reliance by such Creditor on such contractual provision or such applicable

19  law; and (iv) the legal, equitable or contractual rights to which such Allowed Secured Claim

20  entitles the holder of such Claim shall not otherwise be altered.

21          The foregoing treatment shall be in full satisfaction of each Class 2

22  Creditor's Allowed Secured Claim.

23  **C.      Class 3 -- Allowed Secured Capital Lease Claims.** The Debtors believe that no

24  Allowed Secured Capital Lease Claim will be asserted against them. In the event that the Debtors

25  should determine that Allowed Secured Capital Lease Claims will be asserted, each such Claim

26  shall be classified as a separate subclass under Section 6.3 of the Plan. Any holder of an Allowed

27  Secured Capital Lease Claim shall be treated as follows at the election of the Debtors after

28  consultation with the Committee or the Creditor Board Members, as the case may be:

1        1.      Option 1. Each holder in Class 3 2.1 shall be paid in full through eighty-

2   four (84) equal monthly installments of principal equal to the Creditor's Allowed Secured Capital

3   Lease Claim plus interest accruing at the Allowable Interest Rate commencing on the First

4   Payment Date. Any Allowed Secured Capital Lease Claim may be prepaid at any time without

5   penalty or other charge. The Creditor's Allowed Secured Capital Lease Claim shall continue to be

6   secured by the Creditor's existing Lien on its collateral. Upon full satisfaction of the Creditor's

7   Allowed Secured Capital Lease Claim, the Creditor's Lien on its collateral shall be released and

8   the applicable Debtor shall retain title to such collateral free and clear of the Creditor's Lien. Any

9   Allowed Deficiency Claim of the Creditor shall be treated as a Class 5 Allowed General

10  Unsecured Claim.

11       2.      Option 2. The Creditor's collateral shall be returned to the Creditor on the

12  Effective Date in full satisfaction of such Creditor's Allowed Secured Capital Lease Claim. Any

13  Allowed Deficiency Claim of the Creditor shall be treated as a Class 5 Allowed General

14  Unsecured Claim.

15       3.      Option 3. Notwithstanding any contractual provision or applicable law that

16  entitles the holder of the Allowed Secured Capital Lease Claim to demand or to receive

17  accelerated payment of such Claim after the occurrence of a default: (i) any such default shall be

18  cured, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) the

19  maturity of such Claim shall be reinstated as such maturity existed before such default; (iii) the

20  holder of such Allowed Secured Capital Lease Claim shall be compensated for any damages

21  incurred by such Creditor as a result of any reasonable reliance by such Creditor on such

22  contractual provision or such applicable law; and (iv) the legal, equitable or contractual rights to

23  which such Allowed Secured Capital Lease Claim entitles the holder of such Claim shall not

24  otherwise be altered. The foregoing treatment shall be in full satisfaction of each Class 3

25  Creditor's Allowed Secured Claim.

26       **D.      Class 4 -- Allowed Priority Unsecured Wage Claims**. Each holder of an Allowed

27  Priority Unsecured Wage Claim shall be paid the full amount of its Allowed Priority Unsecured

28  Wage Claim in cash on the latest of the following dates: (i) the Effective Date, (ii) the tenth (10th)

1    Business Day after the date upon which such Priority Unsecured Claim becomes an Allowed

2    Priority Unsecured Wage Claim, or (iii) the date upon which such Allowed Priority Unsecured

3    Wage Claim becomes due according to its terms.

4        **E.    Class 5 -- Allowed General Unsecured Claims**. Class 5 consists of all Allowed

5    General Unsecured Claims. Each General Unsecured Creditor shall receive, in exchange for its

6    Claim against the Estate, an Interest in and Claim against Holdco. The treatment of Allowed

7    General Unsecured Claims is more particularly described as follows:

8        1.    Equity Interest in Holdco. General Unsecured Creditors shall receive a 95%

9    Interest in Holdco, which shall include 100% voting rights over the Reorganized Debtors. General

10   Unsecured Creditors shall retain 100% voting rights over the Reorganized Debtors until Paid in

11   Full. The actual Interest provided to each General Unsecured Creditor will be based on each

12   General Unsecured Creditor's Pro Rata share of the aggregate of Allowed General Unsecured

13   Claims. For an additional description of the equity interest to be owned by the General Unsecured

14   Creditors and the rights associated therewith, see Section 7.2. of the Plan.

15       2.    Payment of Claims. Holdco shall assume all Allowed General Unsecured

16   Claims, which shall be paid, with simple interest accruing at the Allowable Interest Rate per

17   annum, commencing on the Effective Date, and continuing until Paid in Full, based on the

18   parameters described herein. The Reorganized Debtors shall pay to each General Unsecured

19   Creditor, based on its Pro Rata share of all Allowed General Unsecured Claims, a semiannual

20   payment in an amount equal to the lesser of: (i) Excess Cash, or (ii) Unsecured Creditors

21   Semiannual Payment Cap, unless Priority Tax Claims have been Paid in Full, in which case the

22   semiannual payment to General Unsecured Creditors may equal the Excess Cash. Payments to

23   General Unsecured Creditors shall commence on the later of: (a) the fifteenth (15th) business day

24   of the first full month following the Effective Date, or (b) the tenth (10th) Business Day after entry

25   of a Final Order allowing all General Unsecured Creditors' Claims, and shall continue on a

26   semiannual basis thereafter, until the Allowed General Unsecured Claims are Paid in Full, with

27   interest. For purpose of calculating Excess Cash in determining payment amounts, the formula

28   defined in paragraph 2.1.50 shall be applied to each Restaurant, and then aggregated. To the

1    extent that any Restaurant has less than the Minimum Cash Balance, then that Restaurant will not

2    contribute toward any Distributions at that time. In addition to the foregoing, General Unsecured

3    Creditors shall also receive any Net Proceeds to which they are entitled pursuant to Section 7.9 of

4    the Plan. Allowed General Unsecured Claims may be prepaid at any time without penalty or other

5    charge.

6            3.    Holdco Board. The General Unsecured Creditors, through the Creditor

7    Board Members, shall actively manage the Holdco Board and thus the Reorganized Debtors. For a

8    detailed discussion of the composition, roles, responsibilities, and other matters relating to the

9    Holdco Board, see Section 7.3 of the Plan.

10           4.    Waiver of Gantes Parties' Claims. Except as other provided herein, the

11   Gantes Parties have agreed to waive all Claims against the Estates. Accordingly, the Gantes

12   Parties shall be barred from asserting any General Unsecured Claim against the Estates.

13           5.    Waiver. Except as expressly provided herein with respect to consent

14   required by the Holdco Board, any conditions set forth herein may be waived by the Holdco Board

15   in its sole discretion.

16   **F.    Class 6 -- Any Allowed Secured Claim of Governmental Units**. The Debtors

17   believe that no significant Claims of Governmental Units will be allowed as a secured claim

18   against the Estates. Nevertheless, if any of the asserted Claims are allowed, each Holder of an

19   Allowed Secured Claim of Governmental Units, including the County of San Bernardino, shall

20   receive under the Plan deferred cash payments, of a value, as of the Effective Date, equal to its

21   Allowed Claim. Such deferred cash payments, including principal and interest, shall be paid on a

22   quarterly basis, and shall be in an amount sufficient to fully amortize each Allowed Secured Claim

23   of Governmental Units over a period not to exceed five (5) years from the Effective Date. The

24   outstanding and unpaid amount of each Allowed Secured Claim of Governmental Units shall bear

25   interest accruing at the rate of interest specified by Sections 506(b) and 511 of the Bankruptcy

26   Code, commencing on the Effective Date and continuing until such Allowed Secured Claim of

27   Governmental Units is paid in full. Payment of any Allowed Secured Claim of Governmental

28   Units shall commence on the later of (a) the fifteenth (15th) day of the first full month following

the Effective Date, or (b) the tenth (10th) Business Day after the entry of a Final Order allowing the Allowed Secured Claim of Governmental Units. Such payments shall continue quarterly on the fifteenth day of each full month every three (3) months thereafter until Paid in Full. Creditors holding Allowed Secured Claim of Governmental Units may be prepaid at any time without any penalty or other charges. Each Holder of a Secured Claim of Governmental Units, including the County of San Bernardino, shall retain Liens of the same priority, nature, type, extent and scope as any duly perfected and unavoidable Liens on property of the Debtors held by such Holder of Allowed Secured Claim of Governmental Units as of the Petition Date.

G. **Class 7 -- Any Allowed Non-Pecuniary Loss Penalty Claims.** Each such Allowed Non-Pecuniary Loss Penalty Claim shall be classified as a separate subclass under Section 6.7 of the Plan. Each Class 7 Creditor shall receive an amount equal to 10% of the Allowed Non-Pecuniary Loss Penalty Claim, which shall not accrue interest, and shall be paid in one lump sum on the Repayment Date.

The Debtors reserve the right to object to any Non-Pecuniary Loss Penalty Claim asserted by a Governmental Unit. Nothing contained herein shall be deemed to be any admission by the Debtors of the amount of the Claim asserted by a Governmental Unit.

H. **Class 8 -- Interests in BlueOcean and SoWestBreck.** Class 8 is comprised of the Interests of the holders of all of the interests in BlueOcean and SoWestBreck. All legal, equitable and contractual rights of the holders of all interests in BlueOcean and SoWestBreck are hereby unequivocally extinguished in their entirety. Accordingly, these Interests are impaired by this Plan.

# XI.

## MEANS OF IMPLEMENTING THE PLAN

A. **Introduction**. This article is intended to explain the means by which the Debtors intend to effectuate the reorganization provided for under the Plan, and how the Debtors intend to fund the obligations to Creditors undertaken in the Plan. This article provides information regarding prospective corporate governance of the Debtors, funding sources for Plan obligations, and other material issues bearing upon the performance of the Plan.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

**B.**    **The Reorganized Debtors**.  Subject to the provisions of Article III of the Plan, each Restaurant shall, upon the Effective Date, be transferred to and owned by a separate Subco, which shall be wholly-owned and managed by Holdco.  A schematic illustrating the organization structure of Holdco and its subsidiary Subcos is attached as Schedule 7.2 to the Plan.

1.    General Unsecured Creditors' Interest in Holdco.  General Unsecured Creditors shall own and hold all of the Interests in Holdco other than the securities owned by Gantes as described below, as well as 100% of all shareholder voting rights in Holdco until General Unsecured Creditors are Paid in Full.  The Creditor Board Members shall control the shareholder voting rights of the Holdco equity owned by the General Unsecured Creditors, and the shareholder voting rights of the Holdco equity owned by Gantes until the Repayment Date.  Once the General Unsecured Creditors have been Paid in Full, any Interests in Holdco owned by the General Unsecured Creditors shall be immediately transferred to Gantes.

2.    Gantes's Interest in Holdco.  Gantes shall initially receive a 5% Interest in Holdco for his post-confirmation services, for serving as the operator or franchisee, and shall be entitled to earn the remaining 95% Interests in Holdco as General Unsecured Creditors are indefeasibly repaid in cash above certain thresholds (see Schedule 7.2 attached to the Plan, which outlines Gantes's right to earn additional Interests in Holdco) during the Gantes Involvement Period.  Gantes shall assign his shareholder voting rights in Holdco to the Creditor Board Members until the Repayment Date.  Gantes shall not be entitled to accrue or receive any dividends, distributions or other payment, compensation or consideration until the Repayment Date.  Once the General Unsecured Creditors have been Paid in Full, all securities for and shareholder rights in Holdco owned by the General Unsecured Creditors shall be immediately transferred to Gantes.

**C.**    **Management/Board of Directors**.  During the Creditor Involvement Period, Holdco shall be controlled by the Holdco Board consisting of five members, three of which shall be Creditor Board Members, unless the Creditor Board Members determine a lesser number should serve on the Holdco Board, and two of which shall include Gantes and Brian Weiss, unless either choose to be replaced, which replacement must be approved by the Creditor Board

-49-

1  Members. It is anticipated that Al Chavez (the Committee's financial advisor), Daniel W. Harrow

2  and Lewis Jaffe will serve as the initial Creditor Board Members. Résumés for these Creditor

3  Board Members are attached collectively as Exhibit "7." Should a change in the composition of

4  the Creditor Board Members be necessary prior to the Effective Date, then the Debtors shall make

5  such changes after considering input from the Committee.

6          1.     Gantes. During the Creditor Involvement Period, Gantes will not receive

7  any direct compensation from the Debtors for his services as a member of the Holdco Board. It is

8  expected that Gantes will receive an annual salary of $260,000 from Synergy for his services as the

9  executive director of Synergy, which services include the management of numerous restaurants

10  other than those owned by the Debtors, many of which Gantes may have an interest. Gantes'

11  compensation from Synergy is outside the control of the Debtors and thus is determined and may

12  be amended by Synergy at its sole discretion.

13  Gantes earned a bachelor's degree in economics from Stanford University in 1976, and a

14  post-graduate degree in Finance and Real Estate from the UCLA Graduate School of Management

15  Executive MBA Program in 1982. In 1983, Gantes, through affiliated companies he owned and/or

16  controlled, began acquiring franchise rights from and operating more than 100 franchises of large

17  franchisors, including Burger King Corporation, Ruby's Diner, Bruegger's Bagel Bakery, On the

18  Border Mexican Grill, Carino's Italian Grill, Arby's, Coco's, Applebees, El Pollo Loco, Famous

19  Dave's, and more. The Gantes affiliated companies are consistently recognized as one of the top

20  franchisees of by various franchisors, and have received over the years numerous awards from the

21  franchisors.

22          2.     Brian Weiss. As stated in Section V.D.3.C above, on or about February 2,

23  2009, Brian Weiss was hired as the Debtors' CRO in order to facilitate the Debtors' efforts to

24  reorganize and to provide assurances to creditors that reorganization decisions are being made by

25  someone whose sole focus is on ensuring that the Debtors fulfill their fiduciary duties to creditors.

26  During the Creditor Involvement Period, Mr. Weiss will continue to serve as the Debtors' CRO for

27  which he will receive an annual salary of $84,000, subject to annual review by the Holdco Board.

28

1  Mr. Weiss's sophisticated experience and qualifications clearly justify his salary.   The following

2  is a brief description of Mr. Weiss's experience.

3         Mr. Weiss has extensive experience advising public and private companies on

4  complex transactions, corporate restructurings, operations, acquisitions and divestitures.  Mr.

5  Weiss has specifically played a critical role in the workouts and at least two successful Chapter 11

6  plan confirmations.  Mr. Weiss has also advised numerous companies through operational and

7  financial restructurings.

8         Mr. Weiss served in senior financial executive capacities for over ten years,

9  including Vice President of Finance, North America for an international toy company with

10  revenues in excess of $1 billion.  Mr. Weiss successfully led the financial turnaround of the North

11  America business unit, prior to its merger with its largest competitor.  Previously, Mr. Weiss

12  served as Financial Controller for Jazz Semiconductor, a spin-off of Conexant Systems'

13  semiconductor manufacturing operations.  Mr. Weiss was responsible for preparing the company

14  for an initial public offering, leading the acquisition due diligence process, structuring joint

15  ventures/strategic investments, oversight of all finance, accounting and reporting functions as well

16  as the company-wide implementation of the Sarbanes-Oxley Act.  Mr. Weiss holds an MBA from

17  the University Southern California and is a licensed Certified Public Accountant and was formerly

18  employed by PriceWaterhouseCoopers LLP.

19         Mr. Weiss was first introduced to Gantes by Winthrop Couchot ("Firm") in

20  approximately February 2009 to assist the Debtors in their organization.  The Firm first became

21  acquainted with Mr. Weiss through the Firm's representation of Flashcom, Inc., where Mr. Weiss

22  was employed in-house and played a critical role in the administration of the bankruptcy and

23  ultimately confirmation of a plan.  Thereafter, the Firm worked with Mr. Weiss on other

24  Chapter 11 bankruptcies, which too resulted in successful confirmation of plans of reorganization.

25  Since then, the Firm has worked with Mr. Weiss on several other workouts and related projects,

26  which has produced successful results.

27         3.     Al Chavez.  Mr. Chavez is a partner of the Phoenix Group, LLC

28  ("Phoenix"), which provides financial advisory and consulting services to clients in a broad array

1  of industries, particularly those in financial distress. Phoenix (and exclusively, Mr. Chavez) has

2  been serving as the Committee's financial advisor in this case. As a result, Mr. Chavez has gained

3  substantial knowledge about the Debtors' business. Mr. Chavez has vast experience in managing

4  and serving as a chief executive for middle market companies with revenues of $10-100 million,

5  particularly those in distress. Mr. Chavez, a Certified Public Accountant, began his career with

6  Arthur Young and Company in 1974, working primarily in the audit and management services

7  practices. Mr. Chavez represented companies in the public and private sectors with revenues

8  ranging from $5 million to over $1 billion. Mr. Chavez was involved in several mergers and

9  acquisitions and initial public offering engagements.

10        4.    Compensation for Independent Holdco Board Members. Only Holdco

11  Board members not employed by the Debtors or Synergy shall receive customary fees and expense

12  reimbursement for Holdco Board participation. Initially, these fees shall be $3,000 per quarter, per

13  Holdco Board Member, and subject to annual review by the Holdco Board. Gantes shall not

14  receive any compensation or expense reimbursement for his Board participation. The Holdco

15  Board Members and officers will be indemnified by Holdco and will be covered by customary

16  directors' and officers' insurance as determined by the Holdco Board, including the affirmative

17  approval of at least a majority of the Creditor Board Members.

18        5.    Management of Operations. Holdco through its officers and subject to

19  Holdco Board oversight and, as necessary, Holdco Board approval, will (i) oversee the restaurant

20  operations performed by Managementco; (ii) oversee all legal functions, monitor operational

21  performance and compliance to the Franchise Agreement, measure Synergy's performance and

22  monitor its financial condition; (iii) provide administrative functions not provided by Synergy; and

23  (iv) manage any acquisitions and divestitures, contract approval and all business proposals whether

24  or not submitted by or on behalf of, or related directly or indirectly to, Synergy and/or Gantes or

25  any affiliate or related party of either of the foregoing subject to Holdco Board oversight and, as

26  necessary, Holdco Board approval.

27        *Major Decisions.* During the Creditor Involvement Period, Major Decisions

28  regarding Holdco, any Subco or any Restaurant require Holdco Board approval, including the

-52-

1    affirmative approval of at least a majority of the Creditor Board Members.  Other items

2    customarily subject to oversight of a board which occur at a Subco or with respect to a Restaurant

3    would need the approval of the Holdco Board.

4           ***Material Changes.***  During the Creditor Involvement Period, any material changes

5    to operations and/or internal controls for Holdco or any Subco, including (a) financial policies and

6    controls surrounding approval of commitments (e.g., purchase orders, non-franchisor advertising)

7    and distribution of funds and (b) operational policies and controls that fall outside of the terms of

8    the franchise agreement relating to restaurant key metrics (financial, operational and sales), will be

9    approved or established by Holdco and the Subcos with the approval of the Holdco Board,

10   including the affirmative approval of a majority of the Creditor Board Members.

11           ***Managementco.***  It is anticipated that each Subco subject to the approval of the

12   board of directors will enter into an amended Management Agreement with Managementco, which

13   shall include a right for each party to terminate the Management Agreement after ninety days'

14   written notice.  This amended Management Agreement shall contain terms more favorable than the

15   Management Agreement already approved by this Court.  Managementco shall oversee the day-to-

16   day restaurant operations, including paying independent vendors, suppliers and employees.  The

17   Management Agreement will include performance criteria, monitoring processes (including

18   receiving regular information), compensation (including fees and expense reimbursement) and

19   penalty provisions for non-performance and/or underperformance.  The officers of Holdco and

20   each Subco shall directly oversee Managementco, including performance of each restaurant,

21   Subcos and Managementco levels.  Synergy will be the initial Managementco.

22           During Creditor Involvement Period, any payment or other compensation or

23   consideration to Managementco, any of the current owners or principals of the Debtors (including

24   Gantes) or any affiliate or related party of any of the foregoing, whether such payment,

25   compensation or consideration is as a dividend, distribution, fee, expense reimbursement or

26   otherwise, would need the approval of the Holdco Board, including the affirmative approval of a

27   majority of the Creditor Board Members.

28

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1     ***Employment Agreements.*** Holdco shall employ Brian Weiss for a period of not

2     less than one year, with a right to terminate Mr. Weiss for cause. Holdco and/or each Subco may

3     enter into other employment agreements with officers and other members of management of

4     Holdco and Subco, as the Holdco Board determines to be necessary or otherwise in the best

5     interests of the Reorganized Debtors.

6         6.    Synergy.  As stated above in Section IV(D)(1), on January 1, 2009, as part

7     of the Debtors' restructuring efforts, the Debtors replaced their management company, BGI, an

8     affiliate of the Debtors, with Synergy, in which no affiliate of the Debtors have an interest.

9     Synergy was formed in December 2008 and is owned by Colin Cooper, a certified public

10    accountant that has provided accounting services to the Debtors and their affiliates.[11]  Colin

11    Cooper has no ownership interest in any of the Debtors or their affiliated debtor and non-debtor

12    entities.  Synergy has retained the same management as BGI, so that they are familiar with the

13    operations of the Debtors.  Specifically, John Gantes is the executive director, George Gantes is

14    the marketing director, Tony Meyer is the accounting director, Allan Gantes is the real estate and

15    hotel director, Ed Rebella is the human resources director, Jim Gantes is the technology director,

16    Rick LeSage is the operations director, and Les Keenan is the operations director.  During the

17    Creditor Involvement Period, except as described herein, each Subco will pay Synergy a monthly

18    management fee of $6,000 per restaurant, except for the Palmdale, West Covina and Sandy

19    locations, which shall be zero, for the first 18 months from the Effective Date as described

20    in IV.(E)(1).

21        7.    Subco's Management Fee to Holdco.  During the Creditor Involvement

22    Period, each restaurant will pay Holdco a management fee equal to  $4,000 for the services

23    provided by Holdco.  Such amount will be paid on the first day of each month.  A copy of the

24    Holdco budget is included in Exhibit "9." Such management fee is designed to pay all of the costs

25    and expenses of Holdco, and shall be adjusted from time to time as the Holdco Board deems

26    reasonable, with the affirmative approval of at least a majority of the Creditor Board Members.

27    Holdco may hire such advisors (including accountants and lawyers), representatives and

28

---

[11] The Reorganized Debtors do not intend to use Cooper for accounting or tax services post Effective Date.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1  consultants, and pay the reasonable costs and expenses of such advisors, representatives and

2  consultants, as the Holdco Board deems reasonable and necessary (with the affirmative approval of

3  at least a majority of the Creditor Board Members) to operate the business and perform the needed

4  or desired functions of Holdco.

5          **D.      Corporate Actions**.  On the Effective Date, all actions contemplated by the Plan

6  shall be deemed authorized and approved in all respects (subject to the provisions of the Plan) by

7  virtue of the entry of the Confirmation Order, in accordance with the Bankruptcy Code and

8  applicable state law and without any requirement of further action by the stockholders, officers or

9  directors of the Debtors or the Reorganized Debtors.  All matters provided for under the Plan

10 involving the corporate structure of the Debtors or Reorganized Debtors and any corporate action

11 required by the Debtors or by the Reorganized Debtors in connection with the Plan shall be

12 deemed to have occurred and shall be in effect pursuant to the Bankruptcy Code, without any

13 requirement of further action by the shareholders, officers or directors of the Debtors or

14 Reorganized Debtors.  On the Effective Date, the officers of the Reorganized Debtors are

15 authorized and directed to implement the provisions by the Plan and any other agreements,

16 documents and instruments contemplated by the Plan in the name of and on behalf of the

17 Reorganized Debtors.

18         **E.      Transfer of Estate Property to Reorganized Debtors**.  Except as otherwise

19 specifically provided in the Plan, on the Effective Date, all property and rights of the Estates of

20 each of the Debtors shall be transferred to each of the Reorganized Debtors as illustrated in

21 Schedule 7.5 attached to the Plan, free and clear of all Claims, Liens, and rights of Creditors and

22 Interests of Interest Holders.  Subject to the provisions of Section 7.6 to the Plan, such property

23 and rights to be transferred to, the Reorganized Debtors include, without limitation, all alter ego

24 and derivative claims existing as of the Effective Date, and all other Avoidance Action claims.  As

25 of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and

26 dispose of property and settle and compromise Claims or Interests without the supervision of, or

27 any authorization from, the Bankruptcy Court or the United States Trustee, and free of any

28 restriction of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions specifically

1    provided for in the Plan or the Confirmation Order. As of the Effective Date, all property of the

2    Reorganized Debtors shall be free and clear of all Claims, Liens, and other rights of Creditors and

3    Interests of Interest Holders, except as otherwise expressly provided herein.

4         **F.**    **Funding of the Plan**. The funds necessary to meet the Debtors' obligations to

5    Creditors under the Plan will be generated primarily from the Debtors' operations after the

6    Effective Date. As the financial projections attached hereto as Exhibit "8" indicate, the Debtors

7    project that there will be cash flow from the Debtors' operations during the term of the Plan

8    sufficient for the Debtors to meet such cash needs. The funds necessary to meet the Debtors'

9    obligations on the Effective Date of the Plan will be obtained from the Debtors' operating capital.

10   As the Debtors' financial projections indicate, the Debtors project that they will have cash

11   sufficient to meet all of the obligations provided for in the Plan.

12        **G.**    **Post-Confirmation Estate Claims**. The Reorganized Debtors shall maintain all

13   rights to enforce, file, litigate, prosecute, settle and collect (on behalf of the Estates) the Post-

14   Confirmation Estate Claims. Notwithstanding the rights of the Debtors with respect to Post-

15   Confirmation Estate Claims, nothing in the Plan shall require the Debtors to prosecute or litigate

16   any such matters, all of which may be determined by the Debtors in the exercise of their sole and

17   absolute discretion.

18        **THE DEBTORS HAVE NOT DETERMINED WHETHER POST-**

19   **CONFIRMATION ESTATE CLAIMS EXIST, INCLUDING, WITHOUT LIMITATION,**

20   **WHETHER THERE ARE ANY AVOIDANCE ACTIONS THAT MAY BE FILED BY**

21   **THE REORGANIZED DEBTORS AFTER THE CONFIRMATION DATE. THIS**

22   **INVESTIGATION IS ONGOING AND WILL OCCUR, IN LARGE PART, AFTER THE**

23   **CONFIRMATION DATE. AS A RESULT, ALL PARTIES-IN-INTEREST ARE HEREBY**

24   **ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE EXISTENCE OF ANY**

25   **PARTICULAR AVOIDANCE ACTION OR OTHER POST-CONFIRMATION ESTATE**

26   **CLAIM MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THE PLAN, AN**

27   **AVOIDANCE ACTION OR OTHER POST-CONFIRMATION ESTATE CLAIM MAY BE**

28   **FILED AGAINST ANY CREDITOR OR OTHER PARTY AT ANY TIME.**

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1       **H.**    **Avoidance Actions**. Notwithstanding anything to the contrary herein, one hundred

2    percent (100%) of any Net Proceeds recovered, either before or after the Effective Date, from

3    prosecution or settlement of Avoidance Action claims shall be paid in the following Order:

4    (i) first, to Creditors holding Allowed Administrative Claims and Allowed Cure Claims, based on

5    the pro rata share of such Claims, up to an amount that, in conjunction with other payments made

6    to these Creditors under the Plan, renders such Creditors Paid in Full; (ii) second, to Creditors

7    holding Allowed Priority Tax Claims, up to an amount that, in conjunction with other payments

8    made to these Creditors under the Plan, renders such Creditors Paid in Full; and (iii) third, to

9    General Unsecured Creditors, up to an amount that, in conjunction with other payments made to

10   these Creditors under the Plan, renders such Creditors Paid in Full.  Within three Business Days

11   after the Debtors receive any such Net Proceeds, the Debtors shall deposit such proceeds into an

12   interest-bearing, segregated account for the benefit of the foregoing from which no disbursements

13   shall be made except for the purpose of funding Distributions hereunder to the foregoing

14   Creditors.  The Debtors shall use the funds held in this account to make distributions pursuant to

15   the terms of the Plan.  Allowed Claims of the foregoing Creditors shall be credited by the amount

16   of Net Proceeds paid to Creditors of such Claims.

17       **I.**    **Disposition of Assets**. From and after the Effective Date, a Reorganized Debtor

18   shall be entitled to sell, transfer, encumber or otherwise dispose of any interest in any of its assets,

19   without any need for obtaining any approval of the Bankruptcy Court.

20       **J.**    **Compromise of Controversies**. From and after the Effective Date, the

21   Reorganized Debtors shall be entitled to compromise any objections to Disputed Claims, or any

22   controversies relating to Post-Confirmation Estate Claims, Avoidance Actions or other litigation

23   pending after the Confirmation Date without any need for any notice to Creditors or any approval

24   of the Bankruptcy Court.

25       **K.**    **Bankruptcy Court Approval Relative to Post-Confirmation Matters**. Nothing

26   contained in the Plan shall be deemed to impair in any manner the right of a Reorganized Debtor

27   or any party-in-interest to seek at any time after the Effective Date orders of the Bankruptcy Court

28

approving actions to be taken consistent with the Plan as may be necessary or desirable to effectuate the provisions of the Plan.

**L.      Debtors' Right of Setoff.** Pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Debtors may set off against any Allowed Claim and Distribution to be made pursuant to the Plan on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any account stated, claim, right, or cause of action which the Debtors or the Estates may possess against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim shall constitute a waiver or release by the Debtors or the Estates of any such account, claim, right, and cause of action that the Debtors or the Estates may possess against the holder of such Allowed Claim. To the extent that the Debtors in allowing a Claim fails to effect a setoff with a Creditor and seeks to collect a claim from such Creditor after a Distribution to such Creditor pursuant to the Plan, the Debtors shall be entitled to full recovery on their claim against such Creditor, notwithstanding any payment of the Creditor's Allowed Claim pursuant to the Plan.

In accordance with the provisions of Section 553 of the Bankruptcy Code, the Internal Revenue Service shall be entitled to set off against any amounts that the Internal Revenue Service may owe to the Debtors on account of overpayments by the Debtors of pre-confirmation taxes any pre-confirmation tax liabilities that the Debtors may owe to the Internal Revenue Service.

**M.      Cash Payments.** Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Reorganized Debtor or by wire transfer from a domestic bank, at the option of the Reorganized Debtor.

**N.      Reorganized Debtors' Certification.** On or before the date upon which the Reorganized Debtors determine, in their sole and absolute discretion, that all Allowed Claims have been duly paid and that all Post-Confirmation Estate Claims and objections to Disputed Claims have been resolved by Final Order, the Reorganized Debtors shall file with the Bankruptcy Court and serve the Reorganized Debtors' Certification upon the United States Trustee.

## XII.

## DISTRIBUTIONS

**A.** **Distribution Agent**. The Reorganized Debtor shall serve as the Distribution Agent for Distributions to be made to holders of Allowed Claims. The Distribution Agent may employ one or more sub-agents on such terms and conditions as it deems appropriate in the exercise of its sole and absolute discretion. The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to the Plan. The Distribution Agent will receive customary fees and expense reimbursement for its services and certain funds shall be set aside by Holdco to pay for such functions.

**B.** **Distributions**.

1. Dates of Distributions. Any Distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within fifteen (15) days after such date. Any Distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter but, in any event, within fifteen (15) days thereafter.

2. Limitation on Liability. Neither the Debtors, the Reorganized Debtors, their respective affiliates, the Committee, the Holdco Board, nor any of their respective employees, members, officers, directors, shareholders, agents, or Professionals shall be liable for (i) any acts or omissions (except for willful misconduct) in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, or (ii) any change in the value of Distributions made pursuant to the Plan resulting from any delays in making such Distributions in accordance with the terms of the Plan (including, but not limited to, any delays caused by the resolution of Disputed Claims).

**C.** **Instruments and Securities**.

1. Rights of Persons Holding Instruments and Securities. Except as otherwise provided herein, as of the Effective Date, and whether or not surrendered by the holder thereof, all Instruments and Securities evidencing or relating to any Claims or Interests shall be deemed

1  automatically cancelled and deemed void and of no further force or effect, without any further
2  action on the part of any person, and any Claims or Interests evidenced by or relating to such
3  Instruments or Securities shall be deemed discharged.

4          2.      Cancellation of Liens.  Except as otherwise provided herein, any Lien
5  securing any Secured Claim shall be deemed released and discharged, and the Creditor holding
6  such Secured Claim shall be authorized and directed to release any collateral or other property of
7  the Debtors (including, without limitation, any cash collateral) held by such Creditor and to take
8  such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of
9  such Lien, including, without limitation, by the execution, delivery and filing or recording of such
10 releases as may be requested by the Reorganized Debtors.

11         D.      De Minimis Distributions.  No Cash payment of less than ten dollars
12 ($10.00) shall be made by the Reorganized Debtors to any Creditor.  Whenever payment of a
13 fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down
14 of such fraction to the nearest whole cent.  Any Cash or other property that is not distributed as a
15 consequence of this Section 8.4 shall, after the last Distribution on account of Allowed Claims in
16 the applicable Class, be treated as Unclaimed Property under Section 8.7 of the Plan.

17         E.      Delivery of Distributions.  Except as provided in Section 8.7 with respect to
18 Unclaimed Property, Distributions to holders of Allowed Claims and Allowed Administrative
19 Claims shall be distributed by mail as follows:  (i) with respect to each holder of an Allowed
20 Claim that has filed a Proof of Claim, at the address for such Creditor reflected in such Proof of
21 Claim; (ii) with respect to each holder of an Allowed Claim that has not filed a Proof of Claim, at
22 the address reflected on the Schedules filed by the Debtors; provided, however, that, if the Debtors
23 or the Reorganized Debtors have received a written notice of a change of address for such
24 Creditor, the address set forth in such notice shall be used; or (iii) with respect to each holder of an
25 Allowed Administrative Claim, at such address as the holder thereof may specify in writing.

26         F.      Undeliverable Distributions.  No further distribution of Unclaimed Property shall
27 be made to a Creditor unless and until the Reorganized Debtors are notified in writing of such
28 Creditor's then current address.  Subject to the provisions of Section 8.7 hereof, Unclaimed

1  Property shall remain in the possession of the Reorganized Debtors pursuant to this Section 8.6,

2  and shall be set aside and held in the Unclaimed Property Reserve to be maintained by the

3  Distribution Agent until such time as the subject Distribution becomes deliverable.  Nothing

4  contained in the Plan shall require the Reorganized Debtors or any other person to attempt to

5  locate such Creditor.

6       **G.**    **Disposition of Unclaimed Property**.  If the Creditor entitled to a Distribution of

7  Unclaimed Property notifies the Reorganized Debtors of such Creditor's claim to the Distribution

8  of such Unclaimed Property within nine (9) months following the Initial Distribution Date, the

9  Unclaimed Property distributable to such Creditor shall be released from the Unclaimed Property

10  Reserve and paid to such Creditor within fifteen (15) days thereof.  Any Holder of an Allowed

11  Claim or Allowed Administrative Claim that does not assert a claim in writing for Unclaimed

12  Property held by the Reorganized Debtors within nine (9) months following the Initial Distribution

13  Date shall no longer have any claim to or interest in such Unclaimed Property, and shall be forever

14  barred from receiving any Distributions under the Plan or otherwise from the Reorganized

15  Debtors.  In such cases, any such Unclaimed Property shall be retained by the Reorganized

16  Debtors, shall not be subject to the unclaimed property or escheat laws of any state or other

17  governmental unit, and shall be distributed on account of Allowed General Unsecured Claims at

18  the time when the succeeding Distribution is to be paid to General Unsecured Creditors pursuant

19  to Section 6.4 of the Plan.

20                              **XIII.**

21                **OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

22       **A.**    **Objections to Claims**.  The Reorganized Debtors shall have the sole and exclusive

23  right to file objections to Claims; provided, however, that (i) any party-in-interest, including

24  without limitation the Creditor Board Members, shall be entitled to object to any Claims asserted

25  by any insider of the Debtors, and (ii) in the event that the Debtors should fail to object, within

26  ninety (90) days after the Effective Date, to a Claim that the Committee disputes, the Committee,

27  through the Holdco Board or Creditor Board Members, shall have the right to file and pursue an

28  objection to such Claim.  Notwithstanding the foregoing, the Committee shall have standing to be

1  heard with respect to any objection that the Debtors may file seeking to have a Secured Claim,

2  Administrative Claim or Priority Unsecured Claim disallowed and treated instead as a General

3  Unsecured Claim hereunder. Unless another date is established by order of the Bankruptcy Court,

4  any objection to a Claim shall be filed with the Bankruptcy Court and served on the Holdco Board

5  or Creditor Board Members and on the Creditor holding such Claim on or before the applicable

6  Claims Objection Deadline. The Reorganized Debtors, and, in the case of any Claim to which the

7  Holdco Board or Creditor Board Members has standing to object under Section 9.1 of the Plan, the

8  Holdco Board or Creditor Board Members, shall have the right to request that the Bankruptcy

9  Court extend the Claims Objection Deadline.

10  **B.    Schedule of Disputed Claims.** The Debtors shall file and serve the Disputed

11  Claims Schedule on the Committee on or before the twenty-fourth (24th) day prior to the

12  Confirmation Hearing. The Debtors reserve the right to amend the Disputed Claims Schedule, by

13  adding or deleting Claims, as the Debtors deem appropriate in the exercise of their sole and

14  absolute discretion.

15  Notwithstanding the fact that the Reorganized Debtors shall have the right to file, litigate,

16  and settle objections to Disputed Claims on behalf of the Debtors and Estates, nothing contained

17  herein shall be deemed to obligate the Reorganized Debtors to take any such actions, all of which

18  shall be determined by the Reorganized Debtors in their sole and absolute discretion.

19  **THE DEBTORS HAVE NOT FULLY REVIEWED THE CLAIMS IN THE CASES**

20  **OR DETERMINED WHETHER OBJECTIONS TO CLAIMS EXIST. THIS**

21  **INVESTIGATION IS ONGOING AND MAY OCCUR, IN LARGE PART, AFTER THE**

22  **CONFIRMATION DATE. AS A RESULT, CREDITORS AND OTHER PARTIES-IN-**

23  **INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THAT THE**

24  **EXISTENCE OF ANY PARTICULAR OBJECTION TO A DISPUTED CLAIM MAY NOT**

25  **BE LISTED, DISCLOSED OR SET FORTH IN THE PLAN, AN OBJECTION TO A**

26  **CLAIM MAY BE FILED AGAINST ANY CREDITOR OR PARTY-IN-INTEREST AT**

27  **ANY TIME, SUBJECT TO THE CLAIMS OBJECTION DEADLINE. THE DEBTORS**

28  **AND THE REORGANIZED DEBTORS HEREBY RESERVE THE RIGHT TO OBJECT**

1  TO AMOUNTS THAT HAVE BEEN SCHEDULED BY THE DEBTORS, OR

2  REFLECTED IN THE DEBTORS' BOOKS AND RECORDS, AND WHICH ARE FOUND

3  TO BE OBJECTIONABLE IN ANY RESPECT.

4       C.    **Treatment of Disputed Claims**.

5       1.    No Distribution Pending Allowance.  If any portion of a Claim is a Disputed

6  Claim, no Distribution provided for under the Plan shall be made on account of such Claim unless

7  and until such Claim becomes an Allowed Claim and is no longer a Disputed Claim.

8       2.    Distribution After Allowance.  Within fifteen (15) days following the date

9  on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the

10  Distribution Agent shall distribute to the Creditor holding such Allowed Claim any Cash that

11  would have been distributable to such Creditor if, at the time of the making of any Distribution to

12  the Class of which such Creditor is a member, such Claim had been an Allowed Claim and not a

13  Disputed Claim.  No interest shall be paid on such Claim.

14       3.    Reserves for Disputed Claims.  In the event that a Disputed Claim is

15  pending as to a Class 5 Creditor, the Distribution Agent shall establish a Disputed Claims Reserve,

16  and maintain a reasonable reserve necessary to pay such Disputed Claim in accordance with

17  Section 6.5.  No disbursement of funds from the Disputed Claims Reserve shall be made on

18  account of a Disputed Claim until such Disputed Claim has been determined by a Final Order of

19  the Bankruptcy Court.  In the event that any Disputed Claim is ultimately disallowed by the

20  Bankruptcy Court, the amount reserved for such Disputed Claim, which has been disallowed by

21  the Bankruptcy Court, shall be distributed on account of Allowed General Unsecured Claims at the

22  time when the succeeding Distribution is to be paid to General Unsecured Creditors pursuant to

23  Section 6.4 of the Plan.

24                                     **XIV.**

25          **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

26       A.    **Executory Contracts Being Assumed**.  Effective as of, and conditioned on, the

27  occurrence of the Effective Date, each of the Debtors hereby assumes all of the executory contracts

28  and unexpired leases of the Debtors, including, without limitation, those executory contracts and

1  unexpired leases of the Debtors listed on Schedule 10.1 of the Plan, except only for those

2  executory contracts and unexpired leases set forth in Schedule 10.3 of the Plan.

3      The Debtors may amend Schedule 10.1 to add thereto any executory contract or unexpired

4  leases, or to delete therefrom any executory contract or lease, up to and including the Confirmation

5  Date. However, if any amendments are made to Schedule 10.1 less than twenty-four (24) days

6  before the Confirmation Date, the affected contract or lease parties shall have fifteen (15) days

7  from the date of service of notice of such amendments within which to serve on the Debtors a

8  written objection to the same. Upon receipt of any such objection, the Debtors shall promptly set a

9  hearing on the same, and the assumption or rejection of the affected contract or lease shall be

10  delayed until the Bankruptcy Court makes a determination on this issue (such determination may

11  be made after the Confirmation Date, without delaying the confirmation of the Plan). To the

12  extent that an executory contract or unexpired lease has been assumed prior to the Confirmation

13  Date by a Debtor pursuant to an order of the Bankruptcy Court, such assumption shall not be

14  affected by the Plan. The assumption of any contract or lease pursuant to the provisions of this

15  Section 10.1 shall be only to the extent that such assumed contract or lease constitutes an

16  executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code.

17  Inclusion of an agreement in Schedule 10.1 does not constitute an admission by the Debtors or

18  Reorganized Debtors that (i) such agreement is an executory contract or unexpired lease within the

19  meaning of Section 365 of the Bankruptcy Code, (ii) the Debtors must assume such agreement in

20  order to continue to receive or retain rights, benefits, or performance thereunder or that any Claim

21  under such agreement must be paid or default cured, or (iii) such agreement is a valid contract or

22  lease. Any contract or lease assumed pursuant to the Plan shall be assumed as previously amended

23  or otherwise modified by the parties thereto, whether before or after the Petition Date.

24      **B.    Payment of Cure Claims.** Each Subco shall be liable and responsible for the

25  payment of all Allowed Cure Claims applicable to such respective Subco as set forth on

26  Schedule 10.1. Payment of such Allowed Cured Claims shall be paid over a period not to exceed

27  thirty-six (36) months, in equal monthly installments commencing on the First Payment Date,

28  which payments are reflected in the Debtors' Budget. Holdco hereby guarantees the payment of

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1    all Allowed Cured Claims, but does not otherwise guarantee the performance of any assumed

2    contract. In addition to the foregoing, the Debtors may make, as the Debtors determine, at their

3    sole discretion, such additional periodic payments on account of unpaid Allowed Cure Claims, so

4    long as each Restaurant making such additional payments maintains the Minimum Cash Balance

5    after such payments.

6        **C.    Executory Contracts Being Rejected**. The Debtors hereby reject all of the

7    executory contracts and unexpired leases listed on Schedule 10.3 of the Plan. The Debtors reserve

8    the right to amend Schedule 10.3 to add thereto any executory contracts or leases, or to delete

9    therefrom any executory contract or unexpired lease, up to and including the Confirmation Date.

10   However, if any amendments are made to Schedule 10.3 later than twenty-four (24) days before

11   the Confirmation Date, the affected contract or lease parties shall have fifteen (15) days from the

12   date of service of notice of such amendments within which to serve on the Debtors a written

13   objection to the same. Upon receipt of any such objection, the Debtors shall promptly set a

14   hearing on the same, and the rejection of the affected contract or lease shall be delayed until the

15   Bankruptcy Court makes a determination on this issue (such determination may be made after the

16   Confirmation Date, without delaying the confirmation of the Plan). To the extent that an

17   executory contract or unexpired lease has been rejected by the Debtors prior to the Confirmation

18   Date pursuant to an order of the Bankruptcy Court, such rejection shall not be affected by the Plan.

19       **D.    Retention of Property Rights By Reorganized Debtors**. To the extent that an

20   agreement that provides the Debtors with property rights does not constitute an executory contract

21   or unexpired lease, or the Debtors have obtained property rights under the executed portion of an

22   executory contract or unexpired lease, rejection of such agreement shall not constitute an

23   abandonment by the Debtors of any such property rights.

24       **E.    Bar Date for Rejection Damages**. Any Claim arising out of the rejection of an

25   executory contract or unexpired lease shall be forever barred and shall not be enforceable against

26   the Debtors, the Reorganized Debtors, their affiliates, their successors, Estates, or their properties,

27   and shall not be entitled to any Distribution under the Plan, unless a Proof of Claim for such

28   Rejection Claim is filed and served on the Debtors or Reorganized Debtors within thirty (30) days

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1   after the later of (i) the date of entry of the order of the Bankruptcy Court approving the rejection

2   of the executory contract or unexpired lease, or (ii) the Confirmation Date.

3       **F.**    **Claims Schedule**. The Cure Claims Schedule shall be filed with the Bankruptcy

4   Court, and served on the Committee and the non-debtor parties to such executory contracts and

5   unexpired leases, on or before the twenty-fourth (24th) day prior to the Confirmation Hearing.

6   Any objection to the amount of any Cure Claim set forth in the Cure Claims Schedule shall be

7   filed and served upon counsel for the Debtors and the Committee on or before the fourteenth

8   (14th) day prior to the Confirmation Hearing. In the event that any such objection to the amount

9   stated for a Cure Claim in the Cure Claims Schedule is not filed and served as set forth herein, the

10   amount of the Creditor's Cure Claim shall be deemed forever to be the amount set forth in the

11   Cure Claims Schedule, and any Cure Claim in excess of the amount set forth in the Cure Claims

12   Schedule shall be waived and shall be forever barred in the Case, without further notice. If the

13   Debtors cannot resolve any such objections with the Creditor, the Debtors may either (i) elect to

14   reject the executory contract or unexpired lease at the Confirmation Hearing, or (ii) have the

15   Bankruptcy Court determine the merits of the objection on or after the Confirmation Hearing

16   (without delaying the confirmation of the Plan). Any amount of Cure Claim payable upon the

17   assumption of an executory contract or unexpired lease shall be due and payable on or before the

18   fifteenth (15th) day after the entry of a Final Order fixing the amount of the Cure Claim and then

19   only in the amount fixed by such Final Order.

20   **XV.**

21   **TAX CONSEQUENCES OF PLAN**

22       **A.**    **Introduction.** The implementation of the Plan may have federal, state and local

23   tax consequences to the Debtors and the Debtors' Creditors and Interest Holders. No tax opinion

24   has been sought or will be obtained with respect to any tax consequences of the Plan. This

25   Disclosure Statement does not constitute, and is not intended to constitute, either a tax opinion or

26   tax advice to any person, and the summary contained herein is provided for informational purposes

27   only.

28

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1    The discussion below summarizes only certain of the federal income tax consequences

2  associated with the Plan's implementation.  This discussion does not attempt to comment on all

3  aspects of the federal income tax consequences associated with the Plan, nor does it attempt to

4  consider various facts or limitations applicable to any particular Creditor or Interest Holder which

5  may modify or alter the consequences described herein.  A Creditor or Interest Holder may find

6  that the tax consequences of the Plan to such Creditor or Interest Holder differ materially from the

7  tax consequences discussed below because of such Creditor's or Interest Holder's facts and

8  circumstances.  This discussion does not address state, local or foreign tax consequences or the

9  consequences of any federal tax other than the federal income tax.

10    The following discussion is based upon the provisions of the Internal Revenue Code of

11  1986, as amended (the "Internal Revenue Code"), the regulations promulgated thereunder, and

12  existing judicial decisions and administrative rulings.  In light of the rapidly-changing nature of tax

13  law, no assurance can be given that legislative, judicial or administrative changes will not be

14  forthcoming that would affect the accuracy of the discussion below.  Any such changes could be

15  material and could be retroactive with respect to the transactions entered into or completed prior to

16  the enactment or promulgation thereof.  The tax consequences of certain aspects of the Plan are

17  uncertain due to the lack of applicable legal authority and may be subject to judicial or

18  administrative interpretations that differ from the discussion below.

19    CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH

20  THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND

21  TO THE DEBTORS OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN,

22  INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

23    **B.**    **Federal Income Tax Consequences to the Debtors.**  Consummation of the Plan

24  may reduce substantially the amount of the Debtors' aggregate outstanding indebtedness (any

25  amount of potential discharged indebtedness for federal income tax purposes will be referred to

26  herein as a "Debt Discharge Amount").  In general, the Internal Revenue Code provides that a

27  taxpayer who realizes a discharge of indebtedness must include the Debt Discharge Amount in its

28  gross income in the taxable year of discharge to the extent that the Debt Discharge Amount

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1  exceeds any consideration given for such discharge.[12]  However, if a taxpayer is in a Title 11 case

2  and the discharge of indebtedness occurs pursuant to a plan approved by the bankruptcy court, as

3  in these Cases, then such discharge of indebtedness is specifically excluded from gross income.

4  Accordingly, the Debtors will not be required to include in income any Debt Discharge Amount as

5  a result of Plan transactions.

6      Although the Debtors will not have to include the Debt Discharge Amount resulting from

7  Plan transactions in their gross income, there will be a tax effect.  The Internal Revenue Code

8  requires certain tax attributes of a debtor to be reduced by the Debt Discharge Amount excluded

9  from income.  Tax attributes are reduced in the following order of priority:  net operating losses

10  and net operating loss carryovers; general business credits; minimum tax credits; capital loss

11  carryovers; basis of property of the taxpayer; passive activity loss or credit carryovers; and foreign

12  tax credit carryovers.  Tax attributes are generally reduced by one dollar for each dollar excluded

13  from gross income, except that general tax credits, minimum tax credits and foreign tax credits are

14  reduced by 33.3 cents for each dollar excluded from gross income.

15      An election can be made to alter the order of priority of attribute reduction by first applying

16  the reduction against depreciable property held by the taxpayer in an amount not to exceed the

17  aggregate adjusted basis of such property.  The Debtors have not yet decided whether to make such

18  election.   The deadline for making such election is the due date (including extensions) of the

19  Debtors' federal income tax return for the taxable year in which such debt is discharged pursuant

20  to the Plan.

21      Any Claim against the Debtors (except a Claim that would give rise to a deduction if paid)

22  that is discharged by payment to a Creditor of Cash and/or property will result in the creation of a

23  Debt Discharge Amount reducing tax attributes to the extent that the adjusted issue price of the

24  debt discharged (plus accrued interest) exceeds the fair market value of the payment made in

25  cancellation thereof.

26

27

28

---

[12] No income from the discharge of indebtedness is realized to the extent that payment of the liability being discharged would have given rise to a deduction.

1  A Debtors' Debt Discharge Amount may be increased to the extent that General Unsecured

2  Creditors holding unscheduled Claims fail to timely file a Proof of Claim and have their claims

3  discharged on the Confirmation Date pursuant to Bankruptcy Code Section 1141.

4      **C.**    **Tax Consequences To Creditors**. A Creditor who receives a Distribution on his or

5  her Claim that is less than the Creditor's adjusted basis in such Claim may be entitled to claim a

6  bad debt deduction for this difference. A bad debt deduction is allowed in the taxable year of the

7  Creditor in which a debt becomes wholly worthless. The discharge of a Claim pursuant to the Plan

8  establishes that such Claim is wholly worthless as of the date of discharge (assuming the holder of

9  the Claim receives no consideration under the Plan with respect to such Claim). It is possible,

10  however, that such Claim may have become wholly worthless on an earlier date, depending upon

11  all the facts and circumstances. The Debtors express no opinion regarding the date or dates on

12  which Claims discharged under the Plan became worthless.

13  **XVI.**

14  **CONFIRMATION REQUIREMENTS AND PROCEDURES**

15      **A.**    **Introduction.** PERSONS OR ENTITIES CONCERNED WITH

16  CONFIRMATION OF THE PLAN OR THE PROVISIONS OF THE PLAN SHOULD

17  CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A

18  PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended

19  solely for the purpose of alerting readers about basic confirmation issues, which they may wish to

20  consider, as well as certain deadlines for filing claims. The Debtors CANNOT and DO NOT

21  represent that the discussion contained below is a complete summary of the law on this topic and

22  are not providing any legal opinions with respect thereto.

23      Many requirements must be met before a Bankruptcy Court can confirm a Chapter 11 plan.

24  Some of the requirements include that the plan must be proposed in good faith, the distributions to

25  non-accepting creditors and impaired classes must be at least as much as such creditors would

26  receive in a Chapter 7 liquidation, and the plan must be feasible. These requirements are not the

27  only requirements for confirmation.

28

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

**B.** **Who May Object to Confirmation of the Plan.** Any party-in-interest may object to the confirmation of the Plan, but, as explained below, not every party-in-interest is entitled to vote to accept or reject the Plan.

**C.** **Who May Vote to Accept/Reject the Plan.** A Creditor or Interest Holder has a right to vote for or against the Plan if that Creditor or Interest Holder has a Claim that is both (1) Allowed or allowed for voting purposes and (2) classified in an impaired Class.

1. What Is an Allowed Claim/Interest. As noted above, a Creditor or Interest Holder must first have an Allowed Claim or Interest to have the right to vote. Generally, a Proof of Claim or Proof of Interest will be allowed, unless a party-in-interest brings a motion objecting to the Claim or Interest. When an objection to a Claim or Interest is filed, the Creditor or Interest Holder holding the Claim or Interest cannot vote unless the Bankruptcy Court, after notice and a hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

2. What Is an Impaired Class of Claim(s)/Interest(s). As noted above, the holder of an Allowed Claim or Interest has the right to vote on the Plan only if it is in a Class that is impaired under the Plan. A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the holders of Claims or Interests in that Class, with certain exceptions.

The Debtors believe that Classes 1 through 7 are impaired under the Plan. Parties who dispute the Debtors' characterization of their Claim or Interest as being in an impaired or unimpaired Class may file an objection to the Plan contending that the Debtors have incorrectly characterized the Class.

**D.** **Who Is Not Entitled to Vote.** The following four types of Claims are not entitled to vote on the Plan: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Administrative Claims and Priority Tax Claims; and (4) Claims in Classes that do not receive or retain any property under the Plan. Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Administrative Claims and Priority Tax Claims are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to

1  have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU

2  MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

3      **E.    Who Can Vote in More Than One Class.**  A Creditor whose Claim is both an

4  Allowed Secured Claim and an Allowed General Unsecured Claim is entitled to accept or reject

5  the Plan in both capacities by casting one ballot for the secured part of the Claim and another

6  ballot for the General Unsecured Claim.  Also, any party who holds Allowed Claims or Interests in

7  more than one Class may vote the Claim or Interest in each Class.

8      **F.    Votes Necessary to Confirm the Plan.**  If impaired classes exist, the Bankruptcy

9  Court cannot confirm a Chapter 11 plan unless (1) all impaired classes have voted to accept the

10  plan, or (2) at least one impaired class has accepted the plan without counting the votes of any

11  insiders within that class and the plan is eligible to be confirmed by "cramdown" on non-accepting

12  classes, as discussed in Article XVI.H below.

13      **G.    Votes Necessary for a Class to Accept the Plan.**  A class of claims is deemed to

14  have accepted a Chapter 11 plan where more than one-half (1/2) in number and at least two-thirds

15  (2/3) in dollar amount of the claims that actually vote, vote in favor of the plan.  A class of

16  interests is deemed to have accepted the plan where at least two-thirds (2/3) in amount of the

17  interest holders of such class which actually vote to accept the plan.

18      **H.    Treatment of Non-Accepting Classes.**  As noted above, even if there are impaired

19  classes that do not accept a Chapter 11 plan, a bankruptcy court may nonetheless confirm the plan

20  if the non-accepting classes are treated in the manner required by the Bankruptcy Code and there is

21  at least one impaired class that accepts the plan.  The process by which a plan can be confirmed

22  and become binding on non-accepting classes notwithstanding rejection by one or more classes is

23  commonly referred to as "cramdown."  The Bankruptcy Code allows a plan to be "crammed

24  down" on non-accepting classes of claims or interests if it meets all requirements for confirmation

25  except the voting requirements of Section 1129(a)(8) of the Bankruptcy Code and if the plan does

26  not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class that has

27  not voted to accept the plan, as provided in Section 1129(b) of the Bankruptcy Code and

28  applicable case law.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1    **I.    Request for Confirmation Despite Non-Acceptance by Impaired Class(es).** The

2    Debtors will ask the Bankruptcy Court to confirm the Plan by cramdown on any impaired Class if

3    such Class does not vote to accept the Plan.

4    **J.    Liquidation Analysis.** Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a

5    plan cannot be confirmed unless the bankruptcy court determines that distributions under the plan

6    to all holders of claims and interests who have not accepted the plan, and whose claims and

7    interests are classified in classes that are impaired under the plan, are no less than those which they

8    would receive in a liquidation proceeding under Chapter 7. This test must be satisfied even if a

9    plan is accepted by each impaired class of claims and interests.  This test, which is often referred

10   to as the "best interests" test, requires the bankruptcy court to find either that (i) all holders of

11   claims and interests in an impaired class of claims or interests have accepted the plan, or (ii) the

12   plan will provide each holder of claims and interests in an impaired class who has not accepted the

13   plan with a recovery of property of a value, as of the effective date of the plan, that is not less than

14   the amount that such holder would receive if the debtor were liquidated under Chapter 7 of the

15   Bankruptcy Code.

16       To satisfy the "best interest" test, the bankruptcy court must reach a conclusion regarding

17   the probable distribution to the holders in each impaired class of claims and interests if the debtor

18   were liquidated in a Chapter 7 proceeding.  The first step in this process is to determine the

19   "liquidation value" that would be generated from a forced sale of the debtor's assets by a Chapter 7

20   trustee. The second step requires the application of the projected liquidation proceeds in

21   accordance with the various rights of creditors holding liens on the property.  For example, if a

22   claimant holds a lien on corporate equipment but not inventory, the proceeds of the liquidation

23   derived from this asset would have to be applied against this claimant's debt.  If the proceeds were

24   sufficient to retire the claimant's secured claim, then the claimant's claim would be paid in full.

25   However, if the liquidation proceeds are not sufficient, then that portion of the claim which is not

26   satisfied from the sale proceeds is treated as an unsecured claim and shares pro rata at this

27   distribution level.  This process must then be repeated as to each collateral category to ensure that

28   the claims secured by collateral are paid from their collateral and only from their collateral.

1      Once all of the claims secured by liens on assets of a debtor's estate are deducted from the

2  projected liquidation proceeds of the sale of the claimant's collateral, then the costs and expenses

3  associated with the liquidation of the estate incurred by the Chapter 7 trustee must be paid. These

4  costs would include the compensation of the trustee, as well as compensation of counsel and other

5  professionals retained by the trustee, and asset disposition expenses.

6      After payment of the costs and expenses associated with the Chapter 7 liquidation are paid,

7  all unpaid administrative expenses incurred by the debtor in its Chapter 11 case (such as

8  compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the

9  Chapter 7 case, and all unpaid claims arising from the operations of the debtor during the pendency

10  of the Chapter 11 case, must be paid.

11      After the payment of Chapter 11 administrative expenses, the remaining liquidation

12  proceeds would be used to pay priority claims, such as tax and wage claims that are entitled to

13  priority under the Bankruptcy Code. Thereafter the remaining liquidation proceeds would be made

14  available to pay general unsecured claims. Finally, to the extent that any proceeds remain after

15  paying all allowed claims, they would be distributed to interest holders in accordance with their

16  liquidation priorities.

17      Attached hereto as Exhibit "9" is a liquidation analysis prepared by the Debtors that

18  estimates the probable liquidation value of the Debtors, and applies the foregoing liquidation

19  methodology to the estimated Claims against the Estates in a Chapter 7 liquidation in an effort to

20  quantify what each Class of Creditors and Interest Holders would receive in a Chapter 7

21  liquidation. Any liquidation analysis of this nature entails a significant degree of estimation and

22  projection regarding both probable asset value and probable Allowed Claim totals. For example,

23  in preparing Exhibit "10," the Debtors have necessarily quantified what they believe will be the

24  Allowed Claims within each Class. Although this quantification was based upon information in

25  the Debtors' books and records, as the date of the preparation of the liquidation analysis, it was not

26  possible to quantify exactly the amount of Allowed Claims in that there was a substantial amount

27  of Disputed Claims and no judicial determinations had been made regarding the merits of the

28

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1   Disputed Claims. These and other factors may significantly increase or reduce the Allowed Claims

2   total within each Class.

3           On the valuation side, the Debtors have estimated the liquidation value of the Debtors'

4   assets utilizing their best estimate of the value of the Debtors' assets assuming the assets are sold

5   through a true asset sale, with each category of assets, and in some instances individual assets,

6   being sold, or collected in the case of accounts receivable and cash, with the proceeds then

7   aggregated for distribution.

8           Although liquidation values are typically substantially lower than going concern values, the

9   Debtors believe that the value differential in this case would be particularly pronounced for the

10  following reasons. Unlike a manufacturing concern, or another business that has a large

11  concentration of tangible assets or intellectual property with substantial realizable values, the

12  Debtors are in the food service industry. Their business model utilizes specialized equipment

13  much of which is "fixturized" in the restaurants. Given the current economic climate and trends in

14  the casual restaurant dining segment, this equipment has a low resale value, and the cost of

15  (i) removing the larger items of equipment from the premises where it is installed, (ii) refurbishing

16  the equipment and (iii) marketing it for resale will frequently exceed the resale value of the

17  equipment. In addition, some items are leasehold improvements that are considered fixtures and

18  may not be removed and liquidated.

19          The core value in the Debtors is derived from the revenue stream generated from the

20  Debtors' restaurants. This revenue stream is generated from a customer base that has a positive

21  perception of restaurants and the trade names under which they operate. The Debtors believe that,

22  if the Debtors ceased operating as going concerns for even an abbreviated period of time, the

23  Debtors' customers would seek alternative dining options, the Debtors' revenue stream would

24  cease, the franchisor may terminate its franchise agreement and the inherent value and goodwill in

25  the trade names under which the restaurants operate would quickly erode; these events could

26  constitute a default under the applicable ground lease. The Debtors believe that the end result

27  would necessarily be a massive and precipitous collapse in values.

28

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1     Although there are inherent difficulties in quantifying with exactitude the potential

2 recoveries that Creditors would receive in a Chapter 7 liquidation scenario, the Debtors believe that

3 the comprehensive liquidation analysis attached hereto as Exhibit "9" provides a fair estimate of

4 the results that would occur in a Chapter 7 liquidation.  As this analysis indicates, a substantial

5 portion of Debtors' assets are currently encumbered by Liens in favor of secured creditors.  Based

6 upon the foregoing valuation assumptions, and given the amount of the existing Secured Claims,

7 the Debtors believe that the Secured Claim will not be paid in full in a Chapter 7 liquidation, and

8 that Creditors holding General Unsecured Claims would receive no distributions whatsoever on

9 account of their Claims.

10     In contrast, the Debtors believe that substantially more value will be available for Creditors

11 under the terms of the Plan.  Consider the following class by class comparative analysis:

12         1.    Class 1 and 2 Claims.  In a Chapter 7 liquidation, the holders of Claims in

13 Classes 1.1 through 1.9 and 2.1 through 2.2 would, in all likelihood, have their property returned to

14 them in full satisfaction of their Allowed Secured Claims.  No funds would be available for

15 payment of these Creditors' Allowed Deficiency Claims.  In contrast, under the Plan, the holders of

16 Allowed Secured Claims on buildings, leasehold interests and equipment may receive their

17 property in satisfaction of their Allowed Secured Claims as in the Chapter 7 liquidation, and

18 receive distributions equal to the value of the assets, which value would be greater than in a

19 Chapter 7 as the valuation under the plan is based on going concern value, which is substantially

20 higher than liquidation value.  In addition, to the extent that such Creditors have Allowed

21 Deficiency Claims, these Creditors will receive a dividend of as much as 100% of their Allowed

22 Deficiency Claims, plus interest over time.  In summary, the Creditors within this Class would

23 receive at least as much under the Plan as they would receive in a Chapter 7 liquidation, and they

24 could well receive substantially more.

25         2.    Class 3 Claims.  The Debtors believe that there are no Allowed Secured

26 Capital Lease Claims.  Assuming that there proves to be Allowed Secured Capital Lease Claims, in

27 a Chapter 7 liquidation, the holders of Allowed Secured Capital Lease Claims would, in all

28 likelihood, have their equipment returned to them in full satisfaction of their Allowed Secured

MAINDOCS-#136659-v12 StarRibs_DisclosureStatement_(Carinos).DOC

1  Claims.  No funds would be available for payment of these Creditors' Allowed Deficiency Claims.

2  In contrast, under the Plan, the holders of Allowed Capital Lease Claims may receive their

3  equipment in satisfaction of their Allowed Secured Claims as in the Chapter 7 liquidation.

4  However, to the extent that such Creditors have Allowed Deficiency Claims, these Creditors will

5  receive a distribution of as much as 100% of their Allowed Deficiency Claims, plus interest over

6  time.  In summary, the Creditors within this Class would receive at least as much under the Plan as

7  they would receive in a Chapter 7 liquidation, and they could well receive substantially more.

8          3.      Class 4.  Under a Chapter 7 liquidation, the Allowed Priority Unsecured

9  Wage Claims would receive nothing.  Under the Plan, Allowed Priority Unsecured Wage Claims

10  will be paid in full.

11          4.      Class 5.  Under a Chapter 7 liquidation, Allowed General Unsecured

12  Creditors would not receive any distribution whatsoever.[13]  In contrast, under the Plan, these

13  Creditors will receive payment of as much as 100% of their Allowed General Unsecured Claims,

14  plus interest.  To gain additional insights, Allowed General Unsecured Creditors should refer to the

15  Financial Projections (defined in Section K(1) below) attached hereto as Exhibit "8."

16          5.      Class 6.  Under a Chapter 7 liquidation, the Allowed Secured Claim of

17  Imperial County, California, Tax Assessor's Office would receive nothing.  In contrast, under the

18  Plan, this Class will be paid in full over time.

19          6.      Class 7.  Under a Chapter 7 liquidation, the Allowed Secured Claim of

20  Governmental Units not Included in Class 5 would receive nothing.  In contrast, under the Plan,

21  this Class will be paid in full over time.

22          7.      Class 8.  Under a Chapter 7 liquidation and the Plan, the holders of Interests

23  in BlueOcean and SoWestBreck would not receive any distribution.  Therefore, the members of

24  this Class would receive at least as much under the Plan as they would receive in a Chapter 7

25  liquidation.

---

[13] It should be noted that, in a liquidation scenario, the amount of General Unsecured Claims may increase substantially by reason of Claims arising from the rejection of unexpired leases and executory contracts that would otherwise be assumed under the Plan.

MAINDOCS-#136659-v12 StarRibs_DisclosureStatement_(Carinos).DOC

1    In summary, the Debtors believe that the Creditors of the Estates will receive as much if not

2    substantially more under the Plan than they would receive in a Chapter 7 liquidation. Accordingly,

3    the Plan fully satisfies the "best interests" of creditors test.

4    **K.    Feasibility.**

5    1.    Projections of Future Cash Flow. Attached hereto as Exhibit "8" are

6    financial projections ("Financial Projections") prepared by the Debtors, with assistance from the

7    Debtors' CRO, which provide support for the feasibility of the Plan, pursuant to

8    Section 1129(a)(11) of the Bankruptcy Code. The Financial Projections set forth the Debtors'

9    estimate of the anticipated cash flow of the Reorganized Debtors for the term of the Plan.

10    Projections of anticipated cash flow are based, in part, upon the historical earnings of the Debtors

11    and the Debtors' historical expenses as such historical financial performance is relevant to the

12    future operations of the Reorganized Debtors, as well as anticipated trends within the casual dining

13    restaurant segment and impact the current economic climate is having on the Debtors' business.

14    Attached to the Financial Projections is a statement of the material assumptions underlying the

15    Financial Projections. Although the Debtors have devoted considerable effort to the development

16    of the Financial Projections and believe that the Financial Projections represent fairly the projected

17    future cash flow of the Reorganized Debtors, care should be taken in analyzing the Financial

18    Projections as no guarantee exists that the Financial Projections can be met by the Reorganized

19    Debtors.

20    THE FINANCIAL PROJECTIONS SET FORTH IN THIS DISCLOSURE STATEMENT

21    REPRESENT AN ESTIMATE OF FUTURE PERFORMANCE BASED UPON CERTAIN

22    ASSUMPTIONS SET FORTH WITH SUCH FINANCIAL PROJECTIONS. THESE FUTURE

23    EVENTS MAY OR MAY NOT OCCUR, AND THE FINANCIAL PROJECTIONS MAY NOT

24    BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL

25    RESULTS WHICH WILL OCCUR. BECAUSE OF THE UNCERTAINTIES INHERENT IN

26    PREDICTIONS OF FUTURE EVENTS AND EVENTS OUTSIDE OF THE DEBTORS'

27    CONTROL, THE REORGANIZED DEBTORS' ACTUAL CASH FLOW MAY WELL BE

28

DIFFERENT FROM THAT PREDICTED, AND SUCH DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF CREDITORS.

The Financial Projections are intended to assess the future cash flow available to the Reorganized Debtors for making the Distributions required by the Plan.  Significant assumptions underlying the Financial Projections include the following:

a.      Effective Date of the Plan.  For the purpose of the Financial Projections, the Debtors estimate that the Confirmation Date will occur on or about May 31, 2010 and that the Effective Date will occur on or about June 30, 2010.

b.      Revenues Generated By the Reorganized Debtors' Business Operations.  The Debtors' projections of the future revenues which will be generated by the Reorganized Debtors' business operations are derived, in large part, from the pattern exhibited by the Debtors' pre-Confirmation operations, to the extent that they are relevant.  As reflected in Exhibit "8" hereto, sales are forecasted to increase by 4.2% through 2010, and then increase by 5% in 2011, 8% in 2012, and then increase at 11% thereafter.

c.      Expenses of the Reorganized Debtors.  The Debtors have assumed, for the purpose of the Financial Projections, that the expenses of the Reorganized Debtors will remain fairly constant as a percentage of historical sales for variable cost and constant in terms of fixed cost based on current expectation during the term of the Plan.

2.      Funding of Distributions Required by the Plan.  The Debtors' Financial Projections indicate that, for each year after the Effective Date, the Reorganized Debtors will have Cash sufficient to pay the expenses which will be incurred in connection with the operation of the Reorganized Debtors' businesses and to make all payments required to be made pursuant to the Plan.

The following components are essential to the execution of the Plan:

a.      Funding of Distributions Required on or About the Effective Date.  In order to emerge from Chapter 11, the Debtors must have Cash sufficient to fund the Distributions that are required to be made on or about the Effective Date.  On or about the Effective Date, the Debtors must pay all of the Allowed Administrative Claims, Allowed Priority

-78-

Unsecured Wage Claims and the amounts necessary to cure all defaults pursuant to the executory contracts and unexpired leases which it will assume on the Effective Date (unless the non-debtor parties to such executory contracts or unexpired leases agree to different treatment of their Claims). The Debtors estimate that, on or about the Effective Date, it may have to pay the following Claims:

| | |
|---|---|
| Administrative Claims | $81,500 |
| Allowed Priority Unsecured Wage Claims | 0 |
| **TOTAL** | **$81,500** |

The Debtors' projections of the Administrative Claims related to fees of Professionals which it will have to pay on or about the Effective Date, is only an estimate, and is not to be construed as any agreement as to the amount or reasonableness of such fees. The actual fees of Professionals which may be allowed by the Bankruptcy Court and which will have to be paid by the Reorganized Debtors on or before the Effective Date may be higher or lower than the amount estimated by the Debtors.

The Debtors' projections regarding the cure of defaults regarding executory contracts and unexpired leases reflect agreements reached with the Debtors' franchisor that allow the Allowed Cure Claims to be paid over time following the Effective Date. The Debtors estimate that the total amount due to the cure claimants as of the Effective Date will be approximately $36,125,[14] which shall be paid over time as provided in the Plan.

The Debtors' Financial Projections indicate that the Reorganized Debtors will have Cash sufficient to fund the Distributions required to be paid to Creditors on or before the Effective Date.

    b.     <u>Funding of Ongoing Distributions to Holders of Allowed Claims Required by the Plan</u>. The second component essential to the execution of the Plan relates to the Reorganized Debtors' funding of the ongoing Distributions to holders of Allowed Claims required by the Plan. The Debtors' Financial Projections indicate that, over the term of the Plan, the Reorganized Debtors will have funds sufficient to timely pay their accruing obligations with

---

[14] Consist of $35,000 due to Fired Up to be paid over a six-month period from the Effective Date for reimbursement of legal fees incurred.

1    respect to the Allowed Secured Claims, the Allowed Priority Tax Claims, and the Allowed

2    General Unsecured Claims, and will be able to timely meet all of the Reorganized Debtors'

3    accruing expenses of operating the Reorganized Debtors' businesses.

4        The Debtors' Financial Projections indicate, therefore, that the Reorganized Debtors will

5    generate revenues sufficient to meet all of their obligations under the Plan, as well as to pay the

6    costs of their ongoing business operations.  While the Debtors recognize that the projections of the

7    revenues and expenses of their future business operations are subject to a variety of unpredictable

8    outside forces and circumstances which could adversely affect such projections, the Debtors

9    believe that the Financial Projections have been prepared with sufficient care to allow the Debtors

10   to endorse them.

11                                    **XVII.**

12                  **EFFECT OF CONFIRMATION OF PLAN**

13       Confirmation of the Debtors' Plan will have, in part, the following effects.

14       **A.    Discharge.**  Except as otherwise specifically provided in the Plan or in the

15   Confirmation Order, pursuant to Section 1141(d) of the Bankruptcy Code, the Distributions and

16   rights that are provided in the Plan will be in complete satisfaction, discharge and release, effective

17   as of the Effective Date, of all Claims, whether known or unknown, Liens, rights against,

18   obligations, liabilities of, and Interests in the Debtors, and any of their assets or properties,

19   regardless of whether any property will have been distributed or retained pursuant to the Plan on

20   account of such Claims, rights and Interests, including but not limited to, Claims and Interests that

21   arose before the Confirmation Date, including all debts of the kind specified in Section 502(g),

22   502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim or

23   Proof of Interest based upon such Claim or Interest is filed or deemed filed under Section 501 of

24   the Bankruptcy Code, (ii) such Claim or Interest is allowed under Section 502 of the Bankruptcy

25   Code, or (iii) the holder of such Claim or Interest accepted the Plan.  The Confirmation Order will

26   constitute a determination of the discharge of all of the Claims against and Interests in the Debtors,

27   subject to the occurrence of the Effective Date.

28

1    **B.**    **Injunction.**  Except as otherwise expressly provided in the Plan, or in the

2    Confirmation Order, on and after the Effective Date, all Creditors who have held, hold, or who

3    may hold a Claim, or Interest Holders who have held, hold, or who may hold an Interest,

4    discharged pursuant to the terms of the Plan (including but not limited to states and other

5    governmental units, and any state official, employee, or other entity acting in an individual or

6    official capacity on behalf of any state or other governmental units) will be permanently enjoined

7    from the following: (i) taking any of the following actions on account of any such discharged

8    Claim or Interest: (a) commencing or continuing in any manner any action or other proceeding

9    against the Debtors, the Reorganized Debtors, their successors, or their property; (b) enforcing,

10   attaching, executing, collecting, or recovering in any manner any judgment, award, decree, or order

11   against the Debtors, the Reorganized Debtors, their successors, or their property; (c) creating,

12   perfecting, or enforcing any Lien against the Debtors, the Reorganized Debtors, their successors,

13   or their property; (d) asserting any set off, right of subrogation, or recoupment of any kind against

14   any obligation due to the Debtors, the Reorganized Debtors, their successors, or their property; and

15   (e) commencing or continuing any action, in any manner, in any place that does not comply with

16   or is inconsistent with the provisions of the Plan; and (ii) taking any action on account of any

17   claims or rights of action that are revested in, or transferred to, the Reorganized Debtors as of the

18   Effective Date or under the Plan (to the extent that a Debtor's Estate first held such claim or right

19   of action or held the right to assert such claim or right of action after the Petition Date), including,

20   without limitation, commencing or continuing in any manner any Avoidance Action (i.e., no party

21   may pursue any avoidance claims, except for Holdco, or as otherwise provided by the Plan).  Any

22   person or entity injured by any willful violation of such injunction will recover its actual damages,

23   including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive

24   damages from the willful violator.

25                                **XVIII.**

26                    **LIMITATION OF LIABILITY AND RELEASES**

27    **A.**    **No Liability for Solicitation or Participation.**  As specified in Section 1125(e) of

28   the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan or that participate in

1   the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and

2   in compliance with the applicable provisions of the Bankruptcy Code, will not be liable, on

3   account of such solicitation or participation, for violation of any applicable law, rule, or regulation

4   governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or

5   purchase of securities.

6        **B.**    **Limitation of Liability.**  Effective as of the Effective Date, none of the Debtors,

7   Reorganized Debtors, their respective affiliates or the Committee, nor any of their respective

8   members, officers, directors, shareholders, employees and other agents, advisors and Professionals

9   will have or incur any liability to any Creditor or Interest Holder or to any other person for any act

10   or omission in connection with or arising out of the negotiation, preparation and pursuit of

11   confirmation of the Plan, the approval of this Disclosure Statement, the consummation of the Plan,

12   the administration of the Plan, the Cases or the property to be distributed under the Plan, to the

13   fullest extent permitted by applicable statutory and case law, except the Reorganized Debtors will

14   be liable for the performance of obligations assumed by them or imposed upon them under or by

15   the Plan.

16                            **XIX.**

17            **CONDITIONS TO CONFIRMATION AND EFFECTIVENESS**

18        **A.**    **Conditions Precedent to Plan Confirmation.**  The following are conditions

19   precedent to the confirmation of the Plan:

20            1.     The Bankruptcy Court will have entered the Confirmation Order.

21            2.     All agreements, instruments and other acts contemplated by, or to be entered

22   into, or completed pursuant to, or in order to facilitate the implementation of, the Plan, will have

23   been duly and validly executed and delivered by the parties thereto, and completed, as the case

24   may be, and all conditions to their effectiveness will have been satisfied or waived, except only for

25   the entry of the Confirmation Order.

26        **B.**    **Condition Precedent to Plan Effectiveness.**  As a condition precedent to the

27   effectiveness of the Plan and the occurrence of the Effective Date, the Confirmation Order must

28   become a Final Order. The Committee reserves the right to object to the form of the Confirmation

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carisos).DOC

1    Order.  In the event that an appeal, petition for certiorari or motion for reargument or rehearing or

2    comparable post-confirmation relief is filed with respect to the Confirmation Order, and no stay of

3    the effectiveness of the Confirmation Order is obtained, the Debtors may elect, in the exercise of

4    their sole and absolute discretion, to proceed with the Effective Date of the Plan and to commence

5    to consummate the Plan, by filing and serving upon counsel for the Lenders, counsel for the

6    Committee, the United States Trustee and the party seeking such post-confirmation relief, notice of

7    such election.

8       **C.     Waiver of Conditions.**  The conditions set forth in Sections 13.1 and 13.2 of the

9    Plan may be waived by the Debtors without notice, leave or order of the Bankruptcy Court, and

10   without any formal action other than proceeding to obtain the Confirmation Order and to

11   consummate the Plan.

12                                             **XX.**

13                          **RETENTION OF JURISDICTION**

14      Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective

15   Date, the Bankruptcy Court will retain jurisdiction over the Cases and any of the proceedings

16   arising from, or relating to, the Cases pursuant to Section 1142 of the Bankruptcy Code and 28

17   U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law,

18   including, without limitation, such jurisdiction as is necessary to ensure that the purposes and

19   intent of the Plan are carried out.  Without limiting the generality of the foregoing, the Bankruptcy

20   Court will retain jurisdiction for the following purposes:

21      A.      To hear and determine any and all objections to the allowance, or requests for

22   estimation, of Claims or the establishment of reserves pending the resolution of Disputed Claims;

23      B.      To consider and act on the compromise and settlement of any Claim against, or

24   cause of action on behalf of, any Debtor or any Estate, including, without limitation, any

25   Avoidance Action;

26      C.      To hear and determine any motions pending on the Effective Date to assume,

27   assume and assign or reject any executory contract or unexpired lease and to determine the

28   allowance of any Claim resulting therefrom;

-83-

1    D.    To enter such orders as may be necessary or appropriate in connection with the

2    recovery of the Debtors' assets, wherever located;

3    E.    To hear and determine any and all applications for allowance of compensation and

4    reimbursement of expenses of Professionals;

5    F.    To hear and determine any and all controversies, suits and disputes arising under or

6    in connection with the interpretation, implementation or enforcement of the Plan and any of the

7    documents intended to implement the provisions of the Plan or any other matters to be resolved by

8    the Bankruptcy Court under the terms of the Plan;

9    G.    To hear and determine any motions or contested matters involving Taxes, tax

10    refunds, tax attributes and tax benefits and similar and related matters with respect to any Debtor,

11    including, without limitation, matters involving federal, state and local Taxes in accordance with

12    Sections 346, 505 and 1146 of the Bankruptcy Code;

13    H.    To hear and determine any and all applications, adversary proceedings and

14    contested matters pending on the Effective Date or that may be commenced after the Effective

15    Date as provided in the Plan;

16    I.    To effectuate Distributions under, and performance of, the provisions of the Plan;

17    J.    To hear and determine any motion to modify any provision of the Plan after

18    confirmation of the Plan, and, if in the best interests of the Debtors and Creditors, modification of

19    the Plan even after the Plan has been substantially consummated;

20    K.    To correct any defect, cure any omission or reconcile any inconsistency in the Plan,

21    the exhibits to the Plan or this Disclosure Statement and any documents executed in connection

22    with the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, as may be

23    necessary to carry out the purposes and intent of the Plan;

24    L.    To determine such other matters as may be provided for in the Confirmation Order

25    or as may from time to time be authorized under the provisions of the Bankruptcy Code or any

26    other applicable law;

27    M.    To enforce all orders, judgments, injunctions and exculpations issued or entered in

28    connection with the Cases or the Plan;

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1     N.     To enter such orders as may be necessary or appropriate in aid of confirmation and

2 to facilitate implementation of the Plan, including, without limitation, any orders as may be

3 appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or

4 vacated;

5     O.     To determine any other matter not inconsistent with the Bankruptcy Code; and

6     P.     To issue a final decree closing the Cases.

7 **XXI.**

8 **MODIFICATION OF THE PLAN; CRAMDOWN**

9     **A.**     **Modification of the Plan.** At any time prior to the confirmation of the Plan, the

10 Debtors may supplement, amend or modify the Plan, provided that, without the consent of the

11 Committee, after the voting with respect to the Plan, the Debtors will not make any modifications

12 to the Plan which affect materially and adversely the interests of General Unsecured Creditors

13 under the Plan. The Debtors will provide to the Committee notice of any such modification of the

14 Plan, and an opportunity to be heard thereon. After confirmation of the Plan, the Debtors or

15 Reorganized Debtors may (i) apply to the Bankruptcy Court to modify the Plan, notwithstanding

16 any substantial consummation of the Plan if in the best interests of the Debtors and Creditors; and

17 (ii) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile

18 inconsistencies in the Plan.

19     **B.**     **Nonconsensual Confirmation.** In the event that any impaired Class of Claims or

20 Interests should fail to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy

21 Code, the Debtors (i) may request that the Bankruptcy Court confirm the Plan in accordance with

22 Section 1129(b) of the Bankruptcy Code, and (ii) may modify the Plan in accordance with

23 Section 1127(a) of the Bankruptcy Code and Section 15.1 of the Plan.

24 **XXII.**

25 **MISCELLANEOUS**

26     **A.**     **Payment of Statutory Fees.** All quarterly fees due and payable to the United

27 States Trustee pursuant to 28 U.S.C. 1930(a)(6) will be paid in full on or before the Effective Date,

28 or, to the extent such quarterly fees are disputed, an adequate reserve will be established and set

-85-

1   aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy Code.  The

2   Reorganized Debtors will remain responsible for timely payment of their quarterly fees due and

3   payable after the Effective Date, until the Reorganized Debtors' Cases are closed, to the extent

4   required by 28 U.S.C. 1930(a)(6).

5       **B.**    **Payment Dates.**  Whenever any Distribution to be made under the Plan becomes

6   due on a day other than a Business Day, such Distribution instead will be made, without interest,

7   on the immediately following Business Day.

8       **C.**    **Other Documents and Actions.**  The Reorganized Debtors may execute such other

9   documents and take such other actions as may be necessary or appropriate to effectuate the

10  transactions contemplated under the Plan.

11      **D.**    **Notices.**  Except as expressly set forth herein to the contrary, all notices and

12  requests in connection with the Plan and this Disclosure Statement must be in writing and must be

13  hand delivered or sent by telefacsimile, with a copy sent by first-class mail, addressed to:

14

**TO THE DEBTORS:**
Brian Weiss
Chief Restructuring Officer
c/o BSW & Associates
2020 Main Street, Suite 500
Irvine, CA 92614
Telephone: (949) 933-7011
Facsimile: (949) 428-7401

**WITH A COPY TO:**
Garrick A. Hollander, Esq.
Winthrop Couchot Professional Corporation
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

**TO THE CREDITOR BOARD MEMBER**
Al Chavez
c/o Phoenix Group Advisory Services, LLC
805 Manhattan Beach Blvd., Suite 204
Manhattan Beach, CA 90266
Telephone: (310) 546-5800
Facsimile: (310) 402-8209

-86-

**TO THE CREDITOR BOARD MEMBER**
Daniel Harrow
2312 Janet Lee Drive
La Crescent, CA 91214
Telephone: (818) 249-2271
Facsimile: (818) 249-4249

**TO THE CREDITOR BOARD MEMBER**
Lewis Jaffe
Telephone: (310) 990-7469

**WITH A COPY TO:**
Scott E. Blakeley, Esq.
Blakeley & Blakeley LLP
4685 MacArthur Court, Suite 421
Newport Beach, CA 92660
Telephone: (949) 260-0611
Facsimile: (949) 260-0613

All notices to the Creditor Board Members will be given in accordance with information to be set forth in a notice to be filed by the Committee on or before the Confirmation Date.

All notices to any Creditor or Interest Holder will be sent to it at its last known address or to the last known address of its attorney of record. Any such person may designate in writing any other address for purposes of this Paragraph, which designation will be effective on receipt thereof by the Debtors.

**E.    Governing Law.**  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) will govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

**F.    Binding Effect.**  The Plan and all rights, duties and obligations thereunder will be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, Creditors, Interest Holders, the Committee and their respective successors and assigns.

**G.    Successors and Assigns.**  The rights, benefits, and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

1    **H.    No Waiver.** The failure of the Debtors or any other entity to object to any Claim

2    for purposes of voting will not be deemed to be a waiver of the Debtors' or other entities' right to

3    object to or examine such Claim, in whole or in part.

4    **I.    Inconsistencies.** In the event that the terms or provisions of the Plan are

5    inconsistent with the terms and provisions of the exhibits to the Plan, any document executed in

6    connection with the Plan, the Disclosure Statement, or the exhibits to the Disclosure Statement,

7    the terms of the Plan will control.

8    **J.    Exemption from Certain Transfer Taxes and Recording Fees.** Pursuant to

9    Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or

10    to any other person or entity pursuant to, or implemented by, the Plan (including, without

11    limitation, the granting of a security interest) will not be subject to any document recording tax,

12    stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer

13    tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar

14    tax or governmental assessment. The Confirmation Order will direct the appropriate state or local

15    governmental officials or agents to forego the collection of any such tax or governmental

16    assessment and to accept for filing and recordation any of the foregoing instruments or other

17    documents without the payment of any such tax or governmental assessment.

18    **K.    Exemption from Securities Laws.** Pursuant to Section 1145, the offer or sale of a

19    security of a successor to the Debtors under the Plan shall not require registration for offer or sale

20    of such security or registration or licensing of an issue of, underwriter of, or broker or dealer in,

21    such a security, as such offer or sale under the Plan is in exchange for a Claim against the Debtors.

22    **L.    Post-Confirmation Status Report.** Within 180 days following the entry of the

23    Confirmation Order, the Reorganized Debtors will file with the Bankruptcy Court a status report

24    explaining the progress made toward consummation of the Plan. The status report will be served

25    on the United States Trustee, the Creditor Board Members, and any parties who file a request for

26    special notice of post-confirmation matters. Unless otherwise ordered by the Bankruptcy Court,

27    further status reports will be filed every 180 days and served on the same entities.

28

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC

**M.**     <u>**Post-Confirmation Conversion/Dismissal.**</u>  A Creditor or other party-in-interest may file a motion to convert or dismiss the Cases under Section 1112(b), if there is a default by the Reorganized Debtors in performing the Plan.  The Reorganized Debtors reserve the right to object to any such motion for conversion or dismissal.

**N.**     <u>**Changes in Rates Subject to Regulatory Commission Approval.**</u>  The Debtors are not subject to governmental regulatory commission approval of their rates.

**O.**     <u>**Final Decree.**</u>  Unless earlier filed by the Reorganized Debtors, by the thirtieth (30th) day after the filing of the Reorganized Debtors' Certification, in accordance with Rule 3022 of the Bankruptcy Rules, the Reorganized Debtors will file an application with the Bankruptcy Court to obtain a final decree to close the Cases of the Reorganized Debtors.

## XXIII.

## CONCLUSION

The materials provided in this Disclosure Statement are intended to assist Creditors in voting on the Plan.  If the Plan is confirmed, Creditors will be bound by the terms of the Plan.  Therefore, all Creditors are urged to review this material and to make such further inquiries as they deem appropriate, and then cast an informed vote on the Plan.

Date:  March 18, 2010                          **BLUEOCEAN PARTNERS, LP**
                                               **a California limited partnership**

                                               By: */s/ Brian Weiss*
                                                      Brian Weiss,
                                                      Its:  Chief Restructuring Officer

Date:  March 18, 2010                          **SOWESTBRECK, LLC**
                                               **a California limited liability company**

                                               By: */s/ Brian Weiss*
                                                      Brian Weiss,
                                                      Its:  Chief Restructuring Officer

*[SIGNATURES CONTINUED ON NEXT PAGE]*

-89-

1

**SUBMITTED BY:**

2

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**

3

By: /s/ *Garrick A. Hollander*

4

       Marc J. Winthrop

5

       Garrick A. Hollander
General Insolvency Counsel to the

6

Debtors and Debtors-in-Possession

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#136659-v12-StarRibs_DisclosureStatement_(Carinos).DOC