1    MARC J. WINTHROP -- State Bar No. 63218
mwinthrop@winthropcouchot.com
2    GARRICK A. HOLLANDER -- State Bar No. 166316
ghollander@winthropcouchot.com
3    **WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
4    660 Newport Center Drive, Ste 400
Newport Beach, CA 92660
5    Telephone:  (949) 720-4100
Facsimile:   (949) 720-4111
6
General Insolvency Counsel for
7    Debtors and Debtors-in-Possession

8

9                    **UNITED STATES BANKRUPTCY COURT**

10                    **CENTRAL DISTRICT OF CALIFORNIA**

11                    **SANTA ANA DIVISION**

12

13    In re:                              Case No. 8:08-bk-17182 TA

14    ☐ STARRIBS NORTH, LP                Jointly Administered with Case Nos.
☐ STARRIBS SOUTH, LP                8:08-bk-17183 TA; 8:08-bk-17187 TA;
15    ☐ WHITTOWN PARTNERS, LP             8:08-bk-17193 TA; 8:08-bk-17194 TA;
☐ OCEANCOUNTRY, LP                  8:09-bk-13275 TA and 8:09-bk-13590 TA
16    ☒ BLUEOCEAN PARTNERS, LP
☐ STONERIVER PARTNERS, LP           Chapter 11 Proceedings
17    ☒ SOWESTBRECK, LLC
**DEBTORS' AMENDED CHAPTER 11 PLAN**
18    ☐ All Debtors                       **OF REORGANIZATION**

19                                        **Plan Confirmation Hearing**
Debtors and                    Date:    April 21, 2010
20    Debtors-in-Possession.          Time:    10:00 a.m.
Place:   Courtroom 5B
21                                                 411 West Fourth Street
22                                                 Santa Ana, California 92701

23

24

25

26

27

28

**TABLE OF CONTENTS**

PAGE

I.    INTRODUCTION ................................................................................. 2

II.   DEFINITIONS AND RULES OF INTERPRETATION ........................ 3
      2.1   Definitions .......................................................................... 3
      2.2   Rules of Construction ........................................................ 16
      2.3   Exhibits and Schedules ..................................................... 16

III.  SUBSTANTIVE CONSOLIDATION OF THE DEBTORS .................. 17

IV.   UNCLASSIFIED CLAIMS ................................................................. 17
      4.1   Administrative Claims ....................................................... 17
            4.1.1   Payment Generally .................................................. 18
            4.1.2   Waiver of Claims ..................................................... 18
            4.1.3   Administrative Claims Bar Date .............................. 18
      4.2   Priority Tax Claims ........................................................... 18

V.    CLASSIFICATION OF CLAIMS AND INTERESTS ......................... 19
      5.1   General Overview .............................................................. 19
      5.2   Designation of Classes ...................................................... 20

VI.   PROVISIONS FOR THE TREATMENT OF CLAIMS
      AND INTERESTS ............................................................................. 20
      6.1   Classes 1.1 Through 1.9 ..................................................... 20
            6.1.1   Allowance of Secured Claims .................................. 20
            6.1.2   Payment of Allowed Secured Claim ......................... 21
                    6.1.2.1   Option 1 ...................................................... 21
                    6.1.2.2   Option 2 ...................................................... 22
                    6.1.2.3   Option 3 ...................................................... 22
            6.1.3   Insurance ................................................................. 22
            6.1.4   Late Fees and Event of Default ................................ 22
            6.1.5   Inspection of Equipment .......................................... 23
      6.2   Classes 2.1 Through 2.2 ..................................................... 23
            6.2.1   Allowance of Secured Claims .................................. 23
            6.2.2   Payment of Allowed Secured Claims ........................ 23
      6.3   Class 3 -- Allowed Secured Capital Lease Claims ............... 24
            6.3.1   Option 1 .................................................................. 24
            6.3.2   Option 2 .................................................................. 25
            6.3.3   Option 3 .................................................................. 25
      6.4   Class 4 -- Allowed Priority Unsecured Wage Claims .......... 25
      6.5   Class 5 -- Allowed General Unsecured Claims .................... 25
            6.5.1   Equity Interest in Holdco ........................................ 25
            6.5.2   Payment of Claims .................................................. 26
            6.5.3   Holdco Board ......................................................... 26
            6.5.4   Waiver of Gantes Parties' Claims ............................ 27
            6.5.5   Waiver ................................................................... 27

**TABLE OF CONTENTS**

**(Continued)**

| | | | PAGE |
|---|---|---|---|
| | 6.6 | Class 6 -- Any Allowed Secured Claim of Governmental Units | 27 |
| | 6.7 | Class 7 -- Any Allowed Non-Pecuniary Loss Penalty Claims | 28 |
| | 6.8 | Class 8 -- Interests in BlueOcean and SoWestBreck | 28 |
| VII. | | MEANS FOR IMPLEMENTING THE PLAN | 28 |
| | 7.1 | Introduction | 28 |
| | 7.2 | The Reorganized Debtors | 28 |
| | | 7.2.1 General Unsecured Creditors' Interest in Holdco | 28 |
| | | 7.2.2 Gantes's Interest in Holdco | 29 |
| | 7.3 | Management/Board of Directors | 29 |
| | | 7.3.1 Compensation for Independent Holdco Board Members | 30 |
| | | 7.3.2 Management of Operations | 30 |
| | | 7.3.3 Subco's Management Fee to Holdco | 32 |
| | 7.4 | Corporate Actions | 32 |
| | 7.5 | Transfer of Estate Property to Reorganized Debtors | 33 |
| | 7.6 | Funding of the Plan | 33 |
| | 7.7 | Post-Confirmation Estate Claims | 33 |
| | 7.8 | Avoidance Actions | 34 |
| | 7.9 | Disposition of Assets | 35 |
| | 7.10 | Compromise of Controversies | 35 |
| | 7.11 | Bankruptcy Court Approval Relative to Post-Confirmation Matters | 35 |
| | 7.12 | Debtors' Right of Setoff | 35 |
| | | 7.12.1 Setoffs with Respect to Pre-Confirmation Taxes | 35 |
| | 7.13 | Cash Payments | 36 |
| | 7.14 | Reorganized Debtors' Certification | 36 |
| VIII. | | DISTRIBUTIONS | 36 |
| | 8.1 | Distribution Agent | 36 |
| | 8.2 | Distributions | 36 |
| | | 8.2.1 Dates of Distributions | 36 |
| | | 8.2.2 Limitation on Liability | 36 |
| | 8.3 | Instruments and Securities | 37 |
| | | 8.3.1 Rights of Persons Holding Instruments and Securities | 37 |
| | | 8.3.2 Cancellation of Liens | 37 |
| | 8.4 | De Minimis Distributions | 37 |
| | 8.5 | Delivery of Distributions | 37 |
| | 8.6 | Undeliverable Distributions | 38 |
| | 8.7 | Disposition of Unclaimed Property | 38 |

MAINDOCS-#138153-v6-StarRibs_Revised_Plan__Carino_s_.DOC

**TABLE OF CONTENTS**

**(Continued)**

| | | PAGE |
|---|---|---|
| IX. | OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS | 39 |
| | 9.1 Objections to Claims | 39 |
| | 9.2 Schedule of Disputed Claims | 39 |
| | 9.3 Treatment of Disputed Claims | 40 |
| | 9.3.1 No Distribution Pending Allowance | 40 |
| | 9.3.2 Distribution After Allowance | 40 |
| | 9.3.3 Reserves for Disputed Claims | 40 |
| X. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 41 |
| | 10.1 Executory Contracts Being Assumed | 41 |
| | 10.2 Payment of Cure Claims | 42 |
| | 10.3 Executory Contracts Being Rejected | 42 |
| | 10.4 Retention of Property Rights by Reorganized Debtors | 43 |
| | 10.5 Bar Date for Rejection Damages | 43 |
| | 10.6 Claims Schedule | 43 |
| XI. | EFFECT OF CONFIRMATION OF THIS PLAN | 44 |
| | 11.1 Discharge | 44 |
| | 11.2 Injunction | 44 |
| XII. | LIMITATION OF LIABILITY AND RELEASES | 45 |
| | 12.1 No Liability for Solicitation or Participation | 45 |
| | 12.2 Limitation of Liability | 46 |
| XIII. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS | 46 |
| | 13.1 Conditions Precedent to Plan Confirmation | 46 |
| | 13.2 Condition Precedent to Plan Effectiveness | 46 |
| | 13.3 Waiver of Conditions | 47 |
| XIV. | RETENTION OF JURISDICTION | 47 |
| XV. | MODIFICATION OF THE PLAN; CRAMDOWN | 49 |
| | 15.1 Modification of this Plan | 49 |
| | 15.2 Nonconsensual Confirmation | 49 |
| XVI. | MISCELLANEOUS | 49 |
| | 16.1 Payment of Statutory Fees | 49 |
| | 16.2 Payment Dates | 50 |
| | 16.3 Other Documents and Actions | 50 |
| | 16.4 Notices | 50 |
| | 16.5 Governing Law | 51 |
| | 16.6 Binding Effect | 51 |
| | 16.7 Successors and Assigns | 51 |

1

## TABLE OF CONTENTS

2

### (Continued)

3

| | | PAGE |
|---|---|---|
| 16.8 | No Waiver | 51 |
| 16.9 | Inconsistencies | 52 |
| 16.10 | Exemption from Certain Transfer axes and Recording Fees | 52 |
| 16.11 | Exemption from Securities Laws | 52 |
| 16.12 | Post-Confirmation Status Report | 52 |
| 16.13 | Post-Confirmation Conversion/Dismissal | 52 |
| 16.14 | Changes in Rates Subject to Regulatory Commission Approval | 53 |
| 16.15 | Final Decree | 53 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#138153-v6-StarRibs_Revised_Plan__Carino_s_.DOC

# I.

## **INTRODUCTION**

BlueOcean and SoWestBreck filed voluntary petitions under Chapter 11 of the Bankruptcy Code on November 6, 2008 and April 23, 2009, respectively.[1] Since each respective Petition Date, the Debtors have continued to operate their businesses in the ordinary course as debtors-in-possession. On November 6, 2008 and April 23, 2009, the Bankruptcy Court entered orders authorizing the joint administration of the cases of BlueOcean and SoWestBreck, respectively, along with the above-captioned bankruptcy cases.

The document that you are reading is a plan of reorganization. This Plan provides for the preservation of the Debtors' businesses through a comprehensive reorganization and debt recapitalization. Under this Plan, the Allowed Claims of Creditors will be paid in full in accordance with the terms and conditions of this Plan, primarily from the proceeds of the continued operations of the Debtors, and will otherwise be discharged. While the Debtors cannot predict when creditors will be paid in full, the projections attached as Exhibit "8" to the Disclosure Statement accompanied with this Plan represent the Debtors' best estimate at this time.

Sent to you in the same envelope as this Plan is the Debtors' Disclosure Statement. The Disclosure Statement has been approved by the Bankruptcy Court, and is being provided along with this Plan in order to provide to you critical information about the Debtors and to help you understand this Plan and to evaluate the merits of this Plan. The Disclosure Statement discusses the Debtors' businesses, the results of the Debtors' operations, the Debtors' assets and liabilities, projections, and a summary and discussion of this Plan. Creditors and Interest Holders and parties to executory contracts and unexpired leases are encouraged to read the Disclosure Statement. No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith and approved for solicitation purposes by the Bankruptcy Court, have been authorized for use in soliciting acceptances or rejections of this Plan.

---

[1] Unless otherwise defined in this Plan, the definitions of the capitalized terms contained in this Plan are set forth in Article II herein.

## II.

## DEFINITIONS AND RULES OF INTERPRETATION

    **2.1**    **Definitions**. The following defined terms are used in this Plan. Any capitalized term that is not defined herein, but that is defined in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

    2.1.1    "Administrative Claim" means a Claim for costs and expenses of the administration of a Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including, without limitation, a Claim of a Professional employed at the expense of an Estate and any fees or charges asserted against an Estate under 28 U.S.C. § 1930.

    2.1.2    "Administrative Tax Claim" means a request by a Governmental Unit for payment of Administrative Claims for Taxes (and for interest or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs within the period from and including the Petition Date through and including the Effective Date.

    2.1.3    "Allowable Interest Rate" means the interest rate that is fixed at one percentage point (1%) over the prime rate of interest as published in the Wall Street Journal on the Effective Date.

    2.1.4    "Allowed Administrative Claim" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(a)(1) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

    2.1.5    "Allowed Claim" means a Claim that is either (i) listed in the Schedules filed with the Bankruptcy Court by the Debtors and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection has been filed; or (ii) with respect to which a Proof of Claim has been filed within the time period fixed by the Bankruptcy Court, and as to which no objection was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, this Plan or order of the Bankruptcy Court, or as to which any such objection has been determined by a Final Order. The amount of an Allowed Claim shall be as follows: (a) if the Creditor did not file a Proof of Claim with the Bankruptcy Court on or before the Bar Date, the amount of the Creditor's Claim as listed in the Schedules as neither disputed, contingent, unliquidated or unknown; or (b) if the Creditor filed a Proof of Claim with the Bankruptcy Court

1   on or before the Bar Date, (1) the amount stated in such Proof of Claim if no objection to such

2   Proof of Claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy

3   Rules, this Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final

4   Order of the Bankruptcy Court if an objection to such Proof of Claim was filed within the time

5   period fixed by the Bankruptcy Code, the Bankruptcy Rules, this Plan or order of the Bankruptcy

6   Court.  Any Claim that is not filed by the applicable Bar Date and that is listed as disputed,

7   unliquidated, contingent or unknown, or that is not allowed under the terms of this Plan, shall be

8   zero, and no Distribution shall be made on account of such Claim.

9            2.1.6    "Allowed Cure Claims" means an Allowed Claim for Cure Claims

10   pursuant to the terms of this Plan and a Final Order.

11           2.1.7    "Allowed Deficiency Claim" means that portion of an Allowed Claim

12   which is in excess of the value of any collateral which is security for the repayment of the Claim,

13   calculated in accordance with the provisions of Section 506 of the Bankruptcy Code.  Unless the

14   Creditor should make an election under Section 1111(b) of the Bankruptcy Code, an Allowed

15   Deficiency Claim is treated hereunder as a Class 5 Allowed General Unsecured Claim.

16           2.1.8    "Allowed General Unsecured Claim" means an unsecured Allowed Claim

17   against the Debtors, however arising, not entitled to priority under Section 507(a) of the

18   Bankruptcy Code, including, without limitation, a Rejection Claim.

19           2.1.9    "Allowed Interest" means an Interest to the extent, and only to the extent,

20   of the allowed amount of such Interest.  The amount of an Allowed Interest shall be (i) the amount

21   provided by or established in the records of the Debtors on the Confirmation Date, provided,

22   however, that a timely filed Proof of Interest shall supersede any listing of such Interest on the

23   records of the Debtors; (ii) the amount stated in a timely filed Proof of Interest if no objection to

24   such Interest is filed prior to the Confirmation Date or such later date as the Bankruptcy Court

25   allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

26           2.1.10   "Allowed Non-Pecuniary Loss Penalty Claim" means an Allowed Claim

27   for non-pecuniary loss penalties of the type described in Section 726(a)(4).

28

1        2.1.11    "Allowed Priority Tax Claim" means an Allowed Claim provided for by

2    Section 507(a)(8) of the Bankruptcy Code.

3        2.1.12    "Allowed Priority Unsecured Wage Claim" means an unsecured Allowed

4    Claim entitled to priority under Sections 507(a)(3) or (4) of the Bankruptcy Code.

5        2.1.13    "Allowed Section 503(b)(9) Administrative Claims" means an Allowed

6    Claim entitled to administrative priority pursuant to Section 503(b)(9) of the Bankruptcy Code.

7        2.1.14    "Allowed Secured Claim" means an Allowed Claim secured by a valid

8    and unavoidable Lien against property in which an Estate has an interest, or which is subject to

9    setoff under Section 553 of the Bankruptcy Code, to the extent of the value, determined in

10   accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such

11   Allowed Claim in the Estate's interest in such property, or to the extent of the amount subject to

12   any setoff, as the case may be.

13       2.1.15    "Allowed Secured Capital Lease Claim" means the Allowed Secured

14   Claim of a Creditor under a capital lease.

15       2.1.16    "Avoidance Action" means any action or proceeding filed pursuant to the

16   provisions of Sections 510, 542, 543, 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code, or

17   any similar action or proceeding filed to recover property for or on behalf of an Estate or to avoid

18   a Lien or transfer.

19       2.1.17    "Bankruptcy Code" means Title 11, United States Code, as amended. All

20   citations in this Plan to Section numbers are to the Bankruptcy Code, unless otherwise expressly

21   stated herein.

22       2.1.18    "Bankruptcy Court" means the United States Bankruptcy Court for the

23   Central District of California, Santa Ana Division, which has jurisdiction over the Cases and the

24   Estates of the Debtors, or such successor court or tribunal as may hereafter be confirmed or

25   created by lawful authority with power to confirm reorganization plans under Chapter 11 of the

26   Bankruptcy Code and all applicable statutes, rules and regulations pertaining thereto.

27

28

MAINDOCS-#138153-v6-StarRibs_Revised_Plan__Carino_s_DOC

1    2.1.19  "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy

2    Procedure, as amended, and the Local Bankruptcy Rules for use in the United States Bankruptcy

3    Court for the Central District of California, as amended.

4    2.1.20  "Bar Date" means the last date for creditors and equity security holders

5    whose claims or interests are not scheduled, or are scheduled as disputed, contingent, or

6    unliquidated in the Debtors' Schedules to file Proofs of Claim, except for the following Claims:

7    (i) Administrative Claims other than Section 503(b)(9) Administrative Claims, and (ii) Rejection

8    Claims.  The Bar Date for BlueOcean is May 5, 2009 and for SoWestBreck is April 28, 2010.

9    2.1.21  "BlueOcean" means BlueOcean, LP, one of the jointly administered

10   debtors in the above captioned cases.

11   2.1.22  "Budget" means an annual operating budget of the Reorganized Debtors

12   which shall be approved by the Holdco Board.

13   2.1.23  "Business Day" means any day, other than a Saturday, a Sunday or a

14   "legal holiday," as defined in Rule 9006(a) of the Bankruptcy Rules.

15   2.1.24  "Capital Lease" means a transaction in the form of a lease that creates a

16   security interest pursuant to Section 1203 of the California Commercial Code.

17   2.1.25  "Carino's" means the Carino's Italian Grill restaurants owned and

18   operated by BlueOcean and SoWestBreck under the Fired Up, Inc. franchise agreement.

19   2.1.26  "Cases" means the Chapter 11 cases commenced by the Debtors on their

20   respective Petition Dates and pending before the Bankruptcy Court, as Case Nos. 8:08-bk-

21   17194 TA and 8:09-bk-13590 TA.

22   2.1.27  "Cash" means cash and cash equivalents including, but not limited to,

23   checks or similar forms of payment or exchange.

24   2.1.28  "Claim" means (i) a right to payment from the Debtors, whether or not

25   such right to payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

26   unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (ii) a right to an

27   equitable remedy for breach of performance if such breach gives rise to a right to payment from

28

-6-

1   the Debtors whether or not such right to an equitable remedy is reduced to judgment, liquidated,

2   unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

3          2.1.29    "Claims Objection Deadline" means, the latest of the following: (i) the

4   one hundredth (100th) day after the Effective Date; (ii) with respect to a specific Claim, the one

5   hundredth (100th) day after a Proof of Claim with respect to such Claim is filed by a Creditor, or

6   (iii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by

7   agreement between a Debtor or Reorganized Debtor and the Creditor.

8          2.1.30    "Class" means the group of Claims or Interests classified in Article V of

9   this Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

10         2.1.31    "Class 1 Event of Default" means a material breach of the Debtors'

11  obligations to any Creditor of Class 1.1 through 1.9 under this Plan as against such Creditor.

12         2.1.32    "Committee" means the duly appointed and acting Official Committee of

13  Creditors Holding Unsecured Claims in the Cases, and its successor under this Plan, the Holdco

14  Board.

15         2.1.33    "Confirmation Date" means the date on which the Bankruptcy Court

16  enters the Confirmation Order.

17         2.1.34    "Confirmation Hearing" means the hearing(s) scheduled by the

18  Bankruptcy Court for the purpose of considering the confirmation of this Plan.

19         2.1.35    "Confirmation Order" means the order, as entered, of the Bankruptcy

20  Court confirming this Plan.

21         2.1.36    "Creditor" means the holder of an Allowed Claim or Allowed

22  Administrative Claim.

23         2.1.37    "Creditor Board Member" means a person that serves as a member of the

24  Holdco Board pursuant to the Plan.

25         2.1.38    "Creditor Involvement Period" means the period of time from the

26  Effective Date through the date at which point the General Unsecured Creditors no longer own an

27  Interest in Holdco pursuant to the terms of this Plan.

28

-7-

2.1.39   "Cure Claims" means the amounts necessary to cure any defaults under executory contracts and unexpired leases assumed under this Plan.

2.1.40   "Cure Claims Schedule" means the schedule of the Cure Claims, which shall be filed with the Bankruptcy Court, and served on the Committee, on or before the twenty-fourth (24th) day prior to the Confirmation Hearing.

2.1.41   "Debtors" means BlueOcean and SoWestBreck.  For the purpose of this Plan, reference to "Debtors" shall include the Reorganized Debtors.

2.1.42   "Disclosure Statement" means the Debtors' Amended Disclosure Statement, as the same may be amended or modified from time to time.

2.1.43   "Disputed Claim" means all or any part of a Claim as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and the Claim is listed in the Schedules as unliquidated, disputed, contingent or unknown, or; (ii) the Claim is the subject of a timely objection or request for estimation which is filed on or before the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or determined by a Final Order.  In addition, prior to the earlier of (a) the Claims Objection Deadline, and (b) such date as the Bankruptcy Court allows the Claim pursuant to a Final Order, any Claim that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of calculating and making any Distributions under this Plan if: (1) no Claim corresponding to the Proof of Claim is listed in the Schedules, (2) the Claim corresponding to the Proof of Claim is listed in the Schedules as disputed, contingent, unliquidated or unknown, (3) the amount of the Claim as specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the priority or classification of the Claim as specified in the Proof of Claim differs from the priority of any corresponding Claim listed in the Schedules.

2.1.44   "Disputed Claims Reserve" means a segregated, interest-bearing trust account for the benefit of General Unsecured Creditors, established at a financial institution that is an authorized depository under United States Trustee guidelines, into which the Distribution Agent will deposit the Distributions required by Section 9.3.3 hereof.

-8-

1            2.1.45    "Disputed Claims Schedule" means the schedule setting forth a list of

2  Disputed Claims to which the Debtors intend to object.

3            2.1.46    "Distribution" means the Cash that is required to be distributed under this

4  Plan to the holders of Allowed Claims.

5            2.1.47    "Distribution Agent" means Holdco or its designee.

6            2.1.48    "Downey Restaurant" means the Carino's Restaurant located at

7  12036 Lakewood Boulevard, Downey, California 90242.

8            2.1.49    "Effective Date" means a date to occur on or before the thirtieth (30th)

9  day after the satisfaction or waiver of the conditions set forth in Sections 13.1 and 13.2 of this

10  Plan.

11           2.1.50    "Estates" means the Debtors' bankruptcy estates created under

12  Section 541 of the Bankruptcy Code in the Cases.

13           2.1.51    "Excess Cash" means the aggregate of each of the Restaurants'

14  semiannual net income generated post-confirmation, plus cash on hand, depreciation, amortization

15  and non-cash items, minus the following: (i) payments for debt service, if any, including principal

16  and interest; (ii) capital expenditures; (iii) payments made on Allowed Administrative Claims;

17  (iv) payments made on Allowed Priority Unsecured Wage Claims; (v) payments made on Allowed

18  Priority Tax Claims; (vi) payments made on Allowed Cure Claims; and (vii) Minimum Cash

19  Balance.

20           2.1.52    "Fair Market Value" means the value of an asset based on a going concern

21  basis, as determined by an independent third party holding requisite appraiser credentials.

22           2.1.53    "Final Order" means an order or judgment of the Bankruptcy Court, or of

23  any court of competent jurisdiction where there is pending an action in which a Debtor, a

24  Reorganized Debtor, or the Committee is a party, as to which the time to appeal, petition for

25  certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for

26  certiorari, or other proceeding for reargument or rehearing shall then be pending or as to which

27  any right to appeal, petition for certiorari, move to reargue, or to rehear shall have been waived in

28  writing in form and substance satisfactory to the Debtor or to the Reorganized Debtor.

2.1.54    "Fired Up" means Fired Up, Inc., the franchisor of the Debtors' Carino's restaurants.

2.1.55    "First Payment Date" means the first Business Day of the first full month following the Effective Date.

2.1.56    "Franchisor" means Fired Up.

2.1.57    "Gantes" means John D. Gantes, or as it relates to Interests in Holdco, as set forth in subsections 7.2.1 and 7.2.2, means John D. Gantes or an entity designated by John D. Gantes, as applicable.

2.1.58    "Gantes Involvement Period" means the period of time that Gantes continues to be actively engaged in providing management services with respect to Holdco and the Subcos pursuant to a management agreement either directly or through Managementco.

2.1.59    "Gantes Parties" means Gantes, Allan Gantes, James Gantes, George Gantes, and all other family members of and related parties to the foregoing, and any and all affiliates of the Debtors and all other entities in which Gantes or a related party to Gantes hold an interest.

2.1.60    "General Administrative Claims Bar Date" means the date by which all requests for payment of Administrative Claims, with the exception of Administrative Tax Claims and Section 503(b)(9) Administrative Claims, shall be filed with the Bankruptcy Court and served upon the Reorganized Debtors, which date shall be no later than sixty (60) days after the Effective Date.

2.1.61    "General Unsecured Claim" means an unsecured Claim against the Debtor, however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, a Rejection Claim.

2.1.62    "General Unsecured Creditor" means the holder of an Allowed General Unsecured Claim.

2.1.63    "Governmental Unit" shall have the meaning provided in Section 101(27) of the Bankruptcy Code.

1    2.1.64    "Holdco" means a Delaware corporation, or such other corporate entity as

2    the Debtor determined to be in the best interests of creditors, which will be formed and will be the

3    parent company that will manage and own 100% of the Interests in all Subcos, each of which will

4    own one Restaurant.

5    2.1.65    "Holdco Board" means the board of directors of Holdco.

6    2.1.66    "Independent Holdco Board Member" means a member of the Holdco

7    Board that is not employed or otherwise compensated (other than through director fees) by

8    (a) Holdco, (b) a Subco, (c) Synergy, or (d) any affiliate or related party of Synergy or Gantes.

9    2.1.67    "Initial Distribution Date" means the date on which the first Distribution

10    is made to a Class.

11    2.1.68    "Interest" means any equity security in any Debtor or Reorganized

12    Debtor, as provided by Section 101(16) of the Bankruptcy Code, including, without limitation, any

13    common stock interest, preferred stock interest, stock option, warrant, partnership interest, or

14    membership interest.

15    2.1.69    "Interest Holder" means the holder of an Interest in a Debtor.

16    2.1.70    "Internal Revenue Code" means the Internal Revenue Code of 1986, as

17    amended.

18    2.1.71    "Lenders" means, collectively all of the Creditors in Classes 1.1

19    through 1.9.

20    2.1.72    "Lien" means any lien, encumbrance, pledge or other charge against

21    property.

22    2.1.73    "Major Decisions" means significant and important decisions to be made

23    by the Reorganized Debtors, including any of the following regarding  Holdco, any Sub and/or

24    any Restaurant:  (a) issuing or repurchasing any beneficial interest in Holdco; (b) issuing,

25    increasing, amending or repurchasing debt; (c) acquisitions or divestitures of any business or any

26    assets (other than inventory in the normal course of business); (d) approval of an annual Budget;

27    (e) capital expenditures above approved budgeted amounts; (f) any merger, restructuring or other

28    reorganization; (g) dividends, distributions or other payments to or on behalf of holders of

-11-

beneficial interests in Holdco; (h) any other extraordinary expenditure; (i) entering into contracts or obligations; (j) changes or amendments to the Managementco contract; (k) opening or closing of a restaurant; (l) compliance with the terms of this Plan; or (m) bankruptcy or other insolvency related action, any liquidation or dissolution, or any similar action.

2.1.74   "Management Agreement" means the management services agreement entered into between Managementco and each Subco.

2.1.75   "Managementco" means a designated management company that will oversee day-to-day restaurant operations, marketing, information technology and back-office functions of the Subcos post-confirmation, including paying independent vendors, suppliers and employees of all Subcos.

2.1.76   "Minimum Cash Balance" means the minimum amount of cash that each Restaurant must maintain after payment of capital expenditures, debt service, and the required semiannual payments under this Plan on account of Allowed Administrative Claims, Allowed Priority Unsecured Wage Claims, Allowed Priority Tax Claims and Allowed Cure Claims, which initially shall be $75,000, but which may be modified from time to time by the Holdco Board.

2.1.77   "Natomas Equipment" means the furniture, fixture and equipment used by and located at the Natomas Restaurant.

2.1.78   "Natomas Restaurant" means that Carino's Restaurant located at 3860 Truxel Road, Sacramento, California.

2.1.79   "Net Proceeds" means the proceeds generated from the pursuit of Post-Confirmation Estate Claims, net of all attorneys' fees and other costs necessary to recover such proceeds.

2.1.80   "Objection Value" means the highest Fair Market Value of property asserted by a Creditor in opposition to the Debtors' asserted value in this Plan of a property securing such Creditor's Claim.

2.1.81   "Paid in Full" means the Debtor's payment obligations to a particular Class of Creditor under this Plan have been fully satisfied.

-12-

2.1.82    "Petition Date" means the date on which each Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code (November 6, 2008 for BlueOcean and April 12, 2009 for SoWestBreck).

2.1.83    "Plan" means this Chapter 11 Amended Plan of Reorganization, together with the exhibits and schedules hereto, as the same may be amended or modified from time to time.

2.1.84    "Post-Confirmation Estate Claims" means any and all claims and causes of action that constitute property of the Estates including, but not limited to, any Avoidance Actions and any causes of action or claims for recovery of any amounts owing to the Debtors or the Estates.

2.1.85    "Priority Tax Claim" means any Claim provided for by Section 507(a)(8) of the Bankruptcy Code.

2.1.86    "Priority Tax Claim Semiannual Yield" means the semiannual rate of return paid to Creditors holding Allowed Priority Tax Claims, which shall be calculated by the quotient of the semiannual cash payment made to the Creditors holding Allowed Priority Tax Claims divided by the total Allowed Priority Tax Claims.

2.1.87    "Priority Tax Creditor" means a holder of an Allowed Priority Tax Claim.

2.1.88    "Priority Unsecured Claim" means any Claim provided for by Section 507(a)(3) or (4) of the Bankruptcy Code.

2.1.89    "Professional" means a person or entity employed by the Debtors or by the Committee pursuant to a Final Order in accordance with Sections 327 or 1103 of the Bankruptcy Code.

2.1.90    "Proof of Claim" means a written statement filed in a Case by a Creditor in which the Creditor sets forth the amount of its Claim, in accordance with Rule 3001 of the Bankruptcy Rules.

2.1.91    "Proof of Interest" means a written statement filed in a Case by an Interest Holder in which the Interest Holder sets forth the amount of its Interest.

MAINDOCS-#138153-v6-StarRibs_Revised_Plan__Carino_s_.DOC

2.1.92    "Pro Rata" means proportionately, so that with respect to any Distribution in respect of any Allowed Claim, the ratio of (i) (a) the amount of property distributed or reserved on account of such Allowed Claim to (b) the amount of such Allowed Claim, is the same as the ratio of (ii) (a) the amount of property distributed or reserved on account of all Allowed Claims of the Class sharing in such Distribution to (b) the amount of all Allowed Claims in such Class.

2.1.93    "Rejection Claim" means any Claim based upon, or arising from, the rejection of any executory contract or unexpired lease pursuant to order of the Bankruptcy Court or pursuant to this Plan.

2.1.94    "Reorganized Debtors" means the Debtors, as reorganized under the terms of this Plan on and after the Effective Date, and any successors thereto by merger, consolidation, acquisition, or otherwise, which, as contemplated by this Plan, would include Holdco and all Subcos.

2.1.95    "Reorganized Debtors' Certification" means a certification by a person with requisite authority on behalf of the Reorganized Debtors stating that, in their sole and absolute discretion, the Reorganized Debtors have determined that all Allowed Claims have been duly paid and that all Post-Confirmation Estate Claims and objections to Disputed Claims have been resolved by Final Order, which certification shall be filed with the Bankruptcy Court and served upon the United States Trustee, as provided in Section 7.16 hereof.

2.1.96    "Repayment Date" means the date that Allowed General Unsecured Claims have been Paid in Full.

2.1.97    "Repossession Option" means the Debtor's option pursuant to Section 6.1.1 to require a holder of an Allowed Secured Claim to repossess the property securing such Claim.

2.1.98    "Restaurant" means each individual restaurant operations owned by the Debtors and all assets used therein.

2.1.99    "Sale Order" means that Order (1) Approving the Sale and Purchase of Certain Assets Pursuant to 11 U.S.C. § 363; and (2) Authorizing the Assumption and Assignment

1   of Certain Unexpired Leases and Executory Contracts [Downey Location] entered on February 19,

2   2010.

3          2.1.100   "Schedules" means the Schedules of Assets and Liabilities and Statement

4   of Financial Affairs filed by the Debtors in the Cases, as required by Section 521(1) of the

5   Bankruptcy Code, Rules 1007(a)(3) and (b)(1) of the Bankruptcy Rules, and Official Bankruptcy

6   Form No. 6, as the Schedules may be amended from time to time.

7          2.1.101   "Section 503(b)(9) Administrative Claims" means any Claim, to the

8   extent allowable pursuant to Section 503(b)(9) of the Bankruptcy Code and this Plan.

9          2.1.102   "Secured Claim" means any Claim, including interest, reasonable

10  attorneys' fees, costs, and charges, to the extent allowable pursuant to Section 506(b) of the

11  Bankruptcy Code and this Plan, that is secured by a Lien on property in which a Debtor has an

12  interest or that is subject to recoupment or setoff under Section 553 of the Bankruptcy Code, to the

13  extent of the value of the interest of the holder of such Secured Claim in the Debtor's interest in

14  the property, determined pursuant to Section 506(a) of the Bankruptcy Code.

15         2.1.103   "SoWestBreck" means SoWestBreck, LLC, one of the jointly

16  administered debtors in the above-captioned cases.

17         2.1.104   "Subco" means a Delaware limited liability company that will be formed

18  and will own a Restaurant post-confirmation, which will be a wholly-owned subsidiary of Holdco.

19         2.1.105   "Synergy" means Synergy Pacific Management, LLC.

20         2.1.106   "Tax" means any tax, charge, fee, levy, or other assessment by any

21  federal, state, local or foreign taxing authority, including, without limitation, income, excise,

22  property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

23  estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or

24  additions attributable to, or imposed on or with respect to, such assessments.

25         2.1.107   "Tax Claims" means any Claim, pre-petition or post-petition, relating to a

26  Tax.

27         2.1.108   "Unclaimed Property" means any Distribution of Cash or other property

28  to a Creditor that is returned to the Reorganized Debtor as undeliverable.

-15-

2.1.109  "Unclaimed Property Reserve" means an interest-bearing segregated account in which Unclaimed Property shall be set aside and held as provided in Section 8.7 hereof.

2.1.110  "United States Trustee" means the Office of the United States Trustee.

2.1.111  "Unsecured Creditors Semiannual Payment Cap" means the maximum semiannual distribution to Creditors holding Allowed General Unsecured Claims, which shall equal the product of the total Allowed General Unsecured Claims and the Priority Tax Claim Semiannual Yield.

**2.2    Rules of Construction**.  For the purpose of this Plan, unless otherwise provided in this Plan, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine, feminine and neuter; (iii) any reference in this Plan to an existing document, exhibit or schedule filed or to be filed means such document or schedule as it may have been or may be amended, modified or supplemented pursuant to this Plan; (iv) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (v) except as otherwise stated herein, all references in this Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this Plan; (vi) the words "herein," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (vii) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (viii) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of this Plan or any other provision in this Section 2.2.

**2.3    Exhibits and Schedules**.  All exhibits and schedules to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

-16-

# III.

## SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

This Plan constitutes a plan which effectuates a substantive consolidation of the Debtors. The Debtors' respective Estates shall be merged. Each Debtor shall assume liability under this Plan for the Allowed Claims against each other Debtor.

Pursuant to the substantive consolidation of the Debtors, (i) all assets and liabilities of the Debtors shall be consolidated for purposes of this Plan and deemed assets and liabilities of the consolidated Debtors, (ii) any Claim filed against any Debtor shall be treated as a Claim against the consolidated Debtors and any obligation of any Debtor shall be deemed to be an obligation of the consolidated Debtors and all duplicate claims or obligations shall be eliminated, and (iii) all obligations due or owing from any Debtor to any other Debtor shall be eliminated.

Accordingly, the treatment of Claims set forth below shall be deemed to apply to each Debtor.

# IV.

## UNCLASSIFIED CLAIMS

As required by the Bankruptcy Code, this Plan places Claims and Interests into various Classes according to their right to priority. However, in accordance with the provisions of Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Section 503(b)(9) Administrative Claims, and Priority Tax Claims are deemed "unclassified." These Claims are not considered impaired, and they do not vote on this Plan, because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed these Claims in a Class. The treatment of these unclassified Claims is as provided below.

**4.1    Administrative Claims.** Administrative Claims are Claims for the expenses of administering a Debtor's Case that are allowed under Bankruptcy Code Section 507(a)(2), as well as Claims for goods received by the Debtors in the ordinary course of business within 20 days of the Petition Date. The Bankruptcy Code requires that all administrative claims be paid on the effective date of a Chapter 11 plan, unless a particular creditor agrees to a different treatment of its

claim.  The treatment of Administrative Claims and Section 503(b)(9) Administrative Claims are as described below.

  4.1.1 <u>Payment Generally</u>.  Except to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment of its Administrative Claim, and subject to the bar dates for Section 503(b)(9) Administrative Claims and all other Administrative Claims, each Allowed Administrative Claim shall be Paid in Full, in Cash, on the latest of (i) the Effective Date, (ii) the tenth (10th) Business Day after the date upon which such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date upon which such Allowed Administrative Claim becomes due according to its terms.

  4.1.2 <u>Waiver of Claims</u>.  The Gantes Parties have agreed to waive and thus are hereby barred from asserting any and all Claims, including, but not limited to, Administrative Claims, that any of the Gantes Parties, individually or collectively, have or may have against the Estates.

  4.1.3 <u>Administrative Claims Bar Date</u>.  Any holder of an Administrative Claim that does not file and properly serve such a request for payment by the General Administrative Claims Bar Date and the Bar Date for Section 503(b)(9) Claims, as the case may be, shall be forever barred from asserting such Administrative Claim against the Debtors, the Reorganized Debtors, their Estates, or any of their property, or the Committee.  Notwithstanding anything to the contrary contained in the foregoing, (i) any Governmental Unit may assert an Administrative Tax Claim or other post-petition Tax Claim pursuant to the statutory requirements applicable thereto without regard to the General Administrative Claims Bar Date; and (ii) holders of accrued post-petition *ad valorem* Tax Claims against property owned by the Reorganized Debtors shall retain any Liens that they may have pursuant to applicable law on account of such Tax Claims, and holders of such Tax Claims shall be paid the amount of their Tax Claims in the ordinary course of the Reorganized Debtors' businesses without the requirement that a Proof of Claim or request for payment of such Tax Claim be filed with the Bankruptcy Court.

  **4.2** **<u>Priority Tax Claims</u>**.  Each holder of an Allowed Priority Tax Claim shall receive under this Plan deferred cash payments, of a value, as of the Effective Date, equal to its Allowed

1 | Claim. Except as described below, such deferred cash payments, including principal and interest,

2 | shall be paid on a quarterly basis, in an amount sufficient to fully amortize each Allowed Priority

3 | Tax Claim over a period not to exceed seven and a half years from the Effective Date. The

4 | outstanding and unpaid amount of each Allowed Priority Tax Claim shall bear interest accruing at

5 | the rate specified by Section 6621(a) of the Internal Revenue Code on the Effective Date,

6 | commencing on the first Business Day after the six month following the Effective Date and

7 | continuing until such Allowed Priority Tax Claim is paid in full. Payment of any Allowed Priority

8 | Tax Claim shall commence on the later of (a) the fifteenth day (15th) of the seventh month

9 | following the Effective Date, or (b) the tenth (10th) Business Day after the entry of a Final Order

10 | allowing the Priority Tax Claim. All remaining cash payments, which shall include principal and

11 | interest amortized over the balance of the term (seven years), shall continue quarterly on the

12 | fifteenth day of each full month every three (3) months thereafter until Paid in Full. Priority Tax

13 | Creditors may be prepaid at any time without any penalty or other charges. If the Debtors fail to

14 | make payments as required herein (or, in the case of the Internal Revenue Service, fail to remain

15 | in current Form 941 compliance), such Priority Tax Creditor shall give notice of such default. If

16 | the default is not cured within thirty (30) days after receipt of such notice, such Priority Tax

17 | Creditor may declare a default, whereby all remaining payments due to such Priority Tax Creditor

18 | under the Plan will become due and payable. **Any Priority Tax Creditor who fails to object to**

19 | **the Plan and the proposed treatment herein shall be deemed to have consented under**

20 | **section 1129(a)(9) to the proposed treatment of such Claim, which treatment does not**

21 | **otherwise comply with the Bankruptcy Code.**

22 | **V.**

23 | **CLASSIFICATION OF CLAIMS AND INTERESTS**

24 |     **5.1**   **General Overview**. As required by the Bankruptcy Code, this Plan places Claims

25 | and Interests into various Classes according to their right to priority and other relative rights. The

26 | table in Section 5.2 hereof lists each Class of Claims and Interests established under this Plan and

27 | states whether each Class is impaired or is unimpaired by this Plan. A Class is "unimpaired" if the

28 | Plan leaves unaltered the legal, equitable and contractual rights to which the holders of Claims or

1  Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

2  Article VI of this Plan sets forth the treatment that each Class will receive under this Plan.

3       **5.2**   **Designation of Classes**.  This Plan provides for the establishment of the following

4  Classes of Claims and Interests.

| Class | Creditors | Impaired or Unimpaired |
|---|---|---|
| Class 1.1 Claims | Allowed Secured Claim of Irwin Franchise Capital | Impaired |
| Class 1.2 Claims | Allowed Secured Claim of Irwin Franchise Capital | Impaired |
| Class 1.3 Claims | Allowed Secured Claim of Irwin Franchise Capital | Impaired |
| Class 1.4 Claims | Allowed Secured Claim of American Sterling | Impaired |
| Class 1.5 Claims | Allowed Secured Claim of American Sterling | Impaired |
| Class 1.6 Claims | Allowed Secured Claim of California Bank & Trust | Impaired |
| Class 1.7 Claims | Allowed Secured Claim of Coca Cola Financial | Impaired |
| Class 1.8 Claims | Allowed Secured Claim of Leaf Financial | Impaired |
| Class 1.9 Claims | Allowed Secured Claim of Vineyard Bank | Impaired |
| Class 2.1 Claims | Allowed Secured Claims of CommerceWest | Unimpaired |
| Class 2.2 Claims | Allowed Secured Claims of CommerceWest | Unimpaired |
| Class 3 Claims | Allowed Secured Capital Lease Claims | Impaired |
| Class 4 Claims | Allowed Priority Unsecured Wage Claims | Impaired |
| Class 5 Claims | Allowed General Unsecured Claims | Impaired |
| Class 6 Claim | Allowed Secured Claims of Governmental Units | Impaired |
| Class 7 Claims | Allowed Non-Pecuniary Loss Penalty Claims | Impaired |
| Class 8 Interests | Interests in BlueOcean and SoWestBreck | Impaired |

## VI.

## PROVISIONS FOR THE TREATMENT OF CLAIMS AND INTERESTS

     **6.1**   **Classes 1.1 Through 1.9.**  All Claims and rights of the members of Classes 1.1

through 1.9, as of the Effective Date, shall be governed by the terms of this Plan only, and all prior

agreements shall be null and void.  The treatment provided herein shall be in full satisfaction of

each Creditor's Allowed Secured Claim in Class 1.

        6.1.1   Allowance of Secured Claims.  Each Creditor in Classes 1.1 through 1.9

shall be allowed a Secured Claim to the extent of the value of such Creditor's Claim and interest

in the Estate's interest in such property, which shall be based on Fair Market Value of the property

(or such other value as agreed to by the Debtors and the respective Secured Creditor), securing

such Creditor's Claim in Classes 1.1 through 1.9 as set forth in Schedule 6.1 attached hereto.  If

any Creditor objects to the Debtor's asserted value of the property securing such Creditor's Claim,

then, the Debtors may elect, at their sole discretion, to:  (i) fix the amount of such objecting

Creditor's Allowed Secured Claim at the Objection Value, and (ii) in lieu of making payments as

1    proposed in Section 6.1.2, and in full satisfaction of such Creditor's Allowed Secured Claim,

2    require that such Creditor repossess the property securing such Claim. In the event of such an

3    objection and the Debtors' election of the Repossession Option, then the Allowed Deficiency

4    Claim for such objecting Creditor shall be equal to the difference between such Creditor's Claim

5    and the Objection Value.

6          6.1.2    Payment of Allowed Secured Claim. Each holder of an Allowed Secured

7    Claim in Classes 1.1 through 1.9 shall be treated, at the election of the Debtors, as follows:

8          6.1.2.1    Option 1. Each holder of an Allowed Secured Claim in

9    Classes 1.1 through 1.9 will receive on account of such Allowed Secured Claim deferred cash

10   payments totaling the allowed amount of such Allowed Secured Claim, equal to the value, as of

11   the Effective Date, of such Creditor's interest in the Estate's interest in such property. In

12   particular, Creditors of Classes 1.1 through 1.9 shall each be paid interest only for the first twelve

13   months after the Effective Date, and thereafter, shall be paid in equal monthly installments, with

14   interest, which, unless otherwise provided for in Schedule 6.2, shall accrue at the Allowable

15   Interest Rate, commencing on the First Payment Date, fully amortized over the periods set forth in

16   Schedule 6.1 based on the Allowed Secured Claim. The total Claim, Allowed Secured Claim (i.e.,

17   Fair Market Value of the property securing the Claim), Allowed Deficiency Claim, and monthly

18   payments to be made to each particular Creditor is set forth on Schedule 6.1 attached hereto. Any

19   Allowed Secured Claim in Classes 1.1 through 1.9 may be prepaid at any time without penalty or

20   other charge. Notwithstanding the foregoing, in the event any collateralized equipment or

21   building is sold by the Reorganized Debtors, the proceeds generated from the disposition of such

22   sale, net of all expenses, shall be paid to the holder of the Allowed Secured Claim whose collateral

23   was sold, up to the amount of the Allowed Secured Claim, reflecting all payments made to such

24   Creditor under the terms of this Plan.

25         The Creditors' Allowed Secured Claims of Class 1 shall continue to be secured by the

26   Creditors' existing Lien on each of its collateral. Upon full satisfaction of the Creditors' Allowed

27   Secured Claim in Class 1, the Creditors' Lien on its collateral shall be released and the applicable

28   Debtor shall retain title to such collateral free and clear of the Creditors' Lien. Any Allowed

1    Deficiency Claim of the Creditor shall be treated as an Allowed General Unsecured Claim in the

2    amount set forth in Schedule 6.1.

3        6.1.2.2    Option 2.  The Creditor's collateral shall be returned to the

4    Creditor on the Effective Date in full satisfaction of such Creditor's Allowed Secured Claim.  Any

5    Allowed Deficiency Claim of the Creditor as set forth on Schedule 6.1 shall be treated as a Class 4

6    Allowed General Unsecured Claim.

7        6.1.2.3    Option 3.  Notwithstanding any contractual provision or applicable

8    law that entitles the holder of the Allowed Secured Claim to demand or to receive accelerated

9    payment of such Claim after the occurrence of a default: (i) any such default shall be cured, other

10    than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) the maturity of

11    such Claim shall be reinstated as such maturity existed before such default; (iii) the holder of such

12    Allowed Secured Claim shall be compensated for any damages incurred by such Creditor as a

13    result of any reasonable reliance by such Creditor on such contractual provision or such applicable

14    law; and (iv) the legal, equitable or contractual rights to which such Allowed Secured Claim

15    entitles the holder of such Claim shall not otherwise be altered.

16        The foregoing treatment shall be in full satisfaction of each Class 1

17    Creditor's Allowed Secured Claim.

18        6.1.3    Insurance.  If either Option 1 or 3 is elected by the Debtors for a particular

19    Creditor in this Class, then the Debtors shall maintain insurance coverage for the property securing

20    the Claim for such Creditor.

21        6.1.4    Late Fees and Event of Default.  If either Option 1 or 3 is elected by the

22    Debtors for a particular Creditor in this Class, then the Debtors shall be liable for a late fee equal

23    to five percent (5%) of the past due amount for failure to make payments to this Creditor within

24    ten business days after the date due under this Plan, which is not imposed as a charge for the use

25    of money, but to offset administrative expenses and other costs incurred.  Failure to make a

26    payment due to this Creditor under this Plan within fifteen business days after the date due under

27    this Plan shall constitute a Class 1 Event of Default as against such Creditor.  The Debtors shall

28    have a period of thirty (30) days after receipt of written notice of an asserted Class 1 Event of

-22-

1    Default relating to an alleged failure by the Debtors to pay a payment required under this Plan

2    within which to cure such Class 1 Event of Default.  In the event that the Debtors should fail to

3    cure timely any such Class 1 Event of Default, the applicable Class 1 creditor shall be entitled to

4    proceed to exercise its remedies against the Debtors and against such creditor's respective

5    collateral, in accordance with the provisions of the Bankruptcy Code, this Plan and applicable law.

6            6.1.5    Inspection of Equipment.  If either Option 1 or 3 is elected by the Debtors

7    for a particular Creditor in this Class, then in the event of an Unsecured Class 1 Default, the

8    applicable Creditor shall be entitled to inspect the collateral securing its Claim upon reasonable

9    notice made in writing not less than five Business Days in advance.

10        **6.2    Classes 2.1 Through 2.2.**  All Claims and rights of the members of Classes 2.1

11    through 2.2, as of the Effective Date, shall be governed by the Plan and the terms of the loan

12    assumption agreement entered into post-petition between BlueOcean and each member of Class 2.

13    To the extent there is any conflict between the terms of the Plan, Sale Order and the loan

14    assumption agreement, the Sale Order and loan assumption agreement shall control.  The

15    treatment provided herein shall be in full satisfaction of each Creditor's Allowed Secured Claim in

16    Class 2.

17            6.2.1    Allowance of Secured Claims.  Each Creditor in Classes 2.1 through 2.2

18    shall be allowed a Secured Claim in the amount set forth in Schedule 6.2 attached hereto.

19            6.2.2    Payment of Allowed Secured Claim.  Each holder of an Allowed Secured

20    Claim in Classes 2.1 through 2.2 will receive on account of such Allowed Secured Claim deferred

21    cash payments totaling the allowed amount of such Allowed Secured Claim, equal to the value, as

22    of the Effective Date, of such Creditor's interest in the Estate's interest in such property.  In

23    particular, Creditors of Classes 2.1 through 2.2 shall each be paid in equal monthly installments,

24    with interest, which shall accrue at the Allowable Interest Rate, commencing on the First Payment

25    Date, fully amortized over the periods set forth in Schedule 6.2 based on the Allowed Secured

26    Claim.  The total Allowed Secured Claim and monthly payments to be made to each particular

27    Creditor is set forth on Schedule 6.2 attached hereto.  Any Allowed Secured Claim in Classes 2.1

28    through 2.2 may be prepaid at any time without penalty or other charge.  Notwithstanding the

-23-

1  foregoing, in the event any collateralized equipment or building is sold by the Reorganized

2  Debtors, the proceeds generated from the disposition of such sale, net of all expenses, shall be paid

3  to the holder of the Allowed Secured Claim whose collateral was sold, up to the amount of the

4  Allowed Secured Claim, reflecting all payments made to such Creditor under the terms of this

5  Plan.

6  The Creditors' Allowed Secured Claims of Class 2 shall continue to be secured by the

7  Creditors' existing Lien on each of its collateral. Upon full satisfaction of the Creditors' Allowed

8  Secured Claim in Class 1, the Creditors' Lien on its collateral shall be released and the applicable

9  Debtor shall retain title to such collateral free and clear of the Creditors' Lien.

10  The foregoing treatment shall be in full satisfaction of each Class 2 Creditor's Allowed

11  Secured Claim.

12  **6.3** **Class 3 -- Allowed Secured Capital Lease Claims**. The Debtors believe that no

13  Allowed Secured Capital Lease Claim will be asserted. In the event that the Debtors should

14  determine that Allowed Secured Capital Lease Claims will be asserted, each such Claim shall be

15  classified as a separate subclass under this Section 6.3. Any holder of an Allowed Secured Capital

16  Lease Claim shall be treated as follows at the election of the Reorganized Debtors after

17  consultation with the Committee or the Creditor Board Members, as the case may be:

18  6.3.1  Option 1. Each holder in Class 3 shall be paid in full through eighty-four

19  (84) equal monthly installments of principal equal to the Creditor's Allowed Secured Capital

20  Lease Claim plus interest accruing at the Allowable Interest Rate commencing on the First

21  Payment Date. Any Allowed Secured Capital Lease Claim may be prepaid at any time without

22  penalty or other charge. The Creditor's Allowed Secured Capital Lease Claim shall continue to be

23  secured by the Creditor's existing Lien on its collateral. Upon full satisfaction of the Creditor's

24  Allowed Secured Capital Lease Claim, the Creditor's Lien on its collateral shall be released and

25  the applicable Debtor shall retain title to such collateral free and clear of the Creditor's Lien. Any

26  Allowed Deficiency Claim of the Creditor shall be treated as a Class 5 Allowed General

27  Unsecured Claim.

28

-24-

1          6.3.2   <u>Option 2</u>. The Creditor's collateral shall be returned to the Creditor on the

2  Effective Date in full satisfaction of such Creditor's Allowed Secured Capital Lease Claim. Any

3  Allowed Deficiency Claim of the Creditor shall be treated as a Class 5 Allowed General

4  Unsecured Claim.

5          6.3.3   <u>Option 3</u>. Notwithstanding any contractual provision or applicable law that

6  entitles the holder of the Allowed Secured Capital Lease Claim to demand or to receive

7  accelerated payment of such Claim after the occurrence of a default: (i) any such default shall be

8  cured, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) the

9  maturity of such Claim shall be reinstated as such maturity existed before such default; (iii) the

10  holder of such Allowed Secured Capital Lease Claim shall be compensated for any damages

11  incurred by such Creditor as a result of any reasonable reliance by such Creditor on such

12  contractual provision or such applicable law; and (iv) the legal, equitable or contractual rights to

13  which such Allowed Secured Capital Lease Claim entitles the holder of such Claim shall not

14  otherwise be altered.

15      The foregoing treatment shall be in full satisfaction of each Class 3 Creditor's Allowed

16  Secured Capital Lease Claim.

17      **6.4**   **<u>Class 4 -- Allowed Priority Unsecured Wage Claims</u>**. Each holder of an

18  Allowed Priority Unsecured Wage Claim shall be paid the full amount of its Allowed Priority

19  Unsecured Wage Claim in cash on the latest of the following dates: (i) the Effective Date, (ii) the

20  tenth (10th) Business Day after the date upon which such Priority Unsecured Claim becomes an

21  Allowed Priority Unsecured Wage Claim, or (iii) the date upon which such Allowed Priority

22  Unsecured Wage Claim becomes due according to its terms.

23      **6.5**   **<u>Class 5 -- Allowed General Unsecured Claims</u>**. Class 5 consists of all Allowed

24  General Unsecured Claims. Each General Unsecured Creditor shall receive, in exchange for its

25  Claim against the Estate, an Interest in and Claim against Holdco. The treatment of Allowed

26  General Unsecured Claims is more particularly described as follows:

27          6.5.1   <u>Equity Interest in Holdco</u>. General Unsecured Creditors shall receive a 95%

28  Interest in Holdco, which shall include 100% voting rights over the Reorganized Debtors. General

1  Unsecured Creditors shall retain 100% voting rights over the Reorganized Debtors until Paid in

2  Full. The actual membership Interest provided to each General Unsecured Creditor will be based

3  on each General Unsecured Creditor's Pro Rata share of the aggregate of Allowed General

4  Unsecured Claims. For an additional description of the equity interest to be owned by the General

5  Unsecured Creditors and the rights associated therewith, see Section 7.2.

6          6.5.2   Payment of Claims.  Holdco shall assume all Allowed General Unsecured

7  Claims, which shall be paid, with simple interest accruing at the Allowable Interest Rate per

8  annum, commencing on the Effective Date, and continuing until Paid in Full, based on the

9  parameters described herein. The Reorganized Debtors shall pay to each General Unsecured

10 Creditor, based on its Pro Rata share of all Allowed General Unsecured Claims, a semiannual

11 payment in an amount equal to the lesser of: (i) Excess Cash, or (ii) Unsecured Creditors

12 Semiannual Payment Cap, unless Priority Tax Claims have been Paid in Full, in which case the

13 semiannual payment to General Unsecured Creditors may equal the Excess Cash. For purpose of

14 calculating Excess Cash in determining payment amounts, the formula defined in paragraph 2.1.50

15 shall be applied to each Restaurant, and then aggregated. To the extent that any Restaurant has

16 less than the Minimum Cash Balance, then that Restaurant will not contribute toward any

17 Distributions at that time. To the extent that any Restaurant has less than the Minimum Cash

18 Balance, then that Restaurant will not be required to make any Distributions at that time.

19 Payments to General Unsecured Creditors shall commence on the later of: (a) the fifteenth (15th)

20 day of the first full month following the Effective Date, or (b) the tenth (10th) Business Day after

21 entry of a Final Order allowing all General Unsecured Creditors' Claims, and shall continue on an

22 semiannual basis thereafter until the Allowed General Unsecured Claims are Paid in Full, with

23 interest. In addition to the foregoing, General Unsecured Creditors shall also receive any Net

24 Proceeds to which they are entitled pursuant to Section 7.8. Allowed General Unsecured Claims

25 may be prepaid at any time without penalty or other charge.

26          6.5.3   Holdco Board.  The General Unsecured Creditors, through the Creditor

27 Board Members, shall actively manage the Holdco Board and thus the Reorganized Debtors. For

28

-26-

MAINDOCS-#138153-v6-StarRibs_Revised_Plan__Carino_s_.DOC

1  a detailed discussion of the composition, roles, responsibilities, and other matters relating to the

2  Holdco Board, see Section 7.3.

3          6.5.4   Waiver of Gantes Parties' Claims.  Except as otherwise provided herein, the

4  Gantes Parties have agreed to waive all Claims against the Estates.  Accordingly, the Gantes

5  Parties shall be barred from asserting any General Unsecured Claim against the Estates.

6          6.5.5   Waiver.  Except as expressly provided herein with respect to consent

7  required by the Holdco Board, any conditions set forth herein may be waived by the Holdco Board

8  in its sole discretion.

9     **6.6     Class 6 -- Any Allowed Secured Claim of Governmental Units**.  The Debtors

10 believe that no significant Claims of Governmental Units will be allowed as a secured claim

11 against the estates.  Nevertheless, if any of the asserted Claims are allowed,  each Holder of an

12 Allowed Secured Claim of Governmental Units, including the County of San Bernardino, shall

13 receive under the Plan deferred cash payments, of a value, as of the Effective Date, equal to its

14 Allowed Claim.  Such deferred cash payments, including principal and interest, shall be paid on a

15 quarterly basis, and shall be in an amount sufficient to fully amortize each Allowed Secured Claim

16 of Governmental Units over a period not to exceed five (5) years from the Effective Date.  The

17 outstanding and unpaid amount of each Allowed Secured Claim of Governmental Units shall bear

18 interest accruing at the rate of interest specified by Sections 506(b) and 511 of the Bankruptcy

19 Code, commencing on the Effective Date and continuing until such Allowed Secured Claim of

20 Governmental Units is paid in full.  Payment of any Allowed Secured Claim of Governmental

21 Units shall commence on the later of (a) the fifteenth (15th) day of the first full month following

22 the Effective Date, or (b) the tenth (10th) Business Day after the entry of a Final Order allowing

23 the Allowed Secured Claim of Governmental Units.  Such payments shall continue quarterly on

24 the fifteenth day of each full month every three (3) months thereafter until Paid in Full.  Creditors

25 holding Allowed Secured Claim of Governmental Units may be prepaid at any time without any

26 penalty or other charges.  Each Holder of a Secured Claim of Governmental Units, including the

27 County of San Bernardino, shall retain Liens of the same priority, nature, type, extent and scope as

28

-27-

any duly perfected and unavoidable Liens on property of the Debtors held by such Holder of Allowed Secured Claim of Governmental Units as of the Petition Date.

    **6.7    Class 7 -- Any Allowed Non-Pecuniary Loss Penalty Claims**. Each such Allowed Non-Pecuniary Loss Penalty Claim shall be classified as a separate subclass under this Section 6.7. Each Class 7 Creditor shall receive an amount equal to 10% of the Allowed Non-Pecuniary Loss Penalty Claim, which shall not accrue interest, and shall be paid in one lump sum on the Repayment Date.

    The Debtors reserve the right to object to any Non-Pecuniary Loss Penalty Claim asserted by a Governmental Unit. Nothing contained herein shall be deemed to be any admission by the Debtors of the amount of the Claim asserted by a Governmental Unit.

    **6.8    Class 8 -- Interests in BlueOcean and SoWestBreck**. Class 8 is comprised of the Interests of the holders of all of the interests in BlueOcean and SoWestBreck. All legal, equitable and contractual rights of the holders of all interests in BlueOcean and SoWestBreck are hereby unequivocally extinguished in their entirety. Accordingly, these Interests are impaired by this Plan.

## VII.

## MEANS FOR IMPLEMENTING THE PLAN

    **7.1    Introduction**. This article is intended to explain the means by which the Debtors intend to effectuate the reorganization provided for under this Plan, and how the Debtors intend to fund the obligations to Creditors undertaken in this Plan. This article provides information regarding prospective corporate governance of the Debtors, funding sources for Plan obligations, and other material issues bearing upon the performance of this Plan.

    **7.2    The Reorganized Debtors**. Subject to the provisions of Article III hereof, each Restaurant shall, upon the Effective Date, be transferred to and owned by a separate Subco, which shall be wholly-owned and managed by Holdco. A schematic illustrating the organization structure of Holdco and its subsidiary Subcos is attached as Schedule 7.2.

    7.2.1    General Unsecured Creditors' Interest in Holdco. General Unsecured Creditors shall own and hold all of the Interests in Holdco other than the securities owned by

1    Gantes as described below, as well as 100% of all shareholder voting rights in Holdco until

2    General Unsecured Creditors are Paid in Full. The Creditor Board Members shall control the

3    shareholder voting rights of the Holdco equity owned by the General Unsecured Creditors, and the

4    shareholder voting rights of the Holdco equity owned by Gantes until the Repayment Date.

5    Accordingly, this Plan shall, among other things, serve as a proxy authorizing the Holdco Board to

6    vote all shareholder rights. Once the General Unsecured Creditors have been Paid in Full, any

7    Interests in Holdco owned by the General Unsecured Creditors shall be immediately transferred to

8    Gantes.

9            7.2.2    Gantes's Interest in Holdco. Gantes shall initially receive a 5% Interest in

10   Holdco for his post-confirmation services, for serving as the operator or franchisee, and shall be

11   entitled to earn the remaining 95% Interests in Holdco as General Unsecured Creditors are

12   indefeasibly repaid in cash above certain thresholds (see Schedule 7.2.2, which outlines Gantes's

13   right to earn additional Interests in Holdco) during the Gantes Involvement Period. As Gantes

14   earns additional Interests in Holdco as set forth in Schedule 7.2.2, such Interests will immediately

15   and irrevocably vest in Gantes. Gantes shall assign his shareholder voting rights in Holdco to the

16   Creditor Board Members until the Repayment Date. Gantes shall not be entitled to accrue or

17   receive any dividends, distributions or other payment, compensation or consideration until the

18   Repayment Date. Once the General Unsecured Creditors have been Paid in Full, all securities for

19   and shareholder rights in Holdco owned by the General Unsecured Creditors shall be immediately

20   transferred to Gantes. Should Holdco, any Subco, any Restaurant, or any part thereof be sold prior

21   to the Repayment Date, proceeds will first go to payments as set forth in this Plan. To the extent

22   such a sale results in creditors being Paid in Full, Gantes shall be entitled to the remaining sum,

23   whether or not such a sale occurs during the Gantes Involvement Period.

24       **7.3**    **Management/Board of Directors**. During the Creditor Involvement Period,

25   Holdco shall be controlled by the Holdco Board consisting of five members, three of which shall

26   be Creditor Board Members, unless the Creditor Board Members determine a lesser number

27   should serve on the Holdco Board, and two of which shall include Gantes and Brian Weiss, unless

28   either choose to be replaced, which replacement must be approved by the Creditor Board

-29-

1   Members.  It is anticipated that Al Chavez (the Committee's financial advisor), Daniel W. Harrow

2   and Lewis Jaffe will serve as the initial Creditor Board Members.  Should a change in the

3   composition of the Creditor Board Members be necessary prior to the Effective Date, then the

4   Debtors shall make such changes after considering input from the Committee.

5            7.3.1    Compensation for Independent Holdco Board Members.  Only Holdco Board

6   members not employed by the Debtors or Synergy shall receive customary fees and expense

7   reimbursement for Holdco Board participation.  Initially, these fees shall be $3,000 per quarter,

8   per Holdco Board Member, and subject to annual review by the Holdco Board.  Gantes shall not

9   receive any compensation or expense reimbursement for his Board participation.  The Holdco

10  Board Members and officers will be indemnified by Holdco and will be covered by customary

11  directors' and officers' insurance as determined by the Holdco Board, including the affirmative

12  approval of at least a majority of the Creditor Board Members.

13           7.3.2    Management of Operations.  During the Creditor Involvement Period,

14  Holdco shall have officers independent and distinct from (a) Managementco, (b) the pre-petition

15  and current owners or principals of the Debtors (including Gantes) and (c) the affiliates and related

16  parties of any of the forgoing.  Holdco through its officers and subject to Holdco Board oversight

17  and, as necessary, Holdco Board approval, will (i) oversee the restaurant operations performed by

18  Managementco; (ii) oversee all legal functions, monitor the operational performance and

19  compliance to the Franchise Agreement, and measure Synergy's performance and monitor its

20  financial condition; (iii) provide administrative functions not provided by Synergy (including

21  taxation and corporate filings), and (iv) manage all acquisitions and divestitures, contract approval

22  and all business proposals whether or not submitted by or on behalf of, or related directly or

23  indirectly to, Synergy and/or Gantes or any affiliate or related party of either of the foregoing

24  subject to Holdco Board oversight and, as necessary, Holdco Board approval.

25           *Major Decisions.*  During the Creditor Involvement Period, Major Decisions

26  regarding Holdco, any Subco or any Restaurant require Holdco Board approval, including the

27  affirmative approval of at least a majority of the Creditor Board Members.  Other items

28

customarily subject to oversight of a board which occur at a Subco or with respect to a Restaurant would need the approval of Holdco.

**Material Changes.** During the Creditor Involvement Period, any material changes to operations and/or internal controls for Holdco or any Subco, including (a) financial policies and controls surrounding approval of commitments (e.g., purchase orders, non-franchisor advertising) and distribution of funds and (b) operational policies and controls that fall outside of the terms of the franchise agreement relating to restaurant key metrics (financial, operational and sales), will be approved or established by Holdco and the Subcos with the approval of the Holdco Board, including the affirmative approval of a majority of the Creditor Board Members.

**Managementco.** It is anticipated that each Subco, subject to the approval of the Holdco Board, will enter into an amended Management Agreement with Managementco, which may include a right for each party to terminate the Management Agreement after ninety days' notice. This amended Management Agreement is anticipated to contain terms more favorable than the Management Agreement already approved by this Court. Managementco shall oversee the day-to-day operations, including paying independent vendors, suppliers and employees. The Management Agreement will include performance criteria, monitoring processes (including receiving regular information), compensation (including fees and expense reimbursement) and penalty provisions for non performance and/or underperformance. The officers of Holdco and each Subco shall directly oversee Managementco, including performance of each restaurant, Subcos and Managementco levels. Synergy will serve as the initial Managementco.

During Creditor Involvement Period, any payment or other compensation or consideration to Managementco, any of the current owners or principals of the Debtors (including Gantes) or any affiliate or related party of any of the foregoing, whether such payment, compensation or consideration is as a dividend, distribution, fee, expense reimbursement or otherwise, would need the approval of the Holdco Board, including the affirmative approval of a majority of the Creditor Board Members.

**Employment Agreements.** Holdco shall employ Brian Weiss for a period of not less than one year, with a right to terminate Mr. Weiss for cause. Holdco and/or each Subco may

-31-

1    enter into other employment agreements with officers and other members of management of

2    Holdco and Subco, as the Holdco Board determines to be necessary or otherwise in the best

3    interests of the Reorganized Debtors.

4            7.3.3    Subco's Management Fee to Holdco.  During the Creditor Involvement

5    Period, each Subco will pay Holdco a management fee equal to $4,000 for the services provided

6    by Holdco.  Such amount will be paid in two equal installments on the first and fifteenth of each

7    month.  A copy of the Holdco budget is included in Exhibit "8" to the Disclosure Statement.  Such

8    management fee is designed to pay all of the costs and expenses of Holdco, and shall be adjusted

9    from time to time as the Holdco Board deems reasonable, with the affirmative approval of at least

10   a majority of the Creditor Board Members.  Holdco may hire such advisors (including accountants

11   and lawyers), representatives and consultants, and pay the reasonable costs and expenses of such

12   advisors, representatives and consultants, as the Holdco Board deems reasonable and necessary

13   (with the affirmative approval of at least a majority of the Creditor Board Members) to operate the

14   business and perform the needed or desired functions of Holdco.

15       **7.4    Corporate Actions**.  On the Effective Date, all actions contemplated by this Plan

16   shall be deemed authorized and approved in all respects (subject to the provisions of this Plan) by

17   virtue of the entry of the Confirmation Order, in accordance with the Bankruptcy Code and

18   applicable state law and without any requirement of further action by the stockholders, officers or

19   directors of the Debtors or the Reorganized Debtors.  All matters provided for under this Plan

20   involving the corporate structure of the Debtors or Reorganized Debtors and any corporate action

21   required by the Debtors or by the Reorganized Debtors in connection with this Plan shall be

22   deemed to have occurred and shall be in effect pursuant to the Bankruptcy Code, without any

23   requirement of further action by the shareholders, officers or directors of the Debtors or

24   Reorganized Debtors.  On the Effective Date, the officers of the Reorganized Debtors are

25   authorized and directed to implement the provisions by this Plan and any other agreements,

26   documents and instruments contemplated by this Plan in the name of and on behalf of the

27   Reorganized Debtors.

28

1    **7.5    Transfer of Estate Property to Reorganized Debtors**.  Except as otherwise
2    specifically provided in this Plan, on the Effective Date, all property and rights of the Estates of
3    each of the Debtors shall be transferred to each of the Reorganized Debtors as illustrated in
4    Schedule 7.5, free and clear of all Claims, Liens, and rights of Creditors and Interests of Interest
5    Holders.  Subject to the provisions of Section 7.6 hereof, such property and rights to be transferred
6    to, the Reorganized Debtors include, without limitation, all alter ego and derivative claims existing
7    as of the Effective Date, and all other Avoidance Action claims.  As of the Effective Date, the
8    Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and
9    settle and compromise Claims or Interests without the supervision of, or any authorization from,
10   the Bankruptcy Court or the United States Trustee, and free of any restriction of the Bankruptcy
11   Code or Bankruptcy Rules, other than those restrictions specifically provided for in this Plan or
12   the Confirmation Order.  As of the Effective Date, all property of the Reorganized Debtors shall
13   be free and clear of all Claims, Liens, and other rights of Creditors and Interests of Interest
14   Holders, except as otherwise expressly provided herein.

15   **7.6    Funding of the Plan**.  The funds necessary to meet the Debtors' obligations to
16   Creditors under this Plan will be generated from the Debtors' operations after the Effective Date.
17   As the financial projections accompanying the Disclosure Statement (Exhibit "8" to the Disclosure
18   Statement) indicate, the Debtors project that there will be cash flow from the Debtors' operations
19   during the term of this Plan sufficient for the Debtors to meet such cash needs.  The funds
20   necessary to meet the Debtors' obligations on the Effective Date of the Plan will be obtained from
21   the Debtors' operating capital.  As the Debtors' financial projections indicate, the Debtors project
22   that they will have cash sufficient to meet all of the obligations provided for in this Plan.

23   **7.7    Post-Confirmation Estate Claims**.  The Reorganized Debtors shall maintain all
24   rights to enforce, file, litigate, prosecute, settle and collect (on behalf of the Estates) the Post-
25   Confirmation Estate Claims.  Notwithstanding the rights of the Debtors with respect to Post-
26   Confirmation Estate Claims, nothing in this Plan shall require the Debtors to prosecute or litigate
27   any such matters, all of which may be determined by the Debtors in the exercise of their sole and
28   absolute discretion.

**THE DEBTORS HAVE NOT DETERMINED WHETHER POST-CONFIRMATION ESTATE CLAIMS EXIST, INCLUDING, WITHOUT LIMITATION, WHETHER THERE ARE ANY AVOIDANCE ACTIONS THAT MAY BE FILED BY THE REORGANIZED DEBTORS AFTER THE CONFIRMATION DATE. THIS INVESTIGATION IS ONGOING AND WILL OCCUR, IN LARGE PART, AFTER THE CONFIRMATION DATE. AS A RESULT, ALL PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE EXISTENCE OF ANY PARTICULAR AVOIDANCE ACTION OR OTHER POST-CONFIRMATION ESTATE CLAIM MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THIS PLAN, AN AVOIDANCE ACTION OR OTHER POST-CONFIRMATION ESTATE CLAIM MAY BE FILED AGAINST ANY CREDITOR OR OTHER PARTY AT ANY TIME.**

    **7.8**    <u>Avoidance Actions</u>. Notwithstanding anything to the contrary herein, one hundred percent (100%) of any Net Proceeds recovered, either before or after the Effective Date, from prosecution or settlement of Avoidance Action claims shall be paid in the following Order: (i) first, to Creditors holding Allowed Administrative Claims and Allowed Cure Claims, based on the pro rata share of such Claims, up to an amount that, in conjunction with other payments made to these Creditors under this Plan, renders such Creditors Paid in Full; (ii) second, to Creditors holding Allowed Priority Tax Claims, up to an amount that, in conjunction with other payments made to these Creditors under this Plan, renders such Creditors Paid in Full; and (iii) third, to General Unsecured Creditors, up to an amount that, in conjunction with other payments made to these Creditors under this Plan, renders such Creditors Paid in Full. Within three Business Days after the Debtors receive any such Net Proceeds, the Debtors shall deposit such proceeds into an interest-bearing, segregated account for the benefit of the foregoing from which no disbursements shall be made except for the purpose of funding Distributions hereunder to the foregoing Creditors. The Debtors shall use the funds held in this account to make distributions pursuant to the terms of this Plan, which distributions shall be made to Creditors in accordance with the timing and priority scheme as set forth in this Plan. Allowed Claims of the foregoing Creditors shall be credited by the amount of Net Proceeds paid to Creditors of such Claims.

1   **7.9    Disposition of Assets.** From and after the Effective Date, a Reorganized Debtor

2   shall be entitled to sell, transfer, encumber or otherwise dispose of any interest in any of its assets,

3   without any need for obtaining any approval of the Bankruptcy Court.

4   **7.10    Compromise of Controversies.** From and after the Effective Date, the

5   Reorganized Debtors shall be entitled to compromise any objections to Disputed Claims, or any

6   controversies relating to Post-Confirmation Estate Claims, Avoidance Actions or other litigation

7   pending after the Confirmation Date without any need for any notice to Creditors or any approval

8   of the Bankruptcy Court.

9   **7.11    Bankruptcy Court Approval Relative to Post-Confirmation Matters.** Nothing

10   contained in this Plan shall be deemed to impair in any manner the right of a Reorganized Debtor

11   or any party-in-interest to seek at any time after the Effective Date orders of the Bankruptcy Court

12   approving actions to be taken consistent with this Plan as may be necessary or desirable to

13   effectuate the provisions of this Plan.

14   **7.12    Debtors' Right of Setoff.** Pursuant to Section 553 of the Bankruptcy Code or

15   applicable non-bankruptcy law, a Debtor may set off against any Allowed Claim and Distribution

16   to be made pursuant to this Plan on account of such Allowed Claim (before any Distribution is

17   made on account of such Allowed Claim), any account stated, claim, right, or cause of action

18   which the Debtor or the Estate may possess against the holder of such Allowed Claim; provided,

19   however, that neither the failure to effect such a setoff nor the allowance of any Claim shall

20   constitute a waiver or release by a Debtor or an Estate of any such account, claim, right, and cause

21   of action that the Debtor or the Estate may possess against the holder of such Allowed Claim.  To

22   the extent that a Debtor in allowing a Claim fails to effect a setoff with a Creditor and seeks to

23   collect a claim from such Creditor after a Distribution to such Creditor pursuant to this Plan, the

24   Debtor shall be entitled to full recovery on its claim against such Creditor, notwithstanding any

25   payment of the Creditor's Allowed Claim pursuant to this Plan.

26   7.12.1 Setoffs with Respect to Pre-Confirmation Taxes.  In accordance with the

27   provisions of Section 553 of the Bankruptcy Code, the Internal Revenue Service and any other

28   taxing authority shall be entitled to set off against any amounts that such taxing authority may owe

to the Debtors on account of overpayments by the Debtors of pre-confirmation taxes any pre-confirmation tax liabilities that the Debtors may owe to such taxing authority.

**7.13**    **Cash Payments**.  Cash payments made pursuant to this Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Reorganized Debtor or by wire transfer from a domestic bank, at the option of the Reorganized Debtor.

**7.14**    **Reorganized Debtors' Certification**.  On or before the date upon which the Reorganized Debtors determine, in their sole and absolute discretion, that all Allowed Claims have been duly paid and that all Post-Confirmation Estate Claims and objections to Disputed Claims have been resolved by Final Order, the Reorganized Debtors shall file with the Bankruptcy Court and serve the Reorganized Debtors' Certification upon the United States Trustee.

**VIII.**

**DISTRIBUTIONS**

**8.1**    **Distribution Agent**.  The Reorganized Debtor shall serve as the Distribution Agent for Distributions to be made to holders of Allowed Claims.  The Distribution Agent may employ one or more sub-agents on such terms and conditions as it deems appropriate in the exercise of its sole and absolute discretion.  The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to this Plan.  The Distribution Agent will receive customary fees and expense reimbursement for its services and certain funds shall be set aside by Holdco to pay for such functions.

**8.2**    **Distributions**.

8.2.1    Dates of Distributions.  Any Distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within fifteen (15) days after such date.  Any Distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter but, in any event, within fifteen (15) days thereafter.

8.2.2    Limitation on Liability.  Neither the Debtors, the Reorganized Debtors, their respective affiliates, the Committee, the Holdco Board, nor any of their respective employees,

-36-

1    members, officers, directors, shareholders, agents, or Professionals shall be liable for (i) any acts

2    or omissions (except for willful misconduct) in connection with implementing the Distribution

3    provisions of this Plan and the making or withholding of Distributions pursuant to this Plan, or

4    (ii) any change in the value of Distributions made pursuant to this Plan resulting from any delays

5    in making such Distributions in accordance with the terms of this Plan (including, but not limited

6    to, any delays caused by the resolution of Disputed Claims).

7        **8.3    Instruments and Securities**.

8            8.3.1    Rights of Persons Holding Instruments and Securities.  Except as otherwise

9    provided herein, as of the Effective Date, and whether or not surrendered by the holder thereof, all

10   Instruments and Securities evidencing or relating to any Claims or Interests shall be deemed

11   automatically cancelled and deemed void and of no further force or effect, without any further

12   action on the part of any person, and any Claims or Interests evidenced by or relating to such

13   Instruments or Securities shall be deemed discharged.

14           8.3.2    Cancellation of Liens.  Except as otherwise provided herein, any Lien

15   securing any Secured Claim shall be deemed released and discharged, and the Creditor holding

16   such Secured Claim shall be authorized and directed to release any collateral or other property of

17   the Debtors (including, without limitation, any cash collateral) held by such Creditor and to take

18   such actions as may be reasonably requested by the Reorganized Debtors to evidence the release

19   of such Lien, including, without limitation, by the execution, delivery and filing or recording of

20   such releases as may be requested by the Reorganized Debtors.

21       **8.4    De Minimis Distributions**.  No Cash payment of less than ten dollars

22   ($10.00) shall be made by the Reorganized Debtors to any Creditor.  Whenever payment of a

23   fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down

24   of such fraction to the nearest whole cent.  Any Cash or other property that is not distributed as a

25   consequence of this Section 8.4 shall, after the last Distribution on account of Allowed Claims in

26   the applicable Class, be treated as Unclaimed Property under Section 8.7 of this Plan.

27       **8.5    Delivery of Distributions**.  Except as provided in Section 8.7 with respect to

28   Unclaimed Property, Distributions to holders of Allowed Claims and Allowed Administrative

1   Claims shall be distributed by mail as follows:  (i) with respect to each holder of an Allowed

2   Claim that has filed a Proof of Claim, at the address for such Creditor reflected in such Proof of

3   Claim; (ii) with respect to each holder of an Allowed Claim that has not filed a Proof of Claim, at

4   the address reflected on the Schedules filed by the Debtors; provided, however, that, if the Debtors

5   or the Reorganized Debtors have received a written notice of a change of address for such

6   Creditor, the address set forth in such notice shall be used; or (iii) with respect to each holder of an

7   Allowed Administrative Claim, at such address as the holder thereof may specify in writing.

8       **8.6     Undeliverable Distributions**.  No further distribution of Unclaimed Property shall

9   be made to a Creditor unless and until the Reorganized Debtors are notified in writing of such

10   Creditor's then current address.  Subject to the provisions of Section 8.7 hereof, Unclaimed

11   Property shall remain in the possession of the Reorganized Debtors pursuant to this Section 8.6,

12   and shall be set aside and held in the Unclaimed Property Reserve to be maintained by the

13   Distribution Agent until such time as the subject Distribution becomes deliverable.  Nothing

14   contained in this Plan shall require the Reorganized Debtors or any other person to attempt to

15   locate such Creditor.

16       **8.7     Disposition of Unclaimed Property**.  If the Creditor entitled to a Distribution of

17   Unclaimed Property notifies the Reorganized Debtors of such Creditor's claim to the Distribution

18   of such Unclaimed Property within nine (9) months following the Initial Distribution Date, the

19   Unclaimed Property distributable to such Creditor shall be released from the Unclaimed Property

20   Reserve and paid to such Creditor within fifteen (15) days thereof.  Any Holder of an Allowed

21   Claim or Allowed Administrative Claim that does not assert a claim in writing for Unclaimed

22   Property held by the Reorganized Debtors within nine (9) months following the Initial Distribution

23   Date shall no longer have any claim to or interest in such Unclaimed Property, and shall be forever

24   barred from receiving any Distributions under this Plan or otherwise from the Reorganized

25   Debtors.  In such cases, any such Unclaimed Property shall be retained by the Reorganized

26   Debtors, shall not be subject to the unclaimed property or escheat laws of any state or other

27   governmental unit, and shall be distributed on account of Allowed General Unsecured Claims at

28

the time when the succeeding Distribution is to be paid to General Unsecured Creditors pursuant
to Section 6.4 hereof.

<h2 style="text-align:center">IX.</h2>

<h2 style="text-align:center">OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS</h2>

**9.1** **Objections to Claims**. The Reorganized Debtors shall have the sole and exclusive right to file objections to Claims; provided, however, that (i) any party-in-interest, including without limitation the Creditor Board Members, shall be entitled to object to any Claims asserted by any insider of the Debtors, and (ii) in the event that the Debtors should fail to object, within ninety (90) days after the Effective Date, to a Claim that the Committee disputes, the Committee, through the Holdco Board or Creditor Board Members, shall have the right to file and pursue an objection to such Claim. Notwithstanding the foregoing, the Committee shall have standing to be heard with respect to any objection that the Debtors may file seeking to have a Secured Claim, Administrative Claim or Priority Unsecured Claim disallowed and treated instead as a General Unsecured Claim hereunder. Unless another date is established by order of the Bankruptcy Court, any objection to a Claim shall be filed with the Bankruptcy Court and served on the Holdco Board, the Creditor Board Members, and the Creditor holding such Claim on or before the applicable Claims Objection Deadline. The Reorganized Debtors, and, in the case of any Claim to which the Holdco Board or Creditor Board Members have standing to object under this Section 9.1, the Holdco Board and the Creditor Board Members, shall have the right to request that the Bankruptcy Court extend the Claims Objection Deadline.

**9.2** **Schedule of Disputed Claims**. The Debtors shall file and serve the Disputed Claims Schedule on the Committee on or before the twenty-fourth (24th) day prior to the Confirmation Hearing. The Debtors reserve the right to amend the Disputed Claims Schedule, by adding or deleting Claims, as the Debtors deem appropriate in the exercise of their sole and absolute discretion.

Notwithstanding the fact that the Reorganized Debtors shall have the right to file, litigate, and settle objections to Disputed Claims on behalf of the Debtors and Estates, nothing contained

MAINDOCS-#138153-v6-StarRibs_Revised_Plan__Carino_s_.DOC

1  herein shall be deemed to obligate the Reorganized Debtors to take any such actions, all of which

2  shall be determined by the Reorganized Debtors in their sole and absolute discretion.

3  **THE DEBTORS HAVE NOT FULLY REVIEWED THE CLAIMS IN THE CASES**

4  **OR DETERMINED WHETHER OBJECTIONS TO CLAIMS EXIST.  THIS**

5  **INVESTIGATION IS ONGOING AND MAY OCCUR, IN LARGE PART, AFTER THE**

6  **CONFIRMATION DATE.  AS A RESULT, CREDITORS AND OTHER PARTIES-IN-**

7  **INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THAT THE**

8  **EXISTENCE OF ANY PARTICULAR OBJECTION TO A DISPUTED CLAIM MAY**

9  **NOT BE LISTED, DISCLOSED OR SET FORTH IN THIS PLAN, AN OBJECTION TO A**

10  **CLAIM MAY BE FILED AGAINST ANY CREDITOR OR PARTY-IN-INTEREST AT**

11  **ANY TIME, SUBJECT TO THE CLAIMS OBJECTION DEADLINE.  THE DEBTORS**

12  **AND THE REORGANIZED DEBTORS HEREBY RESERVE THE RIGHT TO OBJECT**

13  **TO AMOUNTS THAT HAVE BEEN SCHEDULED BY THE DEBTORS, OR**

14  **REFLECTED IN THE DEBTORS' BOOKS AND RECORDS, AND WHICH ARE FOUND**

15  **TO BE OBJECTIONABLE IN ANY RESPECT.**

16      **9.3**    **Treatment of Disputed Claims**.

17      9.3.1  No Distribution Pending Allowance.  If any portion of a Claim is a

18  Disputed Claim, no Distribution provided for under this Plan shall be made on account of such

19  Claim unless and until such Claim becomes an Allowed Claim and is no longer a Disputed Claim.

20      9.3.2  Distribution After Allowance.  Within fifteen (15) days following the date

21  on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the

22  Distribution Agent shall distribute to the Creditor holding such Allowed Claim any Cash that

23  would have been distributable to such Creditor if, at the time of the making of any Distribution to

24  the Class of which such Creditor is a member, such Claim had been an Allowed Claim and not a

25  Disputed Claim.  No interest shall be paid on such Claim.

26      9.3.3  Reserves for Disputed Claims.  In the event that a Disputed Claim is

27  pending as to a Class 5 Creditor, the Distribution Agent shall establish a Disputed Claims Reserve,

28  and maintain a reasonable reserve necessary to pay such Disputed Claim in accordance with

MAINDOCS-#138153-v6-StarRibs_Revised_Plan__Carino_s_.DOC

1    Section 6.5. No disbursement of funds from the Disputed Claims Reserve shall be made on

2    account of a Disputed Claim until such Disputed Claim has been determined by a Final Order of

3    the Bankruptcy Court. In the event that any Disputed Claim is ultimately disallowed by the

4    Bankruptcy Court, the amount reserved for such Disputed Claim, which has been disallowed by

5    the Bankruptcy Court, shall be distributed on account of Allowed General Unsecured Claims at

6    the time when the succeeding Distribution is to be paid to General Unsecured Creditors pursuant

7    to Section 6.4 hereof.

8

<h2 style="text-align:center">X.</h2>

9

<h2 style="text-align:center">EXECUTORY CONTRACTS AND UNEXPIRED LEASES</h2>

10         **10.1**    **Executory Contracts Being Assumed**. Effective as of, and conditioned on, the

11    occurrence of the Effective Date, each of the Debtors hereby assumes all of the executory

12    contracts and unexpired leases of the Debtors, including, without limitation, those executory

13    contracts and unexpired leases of the Debtors listed on Schedule 10.1 hereto, except only for those

14    executory contracts and unexpired leases set forth in Schedule 10.3 hereto.

15         The Debtors may amend Schedule 10.1 to add thereto any executory contract or unexpired

16    leases, or to delete therefrom any executory contract or lease, up to and including the

17    Confirmation Date. However, if any amendments are made to Schedule 10.1 less than twenty-four

18    (24) days before the Confirmation Date, the affected contract or lease parties shall have fifteen

19    (15) days from the date of service of notice of such amendments within which to serve on the

20    Debtors a written objection to the same. Upon receipt of any such objection, the Debtors shall

21    promptly set a hearing on the same, and the assumption or rejection of the affected contract or

22    lease shall be delayed until the Bankruptcy Court makes a determination on this issue (such

23    determination may be made after the Confirmation Date, without delaying the confirmation of this

24    Plan). To the extent that an executory contract or unexpired lease has been assumed prior to the

25    Confirmation Date by a Debtor pursuant to an order of the Bankruptcy Court, such assumption

26    shall not be affected by this Plan. The assumption of any contract or lease pursuant to the

27    provisions of this Section 10.1 shall be only to the extent that such assumed contract or lease

28    constitutes an executory contract or unexpired lease within the meaning of Section 365 of the

1    Bankruptcy Code.  Inclusion of an agreement in Schedule 10.1 does not constitute an admission

2    by the Debtors or Reorganized Debtors that (i) such agreement is an executory contract or

3    unexpired lease within the meaning of Section 365 of the Bankruptcy Code, (ii) the Debtors must

4    assume such agreement in order to continue to receive or retain rights, benefits, or performance

5    thereunder or that any Claim under such agreement must be paid or default cured, or (iii) such

6    agreement is a valid contract or lease.  Any contract or lease assumed pursuant to this Plan shall be

7    assumed as previously amended or otherwise modified by the parties thereto, whether before or

8    after the Petition Date.

9        **10.2    Payment of Cure Claims.**  Each Subco shall be liable and responsible for the

10    payment of all Allowed Cure Claims applicable to such respective Subco as set forth on

11    Schedule 10.1.  Payment of such Allowed Cure Claims shall be paid over a period not to exceed

12    eighteen months in equal monthly installments commencing on the First Payment Date, which

13    payments are reflected in the Debtors' Budget.  Allowed Cure Claims shall be entitled to

14    administrative priority in the event of a sale, disposition, or liquidation of any assets of the

15    Reorganized Debtors that results in proceeds available to pay such claims.  Holdco hereby

16    guarantees the payment of all Allowed Cured Claims.  In addition to the foregoing, the Debtors

17    may make, as the Debtors determine, at their sole discretion, such additional periodic payments on

18    account of unpaid Allowed Cure Claims; however, no such periodic payments shall be made from

19    any Restaurant unless such Restaurant maintains the Minimum Cash Balance after such payments.

20        **10.3    Executory Contracts Being Rejected**.  The Debtors hereby reject all of the

21    executory contracts and unexpired leases listed on Schedule 10.3 hereto.  The Debtors reserve the

22    right to amend Schedule 10.3 to add thereto any executory contracts or leases, or to delete

23    therefrom any executory contract or unexpired lease, up to and including the Confirmation Date.

24    However, if any amendments are made to Schedule 10.3 later than twenty-four (24) days before

25    the Confirmation Date, the affected contract or lease parties shall have fifteen (15) days from the

26    date of service of notice of such amendments within which to serve on the Debtors a written

27    objection to the same.  Upon receipt of any such objection, the Debtors shall promptly set a

28    hearing on the same, and the rejection of the affected contract or lease shall be delayed until the

MAINDOCS-#138153-v6-StarRibs_Revised_Plan__Canno_s_DOC

1  Bankruptcy Court makes a determination on this issue (such determination may be made after the

2  Confirmation Date, without delaying the confirmation of this Plan).  To the extent that an

3  executory contract or unexpired lease has been rejected by the Debtors prior to the Confirmation

4  Date pursuant to an order of the Bankruptcy Court, such rejection shall not be affected by this

5  Plan.

6      **10.4    Retention of Property Rights by Reorganized Debtors**.  To the extent that an

7  agreement that provides the Debtors with property rights does not constitute an executory contract

8  or unexpired lease, or the Debtors have obtained property rights under the executed portion of an

9  executory contract or unexpired lease, rejection of such agreement shall not constitute an

10  abandonment by the Debtors of any such property rights.

11      **10.5    Bar Date for Rejection Damages**.  Any Claim arising out of the rejection of an

12  executory contract or unexpired lease shall be forever barred and shall not be enforceable against

13  the Debtors, the Reorganized Debtors, their affiliates, their successors, Estates, or their properties,

14  and shall not be entitled to any Distribution under this Plan, unless a Proof of Claim for such

15  Rejection Claim is filed and served on the Debtors or Reorganized Debtors within thirty (30) days

16  after the later of (i) the date of entry of the order of the Bankruptcy Court approving the rejection

17  of the executory contract or unexpired lease, or (ii) the Confirmation Date.

18      **10.6    Claims Schedule**.  The Cure Claims Schedule shall be filed with the Bankruptcy

19  Court, and served on the Committee and the non-debtor parties to such executory contracts and

20  unexpired leases, on or before the twenty-fourth (24th) day prior to the Confirmation Hearing.

21  Any objection to the amount of any Cure Claim set forth in the Cure Claims Schedule shall be

22  filed and served upon counsel for the Debtors and the Committee on or before the fourteenth

23  (14th) day prior to the Confirmation Hearing.  In the event that any such objection to the amount

24  stated for a Cure Claim in the Cure Claims Schedule is not filed and served as set forth herein, the

25  amount of the Creditor's Cure Claim shall be deemed forever to be the amount set forth in the

26  Cure Claims Schedule, and any Cure Claim in excess of the amount set forth in the Cure Claims

27  Schedule shall be waived and shall be forever barred in the Case, without further notice.  If the

28  Debtors cannot resolve any such objections with the Creditor, the Debtors may either (i) elect to

-43-

reject the executory contract or unexpired lease at the Confirmation Hearing, or (ii) have the

Bankruptcy Court determine the merits of the objection on or after the Confirmation Hearing

(without delaying the confirmation of this Plan).  Any amount of Cure Claim payable upon the

assumption of an executory contract or unexpired lease shall be due and payable on or before the

fifteenth (15th) day after the entry of a Final Order fixing the amount of the Cure Claim and then

only in the amount fixed by such Final Order.

# XI.

## EFFECT OF CONFIRMATION OF THIS PLAN

**11.1    Discharge**.  Except as otherwise specifically provided in this Plan or in the

Confirmation Order, pursuant to Section 1141(d) of the Bankruptcy Code, the Distributions and

rights that are provided in this Plan shall be in complete satisfaction, discharge and release,

effective as of the Effective Date, of all Claims, whether known or unknown, liabilities of, Liens

on, obligations of, rights against and Interests in the Debtors, and any of their assets or properties,

regardless of whether any property shall have been distributed or retained pursuant to this Plan on

account of such Claims, rights and Interests, including but not limited to, Claims and Interests that

arose before the Confirmation Date, including all debts of the kind specified in Section 502(g),

502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim or

Proof of Interest based upon such Claim or Interest is filed or deemed filed under Section 501 of

the Bankruptcy Code, (ii) such Claim or Interest is allowed under Section 502 of the Bankruptcy

Code, or (iii) the holder of such Claim or Interest accepted the Plan.  The Confirmation Order shall

constitute a determination of the discharge of all of the Claims against and Interests in the Debtors,

subject to the occurrence of the Effective Date.

**11.2    Injunction**.  Except as otherwise expressly provided in this Plan, or in the

Confirmation Order, on and after the Effective Date, all Creditors who have held, hold, or who

may hold a Claim, or Interest Holders who have held, hold, or who may hold an Interest,

discharged pursuant to the terms of this Plan (including but not limited to states and other

governmental units, and any state official, employee, or other entity acting in an individual or

official capacity on behalf of any state or other governmental units) shall be permanently enjoined

1  from the following: (i) taking any of the following actions on account of any such discharged

2  Claim or Interest: (a) commencing or continuing in any manner any action or other proceeding

3  against the Debtors, the Reorganized Debtors, their successors, or their property; (b) enforcing,

4  attaching, executing, collecting, or recovering in any manner any judgment, award, decree, or

5  order against the Debtors, the Reorganized Debtors, their successors, or their property;

6  (c) creating, perfecting, or enforcing any Lien against the Debtors, the Reorganized Debtors, their

7  successors, or their property; (d) asserting any set off, right of subrogation, or recoupment of any

8  kind against any obligation due to the Debtors, the Reorganized Debtors, their successors, or their

9  property; and (e) commencing or continuing any action, in any manner, in any place that does not

10 comply with or is inconsistent with the provisions of this Plan; and (ii) taking any actions on

11 account of any claims or rights of action that are revested in, or transferred to, the Reorganized

12 Debtors as of the Effective Date or under this Plan (to the extent that a Debtor's Estate first held

13 such claim or rights of action or held the right to assert such claim or right of action after the

14 Petition Date), including, without limitation, commencing or continuing in any manner any

15 Avoidance Action (i.e., no party may pursue any avoidance claims, except as otherwise provided

16 by this Plan).  Any person or entity injured by any willful violation of such injunction shall

17 recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances,

18 may recover punitive damages from the willful violator.

19                                             **XII.**

20                      **LIMITATION OF LIABILITY AND RELEASES**

21      **12.1    No Liability for Solicitation or Participation**. As specified in Section 1125(e) of

22 the Bankruptcy Code, entities that solicit acceptances or rejections of this Plan or that participate

23 in the offer, issuance, sale, or purchase of securities offered or sold under this Plan, in good faith

24 and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on

25 account of such solicitation or participation, for violation of any applicable law, rule, or regulation

26 governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale, or

27 purchase of securities.

28

-45-

**12.2    Limitation of Liability**.  Effective as of the Effective Date, none of the Debtors, Reorganized Debtors, their respective affiliates, the Committee, the Holdco Board, the Creditor Board Members nor any of their respective members, officers, directors, shareholders, employees and other agents, advisors and Professionals shall have or incur any liability to any Creditor or Interest Holder or to any other person for any act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of this Plan, the approval of the Disclosure Statement, the consummation of this Plan, the administration of this Plan, the Cases or the property to be distributed under this Plan, to the fullest extent permitted by applicable statutory and case law except the Reorganized Debtors shall be liable for the performance of obligations assumed by them or imposed upon them under or by this Plan.

XIII.

<b>CONDITIONS TO CONFIRMATION AND EFFECTIVENESS</b>

**13.1    Conditions Precedent to Plan Confirmation**.  The following are conditions precedent to the confirmation of this Plan:

13.1.1  The Bankruptcy Court shall have entered the Confirmation Order.

13.1.2  All agreements, instruments and other acts contemplated by, or to be entered into, or completed pursuant to, or in order to facilitate the implementation of, this Plan, shall have been duly and validly executed and delivered by the parties thereto, and completed, as the case may be, and all conditions to their effectiveness shall have been satisfied or waived, except only for the entry of the Confirmation Order.

**13.2    Condition Precedent to Plan Effectiveness**.  As a condition precedent to the effectiveness of this Plan and the occurrence of the Effective Date, the Confirmation Order must become a Final Order.  The Committee reserves the right to object to the form of the Confirmation Order.  In the event that an appeal, petition for certiorari or motion for reargument or rehearing or comparable post-confirmation relief is filed with respect to the Confirmation Order, and no stay of the effectiveness of the Confirmation Order is obtained, the Debtors may elect, in the exercise of their sole and absolute discretion, to proceed with the Effective Date of this Plan and to commence to consummate this Plan, by filing and serving upon counsel for the Lenders, counsel for the

-46-

1  Committee, the United States Trustee and the party seeking such post-confirmation relief, notice

2  of such election.

3      **13.3    Waiver of Conditions**.  The conditions set forth in Sections 13.1 and 13.2 hereof

4  may be waived by the Debtors without notice, leave or order of the Bankruptcy Court, and without

5  any formal action other than proceeding to obtain the Confirmation Order and consummate this

6  Plan.

7                                      **XIV.**

8                          **RETENTION OF JURISDICTION**

9      Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective

10  Date, the Bankruptcy Court shall retain jurisdiction over the Cases and any of the proceedings

11  arising from, or relating to, the Cases pursuant to Section 1142 of the Bankruptcy Code and 28

12  U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law,

13  including, without limitation, such jurisdiction as is necessary to ensure that the purposes and

14  intent of this Plan are carried out.  Without limiting the generality of the foregoing, the

15  Bankruptcy Court shall retain jurisdiction for the following purposes:

16      **14.1**    To hear and determine any and all objections to the allowance, or requests for

17  estimation, of Claims or the establishment of reserves pending the resolution of Disputed Claims;

18      **14.2**    To consider and act on the compromise and settlement of any Claim against, or

19  cause of action on behalf of, any Debtor or any Estate, including, without limitation, any

20  Avoidance Action;

21      **14.3**    To hear and determine any motions pending on the Effective Date to assume,

22  assume and assign or reject any executory contract or unexpired lease and to determine the

23  allowance of any Claim resulting therefrom;

24      **14.4**    To enter such orders as may be necessary or appropriate in connection with the

25  recovery of the Debtors' assets, wherever located;

26      **14.5**    To hear and determine any and all applications for allowance of compensation and

27  reimbursement of expenses of Professionals;

28

-47-

MAINDOCS-#138153-v6-StarRibs_Revised_Plan__Carino_s_.DOC

1    **14.6**    To hear and determine any and all controversies, suits and disputes arising under or

2    in connection with the interpretation, implementation or enforcement of this Plan and any of the

3    documents intended to implement the provisions of this Plan or any other matters to be resolved

4    by the Bankruptcy Court under the terms of this Plan;

5    **14.7**    To hear and determine any motions or contested matters involving Taxes, tax

6    refunds, tax attributes and tax benefits and similar and related matters with respect to any Debtor,

7    including, without limitation, matters involving federal, state and local Taxes in accordance with

8    Sections 346, 505 and 1146 of the Bankruptcy Code;

9    **14.8**    To hear and determine any and all applications, adversary proceedings and

10    contested matters pending on the Effective Date or that may be commenced after the Effective

11    Date as provided in this Plan;

12    **14.9**    To effectuate Distributions under, and performance of, the provisions of this Plan;

13    **14.10**    To hear and determine any motion to modify any provision of this Plan after

14    confirmation of this Plan, and, if in the best interests of the Debtors and Creditors, modification of

15    this Plan even after this Plan has been substantially consummated;

16    **14.11**    To correct any defect, cure any omission or reconcile any inconsistency in this

17    Plan, the exhibits to this Plan and any documents executed in connection with this Plan, or any

18    order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out

19    the purposes and intent of this Plan;

20    **14.12**    To determine such other matters as may be provided for in the Confirmation Order

21    or as may from time to time be authorized under the provisions of the Bankruptcy Code or any

22    other applicable law;

23    **14.13**    To enforce all orders, judgments, injunctions and exculpations issued or entered in

24    connection with the Cases or this Plan;

25    **14.14**    To enter such orders as may be necessary or appropriate in aid of confirmation and

26    to facilitate implementation of this Plan, including, without limitation, any orders as may be

27    appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or

28    vacated;

-48-

1    **14.15**  To determine any other matter not inconsistent with the Bankruptcy Code; and

2    **14.16**  To issue a final decree closing the Cases.

3                                    **XV.**

4                    **MODIFICATION OF THE PLAN; CRAMDOWN**

5    **15.1**    **Modification of this Plan**.  At any time prior to the confirmation of this Plan, the

6    Debtors may supplement, amend or modify this Plan, provided that, without the consent of the

7    Committee, after the voting with respect to this Plan, the Debtors shall not make any modifications

8    to the Plan which affect materially and adversely the interests of General Unsecured Creditors

9    under this Plan.  The Debtors shall provide to the Committee notice of any such modification of

10   this Plan, and an opportunity to be heard thereon.  After confirmation of this Plan, the Debtors or

11   Reorganized Debtors may (i) apply to the Bankruptcy Court to modify this Plan, notwithstanding

12   any substantial consummation of this Plan if in the best interests of the Debtors and Creditors; and

13   (ii) apply to the Bankruptcy Court to remedy defects or omissions in this Plan or to reconcile

14   inconsistencies in this Plan.

15   **15.2**    **Nonconsensual Confirmation**.  In the event that any impaired Class of Claims or

16   Interests should fail to accept this Plan in accordance with Section 1129(a)(8) of the Bankruptcy

17   Code, the Debtors (i) may request that the Bankruptcy Court confirm this Plan in accordance with

18   Section 1129(b) of the Bankruptcy Code, and (ii) may modify this Plan in accordance with

19   Section 1127(a) of the Bankruptcy Code and Section 15.1 of this Plan.

20                                   **XVI.**

21                             **MISCELLANEOUS**

22   **16.1**    **Payment of Statutory Fees**.  All quarterly fees due and payable to the United

23   States Trustee pursuant to 28 U.S.C. 1930(a)(6) shall be paid in full on or before the Effective

24   Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall be established

25   and set aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy

26   Code.  The Reorganized Debtors shall remain responsible for timely payment of their quarterly

27   fees due and payable after the Effective Date, until the Reorganized Debtors' Cases are closed, to

28   the extent required by 28 U.S.C. 1930(a)(6).

1        **16.2**    **Payment Dates**.  Whenever any Distribution to be made under this Plan becomes

2    due on a day other than a Business Day, such Distribution shall instead be made, without interest,

3    on the immediately following Business Day.

4        **16.3**    **Other Documents and Actions**.  The Reorganized Debtors may execute such

5    other documents and take such other actions as may be necessary or appropriate to effectuate the

6    transactions contemplated under this Plan.

7        **16.4**    **Notices**.  Except as expressly set forth herein to the contrary, all notices and

8    requests in connection with this Plan shall be in writing and shall be hand delivered or sent by

9    telefacsimile, with a copy sent by first-class mail, addressed to:

10

11   **TO THE DEBTORS:**
     Brian Weiss
     Chief Restructuring Officer

12   BSW & Associates
     2020 Main Street, Suite 500

13   Irvine, CA 92614
     Telephone:  (949) 933-7011

14   Facsimile:  (949) 428-7401

15

16   **WITH A COPY TO:**
     Garrick A. Hollander, Esq.

17   Winthrop Couchot Professional Corporation
     660 Newport Center Drive, Fourth Floor

18   Newport Beach, CA 92660
     Telephone:  (949) 720-4100

19   Facsimile:  (949) 720-4111

20

21   **TO THE CREDITOR BOARD MEMBER:**
     Al Chavez
     c/o Phoenix Group Advisory Services, LLC

22   805 Manhattan Beach Blvd., Suite 204
     Manhattan Beach, CA 90266

23   Telephone:  (310) 546-5800
     Facsimile:  (310) 402-8209

24

25   **TO THE CREDITOR BOARD MEMBER:**
     Daniel Harrow

26   2312 Janet Lee Drive
     La Crescenta, CA 91214

27   Telephone:  (818) 249-2271
     Facsimile:  (818) 249-4249

28

-50-

**TO THE CREDITOR BOARD MEMBER:**
Lewis Jaffe
Telephone:  (781) 910-9533

**WITH A COPY TO:**
Scott E. Blakeley, Esq.
Blakeley & Blakeley LLP
4685 MacArthur Court, Suite 421
Newport Beach, CA 92660
Telephone:  (949) 260-0611
Facsimile:  (949) 260-0613

    All notices to the Creditor Board Members and to their counsel shall be given in accordance with information to be set forth in a notice to be filed by the Committee on or before the Confirmation Date.

    All notices to any Creditor or Interest Holder shall be sent to it at its last known address or to the last known address of its attorney of record.  Any such person may designate in writing any other address for purposes of this Section 16.4, which designation shall be effective on receipt thereof by the Debtors.

    **16.5**   __Governing Law__.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the state of California (without reference to its conflict of law rules) shall govern the construction and implementation of this Plan and any agreements, documents, and instruments executed in connection with this Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

    **16.6**   __Binding Effect__.  This Plan and all rights, duties and obligations hereunder shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, Creditors, Interest Holders, the Committee and their respective successors and assigns.

    **16.7**   __Successors and Assigns__.  The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

    **16.8**   __No Waiver__.  The failure of the Debtors or any other entity to object to any Claim for purposes of voting shall not be deemed to be a waiver of the Debtors' or other entities' right to object to or examine such Claim, in whole or in part.

-51-

1    **16.9    <u>Inconsistencies</u>.**  In the event that the terms or provisions of this Plan are

2    inconsistent with the terms and provisions of the exhibits to this Plan, any document executed in

3    connection with this Plan, or the Disclosure Statement, the terms of this Plan shall control.

4    **16.10    <u>Exemption from Certain Transfer Taxes and Recording Fees</u>.**  Pursuant to

5    Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or

6    to any other person or entity pursuant to, or implemented by, this Plan (including, without

7    limitation, the granting of a security interest) shall not be subject to any document recording tax,

8    stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer

9    tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar

10    tax or governmental assessment.  The Confirmation Order shall direct the appropriate state or local

11    governmental officials or agents to forego the collection of any such tax or governmental

12    assessment and to accept for filing and recordation any of the foregoing instruments or other

13    documents without the payment of any such tax or governmental assessment.

14    **16.11    <u>Exemption from Securities Laws</u>.**  Pursuant to Section 1145, the offer or sale of a

15    security of a successor to the Debtors under this Plan shall not require registration for offer or sale

16    of such security or registration or licensing of an issue of, underwriter of, or broker or dealer in,

17    such a security, as such offer or sale under this Plan is in exchange for a Claim against the

18    Debtors.

19    **16.12    <u>Post-Confirmation Status Report</u>.**  Within 180 days following the entry of the

20    Confirmation Order, the Reorganized Debtors shall file with the Bankruptcy Court a status report

21    explaining the progress made toward consummation of this Plan.  The status report shall be served

22    on the United States Trustee, the Holdco Board, and any parties who file a request for special

23    notice of post-confirmation matters.  Unless otherwise ordered by the Bankruptcy Court, further

24    status reports shall be filed every 180 days and served on the same entities.

25    **16.13    <u>Post-Confirmation Conversion/Dismissal</u>.**  A Creditor or other party-in-interest

26    may file a motion to convert or dismiss the Cases under Section 1112(b), if there is a default by

27    the Reorganized Debtors in performing this Plan.  The Reorganized Debtors reserve the right to

28    object to any such motion for conversion or dismissal.

MAINDOCS-#138153-v6-StarRibs Revised Plan _Carino_s_DOC

1    **16.14  Changes in Rates Subject to Regulatory Commission Approval**.  The Debtors

2  are not subject to governmental regulatory commission approval of their rates.

3    **16.15  Final Decree**.  Unless earlier filed by the Reorganized Debtors, by the thirtieth

4  (30th) day after the filing of the Reorganized Debtors' Certification, in accordance with Rule 3022

5  of the Bankruptcy Rules, the Reorganized Debtors shall file an application with the Bankruptcy

6  Court to obtain a final decree to close the Cases of the Reorganized Debtors.

7

8  Date:  March 18, 2010                          **BLUEOCEAN PARTNERS, LP**
                                                   **a California limited partnership**

9

10                                                 By: /s/ Brian Weiss_____
                                                       Brian Weiss,

11                                                 Its:  Chief Restructuring Officer

12  Date:  March 18, 2010                          **SOWESTBRECK, LLC**
                                                   **a California limited liability company**

13

14                                                 By: /s/ Brian Weiss_____
                                                       Brian Weiss,

15                                                 Its:  Chief Restructuring Officer

16

17  **SUBMITTED BY:**

18  **WINTHROP COUCHOT**
    **PROFESSIONAL CORPORATION**

19

    By:  /s/ Garrick A. Hollander_____
20         Garrick A. Hollander
    General Insolvency Counsel to the
21  Debtors and Debtors-in-Possession

22

23

24

25

26

27

28

MAINDOCS-#138153-v6-StarRibs_Revised_Plan__Carino_s_DOC

# Schedule 6.1

**SoWestBreck and BlueOcean**
Schedule of Secured Claims 1.1 to 1.9

| Class | Impaired (Yes/No) | Debtor | Creditor | Description of Collateral | Balance Outstanding [a] | Allowed Secured Claim | Deficiency Claim | Period (in years) | Monthly Payment [c] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Claim | | | Post-Confirmation Payments | |
| 1.1 | Yes | SoWestBreck | Irwin Franchise Capital | Furniture, fixtures and equipment located at the West Jordan Restaurant | 134,477 [d] | 134,477 [d] | - | 7 | 1,847 |
| 1.2 | Yes | SoWestBreck | Irwin Franchise Capital | First priority lien against the building and fixtures located at the West Jordan restaurant | 559,414 | 325,000 [b] | 234,414 | 10 | 3,317 |
| 1.3 | Yes | SoWestBreck | Irwin Franchise Capital | Furniture, fixtures and equipment located at the Sandy Restaurant | 474,672 | 170,000 [d] | 304,672 | 7 | 2,335 |
| 1.4 | Yes | BlueOcean Partners | American Sterling | Furniture, fixtures and equipment located at the West Covina Restaurant | 337,222 | 149,771 [f] | 187,451 | 7 | 2,064 |
| 1.5 | Yes | BlueOcean Partners | American Sterling | First priority lien against the building and fixtures located at the West Covina restaurant | 1,396,654 | 1,000,000 [b] | 396,654 | 25 | 2,708 |
| 1.6 | Yes | BlueOcean Partners | California Bank & Trust | Furniture, fixtures and equipment located at the Rancho Cucamonga Restaurant | 194,126 | 157,000 [b] | 37,126 | 7 | 2,156 |
| 1.7 | Yes | BlueOcean Partners | Coca Cola Financial | Certain equipment located at the El Centro Restaurant | 17,389 | - [e] | 17,389 | 7 | - |
| 1.8 | Yes | BlueOcean Partners | Leaf Financial | Furniture, fixtures and equipment located at the El Centro Restaurant | 374,523 | 191,000 [b] | 183,523 | 7 | 2,623 |
| 1.9 | Yes | BlueOcean Partners | Vineyard Bank | Furniture, fixtures and equipment located at the Palmdale Restaurant | 323,644 | 170,000 [b] | 153,644 | 7 | 2,335 |
| | | | | **Total** | **3,812,121** | **2,297,248** | **1,514,873** | | **19,387** |

[a] According to the Debtors' books and records as of December 31, 2009.

[b] Except as otherwise agreed to, each Allowed Secured Claim is based on the fair market value (on a going concern basis) of the collateral securing each respective Creditor's Secured Claim, which is based on the appraised value conducted by Braun, Inc. ("Braun Appraisal"), as reflected in the Desktop Opinion of Value Dated July 31, 2009, in the case of furniture, fixtures, equipment and buildings, and based on the Debtors' books and records, in the case of accounts, intangibles, and other personal property.

[c] Payment includes interest at the Allowable Interest Rate, which, for purposes of this schedule, is estimated at 4.25%. For the first twelve month from the Effective Date, Class 1.1 through 1.3 and Class 1.6 through Class 1.9 will receive payments of interest only. Beginning in the thirteenth month, these loans will begin receiving payments of principal and interest.

[d] Allowed Secured Claim is based on the fair market value (on a going concern basis) of the collateral securing Irwin Franchise Capital's Secured Claim, which is based on the appraised value of similar and comparable equipment at other Carino's locations that were valued in the Braun Appraisal. In this case, Irwin's Claim is greater than the market value of the collateral, resulting in an Allowed Secured Claim equal to the total Claim.

[e] Allowed Secured Claim is based on the fair market value (on a going concern basis) of the collateral securing Coca Cola Financial's Secured Claim, which is based on the fair market value of the equipment collateral according to the opinions of Todd Wold of Braun, Inc. and Brian Weiss, the Debtors' Chief Restructuring Officer.

[f] Pursuant to an agreement with the lender, the Allowed Secured Claim is to be amortized over a period of twenty-five years at an interest rate of 3.25%. The note is due three years from the effective date of the Plan the loan is secured by the underlying building and is cross collateralized with the equipment located in the building which is described Class 1.5.

[g] Pursuant to an agreement with the lender, the Allowed Secured Claim is to be amortized over a period of seven years at an interest rate of 3.25%. The note is due three years from the effective date of the Plan, the loan is secured by the underlying equipment and is cross collateralized with the building located in the building which is described Class 1.6.

# Schedule 6.2

## SoWest/Breck and BlueOcean
### Schedule of Secured Claims 2.1 to 2.2

| Class | Impaired (Yes/No) | Debtor | Creditor | Description of Collateral | Claim | | | Post-Confirmation Payments | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Balance Outstanding [a] | Allowed Secured Claim | Deficiency Claim | Period (in years) | Monthly Payment [b] |
| 2.1 | No | BlueOcean Partners | Commerce West Bank | First priority lien against the building located at the Downey restaurant. | 1,000,000 | 1,000,000 [c] [d] | - | 20 | 6,222 |
| 2.2 | No | BlueOcean Partners | Commerce West Bank | First priority lien against the furniture, fixtures and equipment located at the Downey restaurant. | 165,000 | 165,000 [c] | - | 7 | 2,230 |
| | | | | Total | 1,165,000 | 1,165,000 | - | | 8,464 |

[a] According to the Debtors' books and records as of February 28, 2010.

[b] Payment includes interest at the Allowable Interest Rate, which, for purposes of this schedule, is estimated at 4.25%.

[c] This amount represents the amount of secured debt agreed to be assumed by BlueOcean Partners post-petition as part of its purchase from StoneRiver Partners of a Carino's restaurant located in Downey, California, which was approved by the Bankruptcy Court on February 3, 2010.

[d] The loan is being amortized over a twenty year period and is due seven (7) years from the Effective Date of the Plan.

# Schedule 7.2

Schedule 7.2

# REORGANIZED DEBTORS' POST-CONFIRMATION CORPORATE STRUCTURE



Corporate structure chart. Holdco at the center connects to the following subsidiaries, each held 100%:

- Subco: Carino's Palmdale, CA
- Subco: Carino's Rancho Cucamonga, CA
- Subco: Carino's West Covina, CA
- Subco: Carino's El Centro, CA
- Subco: Carino's Sacramento, CA
- Subco: Carino's Downey, CA
- Subco: Carino's West Jordan, UT
- Subco: Carino's Sandy, UT

130931v.2

# Schedule 7.2.2

SCHEDULE 7.2.2

Holdco Beneficial Interests Potentially to be Earned by John Gantes

| Repayment of Obligations Percentage | Beneficial Interest Earned Percentage |
|:---:|:---:|
| 0 | 5 |
| 20 | 10 |
| 33 | 16.5 |
| 50 | 25 |
| 66 | 35 |
| 75 | 50 |
| 90 | 70 |
| 100 | 100 |

# Schedule 7.5



**Schedule 7.5**

[A] Except as otherwise specifically provided in the Plan, liquor license no. 427375 and all other property, agreements, and other rights of the BlueOcean estate related to the Palmdale Restaurant shall be transferred to Palmdale Subco on the Effective Date.

[B] Except as otherwise specifically provided in the Plan, liquor license no. 417005 and all other property, agreements, and other rights of the BlueOcean estate related to the Rancho Cucamonga Restaurant shall be transferred to Rancho Cucamonga Subco on the Effective Date.

[C] Except as otherwise specifically provided in the Plan, liquor license no. 417374 and all other property, agreements, and other rights of the BlueOcean estate related to the West Covina Restaurant shall be transferred to West Covina Subco on the Effective Date.

[D] Except as otherwise specifically provided in the Plan, liquor license no. 418985 and all other property, agreements, and other rights of the BlueOcean estate related to the El Centro Restaurant shall be transferred to El Centro Subco on the Effective Date.

[E] Except as otherwise specifically provided in the Plan, liquor license no. 437378 and all other property, agreements, and other rights of the BlueOcean estate related to the Downey Restaurant shall be transferred to Downey Subco on the Effective Date.

[F] Except as otherwise specifically provided in the Plan, liquor license no. REO1463 and all other property, agreements, and other rights of the SoWestBreck estate related to the West Jordan Restaurant shall be transferred to West Jordan Subco on the Effective Date.

[G] Except as otherwise specifically provided in the Plan, liquor license no. REO1625 and all other property, agreements, and other rights of the SoWestBreck estate related to the Sandy Restaurant shall be transferred to Sandy Subco on the Effective Date.

130931v.2

# Schedule 10.1

In re BlueOcean Partners, L.P. and SoWestBreck, LLC
Schedule of Contracts to be Assumed
Schedule 10.1

| Contracting Party | | | | | | |
|---|---|---|---|---|---|---|
| Non-Debtor | Debtor | Location | Nature of Contract | Commencement | Termination | Cure Claim |
| Ecolab | BlueOcean Partners | El Centro | Dish Machines - Rental Agreement | September 2005 | September 2015 | [2] $ 190 |
| Muzak - San Diego | BlueOcean Partners | El Centro | Music, Cable | July 2009 | July 2010 | [2] $ 200 |
| Muzak - Serran Sound | BlueOcean Partners | Palmdale | Music, Cable | February 2009 | February 2010 | [2] $ 105 |
| Ecolab | SoWestBreck | Sandy | Dish Machines - Rental Agreement | November 2008 | November 2009 | [2] $ 190 |
| Muzak - Salt Lake City | SoWestBreck | Sandy | Music, Cable | July 2009 | July 2010 | [2] $ 200 |
| Ecolab | SoWestBreck | West Jordan | Dish Machines - Rental Agreement | December 2008 | December 2009 | [2] $ 240 |
| Coca Cola | SoWestBreck | Multiple - see [3] | Beverage Marketing Agreement | | | [2] $ - |
| Kona Restaurant Group, Inc. [4] [5] | [1] | Multiple - see [3] | Franchise and related agreements | | | [3] $ 35,000 |

[1] BlueOcean Partners, L.P., and SoWestBreck, LLC.

[2] Auto Renewal - Year to Year

[3] The agreements for each of the locations expire as follows:

| Store # | Location | Expiration Date |
|---|---|---|
| 1604 | West Jordan, UT | December 22, 2022 |
| 1609 | El Centro | November 29, 2024 |
| 1613 | Rancho Cucamonga | August 22, 2025 |
| 1614 | West Covina, CA | September 22, 2025 |
| 1814 | Palmdale, CA | January 30, 2026 |
| 1815 | El Centro, CA | December 1, 2026 |
| 1816 | Sandy, UT | |
| 1618 | Downey, CA | June 12, 2026 |

[4] BlueOcean Partners, L.P., shall assume and assign its franchise agreements to each SubCo that will own and operate the Rancho Cucamonga, West Covina, Palmdale, El Centro, Downey and Natomas Restaurants. SoWestBreck shall assume and assign its franchise agreements to the SubCos that will own and operate the Sandy and West Jordan Restaurants, with such Subco being jointly and severally liable under such agreements.

[5] Fixed Up, Inc. and each of Blue Ocean and Sowestbreck entered into amended franchise agreements to each SubCo to reduce the royalty rate for each restaurant as set forth below. The reduction is effective through February 1, 2012. Thereafter, the royalty rate will revert back to 4.0% for all sales after February 1, 2012. In the event sales of an individual restaurant increases by $300,000 or more in every six fiscal monthly period, commencing at the end of the six fiscal monthly periods ending June 30, 2010 from the trailing twelve fiscal monthly periods, then the royalty rate will increase by 0.5%. For example, if sales for the twelve fiscal monthly periods ending June 30, 2010 (a) were $2,000,000 or more, the royalty rate would increase by 0.5%, or (b) were less than $2,000,000, the royalty rate twelve fiscal monthly periods ending June 30, 2010 (a) were $1,700,000 and sales for the subsequent twelve fiscal monthly periods ending June 30, 2010 (a) were $2,000,000 or more, the royalty rate would increase by 0.5%, or (b) were less than $2,000,000, the royalty rate would remain the same. There will be no royalty rate adjustment for any decrease in sales.

The Franchisor agreed that the accrued past due amounts of the royalties and any Materials Fund for sales prior are forgiven by Franchisor. In addition, Blue Ocean and Sowestbreck have agreed to reimburse the Franchisor $35,000 for legal fees incurred to defend itself against an action brought against the Blue Ocean and Sowestbreck Debtor.

In re BlueOcean Partners, L.P. and SoWestBreck, LLC
Schedule of Contracts to be Assumed
Schedule 10.1

| Location | Reduced Royalty Rate Percentage |
|---|---|
| Rancho Cucamonga | 1.50% |
| Palmdale | 1.00% |
| West Covina | 1.50% |
| El Centro | 2.00% |
| Natomas | 1.50% |
| Downey | 1.50% |
| West Jordan | 1.50% |
| Sandy | 1.00% |

# Schedule 10.3

**In re BlueOcean Partners, L.P. and SoWestBreck, LLC**
**Schedule of Contracts to Reject**
**Schedule 10.3**

| Contracting Party | | | |
|---|---|---|---|
| Non-Debtor | Debtor | Location | Nature of Contract |
| Sandbreck L.P. | Sowestbreck L.P. | Sandy, Utah | Real property lease [1] |

[1] The debtor is currently in the process of negotiating the terms of a new real property lease.

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive., 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as **DEBTORS' AMENDED CHAPTER 11 PLAN OF REORGANIZATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On April 29, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____ 2009 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April 29, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Walter Gouldsbury, III, Esq. – Jeffer Mangels – Pacific Coast Bankers' Bank –wwg@jmbm.com
Ronald E. Ostrin, Esq., for Metcalf Bank, successor to American Sterling – ron@ostrinlaw.com;
Gabrielle.beam@huschblackwell.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 29, 2010 | Susan Connor | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

NEF SERVICE LIST

- Andrew K Alper    aalper@frandzel.com, efiling@frandzel.com;ekidder@frandzel.com - **Appearing Party**
- Adam N Barasch    anb@severson.com
- James C Bastian    jbastian@shbllp.com
- Bradley D Blakeley    bblakeley@blakeleyllp.com
- Brian A Bobb    bab@jmbm.com
- Jess R Bressi    jbressi@luce.com
- William M. Burd    wmburd@burd-naylor.com
- Lawrence G Campitiello    campitiello@shlaw.com, cannone@shlaw.com
- Dan E Chambers    dchambers@jmbm.com
- Joseph Choate    jchoate@choatelaw.net, bcornell@choatelaw.net
- Ronald Clifford    rclifford@blakeleyllp.com, msuydam@blakeleyllp.com - Appearing Party
- Marc S Cohen    mcohen@kayescholer.com
- David J Cook    Cook@SqueezeBloodFromTurnip.com
- Jeffry A Davis    jadavis@mintz.com
- Joseph R Dunn    jrdunn@mintz.com, jadavis@mintz.com;dsjohnson@mintz.com
- Carol J Fogleman    mfrost@bwslaw.com
- Donald L Gaffney    dgaffney@swlaw.com
- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- David Gould    dgould@davidgouldlaw.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Garrick A Hollander    jmartinez@winthropcouchot.com
- Garrick A Hollander    sconnor@winthropcouchot.com
- Mark D Houle    mark.houle@pillsburylaw.com
- Brian D Huben    brian.huben@kattenlaw.com, carole.levine@kattenlaw.com;donna.carolo@kattenlaw.com;laura.nefsky@kattenlaw.com
- Sheri Kanesaka    kanesaka@gmail.com
- Robert B Kaplan    rbk@jmbm.com
- Scott L Keehn    scottk@keehnlaw.com, scottk@keehnlaw.com;cynthial@keehnlaw.com;lesliek@keehnlaw.com;lisak@keehnlaw.com;corrinen@keehnlaw.com
- Pamela Labruyere    pamela@sgsslaw.com
- Sidney P Levinson    levinsons@hbdlawyers.com
- Charles Liu    cliu@mrllp.com, fbaig@mrllp.com
- Charles Liu    cliu@winthropcouchot.com, fbaig@mrllp.com
- Joe M Lozano    notice@NBSDefaultServices.com
- Daniel A McDaniel    damplc@pacbell.net
- Scott H McNutt    smcnutt@ml-sf.com
- Dennis D Miller    dmiller@steinlubin.com - Appearing Party
- Jeffrey C Misley    jeffm@sussmanshank.com
- Tania M Moyron    tmm@lnbrb.com
- William Novotny    william.novotny@mwmf.com
- R G Pagter    gibson@pagterandmiller.com, pandm@pagterandmiller.com;pagterandmiller@yahoo.com
- Eric S Pezold    epezold@swlaw.com, dwlewis@swlaw.com
- Christopher E Prince    cprince@sonnenschein.com
- Dale K Quinlan    dkqlawfirm@msn.com
- Martha E Romero    Romero@mromerolawfirm.com
- Timothy J Silverman    tim@sgsslaw.com
- John L. Smaha    jsmaha@smaha.com
- Richard A Solomon    richard@sgsslaw.com
- Ellen Stern    leaselaw@msn.com
- Wayne R Terry    wterry@hemar-rousso.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

- David J Williams    dwilliams@mrllp.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- Brett K Wiseman    bwiseman@aalaws.com